UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND CHOW, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:24-cv-00634 |
| Plaintiff, | ) ) ) | Judge Thomas M. Durkin |
| vs. | ) ) | CLASS ACTION |
| ARCHER-DANIELS-MIDLAND COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

LEAD PLAINTIFFS' COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

JURISDICTION AND VENUE ...............................................................................................7

PARTIES ..................................................................................................................................8

FACTUAL BACKGROUND ..................................................................................................10

    ADM Historically Was a Low Margin Business ...............................................10

    ADM Expands into the Higher Margin Nutrition Business .............................12

    The Nutrition Business Fails to Grow as Promised ..........................................14

    ADM Starts Inflating the Nutrition Business's Profits Through Accounting Fraud ........15

    Leading into the Class Period, Nutrition Becomes ADM's Most Important
        Segment.....................................................................................................18

    ADM's Stock Price and Executive Compensation Become Increasingly Tied to
        Nutrition's Inflated Results......................................................................20

    Defendants Admit the Accounting Fraud as the SEC and DOJ Open
        Investigations and ADM Fires Its CFO ..................................................25

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ..................28

    Statements Regarding Financial Results and Accounting .................................28

    Statements Regarding the Sources of Nutrition Operating Profits and Growth ...............39

    Statements Regarding Internal Controls ..........................................................55

    Analyst Reaction to the False and Misleading Statements ...............................58

THE TRUTH BEGINS TO EMERGE .....................................................................................60

POST-CLASS PERIOD EVENTS ...........................................................................................63

ADDITIONAL SUPPORT THAT THE FINANCIAL STATEMENTS WERE
    MATERIALLY MISSTATED ......................................................................67

    ADM's Restatement Is an Admission of Falsity .............................................67

    Defendants Violated GAAP by Inflating Nutrition Segment Reported Results...............68

    ADM Had Ineffective Internal Controls ..........................................................71

Defendants' Restated Results and Ineffective Controls Were Material to Investors.........74

*The Restated Results Were Quantitatively Material* ........................................................76

*The Restated Results Were Qualitatively Material* .........................................................77

*ADM's Issuance of "Revisions" Instead of a "Big R" Restatement Does Not Render the Restatement Immaterial* ....................................................................82

ADDITIONAL SCIENTER ALLEGATIONS .................................................................88

The Individual Defendants Controlled the Company's Messaging to the Investing Public ...........................................................................................................88

ADM and the Individual Defendants Closely Monitored Nutrition Operating Profits, Which Were Critical to ADM ...................................................................89

The Individual Defendants' Public Statements Support a Strong Inference of Scienter ...........................................................................................................94

The Simplicity of the GAAP Violations Supports a Strong Inference of Scienter...........96

The Individual Defendants' Incentive Compensation Supports a Strong Inference of Scienter ...........................................................................................................97

The Individual Defendants' Insider Sales Support a Strong Inference of Scienter .........103

Executive Departures and Federal Investigations Support a Strong Inference of Scienter ...........................................................................................................105

LOSS CAUSATION AND ECONOMIC LOSS .........................................................109

PRESUMPTION OF RELIANCE ..............................................................................111

NO SAFE HARBOR ..................................................................................................113

CLASS ACTION ALLEGATIONS ............................................................................113

COUNT I ....................................................................................................................115

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against ADM and the Individual Defendants ...........................................................................115

COUNT II ...................................................................................................................116

**Page**

For Violation of §20(a) of the Exchange Act Against the Individual Defendants ..........116

COUNT III......................................................................................................................117

    For Violations of §20A of the Exchange Act Against Defendants Luciano and
        Young..........................................................................................................117

PRAYER FOR RELIEF ..................................................................................................120

DEMAND FOR JURY ....................................................................................................120

4871-9240-3397.v2

Lead Plaintiffs KBC Asset Management NV ("KBC"), Ethenea Independent Investors S.A. ("Ethenea"), and the National Elevator Industry Pension Fund ("NEI") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Archer-Daniels-Midland Company ("ADM" or the "Company"); ADM press releases, quarterly earnings call transcripts, and other analyst or investor conference call transcripts; statements made by ADM executives during speeches or in online videos; a Harvard Business School case study titled, "To Feed the Planet: Juan Luciano at ADM," which was "reviewed and approved prior to publication by a company designate" ("HBS Case Study"); insiders' trades of ADM stock; analyst reports and media reports about ADM; and other public information regarding ADM, including information posted on the ADM website. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This securities fraud class action is brought on behalf of all purchasers of ADM common stock from April 30, 2020 through January 21, 2024, inclusive (the "Class Period"). The claims are alleged against: (1) ADM; (2) ADM's Chief Executive Officer ("CEO"), President, and Chairman of the Board, Juan Luciano ("Luciano"); (3) ADM's former Chief Financial Officer ("CFO"), Vikram Luthar ("Luthar"); (4) ADM's former CFO, Ray Young ("Young"); and (5) ADM's former President of Nutrition, and Chief Sales and Marketing Officer ("CSMO"), Vincent Macciocchi ("Macciocchi") (collectively, "Defendants"). The claims assert violations of §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      This case arises because Defendants have admitted that they violated stated Company policy and generally accepted accounting principles ("GAAP") to falsely overstate profits of ADM's newest and most important business segment, "Nutrition," every year from 2018 through 2023.  Not only was Nutrition the most important business segment, but Defendants' compensation was tied to improving its profits, which created a motive to continue and conceal the accounting fraud.  Several executives and Defendants have been forced out of the Company as a result of the misconduct, the Company had to restate its financial results, and both the SEC and the United States Department of Justice ("DOJ") have launched investigations into the fraudulent accounting.

3.      The accounting fraud involved charging below market rates for intercompany sales of raw materials from ADM's other segments to the Nutrition segment.  Those below market costs produced overstated profits in the Nutrition segment, which Defendants routinely highlighted during the Class Period because investors and analysts were closely monitoring the Nutrition segment's performance.  In fact, in valuing the Company's stock price, analysts placed outsized emphasis on the Nutrition segment as compared to the other segments.  However, investors were unaware of the accounting fraud because, during the Class Period, Defendants made false and misleading statements that concealed the accounting scheme, falsely claimed that the intersegment sales were recorded at market rates in compliance with Company policy and GAAP, and overstated the performance and profitability of the Nutrition segment.  When the truth about the accounting fraud was revealed, ADM's stock price declined dramatically, erasing more than $8 billion in market capitalization and causing investors substantial harm.

4.      By way of background, for more than 100 years, ADM has served as a middleman in the agricultural industry by purchasing, transporting, and processing crops.  For example, ADM purchases large volumes of corn and wheat from farmers.  ADM can then clean, transport, and re-

- 2 -

sell the corn or wheat to other businesses as raw materials, or it can process the corn and wheat into products such as corn syrup and ethanol.

5.     As a result, ADM's historical businesses relied heavily on trading in agricultural commodities, which are highly volatile and generate low profit margins. The Company has explained in SEC filings that "wide fluctuations" in the "availability and prices of agricultural commodities" cause "volatility . . . in the Company's operating results." Because of the volatility and low margins of its businesses, ADM became a less attractive investment. In the years leading up to 2014, ADM's stock price had gone stagnant, as investors saw little long-term value or growth in such high-volatility businesses.

6.     To boost ADM's stock price performance and provide more stable and higher profit margins, Defendants Luciano, Young, and other ADM executives decided to invest billions of dollars to transform ADM into a "Nutrition" business. Unlike ADM's legacy businesses, which relied upon highly volatile and fluctuating commodity prices, the Nutrition business focused on products further down the consumer chain that were expected to provide sustained (and stable) high profit margins.

7.     The expansion began in 2014, when ADM paid $3 billion to acquire WILD Flavors, a company that created and sold flavor systems, fruit concentrates, and other ingredients to be used in food sold to end-consumers. Defendant Luciano claimed that acquiring WILD Flavors, which remains the largest acquisition in ADM's history, would benefit "our stock" because, unlike ADM's "other parts of the business," WILD Flavors provided "high-margin low volatility, high growth markets that can be a growth engine."

8.     Given the massive investment and its expected contribution to the long-term attractiveness of investing in ADM, analysts closely tracked the operating profit (*i.e.*, revenues less operating expenses) of the Nutrition segment in particular when tracking ADM's overall

- 3 -

performance. The expansion into a new line of business was not easy and the Nutrition business struggled, suffering an overall 4% decline in operating profit from 2015 through 2017. In that same time, ADM's stock price declined from trading at around $50 per share at the start of 2015, to around $40 per share at the end of 2017. With billions already invested in Nutrition, and ADM's stock price flailing, Defendants faced significant pressure to deliver on the promises of the Nutrition business, reverse the Nutrition business's results, and deliver improved stability and profit. As explained more fully herein, that appears to have triggered the Company to resort to the accounting fraud.

9.      ADM's long-standing, and publicly disclosed, accounting policy for intersegment sales (*e.g.*, from ADM's corn business to its Nutrition business), was to record those sales at prices reflecting market rates. In other words, ADM's corn and wheat businesses would charge Nutrition the same prices for raw materials that they would charge an independent customer. This policy was important because Nutrition obtained a large amount of its raw materials from ADM's other businesses so its operating expenses, and operating profits, were significantly impacted by the intercompany prices. The accounting policy was important to analysts and investors because it provided transparency in evaluating the performance of the individual business segments within ADM.

10.      Such intercompany arrangements are ripe for manipulation because the Company controls both sides of the transaction so management can adjust prices to over- or under-state results. Thus, GAAP required the Company to disclose and then comply with its stated accounting policy for such sales (in this case to charge market prices). Without a disclosed policy, segment performance could be obscured, making it difficult for investors and analysts to evaluate the success and future prospects of the Company's entrance into the Nutrition business.

- 4 -

11.    However, as recently admitted in ADM's annual report on Form 10-K for the period ending December 31, 2023 ("Restatement" or "2023 10-K"), from 2018 through 2023, ADM had not been following its publicly-disclosed and GAAP-compliant policy.  Rather, the Company admitted that "intersegment sales . . . were not recorded at amounts approximating market" and were therefore recorded "at amounts that were not in accordance with [GAAP]."  By recording below-market expenses for raw materials, ADM overstated Nutrition operating profit by more than $200 million over 6 years, and by as much as 25% of ADM's reported quarterly Nutrition operating profit during the Class Period.  In addition, ADM admitted that the Company's internal controls over financial reporting that were supposed to be designed to prevent accounting fraud and ensure compliance with GAAP were ineffective during the Class Period, as the Company suffered a "material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for intersegment sales."

12.    While the accounting scheme began in 2018, the Class Period begins more conservatively in 2020, by which time the Nutrition segment had clearly become the Company's most important segment and ADM began tying Defendants' compensation directly to Nutrition operating profit growth.  Specifically, the Company replaced a metric tying compensation to the Company's overall performance with a "new [compensation] metric – growth in operating profit of our Nutrition segment."  The risks of tying compensation to performance are well documented. Experts have explained that "cooked books, false sales reports, and illegal means to performance emerge when financial incentives cause leaders to care more about looking good in terms of results than actually doing well in terms of creating value."  Given the simplicity of the accounting fraud and other factors discussed herein, there can be no doubt that by the time Defendants were aware of the direct impact Nutrition operating profit could have on their compensation, they were either aware of or recklessly disregarded the accounting fraud.

- 5 -

13.     The accounting fraud was concealed from investors because, during the Class Period, Defendants made false and misleading statements.  For example, each quarter, Defendants reported inflated and overstated operating profits for the Nutrition segment, which have subsequently been reduced and restated.  In addition, Defendants represented that "*[i]ntersegment sales have been recorded at amounts approximating market*," assured investors that ADM's financial statements had been "*prepared in accordance with [GAAP]*," and claimed that ADM's "*internal control over financial reporting was effective*."[1]  In truth, Nutrition operating profits were fraudulently overstated because ADM was recording intersegment sales at amounts below market, in violation of ADM policy and GAAP, and ADM's internal controls were not effective.

14.     In addition, Defendants made false and misleading statements attributing the source of Nutrition's improved financial performance and margins to various factors such as "*growth in alternative proteins*," "*positive currency timing*," "*robust demand for fiber*," "*strength in amino acids*," and "*solid performance in texturants*."  Such statements purporting to describe a litany of reasons for Nutrition's improved performance, operating profits, and margins were misleading because they concealed that the improvements were driven in large part from the accounting fraud.

15.     Defendants substantially profited off of their misstatements.  As they made false and misleading statements reporting increased profitability of the Nutrition segment, ADM's stock price skyrocketed, going from around $35 at the start of the Class Period to highs of nearly $100 per share.  While ADM's stock traded at artificially inflated and/or artificially maintained prices, Defendants Luciano, Young, Macciocchi, and Luthar cashed out more than $107 million worth of ADM stock, including at prices exceeding $90 per share, and received more than $151 million in total compensation.

---

[1]     Bold and italics have been added to identify the specific statements being alleged as false and misleading statements.  *See also* ¶¶84-166.

- 6 -

16.     After their stock sales, on January 21, 2024, ADM revealed that it was under investigation by the SEC for accounting practices and procedures relating to intersegment transactions involving the Nutrition segment, that the Company had commenced an internal investigation and placed Defendant Luthar on administrative leave "effective immediately," and that ADM was withdrawing its entire Nutrition profit outlook and delaying the filing of its 2023 10-K. On this news, ADM's stock price declined by $16.50 per share (approximately 24%), reportedly marking the stock's largest one-day percentage decline since 1929.

17.     In subsequent disclosures, ADM and media revealed that the DOJ had launched, and was escalating, an investigation into ADM's accounting practices for Nutrition intersegment sales. The DOJ issued grand jury subpoenas to current and former ADM employees and "interviewed former ADM employees about [the] accounting practices." As pressure mounted, ADM later issued the Restatement, admitting its GAAP violations and overstatements of Nutrition operating profit. The Company executed an agreement to terminate Defendant Luthar's employment, Defendant Macciocchi was forced to "retire" and forfeit up to $2 million in stock awards, and Defendant Young has resigned from his public-company board positions in the wake of the accounting scheme being revealed.

18.     Plaintiffs, on behalf of the putative Class, have brought these federal claims to recover the significant damages they have suffered as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

4871-9240-3397.v2

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  ADM is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place in this District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.     Plaintiff KBC's fund purchased shares of ADM common stock during the Class Period and was damaged thereby.  *See* ECF 27-1.

24.     Plaintiff Ethenea's fund purchased shares of ADM common stock during the Class Period and was damaged thereby.  *See* ECF 27-1.

25.     Plaintiff NEI purchased shares of ADM common stock during the Class Period and was damaged thereby.  *See* ECF 27-1.

26.     Defendant ADM is a multinational company headquartered in Chicago, Illinois.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ADM."

27.     Defendant Luciano has served as ADM's CEO since January 2015, as Chairman of the Board of Directors since January 2016, and as President of ADM since February 2014.  Upon joining ADM in 2011, Luciano served as Executive Vice President and Chief Operating Officer ("COO") from 2011 to February 2014, and COO from February 2014 to December 2014.

28.     Defendant Luthar held several senior-level positions at ADM and its Nutrition segment during his 19-year tenure with the Company.  Luthar served as CFO of ADM beginning in April 2022, and Senior Vice President of ADM beginning in March 2015, until he was placed on "administrative leave" effective January 19, 2024.  From January 2020 to April 2022, Luthar was

- 8 -

CFO of Nutrition. Luthar's positions at ADM also included: Head of Investor Relations (June 2021 to July 2022), President of Nutrition's Health & Wellness business (March 2018 to January 2020), President of Nutrition's Bioactives business (February 2017 to March 2018), President of Nutrition's Enzymes business (December 2015 to February 2017), CFO of ADM's "Corn Processing" segment (March 2014 to February 2017),[2] Group Vice President, Finance (January 2012 to March 2015), and Vice President and Treasurer (November 2004 to December 2011). On April 19, 2024, Luthar entered into a Transition Agreement whereby his "resignation" will become effective on September 30, 2024.

29.     Defendant Young served as CFO of ADM for over 12 years, from December 2010 until April 2022. Upon Luthar's appointment as CFO of ADM in April 2022, Young assumed the position of Vice Chairman of ADM before retiring in December of 2022.

30.     Defendant Macciocchi served as Senior Vice President of ADM, and President of Nutrition, from May 2015 to the end of 2023. Macciocchi also served as ADM's CSMO from January 2020 to the end of 2023, during which he was responsible for ADM's global sales and marketing activities. Macciocchi joined ADM when it acquired WILD Flavors in 2014, where he had previously served as a president and officer since 2012. After the acquisition, Macciocchi was also Global President of WILD Flavors, within ADM, from October 2014 until May 2015. On November 10, 2023, after ADM had received notice of the SEC investigation into the Company's intersegment sales and the Nutrition segment, ADM publicly announced Macciocchi would "retire from ADM at the end of [2023]," forfeiting up to $2 million in performance stock awards.

31.     Defendants Luciano, Luthar, Young, and Macciocchi are collectively referred to herein as the "Individual Defendants."

---

[2]     ADM's Corn Processing segment became the "Carbohydrate Solutions" reporting segment beginning in 2018.

## FACTUAL BACKGROUND

**ADM Historically Was a Low Margin Business**

32.     ADM has historically served as a middleman between farmers and consumers in the agricultural and food processing industry, generating tens of billions of dollars in annual revenue. Although its operating segments have undergone various name changes over the years, ADM's historical business has been driven predominantly by two segments: (i) Ag Services and Oilseeds ("ASO")[3]; and (ii) Carbohydrate Solutions ("Carb Solutions").

33.     The ASO segment generates revenue in several ways. For example, it buys, stores, and transports agricultural goods (such as oilseeds and soybeans), which ASO then resells for use as raw materials for food processing. ASO also crushes and processes oilseeds into vegetable oils and other products for use in foods and animal feed. ADM's Carb Solutions segment similarly generates revenue by, for example, purchasing corn and wheat and converting it into: (i) products used in the food and beverage industry (such as sweeteners, corn syrup, and wheat flour); and (ii) ethanol and biodiesel for use in gasoline and diesel fuel.

34.     In support of these business segments, the Company trades in a high volume of agricultural commodities, such as corn, wheat, soybeans, and other oilseeds. Prices for agricultural commodities can fluctuate quickly and significantly, subjecting ADM's legacy segments to intense volatility. As explained in ADM's annual report on Form 10-K for the year ending December 31, 2013 ("2013 Form 10-K"), "[t]he availability and prices of agricultural commodities are subject to wide fluctuations due to changes in weather conditions, crop disease, plantings, government programs and policies, competition, changes in global demand, changes in standards of living, and global production of similar and competitive crops." These factors, the Company explained, had

---

[3]     Prior to July 2019, ASO was actually comprised of two separate segments: (i) "Agricultural Services" or "Origination," and (ii) "Oilseeds Processing" or "Oilseeds." For ease of reference and consistency, those segments will be referred to collectively as the single ASO segment herein.

"caused volatility in the availability and prices of agricultural commodities and, consequently, in the Company's operating results and working capital requirements."

35.     Likewise, changes in gasoline and diesel fuel prices – which are notoriously volatile – could negatively impact the Company's profits.  The 2013 Form 10-K stated that "[a] significant decrease in the price of gasoline or diesel fuel could result in a significant decrease in the selling price of the Company's ethanol and biodiesel and could adversely affect the Company's revenues and operating results."  As analysts for Credit Suisse would later observe in July 2020, ADM's ASO and Carb Solutions segments "operate on a thin margin and are highly sensitive to numerous factors including global commodity prices, political influences on global trade, farmer selling decisions, weather conditions, and government subsidies for the biofuels industry, just to name a few."

36.     ADM's volatility and dependence on erratic commodities markets caused its stock price to languish for years as market conditions remained unpredictable.  ADM's stock price crept from an average of around $27.20 in January 2009 to an average of around $28.60 in January 2013, a modest 5% increase in over four years.  In that same time, the S&P 500 Index catapulted more than 70% – in excess of tenfold ADM's growth.  The HBS Case Study likewise found that "investors considered ADM to be difficult to understand and evaluate," quoting Defendant Young as stating that investors "'talked about how volatile the company was, how difficult it was to forecast, that ADM was a bit of a "black box," and how we didn't focus on value creation or returns.'"

37.     Even when ADM reported profits that exceeded expectations in the fourth quarter of 2013 ("4Q13"), analysts from BMO Capital Markets ("BMO") refused to increase their rating for ADM stock because, among other reasons, the Company's "extraordinary biodiesel profits" were "likely . . . unsustainable," margins in oilseed crushing "may be limited to [just] one more quarter" due to "tightening US soybean supplies," and the Company's "surge in ethanol margins may begin to wane as capacity returns."  Analysts from Morgan Stanley likewise reported that ADM's 4Q13

- 11 -

results "exceeded both our and the consensus estimates" but maintained their neutral rating for ADM stock because it was "unlikely" that operating profits for various businesses "will continue at this level" due to "fluctuat[ing]" corn prices, large crop oilseeds supplies, and "[o]vercapacity in ethanol." In other words, without a more stable and less volatile line of business, the investing public did not view ADM as a source of reliable (or valuable) growth.

**ADM Expands into the Higher Margin Nutrition Business**

38.     In 2014, to try to counteract the thin operating margins and earnings volatility of its legacy businesses, ADM began investing billions of dollars into a new business, "Nutrition," which had been partly launched in 2013 as a "specialty ingredients division." As Defendant Luciano later admitted, historically, "ADM ha[d] an old model very much reliant [o]n some trading profits and those trading profits over time have evaporated if you will. So we wanted to have much more of a core [that gets its] own margins and getting margins closer to customers, where they were less capital intensive."

39.     Whereas the ASO and Carb Solutions segments focused largely on trading commodities (buying and reselling agricultural products), the new Nutrition segment was more focused on creating high-margin, high-growth products to be used by end-consumers. Specifically, Nutrition engages in the manufacturing, sale, and distribution of ingredients for human and animal consumption. "Human Nutrition" products include flavor systems, special ingredients, and plant-based proteins, and "Animal Nutrition" products include animal feed and additives.

40.     ADM's Human Nutrition business was formed largely through ADM's acquisition of WILD Flavors in 2014. Indeed, Macciocchi has stated that ADM's acquisition of WILD Flavors "served as a foundation to what is today ADM [Human] Nutrition." ADM paid $3 billion to acquire WILD Flavors, a Swiss-German natural ingredient company touted as "the world's leading provider of natural flavor systems to the food and beverage industry." In announcing the WILD Flavors

acquisition, ADM's then-CEO noted that the acquisition was part of ADM's strategy to "expand[] downstream to the higher-margin, higher growth, more stable types of earnings because . . . the [existing] commodity business can have its ups and downs." Defendant Luciano later emphasized that adding WILD flavors would benefit "our stock" because, unlike ADM's "other parts of the business," WILD Flavors provided "high-margin low volatility, high growth markets that can be a growth engine." The WILD Flavors acquisition remains ADM's largest in its more than 100 year history.

41.    Shortly after acquiring WILD Flavors, ADM created a new reporting segment: WILD Flavors and Specialty Ingredients ("WFSI"). ADM's Animal Nutrition business, however, was not part of the WFSI segment. Instead, it was part of Carb Solutions. As stated in ADM's SEC filings in 2017, the segment now known as Carb Solutions "include[d] activities related to the processing and distribution of formula feeds and animal health and nutrition products." Even though Human Nutrition was part of WFSI and Animal Nutrition was part of Carb Solutions, in an October 2020 presentation slide reporting results dating back to 2014, ADM collectively referred to the Animal Nutrition and Human Nutrition businesses as "Nutrition":

- 13 -



## The Nutrition Business Fails to Grow as Promised

42.     Compared to ADM's legacy business, the Nutrition business was portrayed as an exciting opportunity to stably grow "operating profit" and increase the stock price. Operating profit, sometimes referred to by Defendants as "OP," is calculated by taking total revenue and then subtracting the costs of operations (such as payments for raw materials and manufacturing costs), as well as asset-related depreciation and amortization.

43.     ADM's possession of a business segment with stable and growing operating profit was particularly important in making ADM an attractive investment. As discussed, costs in ADM's historic segments fluctuated significantly, making profitability unpredictable and therefore investment in ADM highly risky. Adding the Nutrition business was meant to solve that problem.

44.     However, the Nutrition business faltered out of the gate, hampered especially by ADM's specialty ingredients business. Despite being touted as a "high-margin low volatility . . . growth engine," the Nutrition business was volatile and failed to grow in the first several years. For example, Nutrition reported $323 million in operating profit in 2015, and then fell to $273 million in

- 14 -

2016, only to grow slightly to $311 million in 2017.  Thus, in the first three years after the WILD Flavors acquisition, the Nutrition business fluctuated, and suffered an overall 4% decline in operating profit.  In that same time, ADM's stock price declined from around $50 per share at the start of 2015 to around $40 at the end of 2017.

45.     In a February 7, 2017 report, analysts from Credit Suisse highlighted the struggles of the Nutrition business, reporting that in the fourth quarter 2016, "all segments gr[ew] earnings except WFSI [*i.e.*, Human Nutrition] where the specialty ingredients business remains weak." Without the promised "high-margin low volatility, high growth markets" in Nutrition, analysts continued to see little value in ADM stock.  On May 2, 2017, analysts from Morgan Stanley reiterated a price target of just $33, far below the $45 that ADM's stock closed at the day prior.  In explaining the basis for their rating, the analysts stated that they believed "the current challenging environment is indicative of a 'new normal'" for ADM and that "WFSI performance will not justify the high multiple paid / the low ROIC garnered."  A few months later, on August 2, 2017, analysts from BMO reiterated their price target of just $41 ($2 below the trading price), reporting that despite ADM exceeding consensus expectations, "WFSI, particularly in the specialty ingredients, continues to fall short of expectations."

**ADM Starts Inflating the Nutrition Business's Profits Through Accounting Fraud**

46.     With billions already invested in Nutrition, the stock price flailing, and investors and analysts losing faith after being persuaded that the future of the Company was tied to Nutrition's growth, Defendants faced significant pressure to reverse the Nutrition business's sluggish results from the first three years and deliver on operating profit for Nutrition.  To meet that pressure, Defendants resorted to accounting manipulations to inflate the Nutrition segment's results at the expense of ASO and Carb Solutions.

- 15 -

47.     Effective January 1, 2018, Defendants re-organized ADM's reporting structure to make Nutrition one of ADM's three reportable segments: (1) ASO,[4] (2) Carb Solutions, and (3) Nutrition.  To do so, ADM renamed the WFSI segment to Nutrition, and disclosed that "Nutrition now includes the results of Animal Nutrition and certain product lines previously reported in Carb[] Solutions."

48.     As discussed, ADM's ASO and Carb Solutions businesses focused largely on the sale of raw materials, while the Nutrition business operated further down the chain by taking raw materials and making them into end-consumer products.  Therefore, the Nutrition segment purchased certain raw materials from within the Company to be used as base ingredients.  As one analyst reported in May 2020, "[t]he majority of base ingredients in Nutrition are sourced from ADM."  Stated differently, the Nutrition segment was a customer of ADM's other segments.  This represented a significant shift for the Animal Nutrition sub-segment, which had previously been part of Carb Solutions and therefore obtained raw materials largely from within its own operating segment.  This new structure also represented an opportunity for Defendants to manipulate the numbers.

49.     Because intercompany sales and transfers, like those between Nutrition and the other segments, result in a company selling to itself, they are widely known as an area ripe for accounting fraud.  For example, Deloitte & Touche LLP ("Deloitte") – a global accounting firm – has included "Intercompany Manipulations" on its published list of "fraud schemes" that are employed by management, noting that schemes involving intercompany sales "may occur to over/understate

---

[4]     As referenced above, ASO was actually two separate segments as of January 1, 2018 ("Origination" and "Oilseeds"), which ADM combined in July 2019 to form ASO.

- 16 -

balances."[5]  Deloitte has likewise stated that the "primary risk" of improper intercompany accounting is "financial misstatements, which can impact the company's reputation, stock price, and shareholder value."[6]  Therefore, it is critical that a company implement strong internal controls over financial reporting to ensure that the company's accounting for intercompany transactions is as carefully monitored as its external accounting reporting.

50.     In fact, as detailed herein (*see* ¶¶199-208), GAAP,[7] and specifically ASC 280, *Segment Reporting* and ASC 606, *Revenue from Contracts with Customers*, required ADM to accurately record and disclose its basis of accounting for intersegment transactions, including its pricing methodology when intersegment sales are made from one segment (*e.g.*, Carb Solutions) to another (*e.g.*, Nutrition).  Without such a rule, the Company's reported sales and profits would not accurately reflect the performance of each segment because the intercompany sales prices could be manipulated by changing the pricing methodology.

51.     Here, ADM disclosed that its policy was to record intersegment sales at the market rate (*i.e.*, consistent with revenue principles under ASC 606) – that is, at the price an unrelated party would pay in an arm's length transaction.  ADM's policy meant that when one of ADM's other

---

[5]     *Sample listing of fraud schemes*, Deloitte (2009) https://www2.deloitte.com/content/dam/ Deloitte/in/Documents/risk/Corporate%20Governance/Audit%20Committee/in-gc-fraud-schemes-questions-to-consider-noexp.pdf.

[6]     *Cleaning up the mess under the bed: Why intercompany accounting is increasing corporate risk*, Deloitte, https://www2.deloitte.com/content/dam/Deloitte/us/Documents/risk/us-risk-intercompany-accounting-survey.pdf.

[7]     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*, through which the FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.

- 17 -

segments sold raw materials to Nutrition, the sale had to be recorded at market, like it would have been had Nutrition purchased the raw materials from an external party.

52.     As a further illustration, if the market price for 100 units of a Carb Solutions segment product was $1,000, and the Nutrition segment needed 100 units, the Carb Solutions segment was required to charge $1,000 to the Nutrition segment for those units.  The Carb Solutions segment would then record $1,000 in revenue for the sale, and the Nutrition segment would record $1,000 worth of operating costs.

53.     However, starting in 2018, ADM not only failed to implement effective internal controls to prevent fraud, but ADM – led by Defendants Luciano and Young – engaged in fraud. Specifically, as later admitted in the Restatement (*see* ¶¶188-191, 199-200), ADM violated its own accounting policy and GAAP for "intersegment" sales by secretly selling materials to the Nutrition segment at discounted pricing or with rebates for less than market prices.  By doing so, ADM improperly recorded lower operating costs (*i.e.*, lower raw material costs) for Nutrition and therefore reported falsely inflated operating profits by tens of millions of dollars for the Nutrition segment year after year.

54.     In the Restatement, the Company was forced to admit that: (i) ADM suffered a "material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for intersegment sales"; (ii) ADM reported "intersegment sales that were not recorded at amounts approximating market" and were therefore recorded "at amounts that were not in accordance with ASC 606, *Revenue from Contracts with Customers*"; and (iii) as a result, ADM had falsely inflated Nutrition operating profits from 2018 through 2023.

**Leading into the Class Period, Nutrition Becomes ADM's Most Important Segment**

55.     ADM's accounting fraud paid immediate benefits.  In 2018, without the accounting fraud, the Nutrition segment would have reported operating profit of $312 million, the same as in

- 18 -

2017, resulting in a 0% growth rate for Nutrition.  However, with the accounting fraud, ADM was able to report operating profits of $339 million, a 9% growth rate, and the highest Nutrition business operating profit since the WILD Flavors acquisition.

56.     Then, in February 2019, ADM paid $1.8 billion to acquire Neovia, "a leading global animal nutrition business" that Defendant Luciano claimed would provide "'a strong platform for future growth.'"  During a conference call on July 2, 2018, Defendant Luciano emphasized that the Neovia acquisition showed "how [ADM is] building an important growth machine, [the] integrated Human and Animal Nutrition business units."  He explained that "[f]or the last 4 years, we have been significantly expanding" the Nutrition business as part of a "targeted expansion down the value chain into higher margin, differentiated products for Human and Animal Nutrition."

57.     With the newly found operating profit growth in 2018 (driven by accounting fraud), and having spent roughly $5 billion to build the business, the Nutrition segment became a center point of ADM's business and investor valuation.

58.     In 2019, while both the ASO and Carb Solutions segments reported operating profit declines, Nutrition reported a year-over-year increase of 23%.  Thus, Defendants increasingly touted the Nutrition segment results to reassure investors and cover up disappointing results in the historic segments.  For example, during a January 30, 2020 conference call in which the disappointing ASO and Carb Solutions profits were reported, Defendant Luciano kept investors upbeat by highlighting the "impressive year of growth for Nutrition" and promising that the Company "expect[ed] another year of 20%-plus growth in profitability in our Nutrition segment in 2020."  Moreover, between 2017 and 2019, Nutrition's contribution to ADM's total profits increased from 10% in 2017 to 14% in 2019, and Defendant Luciano claimed in January 2020 that ADM expected Nutrition to make up 25% of ADM's operating profit "within the next 3 to 4 years."

- 19 -

**ADM's Stock Price and Executive Compensation Become Increasingly Tied to Nutrition's Inflated Results**

59.     In order to allow the executives to cash in on the profitability of the Nutrition segment, at the start of the Class Period in 2020, ADM changed "the short-term and long-term [executive] incentive compensation plans" to "emphasize [ADM's] focus on the Nutrition segment of our business." Specifically, the Company replaced the adjusted EBITDA performance metric for executive compensation with the "new [compensation] metric" of "operating profit growth in the Nutrition segment." In other words, executive compensation was divorced from the Company's prior overall performance metric and instead tied directly to Nutrition segment operating profit performance.

60.     While tying management's compensation to performance is designed to align management and shareholder interests, it has also been criticized for doing the opposite, as it incentivizes management to inflate short term performance at the expense of long-term investor interests. For example, in a February 23, 2016 article published by the *Harvard Business Review*, professors of Organizational Behavior and Strategic Management tied "large bonuses and stock options" to "overly risky behavior and short-term strategies" that led to the "global economic crisis of 2008." Citing several studies, the authors stated that "[w]hen people's remuneration depends strongly on a financial measure, they are going to maximize their performance on that measure; no matter how." The authors added that "cooked books, false sales reports, and illegal means to performance emerge when financial incentives cause leaders to care more about looking good in terms of results than actually doing well in terms of creating value."

61.     Here, Defendants did just that: rather than report or disclose that ADM's intersegment accounting fraud was being used to boost Nutrition operating performance, Defendants continued

- 20 -

their scheme to ensure increased compensation and an inflated stock price, thereby harming investors.

62.    During the Class Period, Nutrition continued to play an outsized role on ADM's business as the accounting fraud continued.  Nutrition's operating profits reportedly grew 37% in 2020, and another 20% in 2021, reaching as high as 17% of the Company's total operating profits. From 2018 to 2022, the Nutrition segment's reported profits more than doubled, from $339 million to $736 million, and Defendant Luciano repeatedly emphasized in 2020 and 2021 that the Company planned for "$1 billion" in Nutrition operating profits "in 2024."

**Nutrition Segment Operating Profit**
(in millions)



63.    On top of its significant profit growth, the Nutrition segment required lower capital expenditures than ASO and Carb Solutions, and thus could yield the same level of profits at a fraction of the cost.  During a January 26, 2021 conference call, Defendant Luciano explained:

> Nutrition has a different [operating profit] to capital sensitivity than the other businesses. . . . if you think that the commodity business have maybe a multiplier of – you need 5 units of CapEx to get 1 unit of OP, sometimes in Nutrition, you get the 1-on-1. . . .

- 21 -

[T]he Nutrition is not a heavy capital-intensive business.[8]

64.     Executives viewed Nutrition as a critical ADM business for the present and future, and its ostensible success allowed ADM to shift away from its historical highly-volatile and unpredictable businesses.  As Defendant Young stated during a March 3, 2021 investor call, "becoming a global nutrition player has been actually a very important core pillar of our strategy going forward."  A few months later, during ADM's July 27, 2021 earnings call, Defendant Luciano shared his vision of Nutrition continuing to grow at a fast pace while the other segments play less of a role:

> [W]hen I look at the 3 businesses and we move them forward through the 5 years, we see Ag Services and Oilseeds growth moderately, but it grows.  We see Carb Solutions being flat to slightly declining in our forecasting.  And then we see a strong growth in Nutrition.  That's kind of the – if you will, the algorithm of how the business has moved.

He added, "over the next few years as we reach $1 billion and beyond [in the Nutrition segment], Carb Solutions, as you said, is it basically declines over the period.  And then we have a healthy but not exuberant growth rate for Ag Services and Oilseeds."

65.     Defendant Luciano further remarked on September 21, 2021 that the Nutrition division had "replaced" aspects of ADM's volatile and dwindling ethanol business:

> [W]e also have seen over time some structural market change, not only the change that we have made in our own company.  So some changes being on the negative side, like the largest decline was ethanol.  We don't have a funnel in those earnings like we had it in maybe 2014.  We have replaced that with now a Nutrition division.[9]

---

[8]     Defendant Luciano confirmed again in a later call:

> [I]f you think about the capital intensity of this [Nutrition] business versus the other businesses, it pales.  So if you have a 1:6 capital to profitability – profitability to capital in the commodity business, you have like 1:1 in this type of business.  So from a capital intensity, it's not a problem at all for ADM to finance that.

[9]     As Defendant Luthar would later state in 2023, "in 2014, 60% to 70% of [ADM's] profitability came from the most volatile part of our portfolio, *i.e.*, ethanol.  Last year, it was almost a reverse.  30% to 40% of that came from ethanol."

66.     During a December 10, 2021 call, Defendant Young emphasized that "all the business units are contributing towards growth with a significant amount coming from the Nutrition business" and that "[a] major driver of [ADM's earnings growth] will be our Nutrition business."  The Nutrition business became all the more important as the Carb Solutions segment's growth grounded to a halt.  For example, an analyst observed during a conference with ADM on May 31, 2023, that ADM's "Carbohydrate Solutions growth seems to lag all your other segments," adding "[w]hy is that?  And do you see any improvement coming?"  Luciano agreed with the analyst's assessment, stating:

> Yes.  Absolutely.  It is absolutely correct.  If you think about Carb Solutions, it's based on 3 products at this point in time.  It's based on ethanol, just being very simplistic, high fructose corn syrup or sweeteners in general and flower.  So those products are not growing.  They are not shrinking.

67.     On September 18, 2023, Defendant Luciano reinforced that Nutrition was designed to and would replace highly volatile operating profits from the legacy segments with stable, high-margin profits:

> So when we created the Nutrition business very simplistically, I always thought when I joined the company, we had about $500 million of ethanol business and about $400 million of a trading business that I didn't understand very well the predictability of it.  So I set myself the goal that I said, I need to replace $1 billion of OP with profit because that may go away at one point in time, and I cannot trust on the volatility of that.

68.     Analysts welcomed Defendants' assurances of replacing ADM's volatile earnings with Nutrition's "predictable," "stable" earnings.  For instance, analysts from Barclays noted in October 2020 "a further shift within the broader ADM portfolio towards nutrition should be welcomed by investors, as this business has not only at [sic] high levels of profitability, it also has a fairly stable level of profitability in any given quarter."  Analysts from BMO echoed this sentiment in November 2020, praising the "sustainably high growth, low volatility earnings stream in Nutrition."  Barclays analysts also observed in November 2020 that "nutrition is a clear focus for

- 23 -

ADM's management team," and embraced ADM's "less volatile earnings over time as its Nutrition segment further gains relevance." Barclays analysts added in December 2020: "A relatively higher share of its nutrition business should give ADM several benefits: 1) higher consolidated profitability, 2) less earnings volatility, and 3) stable cash flows, which ultimately should drive higher valuation multiples in the future."

69. Given ADM's multi-segment structure, as well as Nutrition's promise as a growth engine, analysts placed much greater value on earnings in the Nutrition segment than earnings in the ASO and Carb Solutions segments. For example, in arriving at their price target of ADM common stock in October 2020, analysts at J.P. Morgan assigned the Nutrition segment a valuation "multiple" that was 1.85 times the multiple assigned to ASO and Carb Solutions (*i.e.*, J.P. Morgan valued the Nutrition segment at 24X Nutrition's expected earnings, yet valued the ASO and Carb Solutions segments at only 13X their expected earnings). Thus, as Defendants knew, a dollar of profit in the Nutrition segment was worth significantly more to investors – and to ADM's stock price – than a dollar of profit in ASO or Carb Solutions.

70. Even when Nutrition began to face headwinds from "pricing pressure" and "capacity constraints" in 2022, analysts from Credit Suisse stated in January 2023 that "the Nutrition segment represents the company's highest value business unit" and were reassured by the Company's target of reaching $1.25 to $1.5 billion in Nutrition operating profit in 2025. Analysts from J.P. Morgan likewise recognized in January 2023 that ADM's stock price was dependent on the growth of Nutrition, not just the other units, because without Nutrition growth, earnings would "shift from the higher multiple Nutrition segment (where peers typically trade at mid-teens EBITDA multiples) toward the lower multiple AS&O segment (where peers trade at high-single-digit multiples)."

71. In fact, in July 2023, ADM reported consolidated second quarter 2023 ("2Q23") earnings that far exceeded analyst expectations and increased guidance, but analysts from

- 24 -

J.P. Morgan remained "Neutral" on the stock. The analysts explained that although ADM's other businesses outperformed, ADM had reduced guidance for the Nutrition segment, and "the downward earnings revision to the higher multiple Nutrition segment is more meaningful to our valuation than to total ADM earnings." Even with Nutrition's lower earnings, the analysts' ADM price target applied a 13X multiplier to Nutrition's expected earnings, valuing Nutrition at 1.5 to nearly 2 times higher than the ASO (8.5X multiplier) and Carb Solutions segments (7X multiplier), respectively. Similarly, in October 2023, the Company again beat analyst expectations on a consolidated basis, but analysts from Bank of America lowered their price target "on lower Nutrition contribution." The analysts explained that although their overall earnings estimates had not changed, they "believe[d] the earnings mix shift [away from Nutrition] warrants a downward adjustment to ADM's valuation."

72.     Had Defendants disclosed that Nutrition operating profit was being falsely inflated by accounting fraud, that would have resulted in a further negative shift away from Nutrition operating profit and a decline in ADM's stock price.

**Defendants Admit the Accounting Fraud as the SEC and DOJ Open Investigations and ADM Fires Its CFO**

73.     Throughout the Class Period, Defendants never voluntarily stopped or disclosed their illicit accounting scheme. Instead, Defendants used the accounting fraud to boost Nutrition operating income, allowing them to execute insider stock sales at artificially inflated stock prices (¶¶294-299) while enjoying millions in executive compensation (¶15).

74.     However, the SEC can obtain non-public tips and information on securities violations from a variety of sources, including the confidential SEC Whistleblower Program.[10] *See* U.S. Securities and Exchange Commission, Office of the Whistleblower (May 15, 2024),

---

[10]     The federal government's well-documented investigation and prosecution of ADM and its senior executives in an international lysine price-fixing conspiracy in the 1990s was aided in significant part by a former ADM executive turned whistleblower.

https://www.sec.gov/whistleblower. By 2023, the SEC had begun investigating ADM's intersegment sales. On June 30, 2023, ADM received a "voluntary document request from the [SEC] relating to intersegment sales between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments."

75. Following receipt of the SEC document request, ADM and the Board of Directors Audit Committee purportedly hired outside counsel to initiate an internal investigation into ADM's accounting practices and procedures with respect to the Nutrition reporting segment, including as related to intersegment sales. ADM's internal investigation covered the period between January 2018 and September 2023. Still, ADM did not disclose the accounting fraud, SEC investigation, or its internal investigation to the investing public.

76. Finally, in January 2024 at the end of the Class Period, the Company belatedly disclosed the investigation and fraud, and eventually restated and reduced Nutrition operating profit by tens of millions of dollars for each year dating back to 2018. In turn, ADM also restated and increased its revenue and profit for the ASO and Carb Solutions segments to reflect the higher sales prices those segments should have received. As discussed herein, there were ample reasons for Defendants to have fraudulently inflated Nutrition performance at the expense of the other segments.

77. First, analysts and investors were looking to growth in Nutrition as the basis for growing profitability based on Defendants' representations and reported results. Indeed, analysts valued a dollar in Nutrition operating profit as much as nearly two times more than a dollar in the other segments. Defendants knew that shifting earnings from ASO and Carb Solutions to Nutrition would significantly increase ADM's total value as a company (and, correspondingly, its stock price).

78. Second, the Company's stock price had suffered because its historic segments were notoriously unpredictable so fluctuations in the performance of those segments was already baked into investor and analyst expectations.

79.     Third, reduced revenues in ASO and Carb Solutions could be spread across two segments, each of which historically reported higher revenues and operating profits than Nutrition, and any negative impact to those segments' operating profits was small compared to the operating profit impact on Nutrition.  For example, had ADM correctly reported its intersegment sales in 2021, the operating profits for ASO and Carb Solutions would have increased by 0.9% and 2.7%, respectively.  By contrast, correct intersegment accounting in 2021 would have resulted in a 9.3% decline in Nutrition operating profit – more than three to ten times the impact of the other segments:

**Restated Impact of Accounting Scheme on 2021 Segment Operating Profits**



80.     And fourth, executive compensation during the Class Period was specifically tied to growth in Nutrition operating profits, not ASO or Carb Solutions operating profits individually.

81.     In short, the accounting scheme allowed ADM to report inflated operating profits for its cornerstone segment that ADM billed as the future of ADM growth, causing ADM stock to trade

- 27 -

at artificially inflated prices. Confirming the significance of the fraud, the SEC investigation is ongoing, the DOJ has commenced a grand jury investigation, ADM placed Defendant Luthar on administrative leave and then forced his "resignation," Defendant Macciocchi abruptly "retired" despite being entitled to millions in compensation (only to un-retire a month later to work elsewhere), and Defendant Young resigned from his prominent board positions at three public companies "effective immediately" following disclosure of the fraud.

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

82.     Throughout the Class Period, ADM and the Individual Defendants made false and misleading statements and omissions that concealed Defendants' fraudulent scheme and the true results of Nutrition's and ADM's financial results, accounting, and business practices. Specifically, Defendants made false and misleading statements regarding: (i) ADM's reported financial results and accounting policies; (ii) the Nutrition segment's sources of operating profit and growth; and (iii) the existence and effectiveness of ADM's internal controls to ensure accurate financial reporting and public disclosures.

**Statements Regarding Financial Results and Accounting**

83.     During the Class Period, Defendants made false and misleading statements that materially overstated the Nutrition Segment's operating profits and falsely claimed that intersegment sales were recorded at market rates in compliance with corporate policy and GAAP.

84.     On <u>April 29, 2020</u>, ADM issued a release announcing first quarter 2020 ("1Q20") results (the "1Q20 Release"), which was filed with the SEC on a Form 8-K on the next day. The 1Q20 Release reported ***Nutrition Operating Profit of $142 million in 1Q20***.

85.     On <u>May 1, 2020</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Young

and contained signed certifications by Defendants Luciano and Young. The 1Q20 10-Q included the following false and misleading statements:

(a)     The 1Q20 10-Q represented that, as required by GAAP, "*[i]ntersegment sales have been recorded at amounts approximating market*.[11]  Operating profit for each segment is based on net sales less identifiable operating expenses." ("Market Rates Statement").

(b)     The 1Q20 10-Q reported *Nutrition Operating Profit of $142 million in 1Q20*.

(c)     The 1Q20 10-Q assured investors that "*[t]he accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles (GAAP)* for interim financial information." ("Form 10-Q GAAP Compliance Statement").

86.     On July 29, 2020, ADM issued a release announcing second quarter 2020 ("2Q20") results ("2Q20 Release"), which was filed with the SEC on a Form 8-K on the same day. The 2Q20 Release reported *Nutrition Operating Profit of $158 million in 2Q20*.

87.     On July 30, 2020, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. The 2Q20 10-Q included the same *Market Rates Statement* (¶85(a)) and *Form 10-Q GAAP Compliance Statement* (¶85(c)) as in the 1Q20 10-Q, and reported *Nutrition Operating Profit of $158 million in 2Q20*.

---

[11]     In accounting terms, to sell at rates "approximating market" is to sell to a segment within the Company as if it were an independent customer at rates that such a customer would receive taking into account volume and frequency or ordering. *See, e.g.*, *Market price definition*, Accounting Tools (June 15, 2024) ("The market price of tangible goods is considered to be the price at which goods can be sold in arm's-length transactions between unrelated parties in an active market."), *available at* https://www.accountingtools.com/articles/what-is-market-price.html.  Thus, the reporting company is "approximating" the rates such a customer would receive in the marketplace.

88.     On <u>October 29, 2020</u>, ADM issued a release announcing third quarter 2020 ("3Q20") results ("3Q20 Release"), which was filed with the SEC on a Form 8-K on the same day.  The 3Q20 Release reported ***Nutrition Operating Profit of $147 million in 3Q20***.

89.     On <u>October 30, 2020</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2020 (the "3Q20 10-Q").  The 3Q20 10-Q was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  The 3Q20 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $147 million in 3Q20***.

90.     That same day, Defendants Luciano, Young, and Macciocchi participated in a conference call with analysts and investors to discuss ADM's 3Q20 results, during which Defendant Macciocchi falsely and misleadingly highlighted that, for the Nutrition segment, "***[i]f you look on a year-to-date basis through 3 quarters, we're at $448 million, whereas we did $419 million all of last year***."

91.     On <u>January 26, 2021</u>, ADM issued a release announcing full year 2020 ("FY 2020") results ("FY 2020 Release"), which was filed with the SEC on a Form 8-K on the same day.  The FY 2020 Release reported ***Nutrition Operating Profit of $574 million in FY 2020***.

92.     That same day, Defendants Luciano and Young participated in a conference call with analysts and investors to discuss ADM's results, during which Defendant Young reiterated that, "***[f]or the full year, Nutrition results were $574 million***."

93.     On <u>February 18, 2021</u>, ADM filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K was signed by Defendants Luciano and Young, and included the same ***Market Rates Statement*** (¶85(a)) as in the 1Q20 10-Q and reported ***Nutrition Operating Profit of $574 million in FY 2020 and $418 million for the year ended December 31, 2019*** ("FY 2019").  The 2020 10-K also represented that the "***preparation of***

- 30 -

*consolidated financial statements in conformity with [GAAP] require[d] management to make*

*estimates and assumptions*." ("Form 10-K GAAP Compliance Statement").

94. The statements set forth in ¶¶84-93 above were false and misleading when made.

The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a) Defendant ADM's, Luciano's, and Young's Market Rates Statements were

false and misleading because, as explained in detail below (¶¶199-208, 217-240), ADM had been

engaged in an undisclosed, multi-year accounting scheme through which it recorded intersegment

sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP, in

order to falsely inflate Nutrition operating profit.

(b) Defendant ADM's, Luciano's, and Young's statements reporting Nutrition

operating profits of $142 million in 1Q20, $158 million in 2Q20, $147 million in 3Q20, and $574

million in FY 2020, and Defendant Macciocchi's statement highlighting Nutrition operating profits

of $448 million in the first three quarters of 2020 and $419 million in all of 2019, were false and

misleading because, as explained in detail below (¶¶199-208, 217-240), those operating profits were

materially overstated as a result of ADM fraudulently recording intersegment sales to Nutrition at

amounts below market rates, including a $16 million (3%) overstatement of Nutrition operating

profit in FY 2020 and a $27 million (7%) overstatement of Nutrition operating profit in FY 2019.

(c) Defendant ADM's, Luciano's, and Young's Form 10-Q and Form 10-K

GAAP Compliance Statements were false and misleading because, as explained in further detail

below (¶¶199-208, 217-240), the financial statements violated GAAP and were materially misstated

as a result of ADM's accounting scheme to inflate Nutrition operating profit.

95. On April 27, 2021, ADM issued a release announcing first quarter 2021 ("1Q21")

results ("1Q21 Release"), which was filed with the SEC on a Form 8-K on the same day. The 1Q21

Release reported *Nutrition Operating Profit of $154 million in 1Q21*.

- 31 -

96.      On <u>April 28, 2021</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. The 1Q21 10-Q included the same *Market Rates Statement* (¶85(a)) and *Form 10-Q GAAP Compliance Statement* (¶85(c)) as in the 1Q20 10-Q, and reported *Nutrition Operating Profit of $154 million in 1Q21*.

97.      On <u>June 7, 2021</u>, Defendant Macciocchi participated in a conference call as a part of the Deutsche Bank dbAccess Global Consumer Conference, during which he falsely and misleadingly emphasized that "when you look at *2020 results [for Nutrition], $574 million in operating profit*."

98.      On <u>July 27, 2021</u>, ADM issued a release announcing second quarter 2021 ("2Q21") results ("2Q21 Release"), which was filed with the SEC on a Form 8-K on the same day. The 2Q21 Release reported *Nutrition Operating Profit of $201 million in 2Q21*.

99.      On <u>July 27, 2021</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("2Q21 10-Q"). The 2Q21 10-Q was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. The 2Q21 10-Q included the same *Market Rates Statement* (¶85(a)) and *Form 10-Q GAAP Compliance Statement* (¶85(c)) as in the 1Q20 10-Q, and reported *Nutrition Operating Profit of $201 million in 2Q21*.

100.      On <u>October 26, 2021</u>, ADM issued a release announcing third quarter 2021 ("3Q21") results ("3Q21 Release"), which was filed with the SEC on a Form 8-K on the same day. The 3Q21 Release reported *Nutrition Operating Profit of $176 million in 3Q21*.

101.      On <u>October 26, 2021</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. The 3Q21 10-Q

- 32 -

included the same *Market Rates Statement* (¶85(a)) and *Form 10-Q GAAP Compliance Statement* (¶85(c)) as in the 1Q21 10-Q, and reported *Nutrition Operating Profit of $176 million in 3Q21*.

102.    On January 25, 2022, ADM issued a release announcing full year 2021 ("FY 2021") results ("FY 2021 Release"), which was filed with the SEC on a Form 8-K on the same day. The FY 2021 Release reported *Nutrition Operating Profit of $691 million in FY 2021* and *Animal Nutrition Operating Profit of $154 million in FY 2021*.

103.    That same day, Defendants Luciano and Young participated in a conference call with analysts and investors to discuss ADM's full year 2021 results, during which Defendant Luciano reiterated Nutrition's "industry-leading revenue and OP growth" and "*full year OP of $691 million, representing a 20% year-over-year increase*."

104.    On February 17, 2022, ADM filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Luciano and Young, and included the same *Market Rates Statement* (¶85(a)) as in the 1Q20 10-Q and the same *Form 10-K GAAP Compliance Statement* (¶93) as in the 2020 10-K, reported *Nutrition Operating Profit of $691 million in FY 2021*, reported *Animal Nutrition Operating Profit of $154 million in FY 2021*, and claimed that "*Nutrition operating profit increased 20%*."

105.    On March 22, 2022, ADM filed its annual Proxy Statement on Schedule 14A ("2022 Proxy"). The 2022 Proxy was signed by Defendant Luciano and falsely and misleadingly stated: (i) Nutrition "*grew . . . operating profit by 20% year-over-year*" in 2021 versus 2020; (ii) Macciocchi "*[g]rew full-year Nutrition operating profits by 20% over 2020*"; and (iii) ADM "*[a]chiev[ed] a >15% year-over-year increase in Nutrition adjusted operating profit*."

106.    The statements set forth in ¶¶95-105 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     Defendant ADM's, Luciano's, and Young's Market Rates Statements were false and misleading for the same reasons as set forth in ¶94(a).

(b)     Defendant ADM's, Luciano's, and Young's statements reporting Nutrition operating profit of $154 million in 1Q21, $201 million in 2Q21, $176 million in 3Q21, and $691 million in FY 2021 were false and misleading because, as explained in detail below (¶¶199-208, 217-240), those operating profits were materially overstated as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates, including a $59 million (9%) overstatement of Nutrition operating profit in FY 2021.

(c)     Defendant ADM's, Luciano's, and Young's statements reporting Animal Nutrition operating profits of $154 million in FY 2021 were false and misleading because those operating profits were materially overstated by $42 million (38%) as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates.

(d)     Defendant ADM's, Luciano's, and Young's claim that Nutrition operating profit "increased 20%," or grew "by 20%" from 2020 to 2021, was false and misleading because as admitted in the Restatement, ADM's 2021 Nutrition operating profits were overstated by $59 million (9%) by ADM's accounting scheme, and, had the true Nutrition operating profits been disclosed, Nutrition operating profits would have increased by only 13% from 2020 to 2021, far below the touted 20%.

(e)     Defendant Macciocchi's statement highlighting Nutrition operating profits of "$574 million" in 2020 was false and misleading for the same reasons as in ¶94(b).

(f)     Defendant ADM's, Luciano's, and Young's Form 10-Q and Form 10-K GAAP Compliance Statements were false and misleading for the same reasons as set forth in ¶94(c).

- 34 -

107.    On <u>April 26, 2022</u>, ADM issued a release announcing first quarter 2022 ("1Q22") results ("1Q22 Release"), which was filed with the SEC on a Form 8-K on the same day. The 1Q22 Release reported ***Nutrition Operating Profit of $189 million in 1Q22***.

108.    On <u>April 26, 2022</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar. The 1Q22 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $189 million in 1Q22***.

109.    On <u>July 26, 2022</u>, ADM issued a release announcing second quarter 2022 ("2Q22") results ("2Q22 Release"), which was filed with the SEC on a Form 8-K on the same day. The 2Q22 Release reported ***Nutrition Operating Profit of $239 million in 2Q22***.

110.    On <u>July 26, 2022</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar. The 2Q22 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $239 million in 2Q22***.

111.    On <u>October 25, 2022</u>, ADM issued a release announcing third quarter 2022 ("3Q22") results ("3Q22 Release"), which was filed with the SEC on a Form 8-K on the same day. The 3Q22 Release reported ***Nutrition Operating Profit of $177 million in 3Q22***.

112.    On <u>October 25, 2022</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar. The 3Q22 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $177 million in 3Q22***.

- 35 -

113. On <u>January 26, 2023</u>, ADM issued a release announcing full year 2022 ("FY 2022") results ("FY 2022 Release"), which was filed with the SEC on a Form 8-K on the same day. The release reported ***Nutrition Operating Profit of $736 million in FY 2022*** and ***Animal Nutrition Operating Profit of $170 million in FY 2022***.

114. On <u>February 14, 2023</u>, ADM filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Luciano and Luthar, and included the same ***Market Rates Statement*** (¶85(a)) as in the 1Q20 10-Q and the same ***Form 10-K GAAP Compliance Statement*** (¶93) as in the 2020 10-K, reported ***Nutrition Operating Profit of $736 million in FY 2022***," and reported ***Animal Nutrition Operating Profit of $170 million in FY 2022***.

115. The statements set forth in ¶¶107-114 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a) Defendant ADM's, Luciano's, and Luthar's Market Rates Statements were false and misleading for the same reasons as set forth in ¶94(a).

(b) Defendant ADM's, Luciano's, and Luthar's statements reporting Nutrition operating profit of $189 million in 1Q22, $239 million in 2Q22, $177 million in 3Q22, and $736 million in FY 2022 were false and misleading because, as explained in detail below (¶¶199-208, 217-240), those operating profits were materially overstated as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates, including a $68 million (10%) overstatement of Nutrition operating profit in FY 2022.

(c) Defendant ADM's, Luciano's, and Luthar's statements reporting Animal Nutrition operating profits of $170 million in FY 2021 were false and misleading because those operating profits were materially overstated by $59 million (53%) as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates.

- 36 -

(d)     Defendant ADM's, Luciano's, and Luthar's Form 10-Q and Form 10-K GAAP Compliance Statements were false and misleading for the same reasons as set forth in ¶94(c).

116.     On <u>April 25, 2023</u>, ADM issued a release announcing first quarter 2023 ("1Q23") results ("1Q23 Release"), which was filed with the SEC on a Form 8-K on the same day.  The 1Q23 Release reported ***Nutrition Operating Profit of $145 million in 1Q23***.

117.     On <u>April 25, 2023</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2023 (the "1Q23 10-Q").  The 1Q23 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  The 1Q23 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $145 million in 1Q23***.

118.     On <u>July 25, 2023</u>, ADM issued a release announcing 2Q23 results ("2Q23 Release"), which was filed with the SEC on a Form 8-K on the same day.  The 2Q23 Release reported ***Nutrition Operating Profit of $185 million in 2Q23***.

119.     On <u>July 25, 2023</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2023 (the "2Q23 10-Q").  The 2Q23 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  The 2Q23 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, and reported ***Nutrition Operating Profit of $185 million in 2Q23***.

120.     On <u>October 24, 2023</u>, ADM issued a release announcing third quarter 2023 ("3Q23") results ("3Q23 Release"), which was filed with the SEC on a Form 8-K on the same day.  The 3Q23 Release reported ***Nutrition Operating Profit of $138 million in 3Q23*** and ***$468 million in the first nine months of 2023***, and reported ***Animal Nutrition Operating Profit of $28 million in the first nine months of 2023***.

- 37 -

121.    On <u>October 24, 2023</u>, ADM filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2023 (the "3Q23 10-Q").  The 3Q23 10-Q was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  The 3Q23 10-Q included the same ***Market Rates Statement*** (¶85(a)) and ***Form 10-Q GAAP Compliance Statement*** (¶85(c)) as in the 1Q20 10-Q, reported ***Nutrition Operating Profit of $138 million in 3Q23*** and ***$468 million in the first nine months of 2023***, and reported ***Animal Nutrition Operating Profit of $28 million in the first nine months of 2023***.

122.    The statements set forth in ¶¶116-121 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)    Defendant ADM's, Luciano's, and Luthar's Market Rates Statements were false and misleading for the same reasons as set forth in ¶94(a).

(b)    Defendant ADM's, Luciano's, and Luthar's statements reporting Nutrition operating profit of $145 million in 1Q23, $185 million in 2Q23, $138 million in 3Q23, and $468 million in the first nine months of 2023 were false and misleading because, as explained in detail below (¶¶199-208, 217-240), those operating profits were materially overstated as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates, including a $31 million (7%) overstatement of Nutrition operating profit in the first nine months of 2023.

(c)    Defendant ADM's, Luciano's, and Luthar's statements reporting Animal Nutrition operating profits of $28 million in the first nine months of 2023 were false and misleading because those operating profits were materially overstated by $33 million (660%) as a result of ADM fraudulently recording intersegment sales to Nutrition at amounts below market rates, and, had the true operating profits been disclosed, Animal Nutrition would have reported an operating *loss* of ($5 million) for the first nine months of 2023.

- 38 -

(d)     Defendant ADM's, Luciano's, and Luthar's Form 10-Q GAAP and Form 10-K GAAP Compliance Statements were false and misleading for the same reasons as set forth in ¶94(c).

**Statements Regarding the Sources of Nutrition Operating Profits and Growth**

123.    During the Class Period Defendants also made materially false and misleading statements regarding the Nutrition Segment's operating profits and growth, including statements regarding the purported sources of Nutrition's operating profits and growth.

124.    On April 30, 2020, Defendants Luciano and Young participated in a conference call to discuss ADM's 1Q20 financial results.  In response to an analyst question about "margin expansion" in Nutrition, Defendant Luciano falsely and misleadingly emphasized that Nutrition had been enjoying "*organic growth*"[12] and that "*[n]ow all that organic growth is hitting the P&Ls [profits and losses] because these investments are maturing*.  And you're going to see that, and we grew 23% profit last year."

125.    On May 1, 2020, ADM filed the 1Q20 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  The 1Q20 10-Q included a section titled "*Analysis of Statements of Earnings*," in which it reported and discussed the revenues of each segment for first quarter 2019 ("1Q19") and 1Q20, and then reported and discussed the operating profits of each segment for 1Q19 and 1Q20.  In the section addressing "[s]egment operating profit," the 1Q20 10-Q reported that "Nutrition operating profit increased 75%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "*[i]ncreased revenues in North America and EMEAI flavors, continued*

---

[12]     As the statements in this section make clear, Defendants claimed that the Nutrition segment was growing and would continue to grow either "organically," which means through improved performance of the existing businesses, or "inorganically," which means through acquisition.  As to inorganic growth, Defendants said they would focus on "bolt-on" or smaller acquisitions that could be quickly added to the existing business, rather than major acquisitions that would significantly alter the business.

*sales growth in alternative proteins, and additional bioactives income* drove improved results," and "results improved year-over-year driven by *strong performance from Neovia, good volumes and margins in feed additives, and solid sales in pet care*."

126.     On July 30, 2020, ADM filed the 2Q20 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2Q20 10-Q reported that "Nutrition operating profit increased 35%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "*flavors continued* to deliver solid results on *good sales mix and margin expansion in North America*," "*rising customer demand for plant-based proteins and edible beans* drove higher results in Specialty Ingredients," "Health & Wellness delivered higher performance on *strong sales for probiotics, improved volumes and margins in fiber, and additional fermentation income*," and "Animal Nutrition was higher year-over-year on *continued execution on Neovia synergies, robust demand for pet food and treats, and improvement in amino acids* drove improved results."

127.     On October 30, 2020, ADM filed the 3Q20 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 3Q20 10-Q reported that "Nutrition operating profit increased 25%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "[f]lavors delivered another exceptional quarter, driven by *increased revenue globally and improved mix and margins*," "*[s]ales growth in probiotics and enzymes, along with income from fermentation*, contributed to strong results in Health & Wellness," and "*delivery of Neovia synergies, strength in livestock feed, and year-over-year improvement in amino acids*."

- 40 -

128.    That same day, Defendants Luciano, Young, and Macciocchi participated in a conference call with analysts and investors to discuss ADM's 3Q20 results.  In connection with the call, ADM published a set of slides announcing Nutrition's goal of "$1B OP in [the] Medium Term." During the October 30, 2020 call, Defendants Luciano and Macciocchi made the following false and misleading statements:

(a)    In response to analyst questions regarding ADM's "path" to reach the $1 billion Nutrition goal, Defendant Luciano emphasized that the "number is excluding any major M&A.  That number is in *the current strategy, which is organic growth and bolt on*."

(b)    Defendant Macciocchi immediately followed Luciano's response by adding that, "it's a good growth story and a good growth trajectory from an organic basis.  And *what we've done is we've really taken the approach of let's grow organically*."

129.    On November 19, 2020, Defendant Luciano participated in a conference call as a part of the Stephens NASH Investment Conference and made the following false and misleading statements:

(a)    Defendant Luciano touted the Nutrition segment's ability to acquire raw materials through ADM's intersegment sales as a "competitive advantage":

> *The fact that we are in carbohydrates and the fact that we are in oilseeds gives us a footprint to start with this*.  And I think that's very important.  *And that's sometimes an unseen competitive advantage that we have.  The fact that Greg* [Morris, SVP and President of ADM's Agricultural Services and Oilseeds Segment] *provides white flakes for us to be able to make specialty proteins, so plant-based proteins, is a key competitive advantage that we have*.

(b)    And, when an analyst asked about ADM's "interconnected businesses" and the "synergistic nature of having Nutrition within your broader portfolio," Defendant Luciano claimed that "a relatively small business like *Nutrition takes* on all that operational excellence and *all that low cost to come to the market being more efficient than anybody else*" and "*there are*

- 41 -

*incredible number of synergies* that are a little bit like an iceberg, most of them underwater and not seen."

130.     On <u>December 9, 2020</u>, Defendant Young participated in a conference call as part of the BMO Capital Markets Boston Growth Conference - Fireside Chat, and made the following false and misleading statements:

(a)     When an analyst asked about ADM's ability to "create a sustainable operation that you don't have to worry so much about the fluctuation in commodities," Defendant Young emphasized that "***we've actually grown the Nutrition business, whereby now it's a significant contributor. And it's actually very, very robust earnings, right, very predictable, robust earnings***. So the portfolio is one of these areas, Ken."

(b)     In response to an analyst's question about "your key assumptions and drivers" behind "ADM's path to $1 billion in operating profit in Nutrition," Defendant Young stated "***there's organic growth . . . [a]nd then we'll supplement with some bolt-on acquisitions as well***," adding that ADM is "***growing the Nutrition business . . . through . . . organic growth and bolt-on acquisitions***."

131.     On <u>January 26, 2021</u>, ADM issued the FY 2020 Release, which quoted Defendant Luciano as falsely and misleadingly touting that "'***[o]ur Nutrition business continued to*** harvest investments, ***lead in consumer growth trend areas, and partner with customers to deliver new products and solutions in 2020***, driving 37 percent annual operating profit growth.'"

132.     That same day, Defendants Luciano and Young participated in a conference call with analysts and investors to discuss ADM's results, during which Defendant Luciano emphasized that "***the Nutrition business . . . [is] a business that have [sic] a strong organic growth program***."

133.     On <u>February 18, 2021</u>, ADM filed the 2020 10-K, which was signed by Defendants Luciano and Young and contained the following false and misleading statements:

(a)  The 2020 10-K emphasized that "*[ADM's] growth strategy . . . encompasses organic and inorganic initiatives*" and that "*the Company executes its growth strategy . . . through both organic and inorganic growth*" ("Growth Initiatives Statements").

(b)  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2020 10-K reported that "Nutrition operating profit increased 37%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "*[s]trong execution to meet rising customer demand for plant-based proteins and edible beans* drove higher results in Specialty Ingredients," "*[a]dditional income from fermentation and strong sales for probiotics and fiber* drove higher performance in Health & Wellness," and "Animal Nutrition results improved year-over-year driven by *strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids*."

134.  Defendant ADM repeated substantially the same false and misleading statements identified in ¶¶125-127 in the corresponding 1Q20 Release, 2Q20 Release, and 3Q20 Release.

135.  The statements set forth in ¶¶124-134 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)  Defendant ADM's, Luciano's, Young's, and Macciocchi's statements touting Nutrition's "very predictable, robust" profits and claiming the source of those profits was "organic" growth through existing business or "inorganic" growth through "M&A" and "bolt on" acquisitions were false and misleading because a material portion of the Nutrition's predictable operating profits and improved performance were attributable to ADM's undisclosed three-year accounting scheme through which it recorded intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

- 43 -

(b)     Defendants ADM's, Luciano's, and Young's statements purporting to describe the various specific factors that positively impacted Nutrition operating profits, including "lead[ing] in consumer growth trend areas," "partner[ing] with customers to deliver new products," "revenues in North America and EMEAI flavors," "growth in alternative proteins," "additional bioactives income," "good volumes and margins in feed additives," "margin expansion in North America," "demand for plant-based proteins and edible beans," "strong sales for probiotics," "improved volumes and margins in fiber," "additional fermentation income," "improvement in amino acids," and "strength in livestock feed" were false and misleading because they concealed that Nutrition operating profits were not being positively impacted by just the improved performance or margins of small components of the Nutrition business, but in large part by ADM's undisclosed three-year accounting scheme through which it boosted Nutrition profits (including the profits of its component products) by recording intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(c)     Defendant Luciano's statements claiming ADM had a "competitive advantage" and benefitted from "synergies" because Nutrition could acquire raw materials through intersegment sales and such efficiencies helped it achieve a "low cost" were false and misleading because the real advantage of intersegment sales was not sourcing the product or achieving synergies to get low cost, but rather ADM's three-year undisclosed accounting scheme of recording intersegment sales to Nutrition at below market rates in violation of corporate policy and GAAP.

(d)     Defendant Young's statements emphasizing that the Nutrition business was "a significant contributor" to ADM and provided "very robust" and "very predictable" earnings were false and misleading because they concealed that Nutrition's earnings were predictable because they could be manipulated in large part by the Company through the rates it recorded for intersegment sales.

- 44 -

136.     On <u>April 28, 2021</u>, ADM filed the 1Q21 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 1Q21 10-Q reported that "Nutrition operating profit increased 8%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "Flavors results were up, driven by ***strong sales across various market segments, especially beverages***," "***[f]avorable product mix in North America, improved margins in EMEAI, and accelerated income from a customer agreement*** also contributed to results," "Health and Wellness results were strong, with ***robust demand driving higher results in bioactives and fibers***," and "Animal Nutrition results were lower . . . partially offset by ***favorable results in amino acids, driven by improved product mix***."

137.     On <u>June 7, 2021</u>, Defendant Macciocchi participated in a conference call as a part of the Deutsche Bank dbAccess Global Consumer Conference, during which he made the following false and misleading statements:

(a)     Defendant Macciocchi emphasized Nutrition's "***very good organic growth story***."

(b)     An analyst asked about ADM's "$1 billion goal in [Nutrition] operating profit by 2024," to which Defendant Macciocchi responded, "I do wake up every day thinking about it" and emphasized that "our flavor and natural color business [has] ***margins that are very much aligned in the 20% range for EBITDA***[13] ***margin perspective***," "[a]lternative protein ***margins are quite strong***," "[i]n [ADM's] Health and Wellness products, ***the margins are quite strong***," and

---

[13]     EBITDA is similar to operating profit, but removes for example the impact of asset-related depreciation and amortization.  Thus, operating profits and EBITDA margins would be impacted by the same operating costs, including the costs of raw materials.

"where there's an opportunity to continue to ***margin up this business is in the animal side***," which is "***really about this mix shift*** in this transformation and ***making sure we margin up this business***."

       (c)       When asked by an analyst how the Nutrition business "benefit[s] from or complement[s] the traditional ag and processing business of ADM," Macciocchi highlighted intersegment sales, including that "***[w]e manufacture our own white flake***" at ADM, and also emphasized ADM's "***centers of excellence***," "***pending ERP implementation***," "***nutrition customers from the various parts of our business that have come together***" and "***advanced key account management program***."

       138.    On <u>July 27, 2021</u>, ADM filed the 2Q21 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2Q21 10-Q reported that "Nutrition operating profit increased 27%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment***," "Specialty Ingredients delivered ***strong sales growth in specialty proteins***," and "Animal Nutrition results were higher year-over-year [from] ***improved demand and margins in amino acids, strength in feed additives and ingredients, and better performance in EMEA***."

       139.    On <u>September 9, 2021</u>, Defendant Luthar participated in the Barclays Global Consumer Staples Conference, during which he falsely and misleadingly emphasized that ADM was "***driving synergies across the various businesses that Nutrition is capitalized on***, ***to drive earnings growth*** from about $250 million in operating profit in Nutrition to what we would anticipate close to $700 million this year, a significant growth."

       140.    On <u>October 26, 2021</u>, ADM filed the 3Q21 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young. In the "*Analysis of*

- 46 -

*Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 3Q21 10-Q reported that "Nutrition operating profit increased 20%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***[h]igher volume and improved product mix, with particular strength in beverage***, drove support strong flavor results in EMEA and North America," "Specialty ingredients continued to benefit from ***strong demand for alternative proteins***," "Health and wellness results were higher on ***robust sales growth in bioactives and fiber***," and "Animal nutrition results were higher year-over-year, driven primarily by ***strength in amino acids as well as feed additives and ingredients***."

141. On <u>December 10, 2021</u>, Defendants Luciano, Young, Luthar, and Macciocchi participated in ADM's "Global Investor Day" presentations, during which they announced an increased goal of achieving "$1.25 billion to $1.5 billion" Nutrition operating profit in 2025 and made the following false and misleading statements:

(a) Defendant Young assured investors that "***Nutrition has grown as expected through M&A and organic growth*** . . . offsetting some of the deterioration that we've seen in Carb Solutions."

(b) Defendant Macciocchi reiterated that for Nutrition, "***M&A is a spoke in our strategic wheel. We're focused on our organic growth*** and how we'll continue to drive our business," adding that "***we are predicated on organic growth***."

(c) Defendant Macciocchi emphasized that the flavors business "***operates an EBITDA margin range of 20% to 25%***," the Specialty Ingredients business "***plays in the EBITDA margin range of 20% to 25%***," the Health and Wellness business "***operates at the very top of the range at 25-plus percent margins***," and for Animal Nutrition, "***we've identified significant opportunities to margin up this portfolio***."

- 47 -

(d)      Defendant Young again emphasized that "*as every year ticks by, going from '21 to '22, '23, Nutrition is growing.  That's a very stable earnings base*."

142.      On <u>February 17, 2022</u>, ADM filed the 2021 10-K, which was signed by Defendants Luciano and Young and contained the following false and misleading statements:

(a)      The 2021 10-K included substantially the same *Growth Initiatives Statements* as in the 2020 10-K.

(b)      In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2021 10-K reported that "Nutrition operating profit increased 20%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "[i]n North America and EMEAI, *the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment*," "Specialty Ingredients delivered *sales growth in specialty proteins and improved pricing and product mix*," "Health and Wellness results were strong, with robust *demand driving strong results in probiotics and fibers*," and "Animal Nutrition results were higher on *favorable results in amino acids, driven by improved margins and product mix*."

143.      Defendant ADM repeated substantially the same false and misleading statements identified in ¶¶136, 138, and 140 in the corresponding 1Q21 Release, 2Q21 Release, and 3Q21 Release.

144.      The statements set forth in ¶¶136-143 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)      Defendant ADM's, Luciano's, Young's, and Macciocchi's statements claiming the source of Nutrition operating profits was "organic" or "inorganic" growth were false and misleading because a material portion of Nutrition's operating profits and improved performance was attributable to ADM's undisclosed four-year accounting scheme through which it

- 48 -

recorded intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(b) Defendants ADM's, Luciano's, and Young's statements purporting to describe the various factors that positively impacted Nutrition operating profits, including "strong sales . . . [in] beverages," "[f]avorable product mix," "improved margins in EMEAI," "accelerated income from a customer agreement," "higher results in bioactives and fibers," "improved demand and margins in amino acids," "strength in feed additives and ingredients," and "strong demand for alternative proteins" were false and misleading because they concealed that Nutrition operating profits were not being positively impacted by just the improved performance or margins of small components of the Nutrition business, but in large part by ADM's undisclosed four-year accounting scheme through which it boosted Nutrition profits (including the profits of its component products) by recording intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(c) Defendant Macciocchi's statements repeatedly touting the "quite strong" margins and "margin ranges" of 20% to 25% for the Nutrition business and emphasizing ADM's efforts and opportunities to "margin up" the Nutrition business, including by focusing on "mix shift," were false and misleading because they concealed that the Nutrition margins were overstated and being "margined up" by ADM's four-year accounting scheme through which it boosted Nutrition margins by recording intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(d) Defendant Macciocchi's statements purporting to describe the various benefits the Nutrition segment received from ADM's other segments (such as the manufacturing of "white flake," a broad customer base, and company-wide systems), and Defendant Luthar's statement highlighting the "synergies" between ADM's segments, were false and misleading because the real

- 49 -

benefit of intersegment sales was not the manufacturing of raw materials or achieving synergies, but rather ADM's undisclosed four-year accounting scheme of recording intersegment sales to Nutrition at below market rates in violation of corporate policy and GAAP.

(e)     Defendant Young's statement emphasizing that the Nutrition business was "a very stable earnings base" was false and misleading because it concealed that Nutrition's earnings were stable because they could be manipulated in large part by the Company through the rates it recorded for intersegment sales.

145.     On <u>April 26, 2022</u>, ADM filed the 1Q22 10-Q, which was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 1Q22 10-Q reported that "Nutrition operating profit increased 23%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "*[s]trong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and positive currency timing impacts in South America*, offset some higher operating costs to help deliver better year-over-year results in Specialty Ingredients," "Health and Wellness was also higher year-over-year, *powered by probiotics . . . and robust demand for fiber*," and "Animal Nutrition profits were nearly double the prior-year quarter, due primarily to *strength in amino acids*."

146.     That same day, Defendants Luciano, Young, and Luthar held a call to discuss ADM's 1Q22 results, during which Defendant Luthar falsely and misleadingly stated:

> *The reason our profits [in Nutrition] were stronger than what we had guided in Q4 were threefold*.  One is, we did expect some upfront costs that we cited, and we had anticipated inflationary cost pressures and supply disruptions. However, *with the smart pricing and active supply chain collaboration with our AS&O Carb Solutions teams, we manage these very well across all the Nutrition businesses*.

147.     On July 26, 2022, ADM filed the 2Q22 10-Q, which was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2Q22 10-Q reported that "Nutrition operating profit increased 19%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***demand for alternative proteins*** resulted in ***strong soy protein volumes and margins,*** as ***contributions from the Sojaprotein acquisition***, as well as ***good demand for texturants***, drove higher results in Specialty Ingredients," "***[s]trength across probiotics, including . . . [and] robust demand for fibers***, contributed to a stronger quarter in Health and Wellness," and "Animal Nutrition profits were up substantially year-over-year, driven by ***continued strong volumes and margins in amino acids***."

148.     On October 25, 2022, ADM filed the 3Q22 10-Q, which was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 3Q22 10-Q reported that "Nutrition operating profit increased 1%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***[s]trong demand for plant-based proteins, as well as solid performance in texturants***, drove continued growth in Specialty Ingredients," "***continued strong [flavors] demand growth in the region***," and "***strong [pet] volumes and margins in North America.***"

149.     On January 26, 2023, ADM filed the FY 2022 Release.  The same day, Defendants Luciano and Luthar held a conference call with analysts and investors to discuss ADM's 4Q22 and FY 2022 results, during which Defendant Luciano falsely and misleadingly stated:

> [The Nutrition] business has been a very successful story at the customer level for many, many years.  We continue to drive higher growth rates than the industry we participate in.  So that has not changed, the robust pipeline growth's there, and ***we have achieved all that***, Ben, ***through a very disciplined strategy of bolt-on acquisitions and organic growth***.

150.    On February 14, 2023, ADM filed the 2022 10-K, which was signed by Defendants Luciano and Luthar and contained the following false and misleading statements:

(a)    The 2022 10-K included substantially the same **Growth Initiatives Statements** as in the 2020 10-K.

(b)    In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2022 10-K reported that "Nutrition operating profit increased 7%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***[s]trong sales growth in alternative proteins, including . . . good demand for texturants***," "Health and Wellness was also higher year-over-year, ***powered by probiotics, including . . . robust demand for fiber and Vitamin E***," and "***Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids***."

151.    Defendant ADM repeated substantially the same false and misleading statements identified in ¶¶145 and 147-148 in the corresponding 1Q22 Release, 2Q22 Release, and 3Q22 Release.

152.    The statements set forth in ¶¶145-151 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)    Defendant ADM's, Luciano's and Luthar's statements claiming the source of Nutrition operating profits was "organic" or "inorganic" growth were false and misleading because a material portion of Nutrition's operating profits and improved performance was attributable to ADM's undisclosed five-year accounting scheme through which it recorded intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(b)    Defendant ADM's, Luciano's, and Luthar's statements purporting to describe the various factors that positively impacted Nutrition operating profits, including "[s]trong sales growth in alternative proteins," "robust demand for fiber," "strength in amino acids," "strong soy

- 52 -

protein volumes and margins," "[s]trength across probiotics," "strong volumes and margins in amino acids," "solid performance in texturants," and "strong [pet] volumes and margins" were false and misleading because they concealed that Nutrition operating profits were not being positively impacted by just the improved performance or margins of small components of the Nutrition business, but in large part by ADM's undisclosed five-year accounting scheme through which it boosted Nutrition profits (including the profits of its component products) by recording intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

(c)     Defendant Luthar's statement attributing "stronger" Nutrition profits than expected to "the smart pricing and active supply chain collaboration with our AS&O and Carb Solutions teams" was misleading because, rather than benefitting from legitimate "smart pricing" or "supply chain collaboration" with ASO and Carb Solutions, ADM was engaged in an ongoing and undisclosed five-year accounting scheme of recording intersegment sales from ASO and Carb Solutions to Nutrition at below market rates in violation of corporate policy and GAAP.

(d)     Defendant ADM's, Luciano's, and Luthar's statement touting that "Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids" was false and misleading because, as admitted in the Restatement, ADM's 2022 Animal Nutrition was overstated by $59 million (53%) by ADM's accounting scheme, and, had the true Nutrition operating profits been disclosed, Animal Nutrition profits would not have been "higher," but would have instead declined from 2021 to 2022.

153.     On April 25, 2023, ADM filed with the SEC the 1Q23 10-Q, which was signed by Defendant Luthar and contained certifications by Defendants Luciano and Luthar. In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 1Q23 10-Q reported that "Nutrition operating profit decreased 23%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "***Human***

- 53 -

***Nutrition results were in-line with the first quarter of 2022***" and "***Specialty Ingredients results were higher year-over-year driven by healthy margins.***"

154.    On July 25, 2023, ADM filed with the SEC the 2Q23 10-Q, which was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 2Q23 10-Q reported that "Nutrition operating profit decreased 23%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "Flavors results were significantly higher than the prior-year quarter due to ***improved mix and pricing in EMEA as well as improving demand in North America***," "***strong performance in texturants***," and "Health and Wellness results were similar versus the prior-year quarter as lower demand for fibers offset ***lower selling, general, and administrative expenses***."

155.    On October 24, 2023, ADM filed with the SEC the 3Q23 10-Q, which was signed by Defendant Luthar and contained signed certifications by Defendants Luciano and Luthar.  In the "*Analysis of Statements of Earnings*" section specifically addressing "[s]egment operating profit," the 3Q23 10-Q reported that "Nutrition operating profit decreased 22%," and purported to describe the factors that impacted the Nutrition segment's operating profits, highlighting, for example, "Flavors results were substantially higher than the prior-year quarter, driven by ***pricing actions in EMEA and strong win rates pipeline in North America***," "[i]n Health and Wellness, ***a favorable impact related to a revised commercial agreement as well as stronger probiotics sales***, led to higher results versus the prior-year quarter," and "Animal Nutrition results were lower compared to the same quarter last year . . . partially offset by ***cost management optimization actions and improving volumes***."

156.    Defendant ADM repeated substantially the same false and misleading statements identified in ¶¶153-155 in the corresponding 1Q23 Release, 2Q23 Release, and 3Q23 Release.

- 54 -

157. The statements set forth in ¶¶153-156 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a) Defendant ADM's, Luciano's, and Luthar's statements purporting to describe the various factors that positively impacted Nutrition operating profits, including "improved mix and pricing in EMEA," "strong performance in texturants," "lower selling, general, and administrative expenses," "strong win rates pipeline in North America," "a revised commercial agreement," and "stronger probiotic sales" were false and misleading because they concealed that Nutrition operating profits were not being positively impacted by just the performance or margins of small components of the Nutrition business, but in large part by ADM's undisclosed six-year accounting scheme through which it boosted Nutrition profits (including the profits of its component products) by recording intersegment sales to Nutrition at amounts below market rates, in violation of corporate policy and GAAP.

**Statements Regarding Internal Controls**

158. During the Class Period, Defendants also made materially false and misleading statements regarding the effectiveness of ADM's disclosure controls and internal controls over financial reporting, and the accuracy of their SEC filings.

159. On May 1, 2020, ADM filed with the SEC the 1Q20 10-Q, which was signed by Defendant Young and contained certifications by Defendants Luciano and Young. The 1Q20 10-Q included the following false and misleading statements:

(a) The 1Q20 10-Q assured investors that Defendants Luciano and Young had participated in the evaluation "of the effectiveness of the design and operation of the Company's 'disclosure controls and procedures'" and "*[b]ased on that evaluation, the Company's management, including the Chief Executive Officer and Chief Financial Officer, concluded the Company's disclosure controls and procedures were effective*" ("Disclosure Controls Statement").

- 55 -

(b)     The 1Q20 10-Q also included Sarbanes Oxley Certifications signed by both Defendants Luciano and Young, which stated, among other things, that the Company's reported information "*fairly presents, in all material respects, the financial condition and results of operations of the Company*," and that Luciano and Young had "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*" ("SOX Certifications").

160.    On July 30, 2020, ADM filed with the SEC the 2Q20 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  The 2Q20 10-Q included the same *Disclosure Controls Statement* (¶159(a)) and *SOX Certifications* (¶159(b)) as in the 1Q20 10-Q.

161.    On October 30, 2020, ADM filed with the SEC the 3Q20 10-Q, which was signed by Defendant Young and contained signed certifications by Defendants Luciano and Young.  The 3Q20 10-Q included the same *Disclosure Controls Statement* (¶159(a)) and *SOX Certifications* (¶159(b)) as in the 1Q20 10-Q.

162.    On February 18, 2021, ADM filed with the SEC the 2020 10-K, which was signed by Defendants Luciano and Young.  The 2020 10-K included the same *Disclosure Controls Statement* (¶159(a)) and *SOX Certifications* (¶159(b)) as in the 1Q20 10-Q.  The 2020 10-K also represented that ADM's "*internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with [GAAP]*," and that ADM's "*internal control over financial reporting was effective as of December 31, 2020*" ("Internal Controls Statement").

163.    The statements set forth in ¶¶159-162 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)    Defendant ADM's, Luciano's, and Young's representations that they had designed and implemented "effective" disclosure and internal controls and that ADM's disclosure controls and internal controls over financial reporting were "effective" were false and misleading because, as explained in further detail below (¶¶209-216), those controls were ineffective, and ADM suffered a material weakness in its internal controls during the Class Period because ADM lacked adequate controls around the measurement of intersegment sales between the Nutrition segment and the ASO and Carb Solutions segments.

(b)    Defendant ADM's, Luciano's, and Young's representations that ADM's internal controls were "designed to provide reasonable assurance regarding . . . the preparation of financial statements in accordance with [GAAP]" were false and misleading because, as explained in further detail below (¶¶209-216), ADM's internal controls were ineffective and the filings contained clear GAAP violations of not recording intercompany sales at market pricing as required by Company policy.

(c)    Defendant ADM's, Luciano's, and Young's assurances that the financial statements "fairly present[ed], in all material respects, the financial condition and results of operations of the Company" were false and misleading because, as explained in further detail below (¶¶199-240), the financial statements were materially misstated and overstated the Nutrition operating profit results.

164.    Defendants ADM, Luciano, and Young repeated the same *Disclosure Controls Statements* (¶159(a)) and *SOX Certifications* (¶159(b)) as in the 1Q20 10-Q, in each of the 1Q21 10-Q, the 2Q21 10-Q, the 3Q21 10-Q, and the 2021 10-K, and further repeated the same *Internal Controls Statement* (¶162) as in the 2020 10-K, in the 2021 10-K.

- 57 -

165. Defendants ADM, Luciano, and Luthar repeated the same ***Disclosure Controls Statements*** (¶159(a)) and ***SOX Certifications*** (¶159(b)) as in the 1Q20 10-Q, in each of the 1Q22 10-Q, the 2Q22 10-Q, the 3Q22 10-Q, and the 2022 10-K, and further repeated the same ***Internal Controls Statement*** (¶162) as in the 2020 10-K, in the 2022 10-K.

166. Defendants ADM, Luciano, and Luthar repeated the same ***Disclosure Controls Statements*** (¶159(a)) and ***SOX Certifications*** (¶159(b)) as in the 1Q20 10-Q, in each of the 1Q23 10-Q, the 2Q23 10-Q, and the 3Q23 10-Q.

167. The statements set forth in ¶¶164-166 above were false and misleading when made for the same reasons set forth in ¶163.

**Analyst Reaction to the False and Misleading Statements**

168. Analysts reacted positively to Defendants' false and misleading statements and analysts repeatedly highlighted the Nutrition segment's performance, operating profits and growth as positive factors supporting increasing stock price targets for the Company.

169. For example, Defendants reported several quarters of inflated results leading up to and within the Class Period. On October 19, 2020, analysts at J.P. Morgan upgraded their ADM stock rating, citing ADM's "resilient Nutrition OP [operating profit] growth" in 2020, which provided "greater confidence in the segment's growth trajectory for 2021+, resulting in less volatile group earnings and cash flows."

170. Similarly, on November 9, 2020, after ADM reported its 3Q20 results, analysts from Barclays raised their price target for ADM stock "on the continuous strength in ADM's Nutrition segment," heralding Nutrition as "the segment we are most excited about" and describing Defendants' strategy of "consistently grow[ing] this [Nutrition] business through acquisition and organically" as "the perfect combination to gain relevance while maintaining margin strength."

- 58 -

171.     In reiterating their positive outlook for ADM stock on January 26, 2021, analysts from BMO highlighted that ADM reported increased Nutrition profits in 2020, "reflecting strong performances . . . from ASIA and EMEAI regions" and "from plant proteins [and] probiotics/fibers." The analysts remarked that the "Nutrition segment continues to create a sustainably high organic growth, low volatility earnings stream for ADM," helping "offset weaker" results in the historical business segments.

172.     On May 3, 2021, analysts from Barclays stated they "were surprised by the recent strength" in the Nutrition operating profit reported by ADM and raised their ADM price target by 25% (to $75). The analysts explained that "[o]ne of the main reasons for our optimism is the potential we see for ADM to leverage its existing platform to grow its [Nutrition] business organically . . . [and] through potential bolt-on acquisitions."

173.     As ADM continued to post inflated Nutrition profits during the Class Period, analysts continued to focus on Nutrition as the most important segment to the Company's operating profits and stock price growth. For example, on July 15, 2021, a Seaport Research Partners analyst stated that "ADM's nutrition business should maintain strong 15%-plus earnings growth, which now comprises 17% of global operating profits and climbing." The Seaport Research Partners analyst added that "Nutrition earnings growth is visible, stable and sustainable." Similarly, analysts at Barclays on July 22, 2021 stated that ADM's "recent focus on Nutrition will be a key driver of shareholder return, in our view, given the segment's lower earnings volatility while at the same time offering higher absolute levels of profitability."

174.     As Defendants continued to attribute Nutrition's improved performance to misleading sources, analysts continued their bullish views on ADM. For example, on January 26, 2022, analysts from BMO highlighted that ADM's results "exceeded consensus" in part due to increased Nutrition profits reflecting "growth in the Human Nutrition business driven by flavors (specifically beverages)

and growth in bioactives and fermentation" as well as "growth in the Animal Nutrition business owing to strength in amino acids." The analysts noted that "[s]olid fundamentals, continued investment, and improved execution should power attractive growth in ADM's higher margin Nutrition business."

175. Later that year, on October 26, 2022, an analyst from Seaport Research Partners raised 2022 EPS estimates, highlighting that "ADM's strategy continues to emphasize organic growth" and "ADM's normalized earnings are still understated, particularly if Nutrition can generate approximately $1.25-$1.50B of operating profits over the next 3-4 years."

176. Analysts continued to highlight the reported performance of ADM's Nutrition segment well into 2023. For example, on April 13, 2023, analysts from BMO stated that "the Nutrition segment's five-year average operating margin of 9.2% has been the strongest within ADM's portfolio" and "well ahead of 5.4% consolidated operating margin over that timeframe." Reflecting the critical importance of Nutrition and the misleading impression created by Defendants' accounting fraud, the BMO analysts added that Nutrition is a "durable, higher margin growth platform[] that will mitigate against likely lower AS&O profits" and "an attractive long-term earnings power builder that contributes to ADM's portfolio evolution toward more sustainable growth and higher margins."

<b>THE TRUTH BEGINS TO EMERGE</b>

177. The truth about ADM's fraudulent scheme began to emerge on January 21, 2024, causing a momentous decline in ADM's stock price.

178. On Sunday evening, January 21, 2024, ADM published a press release disclosing that: (1) ADM was under investigation by the SEC related to ADM's accounting practices and procedures relating to the Nutrition reporting segment, including intersegment transactions; (2) the Company had initiated an internal investigation prompted by the SEC investigation; (3) ADM had

- 60 -

placed Defendant Luthar on administrative leave, effective immediately, pending the results of the investigation; (4) ADM was withdrawing its entire outlook for the Nutrition reporting segment; and (5) ADM expected to delay issuing its earnings results for fourth quarter 2023 and full year 2023 ("FY 2023"), and filing its report on Form 10-K for FY 2023.

179.     ADM's press release (a copy of which ADM also attached to a Form 8-K filed before trading hours on January 22, 2024) stated:

> [ADM] today announced the appointment of Ismael Roig as Interim Chief Financial Officer.  Mr. Roig is a skilled executive deeply familiar with ADM's business, having served in a variety of global operational and financial leadership roles since joining the Company in 2004.  The appointment follows the decision of the ADM Board of Directors to place Vikram Luthar, Chief Financial Officer and Senior Vice President, on administrative leave, effective immediately.
>
> Mr. Luthar's leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition reporting segment, including as related to certain intersegment transactions.  ADM's investigation was initiated in response to its receipt of a voluntary document request by the U.S. Securities and Exchange Commission (SEC).  ADM is cooperating with the SEC.
>
> "The Board takes these matters very seriously," said Terry Crews, Lead Director.  "Pending the outcome of the investigation, the Board determined that it was advisable to place Mr. Luthar on administrative leave.  The Board will continue to work in close coordination with ADM's advisors to identify the best path forward and ensure ADM's processes align with financial governance best practices."
>
> *     *     *
>
> **Fourth Quarter 2023 Conference Call Update**
>
> In connection with today's announcement, ADM expects to delay its earnings release and conference call relating to fourth quarter and full year 2023 financial results, as well as the filing of its Annual Report on Form 10-K for the year ended December 31, 2023, from its historical schedule.  ADM will provide an update on the timing of its earnings release and Form 10-K filing as soon as practicable.
>
> **Update on 2023 Outlook**
>
> ADM now expects to deliver above $6.90 in adjusted earnings per share for the fiscal year ended December 31, 2023, subject to completion of annual close processes and related internal controls.  The Company also expects to report fourth

quarter and full year 2023 operating profit for its AS&O and Carbohydrate Solutions reporting segments in line with previous indications provided on the October 24, 2023 third quarter 2023 earnings call. Due to the ongoing investigation, ADM withdraws all of its forward-looking outlook for the Nutrition reporting segment.

180.    On this news, ADM's stock price declined by $16.50 per share (approximately 24%), from $68.19 per share on Friday, January 19, 2024, to $51.69 per share on January 22, 2024, reportedly marking the stock's largest one-day percentage decline since 1929, and removing artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses. In comparison to ADM's historic decline on January 22 on heavy trading volume, the S&P 500 Index ("S&P 500") increased 0.22%, and the S&P Consumer Staples Index ("S&P Cons Staples") decreased 0.47%.[14]

181.    Analysts promptly slashed or withdrew their ADM price targets following ADM's shocking disclosures. For instance, on January 22, 2024, Jefferies analysts cut ADM's price target from $82 to $70, citing ADM's announcement of "an SEC investigation on accounting practices of the co.'s Nutrition segment and accordingly plac[ing] CFO Vikram Luther [sic] on leave," as well as the Company's unexpected "withdr[awal] [of] all future outlook on the Nutrition segment." On January 24, 2024, Stephens analysts withdrew ADM's price target altogether (previously set at $75), following news of the "accounting probe within the Nutrition segment" and ADM's withdrawal of its Nutrition outlook. On January 26, 2024, UBS analysts slashed ADM's price target by 51% (from $104 to $51), noting that Nutrition's "[a]ccounting issues" created an "overhang on the stock" and "confidence issues as the street will likely look at [ADM's] numbers with caution."

182.    Media also reported on the disclosures and resulting stock price decline. On January 22, 2024, the Wall Street Journal reported that "[s]hares of [ADM] tumbled after the agriculture company placed [CFO] Vikram Luthar on administrative leave while it investigates accounting

---

[14]    In its Reports on Form 10-K, ADM compared its common stock returns with the returns of the S&P 500 and the S&P Cons Staples.

practices at the company . . . focused on its nutrition business." The article noted that "ADM stock finished down 24%, marking its worst day ever" and that "[i]t was by far the worst performer in the S&P 500 on [January 22]," adding, "[s]everal Wall Street analysts cut their price targets on the stock" following the disclosures.

183. Bloomberg also reported that ADM stock "plunged 24%" after ADM suspended Defendant Luthar and disclosed the investigation into "what ADM described as 'intersegment transactions' involving its nutrition unit." Bloomberg stated that "[t]he investigation is likely to result in a lower margin for nutrition, at a time when investors are already concerned about the risk to earnings, Andrew Strelzik, an analyst at BMO Capital Markets, said in a note." The article added that "[a]nalysts at Robert W Baird & Co., Barclays Plc and Goldman Sachs Group Inc. were among those to cut their stock ratings on ADM after the disclosure of the probe."

## POST-CLASS PERIOD EVENTS

184. On February 5, 2024, Bloomberg reported that the DOJ had launched an investigation into ADM's accounting:

> The US Attorney's Office in Manhattan has launched an investigation into the accounting practices at Archer-Daniels-Midland Co., according to people with direct knowledge of the matter.

> The probe is focused on the company's nutrition business, said the people, who asked not to be named discussing confidential information.

> ADM shook the commodity world last month after it suspended Chief Financial Officer Vikram Luthar and cut its earnings outlook pending an inquiry into its accounting practices prompted by the US Securities and Exchange Commission.

185. Reuters reported on the DOJ investigation that same day, stating, "[t]he U.S. Justice Department is probing accounting practices at [ADM], according to two people with direct knowledge of the matter, ramping up pressure on the global commodities giant." According to Reuters, "[t]he sources each said a SDNY [Southern District of New York] prosecutor asked about

- 63 -

the company's pricing practices related to the sales of goods from ADM's commodities units to its Nutrition division."

186.    In early February 2024, as the DOJ was launching its investigation, Defendant Young abruptly surrendered his seats on the boards of directors of three publicly-traded companies (Hormel Foods Corporation ("Hormel"), Marsh & McLennan, and International Paper).  Defendant Young joined the Hormel board in 2023 and was paid more than $275,000 in total compensation.  He had been re-elected to the board on January 30, 2024.  In an SEC filing dated February 2, 2024, Hormel stated that "[o]n February 1, 2024, Raymond G. Young resigned from the Hormel Foods Corporation Board of Directors, effective immediately."  Thus, Defendant Young resigned from the Hormel board one day after he was elected, foregoing hundreds of thousands of dollars in compensation.

187.    In SEC filings dated February 9, 2024 and February 16, 2024, Marsh & McLennan and International Paper each reported that Defendant Young did not intend to stand for re-election to the boards of directors in May 2024.  Defendant Young had joined the Marsh & McLennan and International Paper boards of directors in March 2023 and September 2014, respectively.  Collectively, Defendant Young received more than $600,000 in total compensation in connection with his 2023 board service for those companies, which he was foregoing in 2024 by not standing for re-election.

188.    On March 12, 2024, ADM filed the 2023 10-K correcting errors in ADM's previously issued financial statements, restating historical financial results for the ASO, Carb Solutions, and Nutrition segments dating back to 2018 and admitting its previously-issued filings with the SEC were not prepared in accordance with GAAP.

189.    In the 2023 10-K, ADM admitted that Defendants ADM's, Luciano's, Young's, and Luthar's statements throughout the Class Period that, "intersegment sales have been recorded at

- 64 -

amounts approximating market" were false, and that sales between the Nutrition segment and the ASO and Carb Solutions segments were not accurately reported:

> The Company has historically disclosed in the footnotes to its financial statements that intersegment sales have been recorded at amounts approximating market. In connection with the Investigation, the Company identified certain intersegment sales that occurred between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments that were not recorded at amounts approximating market.

190.    According to ADM, the errors in the Company's previous filings "generally arise from the measurement of intersegment sales pricing or rebates relating to products sold to the Nutrition reporting segment by the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments."

191.    As a result of Defendants' fraudulent scheme, Defendants had inflated Nutrition's fiscal year operating profit by upwards of 10.2%, and quarterly operating profit by nearly 25%. *See* ¶223.

192.    Buried in the 2023 10-K, Defendants also revealed that the SEC "document request" first publicly disclosed on January 21, 2024 (*see* ¶¶178-179), was received on June 30, 2023 – almost seven months before Defendants announced the SEC investigation. That is, despite their knowledge of the SEC probe throughout the second half of 2023, Defendants continued to falsely claim during those six months that (*inter alia*) ADM recorded intersegment sales at market price. The 2023 10-K also divulged that ADM had received multiple "document requests" from the DOJ "focused primarily on the same subject matter" as the SEC investigation, and that the DOJ had issued grand jury subpoenas to current and former ADM employees.

193.    The 2023 10-K also stated:

As a result of the Investigation, the Company has become subject to a number of risks, including, but not limited to:

- the Company's Board of Directors and senior management have been required to devote significant time to the Investigation, the correction of certain segment-specific historical financial information and related matters, resulting in potential management distraction from the operation of the business;

- the price of the Company's common stock has declined significantly, has been subject to fluctuations and could continue to fluctuate upon further announcements or actions;

- the Company is facing securities litigation and could face additional litigation under federal and state securities laws or other claims arising from the Investigation, such litigation can be costly to defend, and if decided against the Company, such litigation could require the Company to pay substantial judgments or settlements;

- the Company could discover additional material or immaterial errors in its financial statements; and

- two of the Company's credit ratings have been placed "On Credit Watch" and "Ratings Under Review," and if the ratings are effectively downgraded, the Company's access to the credit markets and its ability to fund its working capital and capital expenditures may be affected.

194. The 2023 10-K added that "[e]ach of the risks described above [in ¶193] could have a material adverse effect on the Company's business, results of operations, financial condition and liquidity."

195. With respect to the SEC and DOJ government investigations, the 2023 10-K represented that: (i) "[e]xpenses incurred in connection with these investigations . . . could adversely affect the Company's liquidity position"; (ii) ADM "may be required to pay material fines, consent to injunctions on future conduct or be subject to other penalties, each of which could have a material adverse effect on its business, results of operations, financial condition and liquidity"; (iii) "[t]hese government investigations may adversely affect the Company's ability to obtain, and/or increase the cost of obtaining, directors' and officers' liability insurance and/or other types of insurance"; (iv) "the findings and outcomes of the [Company] Investigation as well as the government investigations could result in additional litigation or actions taken by third parties against the Company"; and (v)

"[t]he effects and results of such other litigation or actions may have a materially adverse effect on the Company's business, results of operations, financial condition and liquidity."

196.    To try to counteract negative investor and stock reaction from the admissions in the Restatement, the same morning it filed the 2023 10-K, ADM also disclosed its plans to repurchase "an additional $2 billion of the Company's shares" pursuant to its share repurchase program, including $1 billion in shares to be repurchased on an "accelerated" basis by no later than June 2024. The Company noted the total share repurchase could reach up to $2.3 billion in 2024. Analysts from Barclays observed on March 13, 2024 that this "significant increase in share buybacks" would "help support the stock's price." That same day, analysts from BMO similarly remarked that the announced "[s]hare repurchases alone add $0.30+ to EPS . . . and create near-term support for shares." Other analysts likewise perceived the $2 billion repurchase announcement as "positive," accretive to ADM's EPS, and a "tailwind" to ADM's stock.

197.    On April 22, 2024, ADM announced that it had reached an agreement to terminate Defendant Luthar's employment by "resignation," effective September 30, 2024.

### ADDITIONAL SUPPORT THAT THE FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED

198.    During the Class Period, ADM's financial statements were included in quarterly reports on Form 10-Q and annual reports on Form 10-K. *See, e.g.*, ¶¶85, 87, 89, 93, 96, 99, 101, 104, 108, 110, 112, 114, 117, 119, 121. Each of the Class Period financial statements were materially false and misleading.

**ADM's Restatement Is an Admission of Falsity**

199.    By restating its historical segment results, ADM has admitted the initially reported financial results and related disclosures in ¶¶84-121 were false and not prepared in accordance with GAAP. Under ASC Topic 250, *Accounting Changes and Error Corrections* ("ASC 250"), GAAP

provides that financial statements should only be corrected in limited circumstances, *i.e.*, there is a change in reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. Here, the Restatement corrected accounting errors because the initial reported results were in violation of GAAP.

200. More specifically, the Restatement admitted that "certain intersegment sales between the Nutrition reporting segment and the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments" were "reported at amounts that were not in accordance with [GAAP] ASC 606, *Revenue from Contracts with Customers.*" Contrary to Defendants' Class Period representations that "intersegment sales have been recorded at amounts approximating market," the Restatement admitted that, for six years, intersegment sales "were not recorded at amounts approximating market." Instead, intersegment sales were recorded at below market rates to increase Nutrition segment profits. To correct those errors and GAAP violations, the Restatement lowered the previously reported Nutrition operating profits for each year from 2018 through 2023. In doing so, ADM admitted that Nutrition operating profit had been falsely overstated in ADM's Class Period financial statements by tens of millions of dollars. Thus, the initially issued financial statements were admittedly false and misleading.

**Defendants Violated GAAP by Inflating Nutrition Segment Reported Results**

201. ADM's Class Period financial statements were not prepared in accordance with GAAP, and violated ASC 280 *Segment Reporting*, and ASC 606 *Revenue from Contracts with Customers*.

202. Segment reporting (ASC 280) is a critical element of financial reporting for public companies as it allows investors to understand a public entity's performance by segment rather than solely as a whole, assess each segment's prospects for future cash flows, and make informed

judgments about whether to invest.[15]   As part of segment reporting, companies must present financial information about its segments using the "management approach."[16]   International accounting firm Ernst & Young Global Limited ("EY") has published guidance on "Segment Reporting," which explains the management approach, stating:

> The objective of this [management] approach is to allow users to see the company's business through the eyes of management based upon the way management reviews performance and makes decisions.  The management approach requires segment information to be reported based on how management internally evaluates the operating performance of the company's business units or segments (*i.e.*, its management reporting structure).[17]

203.    Similar to the purpose of the Management's Discussion and Analysis (MD&A) section in public companies' quarterly and annual reports, segment reporting "enables investors to see the company through the eyes of management," and reporting accurate and complete financial information using the management approach for segment reporting is mandatory under GAAP.[18]  In addition to reporting the consolidated financial results for the entity as a whole, companies are required to disclose their basis of accounting for their intersegment transactions when reporting on each segment's results.[19]

204.    As discussed in ¶49, intersegment (or intercompany) accounting is an area that accounting firms have identified as ripe for accounting manipulations and fraud because the

---

[15]    ASC 280-10-10-1.

[16]    ASC 280-10-05-3.

[17]    *Financial reporting developments, A comprehensive guide, Segment reporting, Accounting Standards Codification 280*, EY (Apr. 2023) ("EY Segment Reporting Guidance"), *available at* https://www.ey.com/en_us/technical/accountinglink/financial-reporting-developments-segment-reporting-. EY is one of the four largest accounting firms in the world.  It publishes "comprehensive guide[s]" on various GAAP provisions, including the above-cited EY Segment Reporting Guidance.

[18]    SEC Release No. 33-8350, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* (December 29, 2003).  *See also generally* ASC 280-10.

[19]    ASC 280-10-50-29.

company is both the buyer and seller and can manipulate the transactions. Further, for global, multinational companies like ADM where intercompany transactions can total in the billions of dollars, and individual segment performance is of particular interest to analysts and investors, the risk of fraudulent financial reporting from intersegment transactions is drastically higher. For example, a Deloitte publication titled "Cleaning up the mess under the bed" highlights an unsettling trend of companies using intercompany accounting practices to manipulate financial results.[20] Not surprisingly, improper intersegment accounting has led to material financial misstatements, material weakness in internal controls, restatements, and SEC and DOJ investigations.[21]

205. In order to provide transparency, GAAP, and specifically ASC 280, required ADM to disclose to investors "the basis of accounting for any transactions between reportable segments," including concerning its intersegment sales pricing.[22] In addition, in order for ADM to recognize any sales as revenue, ASC 606 required ADM to "[d]etermine the transaction price" for sales at "an amount that reflects the consideration to which the entity expects to be entitled to in exchange for th[e] goods [sold]." Here, ADM would expect to be entitled to market rates for sales of raw materials by the ASO and Carb Solutions segments.

206. As a result, ADM disclosed to investors in its Form 10-Qs and 10-Ks that it was recording intersegment sales, such as sales from ASO and Carb Solutions to Nutrition, "at amounts approximating market." This gave investors a false assurance that Defendants were not manipulating their internal pricing through discounts or non-arm's length transactions when ADM's segments sold to one another. In reality, ADM engaged in a six-year accounting scheme through

---

[20]  *Cleaning up the mess under the bed: Why intercompany accounting is increasing corporate risk*, Deloitte, https://www2.deloitte.com/content/dam/Deloitte/us/Documents/risk/us-risk-intercompany-accounting-survey.pdf.

[21]  *See, e.g.*, *id.*

[22]  ASC 280-10-50-29.

which it manipulated the Company's intersegment pricing, in violation of GAAP, in order to artificially inflate Nutrition's financial performance.

207.    As discussed (¶¶53, 188-191, 199-200), ADM has admitted that sales from ASO and Carb Solutions to Nutrition were recorded at below market rates, in violation of GAAP and ADM's publicly stated accounting policy.  ADM's Restatement explained that the sales were below market because of incorrect "measurement of intersegment sales pricing or rebates relating to products sold to the Nutrition reporting segment by the AG services and Oilseeds and Carbohydrate Solutions reporting segments."

208.    Simply put, Defendants were able to increase Nutrition's reported operating profits by having ADM's two other reporting segments sell materials to Nutrition at discounted pricing or with rebates.  This violated GAAP because it violated ADM's publicly stated accounting policy that required those sales to be recorded at market rate to approximate "arm's length" transactions.[23] Defendants cooked the books by overstating Nutrition's operating profit each and every year for six straight years.

**ADM Had Ineffective Internal Controls**

209.    Throughout the Class Period, Defendants represented that they had evaluated ADM's internal control over financial reporting ("ICFR"), and ADM's ICFR were effective and designed to provide reasonable assurance that the financial statements were prepared in accordance with GAAP. *See* ¶¶159-166.  In essence, this was an assurance that the Company developed and implemented checks and balances to prevent material misstatements in its reported results.  But this was not true.

210.    During the Class Period, ADM suffered from a material weakness in internal controls. Consequently, management's disclosures that it had assessed ICFR as effective were materially false

---

[23]    ASC 606-10-32-2; ASC 280-10-50-29.

and misleading.[24]  A material weakness, as defined in Public Company Accounting Oversight Board

("PCAOB") Auditing Standard No. 5 ("AS 5") is a:

> [D]eficiency, or a combination of deficiencies, in internal control over financial
> reporting, such that there is a reasonable possibility that a material misstatement of
> the company's annual or interim financial statements will not be prevented or
> detected on a timely basis.

211.    AS 5 also provides that indicators of material weaknesses in ICFR include "fraud,

whether or not material, on the part of senior management," the "[r]estatement of previously issued

financial statements to reflect the correction of a material misstatement," and "[i]neffective oversight

of the company's external financial reporting . . . by the company's audit committee."  Here, each of

those indicators was present throughout the Class Period, as Defendants were engaged in accounting

fraud, ADM has restated its prior financial statements to correct material misstatements, and ADM

lacked oversight to prevent management from engaging in a six-year fraud.

212.    Indeed, the Restatement disclosed that ADM had a material weakness in its ICFR.

ADM stated:

> Under the supervision and with the participation of management, including
> the Company's Chief Executive Officer and interim Chief Financial Officer, the
> Company's management assessed the design and operating effectiveness of the
> Company's internal control over financial reporting as of December 31, 2023, based
> on the framework set forth in Internal Control-Integrated Framework issued by the
> Committee of Sponsoring Organizations of the Treadway Commission (2013
> Framework).  Based on this assessment, management concluded that the Company's
> internal control over financial reporting *was not effective as of December 31, 2023
> and 2022, due to the material weakness described below*.

213.    Relatedly, disclosure controls are designed to ensure that financial statements are free

of false and misleading or omitted disclosures.[25]  ADM made a virtually identical admission that its

disclosure controls also suffered from a material weakness:

---

[24]    Management's Report on Internal Control Over Financial Reporting, Exchange Act Release No. 34-54976 at 41 (Dec. 20, 2006).

[25]    17 CFR §240.15d-15 (e) of the Exchange Act.

An evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer and interim Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), as of December 31, 2023. Based on that evaluation, the Company's Chief Executive Officer and interim Chief Financial Officer concluded that the Company's disclosure controls and procedures *were not effective as of December 31, 2023 and 2022, due to the material weakness described below*.

214.    ADM described the Company's material weakness due to its improper accounting for its intersegment sales:

> The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amounts that were not in accordance with ASC 606, *Revenue from Contracts with Customers*. Specifically, the Company did not have adequate controls in place around measurement of certain intersegment sales between the Nutrition reporting segment and the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments. The absence of adequate controls with respect to the reporting of intersegment sales impacted the accuracy of the Company's segment disclosures and review controls over projected financial information utilized in goodwill and other long-lived asset impairment tests.

215.    In simple terms, ADM assured investors that it had designed effective controls and the controls were operating to ensure that ADM was recording intersegment sales at market price. But as it belatedly admitted, it did not.

216.    The presence of a material weakness in internal controls (*i.e.*, the absence of adequate controls over segment reporting) existed the entire six-year period despite those management representations. This is clear because ADM issued false (overstated) operating profits for the Nutrition segment over a six-year period starting in 2018. Moreover, in each Form 10-Q filed during the Class Period, Defendants stated there had been "no change in the Company's internal controls over financial reporting," confirming that at no point during the six years did they implement adequate controls over segment reporting. Like restating the numbers, these belated disclosures that the Company suffered from a material weakness in internal and disclosure controls were admissions that Defendants' Class Period statements to the contrary were false and misleading.

- 73 -

**Defendants' Restated Results and Ineffective Controls Were Material to Investors**

217.    Defendants' false and misleading Class Period statements and omissions regarding ADM's accounting, financial results, and ICFR were material under GAAP and to investors.  In August of 1999, the SEC staff issued Staff Accounting Bulletin No. 99 ("SAB 99"), now codified at ASC 250-10-S99.  SAB 99 sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

218.    SAB 99 recognizes that the concept of materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws." Materiality is assessed both from a quantitative and qualitative perspective.  SAB 99 stresses that "there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material . . . ." And, the FASB "has long emphasized that materiality cannot be reduced to a numerical formula." Here, the financial results Defendants initially reported were materially misstated from both a quantitative and qualitative perspective, both individually and – most importantly – from an overall assessment, as SAB 99 requires.

219.    As an initial matter, GAAP recognizes the possibility of insignificant errors in financial statements and only requires that material errors be corrected and restated.  For example, GAAP expressly notes, "[t]he provisions of the Codification need not be applied to immaterial items."[26]  Thus, by publicly correcting ADM's reported Nutrition operating profit and internal

---

[26]   ASC 105-10-05-6.

controls for 2018 through 2023, ADM has conceded that the overstatements and ineffective controls were material and required correction.

220.    Indeed, ADM was not required to disclose immaterial control deficiencies, nor would ADM's ICFR be rendered ineffective by immaterial control deficiencies. Instead, companies are required to disclose *material* weaknesses in internal controls, which render ICFR ineffective.[27]  A control deficiency rises to the level of material weakness if there "is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[28]  Here, ADM admitted that it suffered a *material* weakness in its internal controls and that its ICFR were not effective, and that the material weakness led to the misstatement of historical Nutrition operating profits. ADM has therefore conceded that the ineffectiveness of its internal controls were material, which failed to prevent the "material misstatement of the company's annual or interim financial statements."[29]

221.    ADM's stock price reaction confirms the misstatements of ADM's financial results and internal controls were material. For example, SAB 99 states: "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." As discussed in ¶¶180-183, when investors began to learn of Defendants' improper accounting tactics, ineffective internal controls, and misstated Nutrition operating profits, the market's negative reaction supports qualitative materiality.

---

[27]    Management's Report on Internal Control Over Financial Reporting, Exchange Act Release No. 34-54976 at 14 (Dec. 20, 2006).

[28]    ASC 5.A7.

[29]    *Id*.

*The Restated Results Were Quantitatively Material*

222.    Defendants' GAAP violations and accounting fraud significantly overstated the Nutrition segment's historical financial performance, with the corrections reaching as high as 10.2% for overall annual Nutrition results and 25% for overall quarterly Nutrition results.  ADM, for six straight years, overstated the profits of its Nutrition segment to the detriment of its other two segments.

223.    As further illustrated in the chart below, ADM's Restatement resulted in repeated and material overstatements to Nutrition's operating profit, and almost always above the 5% quantitative threshold referenced in SAB 99.  Nutrition's operating profits for FY 2021, FY 2022, 4Q22, and FY 2023 were overstated by 9.3%, 10.2%, 24.8%, and 7.3%, respectively.[30]

| Nutrition Segment Operating Profit Misstatements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $ (in millions) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | 4Q22 | 1Q23 | FY 2023 |
| Nutrition Operating Profit – Reported | $339 | $418 | $574 | $691 | $736 | $131 | $145 | $458 |
| Nutrition Operating Profit – Restated | $312 | $391 | $558 | $632 | $668 | $105 | $138 | $427 |
| % Overstated | 8.7% | 6.9% | 2.9% | 9.3% | 10.2% | 24.8% | 5.1% | 7.3% |

224.    Within the Nutrition segment, the Company also historically highlighted operating profits from the "Animal Nutrition" sub-segment on a quarterly basis.  As part of the Restatement, downward corrections to the Nutrition sub-segment reached as high as 660% for Animal Nutrition results, with FY 2021, FY 2022, 4Q22, and the first nine months of 2023 operating profits overstated

---

[30]    ADM has reported restatement adjustments for Nutrition operating profits for the years 2018 through 2023.  ADM has also reported restatement adjustments for 4Q22 and 1Q23, but no other quarters.

- 76 -

by 37.5%, 53.2%, 94.4%, and 660%, respectively.  In short, the misstated financial results were quantitatively material.

*The Restated Results Were Qualitatively Material*

225.    Nutrition's reported results were also materially misstated, including the 2.9% overstatement in FY 2020, based on qualitative considerations.

226.    First, the overstated Nutrition profits were qualitatively material because they were intentionally misstated to manage earnings.  According to SAB 99, evidence of materiality "may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."  Similarly, management's willingness to manipulate a company's financial results is always going to be important to investors.[31]

227.    Here, Defendants orchestrated an intentional accounting fraud for six years where they stole profits every year from ADM's two more established – but less important – segments in order to fraudulently inflate the profits of the higher-valued Nutrition segment.  Accounting literature and SAB 99 reflect an understanding that some complex accounting issues are incapable of precise measurement and rely on accounting estimates, or even predictions of future events, such as estimating a reserve or contingent liability.  But here, Defendants repeatedly said they were recording sales at market prices, which are determinable based on historical data and sales to third parties.  Yet, Defendants violated that straightforward policy and were selling internally to Nutrition at lower prices to falsely inflate Nutrition operating profit by more than $220 million over six years.

---

[31]    *See, e.g.*, SAB 99 ("It is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even [quantitatively] immaterial ones – as part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings.").

- 77 -

This type of accounting error is not the result of a mistaken estimate or one requiring accounting judgment or subjectivity, but rather resulted from simply violating the stated policy for six years. Notably, ADM identified no errors or material weaknesses in its accounting and reporting of sales to external customers – that is, customers outside of ADM's corporate structure – or for intersegment sales between Carb Solutions and ASO. The fact that the violations occurred only in sales to Nutrition and only in one direction (to always increase the operating profit of Nutrition) shows that the accounting fraud was intentional and not merely accidental.

228.    Second, the misstated financial results were qualitatively material because of the importance of the Nutrition segment to ADM. As explained in SAB 99:

> The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information – as with materiality generally – situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.

229.    Here, the Nutrition segment was not even a small segment, as it was one of just three reported segments, representing up to 17% of the Company's annual reported operating profit during the Class Period.

230.    Throughout the Class Period, Defendants described Nutrition as the future of ADM and ADM's "fastest growing segment" and highlighted the importance of the Nutrition segment's "predictable, robust earnings" that were "less subjected to market factors" and "volatility" than ADM's other segments. ¶¶56, 58, 64-67, 130(a), 141(d), 263, 270. The Nutrition segment was so

- 78 -

important to the Company that it changed its executive compensation policy in 2020 to "emphasize [ADM's] focus on the Nutrition segment," replacing an overall Company compensation metric with a new compensation metric tied specifically to Nutrition operating profit. ¶¶59, 281-292.

231.    As to ADM's future, the Nutrition segment was repeatedly "represented by management to be important to the future profitability of the entity." On October 30, 2020, Defendant Macciocchi claimed that the Nutrition segment operated in industries with more than $400 billion in global market size, and that "based on the portfolio, footprint, capabilities and talent [ADM has] built, no other company is positioned to meet these needs and lead in these industries like ADM." He added that ADM had "invested just over $6 billion" to build the Nutrition business, which had successfully increased "revenue by $3 billion" and operating profits "by more $300 million" in six years. Macciocchi emphasized to investors that "our eye is to the future" and "we expect to continue to lead the industry outpacing the market and operating profit growth, and we remain confident in reaching $1 billion in [operating profit] in the medium-term future."

232.    On July 27, 2021, Defendant Luciano offered growth projections for the next five years for ADM's three reporting segments, and Nutrition was singled out as the one segment with "strong growth":

> [W]hen I look at the 3 businesses and we move them forward through the 5 years, we see Ag Services and Oilseeds growth moderately, but it grows. We see Carb Solutions being flat to slightly declining in our forecasting. And then we see a strong growth in Nutrition.

233.    Five months later, during ADM's "Global Investor Day," ADM management provided projections that solidified Nutrition as the backbone of ADM's future. The President of ASO stated that the ASO segment faced "negative" market forces and projected the segment to grow from $2.5 billion in operating profit to a range of $2.7 billion to $3.1 billion in 2025. The President of Carb Solutions likewise said "we expect some headwinds" and projected the segment to grow

from a range of $700 to $900 million in operating profit to a range of $800 million to $1.1 billion in 2025. And Defendant Macciocchi projected Nutrition operating profit to grow from $700 million in operating profit to a range of "$1.25 billion to $1.5 billion by 2025." Thus, ADM management projected total ADM operating profit growth of between $750 million and $1.7 billion by 2025, with the Nutrition segment alone accounting for $550 million to $800 million of that growth. Stated differently, ADM management represented that Nutrition would be the most important segment to ADM's future profitability, as it would make up approximately 50% to 70% of the Company's profit growth over the next four years, which would be multiples higher than the contributions of either of the ASO and Carb Solutions segments.

234. Given the Nutrition segment's significant size and Defendants' statements regarding its critical importance, financial analysts that followed ADM likewise saw Nutrition as the most important segment to ADM's stock price valuation and almost twice as important as the other two segments. For example, analysts from J.P. Morgan explained in October 2020 that their ADM stock price target was based on applying a multiplier of 24X to Nutrition earnings, versus just a 13X multiplier to the earnings for the ASO and Carb Solutions segments.[32] Accordingly, although Nutrition comprised 22% of the analysts' projected FY 2022 ADM operating profit, the segment accounted for 34% of the analysts' stock price target. Similarly, analysts from Barclays stated on December 21, 2020: "A relatively higher share of its nutrition business should give ADM several benefits: 1) higher consolidated profitability, 2) less earnings volatility, and 3) stable cash flows, which ultimately should drive higher valuation multiples in the future."

235. Further confirming the outsized importance of the Nutrition segment to investors, even though ADM advised the market on January 21, 2024, that the two other segments – ASO and

---

[32] Similarly, an April 2022 report from J.P. Morgan valued Nutrition at 17X compared to 9.5X for ASO and 7.5X for Carb Solutions segments.

Carb Solutions – were not implicated in the accounting issues and were expected to report results "in line" with ADM's prior guidance, analysts reacted negatively. *See* ¶¶179-183. For example, analysts from Jefferies slashed their price target even though, "[p]er discussion with IR [ADM's investor relations], given transfer pricing is at issue, we expect any restatements to be a headwind for Nutrition segment and tailwind for AS&O." Analysts at UBS slashed ADM's price target by more than half, and analysts from Stephens withdrew their price target altogether.

236. After ADM issued the Restatement, analysts from Barclays immediately noted that the "significant" write-down of Nutrition profits had a substantial impact on ADM's business and valuation, stating:

> While the overall shift in profitability is small, given the large existing segment profits for ASO and Carb Solutions, the significant reduction in Nutrition [profits] nonetheless remains a concern. The segment was positioned as a growth catalyst, providing the company with stable profitability unaffected by volatile commodity prices. As such, a step back in profitability limits near-term growth and the segment's long term viability as a continued driver.

237. As discussed (¶¶222-224), the restated Nutrition profits, eliminating more than $220 million in total profits, had a substantial impact on the critical Nutrition segment, confirming they were qualitatively material.

238. Third, the misstated results were qualitatively material because they masked negative trends in Nutrition. SAB 99 states that "whether the misstatement masks a change in earnings or other trends" could render even a quantitatively small misstatement of a financial statement item qualitatively material. Here, the originally reported operating profit results for Animal Nutrition showed the sub-segment growing operating profit 10.4%, from $154 million in FY 2021 to $170 million in FY 2022. However, after the accounting fraud was revealed, the restated and true numbers showed Animal Nutrition operating profits declined from $112 million in FY 2021 down to $111 million in FY 2022. Consequently, in the MD&A section of ADM's 2023 10-K, Defendants

- 81 -

were forced to change their disclosure that FY 2022 Animal Nutrition profit was not "higher" but rather only "comparable" to FY 2021. This manipulation of results allowed ADM to mask a negative trend to report robust growth, which is a factor that rendered it qualitatively material.

239. Fourth, and relatedly, SAB 99 notes "whether the misstatement changes a loss into income or vice versa" can be a qualitative materiality factor. Here, ADM reported operating profit for Animal Nutrition for the nine months ended September 30, 2023 of $28 million. However, the Restatement revealed the true operating profit for Animal Nutrition had been overstated by $33 million, flipping the reported $28 million of profits into an actual ($5 million) *loss* for the 9 months ended September 30, 2023.

240. Finally, looking at Defendants' admissions, the stock price reaction, and all of the other quantitative and qualitative factors together from the perspective of a reasonable investor, as required by SAB 99, makes clear that the initially reported financial results were materially misstated.

*ADM's Issuance of "Revisions" Instead of a "Big R" Restatement Does Not Render the Restatement Immaterial*

241. As discussed in ¶219, GAAP only needs to be applied to items that are material.[33] Consequently, ADM's decision to restate its historical segment results from 2018 to 2023 demonstrates that the accounting errors were material and could not be corrected or left uncorrected in the current period financial statements.

242. However, here, ADM framed its Restatement of prior financial results as a "correction" of accounting errors and disclosure of "revised" prior financial results, claiming that the adjustments were "not material to the Company's consolidated financial statements taken as a whole for any period." By doing so, ADM has attempted to minimize the significance of the Restatement

---

[33] ASC 105-10-05-06.

by appearing to issue what has become known as a "little r" restatement, rather than a traditional "Big R" restatement.

243.    During a March 9, 2022 speech titled *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*,[34] SEC Chief Accountant Paul Munter ("Munter") addressed this concept of a "little r" restatement versus a "Big R" restatement, explaining:

> When an error is determined to be material to previously-issued financial statements, the error must be corrected by restating the prior-period financial statements.  This type of restatement is sometimes referred to colloquially as a reissuance restatement or a "Big R" restatement.

> If the error is not material to previously-issued financial statements, but either correcting the error or leaving the error uncorrected would be material to the current period financial statements, a registrant must still correct the error, but is not precluded from doing so in the current period comparative financial statements by restating the prior period information and disclosing the error.  This type of restatement is sometimes referred to colloquially as a revision restatement or a "little r" restatement.

244.    In other words, by calling it a "correction," and undoubtedly aware of the impact calling it a "restatement" would have on pending investigations and lawsuits, ADM is suggesting that the restated numbers were material to its current period financial results but not necessarily to all of its previously reported results.  But ADM's subjective characterization is not dispositive under the accounting rules or in the legal sense of materiality to investors.  While ADM (for self-serving reasons) has claimed none of this was important to investors, that is clearly refuted by the SAB 99 materiality factors discussed herein and investor reaction as reflected in the massive stock price decline following news that began to reveal the accounting fraud.

245.    Moreover, regardless of the label chosen by the company, Mr. Munter emphasized that both "Big R" and "little r" corrections "constitute restatements to correct errors in previously-

---

[34]    Paul Munter, *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*, SEC (Mar. 9, 2022), https://www.sec.gov/news/statement/munter-statement-assessing-materiality-030922.  On January 11, 2023, Munter was named the SEC's Chief Accountant, prior to which he served as the Acting Chief Accountant of the SEC since January 2021.

issued financial statements as those terms are defined in U.S. GAAP. In either case, such errors should be transparently disclosed to investors." Likewise, ASC 250-10-20 defines a restatement as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements," regardless of the mechanism for doing so.[35]

246. That the reporting entity has the ability to select a label in the first instance reduces the significance of the distinction, and the credibility of entities doing so has been criticized. For example, as stated by an accounting lecturer at the University of Miami following ADM's disclosures, whether ADM issued a "little r" or "Big R" restatement is a matter of "technical semantics" and the issues are significant "'even if they didn't make the disclosure that they had a Big R restatement.'"[36]

247. As further example, in his March 9, 2022 speech, Mr. Munter noted that companies were increasingly attempting to downplay accounting errors through "little r" restatements, stating "that while the total number of restatements by registrants declined each year from 2013 to 2020, 'little r' restatements as a percentage of total restatements rose to nearly 76% in 2020, up from approximately 35% in 2005." Given this massive shift to calling everything a "little r" restatement or "revisions," Mr. Munter added that "we have observed that some materiality analyses appear to be biased toward supporting an outcome that an error is not material to previously-issued financial statements, resulting in 'little r' revision restatements." Mr. Munter noted that management's fear of compensation loss and liability makes the selection of a label biased, stating:

---

[35] For the 2023 10-K, ADM checked a box on page 2 that stated, "indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements."

[36] Nicola M. White, *Bigger Problems for ADM Lurk Within Small Accounting Error Fix*, Bloomberg (Mar. 13, 2024), https://news.bloombergtax.com/financial-accounting/bigger-problems-for-adm-lurk-within-small-accounting-error-fix.

An objective analysis should put aside any potential bias of the registrant, auditor, or audit committee that would be inconsistent with the perspective of a reasonable investor. For example, a restatement of previously-issued financial statements may result in the clawback of executive compensation, reputational harm, a decrease in the registrant's share price, increased scrutiny by investors or regulators, litigation, or other impacts. An assessment where a registrant's, auditor's, or audit committee's biases based on such impacts influenced a determination that an error is not material to previously-issued financial statements so as to avoid a Big R restatement would not be objective and would be inconsistent with the concept of materiality.

248. Here, the accounting fraud was material regardless of the label or description chosen by ADM. First, as the accounting fraud was revealed, the stock price declined dramatically, which shows it was material to investors. Second, investor, regulator, and the Company's reaction confirms the Restatement was material. Not only was this lawsuit filed on behalf of investors, but the SEC and DOJ have opened investigations (with the DOJ issuing grand jury subpoenas to current and former ADM employees), and the Company has taken action against several individuals. Defendant Luthar was placed on administrative leave and eventually forced out, Defendant Macciocchi suddenly purported to "retire," the previously-departed Defendant Young has abruptly left three public company board positions through which he would have received more than $850,000 in annual compensation, and the Company has conducted an internal investigation. Consequently, ADM management and directors had every incentive to downplay the significance of the accounting fraud and misstatements given the potential for further corporate and personal liability. As noted by *Bloomberg* following the restatement, the benefit of ADM issuing a "so-called Little R revision" is that it results in a more "quiet correction that doesn't require the fanfare of releasing a special 8-K announcing a restatement or re-issuing old financial reports." Yet despite those attempts, massive investigations have continued because the fraud is so clearly material.

249. Third, ADM's claim that the restated Nutrition profits were "not material to the Company's consolidated financial statements taken as a whole for any period" is precisely the type

- 85 -

of bias-driven argument that the SEC has rejected as justification for avoiding "Big R" restatements. As Mr. Munter explained on March 9, 2022, companies have argued that certain elements of financial statements prepared in accordance with GAAP "do not provide useful information to investors" and that "specific line items" are "irrelevant to investors' current investment decisions." But those arguments are unpersuasive "because such views could be used to justify a position that many errors in previously-issued financial statements could never be material regardless of their quantitative significance or other qualitative factors."

250.    In fact, ADM failed to even address the qualitative factors that rendered the errors material under SAB 99 when it issued the Restatement.  By only disclosing in the 2023 10-K that the errors were "not material to the Company's consolidated financial statements taken as a whole for any period," ADM has admitted it only evaluated the errors from a quantitative, consolidated basis and did not consider what a reasonable investor would consider important or the quantitative and qualitative material impact the Restatement had on the Nutrition segment.  ADM's statement makes clear it did not even attempt to consider qualitative materiality, which is as important to the analysis as quantitative materiality.

251.    Moreover, ADM's statement is meaningless in the context of this particular accounting fraud because, by definition, intersegment sales have no impact on the "consolidated financial statements" because the revenue and profits from the sales are eliminated in the consolidation process.[37]  Thus, by this measure, no matter how large an intercompany fraud, under ADM's assessment, it could never impact – and therefore never be material to – the Company's consolidated financial statements, regardless of any qualitative assessment.  Such a self-serving conclusion is contrary to SAB 99 and SEC guidance, and contrary to Defendants' Class Period

---

[37]    ASC 810-10-45-1.

actions in repeatedly discussing and reporting on the individual performance of the Nutrition segment.

252. Fourth, applying the objective analysis from the perspective of the reasonable investor, as GAAP requires, ADM's accounting violations and overstatements of Nutrition profits were material. In his *Assessing Materiality* speech, Mr. Munter made clear SAB 99's requirements that materiality must be assessed from the perspective of a reasonable investor holds equally true to assessing whether to issue a "little r" or "Big R" restatement:

> Central to the process a registrant must follow when an error is identified in its historical financial statements is determining whether the error is material to those historical financial statements. The Supreme Court has held that a fact is material if there is: "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

253. As explained in applying SAB 99 above (¶¶217-240), the GAAP violations and overstatements of Nutrition profits were, from an objective standpoint, quantitatively and qualitatively material in light of: (i) the significant impact the overstatements had on Nutrition operating profit; (ii) the intentional fraud carried out through blatant violations of simplistic, straight-forward accounting rules; (iii) the importance of the Nutrition segment to the Company's financial statements, stock price, and future profitability; (iv) the fact that the fraudulent profits masked negative trends and reversed losses into profits within the Nutrition segment; and (v) the stock price volatility following disclosure of the intersegment accounting issues. ADM's attempts to downplay the significance of the GAAP violations and overstatements are not justified and are contrary to the applicable accounting standards.

254. Finally, the issuance of even a "little r" restatement would concede that "leaving the error uncorrected would be material to the current period financial statements."[38] The current period

---

[38] Munter speech; *see also* ASC 250-10-20 ("Restatement" definition).

financial statements for the Restatement were 2023, which cover false and misleading statements during the Class Period. *See, e.g.*, ¶¶116-121. And, Defendants cannot escape the fact that the errors were as material in prior periods as they were for 2023. For example, Defendants overstated Nutrition's operating profit in the first three quarters of 2023 by roughly 7%, and overstated Nutrition's operating profit by roughly 9% and 10% in 2021 and 2022. Nutrition's operating profits also made up a larger portion of the Company's overall reported profits in 2021 and 2022, than they did in 2023. Thus, there would be no basis to claim that the GAAP violations and overstatements to Nutrition's operating profit were material to 2023, but not to the prior Class Period financial statements.

## ADDITIONAL SCIENTER ALLEGATIONS

### The Individual Defendants Controlled the Company's Messaging to the Investing Public

255. Through Defendant Luciano's role as CEO, President, and Chairman of ADM, Defendant Luthar's role as CFO, Defendant Young's role as CFO, and Defendant Macciocchi's role as Senior Vice President, President of Nutrition, and CSMO, the Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to ADM during the Class Period. Luciano, Luthar, and Young signed ADM's annual reports filed with the SEC. *See* ¶¶93, 104, 114. Luciano, Luthar, and Young signed or certified ADM's quarterly reports filed with the SEC. *See* ¶¶85, 87, 89, 96, 99, 101, 108, 110, 112, 117, 119, 121. And, Luciano, Luthar, Young, and Macciocchi attended conference calls and spoke on behalf of the Company during the Class Period. *See* ¶¶90, 92, 97, 103, 124, 128-130, 132, 137, 139, 141, 146, 149.

256. Further, the Individual Defendants participated in the drafting, preparation and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity

- 88 -

to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

257. During their time as directors and/or senior executive officers of ADM, the Individual Defendants were privy to confidential and proprietary information concerning ADM's Nutrition segment and intersegment sales. Each of them also: (i) had access to, *inter alia*, internal corporate documents, and conversations with corporate officers and employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

258. By executing SOX Certifications (¶¶159(b), 160-162, 164-166), Defendants Luciano, Young, and Luthar undertook the affirmative obligation to ensure the Company's disclosures to the market were true and to obtain the requisite knowledge of material information, like the existence of accounting fraud and violations of stated corporate policies and the performance of the Nutrition segment, including its operating profits. In fact, through signing the SOX Certifications, Defendants Luciano, Young, and Luthar certified that they had designed "disclosure controls and procedures . . . to ensure that material information relating to the registrant . . . is made known to us by others . . . particularly during the period in which [each] report [was] being prepared."

**ADM and the Individual Defendants Closely Monitored Nutrition Operating Profits, Which Were Critical to ADM**

259. In their roles as CEO (Luciano), CFO (Young and Luthar), and CSMO and President of Nutrition (Macciocchi), the Individual Defendants were required to not only keep themselves

- 89 -

informed of the Company's day-to-day business and operations, but to keep ADM's non-management directors apprised of the state of the Company's business, finances, and trends. For example, ADM's 2022 Proxy Statement stated that Luciano, as CEO and Chairman, "is responsible for the day-to-day management of our company and the development and implementation of our company's strategy, and has access to the people, information, and resources necessary to facilitate board function."

260.    As the senior executives of ADM, the Individual Defendants were involved in the decision to enter and invest in the Nutrition business. Defendant Luciano created a Capital Committee, consisting of himself, Defendant Luthar, and Senior Vice President of Strategy and Innovation Ian Pinner, that was responsible for all capital allocation decisions. After executing the two largest acquisitions in ADM's history and additional investments to establish a Nutrition business, Defendants knew that Nutrition represented a massive, $6 billion, bet to transform ADM into a high-margin, high-growth nutrition company. *See* ¶¶40-41, 56, 231. As stated by Defendant Young during an Agricultural Symposium in 2019, "over the last five years, ADM has been going through a significant transformation of the company. We're actually becoming a global nutrition company for humans and animals."[39]

261.    ADM's long-suffering stock price and historical dependence on volatile commodities markets for its ASO and Carb Solutions segments (¶¶32-38) made growing the Nutrition business critical to ADM's ability to attract investors because the Nutrition segment could purportedly produce more stable and increased profitability. The HBS Case Study quoted Defendant Luthar describing how the Company prioritized the Nutrition business when allocating capital and resources internally, stating:

---

[39]    In August 2018, Defendant Macciocchi likewise stated that ADM's "'goal is to be the world's leading nutrition company, and we're taking aggressive action to get there.'"

"There was a deliberate emphasis on capital and resource allocation to the business. That was not popular. You can think about, initially, other businesses feeling like, 'Hey, we used to get the most capital. Now, why is this business that's much smaller than us getting the biggest chunk of the growth capital?' That was important to drive capabilities and drive what was needed for that growth. That was intentional."

262.    As of early 2020, Defendants' stated "objective" was to "get Nutrition to be about 25%" of ADM's total operating profit. Illustrating the central importance of the Nutrition business, after the Company had reported $3 billion in total operating profit and $418 million in Nutrition operating profit in 2019, Defendant Luciano set a goal for Nutrition to bring in $1 billion in profits for 2020 (more than double the prior year). Luciano even had "'$1B X 2020'" printed on foam stress balls to give out to Company staff.

263.    As discussed above, ¶¶40, 58, 64-67, ADM and the Individual Defendants also publicly acknowledged that growing the operating profits of the Nutrition segment was critical to increasing ADM's stock price, to executing Defendants' strategic decision to shift the business away from ADM's legacy segments, and to improving the Company's earnings stability and Return on Invested Capital ("ROIC"). For example, during the Class Period, Defendants described Nutrition operating profit growth as "a core pillar of our strategy" (¶64), tied executive compensation directly to growing Nutrition operating profits (¶¶59, 281-292), and made clear that the Company's long-term growth would be disproportionately driven by Nutrition operating profits as the other segments were expected to do little to grow the business (¶¶232-233). During a June 9, 2021 Stifel Cross Sector Insight Conference, Defendant Young told analysts:

Nutrition, as you know, is our fastest-growing segment. . . .

. . . [I]t's less subjected to market factors, right, compared to Ag Services and Oilseeds and Carb Solutions. So as we continue to grow the Nutrition business, the product mix of our portfolio is going to be less volatile. It's going to be more of a sustained growth as Nutrition becomes a bigger percentage of our overall earnings and cash flows.

- 91 -

264.    Given that Nutrition was seen as the most important business to ADM's corporate strategy and valuation, information concerning the operating profits of ADM's Nutrition segment, and the sources of those profits, was essential information to the Individual Defendants and the market.  ADM reported Nutrition operating profit among the Company's performance "highlights" in each quarter from 1Q20 through 3Q23.  Analysts asked Defendants about the Nutrition segment's actual or projected profits at every quarterly earnings call throughout the Class Period.  And, because of its higher-margin and stable growth profile, analysts valued Nutrition earnings at up to nearly twice as high as other segments.  *See* ¶¶68-69, 234.

265.    In their roles as the leaders of ADM and Nutrition and given their public statements, the Individual Defendants were well aware of the importance of Nutrition operating profits and growth to investors and the Company, and well aware of their need to track Nutrition operating profit performance.  In fact, during the Class Period, analysts placed particular import on the source of the Nutrition segment's profits and repeatedly asked questions at conference calls regarding how Nutrition was and would be growing to meet its targets.  *See, e.g.*, ¶¶124, 128(a), 130(b), 137(b). The Individual Defendants assured investors that they were monitoring the inputs and sources of Nutrition operating profit growth and that the Nutrition segment was growing "organically" and through "bolt on" acquisitions.  *See, e.g.*, ¶¶124, 128, 130, 132, 137(a), 141(a)-(b), 142(a), 149, 150(a).  Defendants even dedicated time during ADM's 3Q20 earnings call to have Macciocchi provide "an update and overview of the [Nutrition] business" and answer analyst questions.  No other segment president presented during any Class Period quarterly earnings calls.

266.    As a further example of the Individual Defendants' close monitoring and knowledge of Nutrition operating profits, in every quarter during the Class Period, Defendants made statements describing very specific factors that purportedly impacted the Nutrition segment's operating profits, such as "growth in alternative proteins," "margins in feed additives," "global pricing" of "amino

acids," "sales for probiotics and fiber," "margins in commercial and livestock premix," "performance in texturants," "[s]ofter animal protein demand," "pockets of softer global feed demand," and "demand fulfillment challenges."[40]  In other words, the Individual Defendants made clear to investors and analysts that they were closely monitoring all significant factors that impacted Nutrition operating profits during the Class Period.  Given its clear and significant impact on such operating profits, Defendants knew or recklessly disregarded that Nutrition was buying raw material from ASO and Carb Solutions at below market prices in violation of Company policy and GAAP.  Defendant Macciocchi confirmed the Individual Defendants' close monitoring of the cost inputs to Nutrition growth, stating in September 2023 that "[w]e're carefully monitoring input costs on our own site and our cost to manufacture."

267.    Moreover, during the November 19, 2020 Stephens NASH Investment Conference, Defendant Luciano attributed the Nutrition segment's growth to its "pipeline" and "win rate," and confirmed that "those are the things that our marketing team and our leadership monitors all the time."  Defendant Luciano also confirmed that the Individual Defendants were able to monitor Nutrition growth inputs because of "the visibility that being a full value chain supplier and a global supplier gives us."  In addressing an analyst's question regarding ADM's "growth algorithm," Luciano reiterated in May 2021 that "of course, we have visibility into next year," adding in October 2022 that Nutrition is "the business in which we have the biggest visibility into the future."

---

[40]    Defendants have long analyzed and monitored such trends, as dating back to the start of the fraud in 2018, Defendants Luciano and Young stated "Nutrition benefitted" from factors such as "strong demand for flavor ingredients and flavor systems and vitamins in the animal nutrition business with favorable positions on certain ingredients," "increased sales in fibers" for Human Nutrition, and "stronger performances in lysine" for Animal Nutrition, but was negatively impacted by "margin pressure in certain non-flavor food ingredient markets" and "decreasing margins on premix resulting from price declines as the market returned to a more normalized state following an industry-wide vitamin supply disruption."

**The Individual Defendants' Public Statements Support a Strong Inference of Scienter**

268.     Defendant Luciano has made clear that ADM is "'in nutrition because I made the ultimate decision,'" adding that he is "'dictatorial on *what* [ADM's] strategy is'" because "'at the end of the day, it's going to be my decision.'"[41]   The HBS Case Study quoted ADM employees describing Defendant Luciano as a "hands-on" CEO who "'knows more than anyone'" about ADM's "core businesses" and "'meets with a lot of people at all levels of the company.'"   ADM's 2023 Proxy Statement also credited Defendant Luciano with "[s]uccessfully deliver[ing] above-target EBITDA for four Nutrition acquisitions."   Defendant Luciano's co-Defendants were likewise directly involved in the creation and growth of the Nutrition segment.

269.     Defendant Young, as CFO of ADM for over 12 years, played a large role in "ADM's transformation into a global leader in human and animal nutrition."   During a speech at the 2022 North American Finance Executives Summit, Defendant Young stated that he "helped negotiate the largest acquisition in the company's history, WILD Flavors of Europe, which really formed the basis of our Nutrition division right now."

270.     Defendant Luthar, before becoming CFO of ADM in 2022, spent two years as the CFO of Nutrition and over four years as a President within Nutrition.   When Luthar was appointed ADM's CFO, Luciano acknowledged Luthar's "'deep understanding of ADM's business having served in leadership roles throughout our finance organization and in key growth areas such as Nutrition.'"   ADM also emphasized that "'[a]s chief financial officer for Nutrition, Luthar has also led with financial agility across ADM's fastest-growing business unit.'"

271.     Defendant Macciocchi was described by Defendant Luciano as ADM's "expert" in the Nutrition field, having previously led WILD Flavors before it was acquired by ADM, and then

---

[41]     HBS Case Study at 10.

leading ADM's Nutrition segment for eight years. As President of Nutrition, ADM repeatedly tied Macciocchi to Nutrition's growth. For example, ADM's 2021 Proxy Statement reported that Macciocchi "[g]rew full-year Nutrition operating profits [in 2020] by 37% over 2019, while growing Nutrition revenue 5 percent on a constant currency basis[] and continuing to expand EBITDA margins."[42] Further, as CSMO over ADM's global sales and marketing activities, Macciocchi was aware of the sales and sales practices across the Company's different business lines.

272.     As the leaders of ADM and its Nutrition segment, the Individual Defendants held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, the Nutrition segment's operating profits and growth, ADM's intersegment sales, and the Company's accounting and internal controls. Their repeated statements to the investing public leading up to and during the Class Period demonstrate knowledge of the topics on which they directly spoke, including the Nutrition segment's operating profits, and the inputs and sources of the Nutrition segment's operating profits and margins (*e.g.*, ¶¶84, 85(b), 86-93, 95-104, 107-114, 116-121, 124-133, 136, 137(a)-(b), 138, 140-142, 145, 147-149, 153-155); ADM's intersegment sales and supply chain "synergies" between segments (*e.g.*, ¶¶137(c), 139, 146), the Company policy that all intersegment sales must be "recorded at prices approximating market" to comply with GAAP and ADM's compliance (or non-compliance) with GAAP (*e.g.*, ¶¶85(a), 85(c), 87, 89, 93, 96, 99, 101, 104, 108, 110, 112, 114, 117, 119, 121); and the effectiveness (or ineffectiveness) of ADM's ICFR and disclosure controls (*e.g.*, ¶¶159-162, 164-166).

273.     Defendants' repeated statements regarding these topics, and their direct involvement in the decisions impacting Nutrition operating profits, support an inference that at the time they

---

[42]     ADM's 2022 Proxy Statement similarly credited Macciocchi with growing "full-year Nutrition operating profits [in 2021] by 20% over 2020, while growing Nutrition revenue 14% on a constant currency basis." And, ADM's 2023 Proxy Statement credited Macciocchi with growing "Nutrition operating profit [in 2022] by 11% over 2021 and Nutrition revenue by 18%" on a constant currency basis.

4871-9240-3397.v2

spoke, they knew or recklessly disregarded the facts that rendered their statements false and misleading.

**The Simplicity of the GAAP Violations Supports a Strong Inference of Scienter**

274.     ADM was required to report its financial statements in accordance with GAAP.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

275.     ADM's stated corporate policy was to record intersegment sales "at amounts approximating market."  In order to comply with both the policy and GAAP (ASC 280 and ASC 606), ADM was required to record intersegment sales "at amounts approximating market."  *See* ¶¶201-208.  This was not a new, unusual, or one-time accounting rule, nor did it represent any changed interpretation of existing rules.  Rather, it was ADM's long-standing accounting policy since at least 2001.  Thus, each of the Individual Defendants, as the senior officers responsible for reporting intersegment sales to the investing public, had years (and even decades) of experience applying the accounting policy in compliance with GAAP.

276.     The accounting policy was simple to apply because it did not require any complex accounting judgment or estimates of future results like certain other accounting matters.  Defendants knew and had access to ADM's market prices for ASO and Carb Solutions raw materials because those were the prices paid by its customers, providing ADM with clear and reliable data.

277.     As such, the failure to account for intersegment sales at market prices was a straightforward and clear violation of GAAP.  From the start of the accounting fraud in 2018 through the Restatement, Defendants ADM and Luciano affirmatively represented to the market in 23 consecutive quarterly or annual reports filed with the SEC that intersegment sales were recorded "at amounts approximating market."  In those same reports, Defendants Young and Luthar made the same affirmative representations 16 and 7 times, respectively.  Yet, from the start of the accounting

fraud in 2018 through the Restatement, the Company continually inflated Nutrition profits by recording intersegment sales to Nutrition at amounts that were below market.

278.    In contrast, the Company also recorded intersegment sales between ASO and Carb Solutions, yet none of those sales needed to be corrected in the Restatement, making clear that such sales were recorded at market rates in compliance with GAAP.  That the violations occurred only in sales to Nutrition and only in one direction (to always increase the operating profit of Nutrition) makes clear that these were not random or unintentional accounting errors.  Rather, it is clear the violation of GAAP was done intentionally because, at the same time, the Company's intercompany sales between ASO and Carb solutions were being properly recorded "at amounts approximating market."

279.    The six year length of the scheme also shows this was an intentional act as it was not a one-time mistake that was quickly corrected.  Rather, for six straight years, operating profits were inflated for Nutrition through intentional violations of accounting policy and GAAP while that same policy and GAAP were being properly followed for intercompany sales between ASO and Carb Solutions.

**The Individual Defendants' Incentive Compensation Supports a Strong Inference of Scienter**

280.    The Individual Defendants were highly and uniquely incentivized to conceal their ongoing scheme and inflate Nutrition's reported results in order to maximize their incentive compensation during the Class Period.

281.    A significant portion of the Individual Defendants' compensation during the Class Period was "performance-based" – that is, it depended on ADM meeting certain present performance metrics or "goals."  The Individual Defendants' performance-based compensation principally consisted of: (i) "Annual Incentive Awards," which were cash bonuses; and (ii) "Long-Term

- 97 -

Incentive Awards" in the form of "Restricted Stock Units" ("RSUs") and "Performance Share Units" ("PSUs"), which were essentially Company promises to award a set number of shares to executives at later dates if certain performance goals were met.

282.    Members of ADM's management had an active role in the structuring of their own compensation at ADM.  For example, according to ADM's March 25, 2020 Proxy Statement ("2020 Proxy"), "[m]embers of management attend meetings of the [Compensation Committee] and make recommendations to the committee regarding compensation for officers other than the Chief Executive Officer."  In addition, Luciano's involvement in the process included "assist[ing] the [Compensation Committee] in determining compensation for the [named executive officers] other than himself," as well as providing the Compensation Committee with his recommendations regarding the performance-based metrics and award target levels used in compensating ADM's other officers.

283.    Historically, long-term incentive compensation for ADM's executives had been contingent on meeting Company-wide performance metrics, such as adjusted earnings, ROIC, and relative total shareholder returns ("TSR").[43]  For example, the three performance metrics for the PSUs ADM granted in 2017, 2018, and 2019 were all based on Company-wide performance, as opposed to the performance of a particular segment.  Luciano claimed on May 6, 2021 that ADM's performance-based compensation structure "rewards our leaders for driving metrics that drive . . . long-term value creation."

284.    In February 2020, the Compensation and Succession Committee ("Compensation Committee") implemented substantial changes to the Company's short-term and long-term performance-based compensation plans in order "to emphasize [ADM's] focus on the Nutrition

_____

[43]    TSR refers to the overall increase (if any) in the Company's stock price, plus any dividends paid.

segment of our business." This dramatic shift in how compensation would be awarded illustrated Defendants' intention to rely on Nutrition – not ASO or Carb Solutions – as the critical driver of "long-term value creation" and their personal compensation. As a result of these changes, the Nutrition segment's performance held an outsized influence over the Individual Defendants' compensation, strongly motivating Defendants to continue to misstate Nutrition's actual financial results.

285. One such change involved tying executives' stock-based compensation directly to the Nutrition segment's profitability. For example, the PSUs granted to ADM executives in February 2020 ("2020 PSUs") were based on a three-year "performance period" of January 1, 2020 to December 31, 2022, with the performance-based metrics tied to: (i) "Average Adjusted ROIC" (50% weighted); (ii) "Average Nutrition Adjusted OP Growth" (50% weighted); and (iii) "Relative TSR" as compared to a defined peer group (+/- 10% modifier). According to ADM, PSUs granted in a particular year "will vest, or not [vest], based on ADM's performance against specific goals over a three year performance period" that begins on January 1 of the year in which the PSUs are granted. Accordingly, the 2020 PSUs were to "vest, or not [vest]" based in substantial part on Nutrition's operating profit performance from January 1, 2020 to December 31, 2022.

286. PSUs comprised nearly 4 to 8 times Defendants' base salaries. For example, at the time the 2020 PSUs were granted in February 2020, the total estimated value of the 2020 PSUs granted to the Individual Defendants was $13.5 million at the base or "Target" achievement level, and $27 million at the higher or "Maximum" achievement level. By comparison, the Individual Defendants' base salaries for 2020 added up to approximately $3.5 million. Half of the PSU targets were dependent upon Nutrition, so the 2020 PSUs granted to the Individual Defendants specific to

Nutrition were worth $6.8 million at target and $13.5 million at maximum, or nearly 2 to 4 times the Individual Defendants' base salaries.[44]

287.    This was similar for 2021.  The March 22, 2022 Proxy ("2022 Proxy") disclosed that PSUs granted to the Individual Defendants in early 2021 ("2021 PSUs") were based on a three-year performance period of January 1, 2021 to December 31, 2023, as well as the same three performance-based metrics that applied to the 2020 PSUs (listed above in ¶285).  The total estimated value of the 2021 PSUs granted to the Individual Defendants in February 2021 totaled $12.4 million at the target achievement level and $24.7 million at the maximum achievement level.  Specific to only the Nutrition-based metric, the total estimated value of the 2021 PSUs granted to the Individual Defendants was $6.2 million at the target achievement level and $12.4 million at the maximum achievement level.  By comparison, the Individual Defendants' base salaries for 2021 added up to approximately $3.5 million.  As a result, the Individual Defendants were highly motivated to maximize Nutrition results, which could result in adding millions of dollars to their total compensation.

288.    In addition to stock awards, beginning in February 2020, ADM also began to tie executives' annual cash bonuses to Nutrition's performance.  For example, regarding fiscal year 2020 annual cash bonuses, ADM's March 26, 2021 Proxy Statement ("2021 Proxy") disclosed that Defendants Luciano, Young, and Macciocchi could receive an upward adjustment to their cash bonuses "based on the company's achievements of five equally weighted strategic goals, each adding 7% to the initial payout amount if achieved."  The first of the listed "strategic goals" was "an increase of 20% in year-on-year adjusted operating profit of the Nutrition reporting segment."

---

[44]    According to the 2020 Proxy, the 2020 base salaries for Luciano, Young, and Macciocchi were $1.4 million, $850,008, and $675,000, respectively.  Although Luthar's 2020 base salary was not disclosed in the 2020 Proxy, his base salary in 2021 was approximately $586,000.

Similarly, regarding fiscal year 2021 annual cash bonuses, the 2022 Proxy disclosed that these same Defendants could receive an upward adjustment "based on the company's achievements of four equally-weighted strategic goals, each adding 5% to the initial payout," including "an increase of 15% in year-over-year adjusted operating profit for the Nutrition reporting segment."

289.    According to the 2022 Proxy, because Nutrition's operating profit grew over 15% in 2021, this 2021 performance-based metric was met.  In fact, although ADM claimed that Nutrition's operating profit grew over 15% in 2021 (*see* ¶105), that reported growth was falsely inflated.  In reality, Nutrition's operating profit grew only 13% in 2021, less than the 2021 performance-based metric required.  The potential to increase their cash bonuses provided another incentive for ADM's executive team to continue to inflate Nutrition's operating profits and conceal the accounting scheme.

290.    In addition, the value of any stock held was inflated from the accounting scheme. According to ADM's March 14, 2023 Proxy Statement ("2023 Proxy"), the Individual Defendants significantly increased their compensation by achieving the maximum payout for the 2020 PSUs and benefited from the inflated stock price.  Specifically, for the performance-based metric "Average Nutrition OP Growth," ADM had assigned certain payout levels based on various growth percentages.  For example, "Average Nutrition OP Growth" of less than 6% resulted in "No payout," 10% growth resulted in a "100% payout," and 20% growth resulted in a "200% payout":

| Performance metric | Weighting | No payout | 50% payout | 100% payout | 150% payout | 175% payout | 200% payout |
|---|---|---|---|---|---|---|---|
| Average Adjusted ROIC | 50% | Below 5.75% | 6.5% | 7.0% | 7.5% | 8.0% | 9.0% or above |
| Average Nutrition OP Growth | 50% | Below 6% Growth | 8% Growth | 10% Growth | 15% Growth | n/a | 20% Growth |
| Relative TSR Modifier | +/-10% | Based on ranking that compares ADM's 3-year TSR against defined peer group 1st Rank - 1.1 Modifier 2nd Rank - 1.067 Modifier 3rd Rank - 1.033 Modifier 4th & 5th Rank - 1.0 Modifier 6th Rank - 0.967 Modifier 7th Rank - 0.933 Modifier 8th Rank - 0.9 Modifier | | | | | |

4871-9240-3397.v2

291.     According to ADM's 2023 Proxy, for the performance period of 2020-2022, the "Average Nutrition OP growth was 21.4%, and therefore, the resulting payout factor was 200%." The 2023 Proxy also stated that "Average adjusted ROIC was 10.4%, and therefore the resulting payout factor was 200%." Based on these determinations, the Committee approved a 200% payout of the target number of 2020 PSUs for each of the Individual Defendants: (i) Luciano received 349,488 2020 PSUs; (ii) Luthar received 22,136 2020 PSUs; (iii) Macciocchi received 93,198 2020 PSUs; and (iv) Young received 128,146 2020 PSUs. These 2020 PSUs were worth approximately $48.5 million on the day they vested, February 13, 2023. While ADM's stock price traded at artificially inflated prices as a result of Defendants' fraudulent scheme, the Individual Defendants increased their compensation by $21.5 million (or 80%) from the date the 2020 PSUs were granted in early 2020 (when ADM's stock price was trading around $46) to the date the 2020 PSUs vested three years later in February 2023 (when ADM's stock price had risen to approximately $82).

292.     Allowing management to effectively determine their compensation based on the performance they are responsible for reporting creates a well-known risk of accounting fraud. For example, in a January 24, 2024 article, *Bloomberg* reported that the very same Nutrition segment that was "under investigation for its accounting practices" had "an outsized influence on recent executive bonuses." The article stated that "for many years" ADM had followed the typical principles of using compensation metrics "that reflect the company's broader financial goals, like adjusted earnings." But "in 2020, [ADM] removed adjusted earnings . . . . as one of the key metrics for executive stock awards and added something much more specific: growth of average operating profit in the nutrition segment." Confirming the unique nature of equity compensation being tied to a single segment's performance, the article reported expert commentary that, "[s]eeing such a large weight on a narrow metric for equity incentives 'is highly unusual,'" according to "Kevin Murphy, a finance professor at the University of Southern California's Marshall School of Business."

- 102 -

293.    In short, ADM's compensation structure provided unusually significant motive for the Individual Defendants to shift profits from one segment of the Company to another, in this case, from the ASO and Carb Solutions segments to the Nutrition segment.

**The Individual Defendants' Insider Sales Support a Strong Inference of Scienter**

294.    In addition to having a compensation motive to inflate Nutrition operating profits, Defendants financially benefited by selling ADM stock at artificially inflated prices during the Class Period.  As noted, given analysts' focus on Nutrition profitability as a driver of their stock price and investment recommendations, the better Nutrition performed, the higher ADM's overall stock price rose.  Thus, as Defendants made false and misleading statements, ADM's stock price increased from around $35 per share at the start of the Class Period to around $98 at various times in 2021 and 2022. While knowingly or recklessly disregarding the undisclosed accounting fraud, Individual Defendants Luciano, Young, Macciocchi, and Luthar sold over 1.3 million shares of ADM common stock at artificially inflated prices during the Class Period, *reaping over $107 million* in personal proceeds.

295.    In contrast to his substantial Class Period sales, in the four years leading up to the start of the Class Period, Defendant Luciano did not report a single sale of ADM stock.[45]  During the Class Period, when ADM was trading at artificially inflated prices, Defendant Luciano engaged in multiple rounds of stock selloffs, dumping a total of approximately 1.047 million shares of ADM common stock.  Luciano received a staggering $83 million in proceeds from his Class Period insider sales.  Certain of these sales occurred just after the inflated results were reported.  For instance, Luciano received over $20 million from insider sales on January 31, 2022, just six days after ADM reported its false financial results for fourth quarter 2021 and FY 2021, wherein Luciano boasted of

---

[45]    SEC regulations required Luciano and ADM's other reporting officers to timely report their open market or private sales of ADM stock to the SEC.

Nutrition's "extremely strong" results and falsely reported that Nutrition's operating profits reached $691 million in 2021.

296.    Defendant Luciano also sold three times more shares during a seven-week span in late 2022 (approximately 584,000 shares) when the stock price was reaching as high as over $90 per share, than he had sold during the first 28 months of the Class Period (approximately 194,000 shares). Based on calculations from reported information filed with the SEC, those late 2022 sales netted Luciano an estimated $32 million in profits. At least one commentator has characterized Luciano's suspicious sales as "unusual," "timely," and "opportunistic."[46]

297.    Like Defendant Luciano, in the four years leading up to the start of the Class Period, Defendant Young did not report a single sale of ADM stock. During the Class Period, when ADM was trading at artificially inflated prices, Defendant Young engaged in multiple bouts of insider trading, selling off 235,643 shares of ADM stock on the open market and pocketing over $15.9 million in proceeds from his insider sales. Defendant Young dumped approximately 66% of these 235,643 shares during a single trading day in 2022, at prices exceeding $76 per share, which alone resulted in approximately $12 million in proceeds and an estimated $7.6 million in profits.

298.    Defendant Macciocchi similarly did not report a stock sale in the four years leading up to the Class Period, and then sold 93,110 shares of ADM on a single trading day during the Class Period, collecting over $7 million in proceeds and netting an estimated $4 million in profits. Macciocchi offloaded these shares less than 2 months after ADM's December 10, 2021 investor conference, during which he and the other Individual Defendants publicly touted Nutrition's success and the purported plan to organically grow Nutrition operating profit to $1.25-$1.5 billion by FY

---

[46]    *See* Sammy Cartagena, *How Deviations in Insider Buying & Selling Behavior Provide Company Valuation Insights*, Verity (Mar. 30, 2023), https://verityplatform.com/resources/how-deviations-in-insider-buying-selling-behavior-provide-company-valuation-insights/.

2025.  *See* ¶¶141, 233.  Finally, Defendant Luthar also sold 7,500 shares of ADM for around $89.59 per share approximately halfway through the Class Period, receiving over $670,000 in proceeds and netting an estimated $400,000 in profits.[47]

299.    The Individual Defendants' sales of 1.383 million shares of ADM common stock during the Class Period were executed at an average stock price of approximately $77 per share, which was near the Class Period highs.  In contrast, had those same sales been executed either before the accounting scheme began in early 2018, or after the accounting scheme was revealed in January 2024, the shares would have sold at around its market value of roughly $50 per share.  As a result of the concealed accounting fraud, Defendants reaped more than $35 million in insider trading proceeds by selling during the Class Period, rather than before or after the accounting fraud.

**Executive Departures and Federal Investigations Support a Strong Inference of Scienter**

300.    The SEC works to protect investors by investigating and bringing actions against companies and executives who commit securities fraud.  Similarly, the DOJ's duties include investigating and prosecuting those that commit securities fraud, including in instances where (as here) a company restates its prior financial results due to accounting fraud.  As the DOJ has explained, it is "particularly" focused on "prosecuting securities and commodities fraud . . . perpetrated by senior executives" and "holding gatekeepers [such as executives] to account." Nevertheless, SEC investigations are rare and DOJ criminal investigations of accounting fraud rarer still.  Thus, the fact that both the SEC and DOJ are investigating Defendants' accounting fraud illustrates the gravity and criminality of the scheme.

301.    Moreover, the SEC and DOJ have limited resources that would not be directed at investigating immaterial matters, yet both agencies have expended considerable efforts pursuing this

---

[47]    Luthar's pre-class period sales in the four years preceding the Class Period, if any, are not publicly available.

accounting fraud.[48]  ADM received a "voluntary document request from the SEC relating to intersegment sales" on June 30, 2023.  Then, in January 2024, the DOJ sent "document requests" to ADM that "focused primarily on" ADM's intersegment sales, as well as directed grand jury subpoenas to current and former ADM employees.[49]  According to *Reuters*, by February 5, 2024, "the U.S. Attorney's Office for the Southern District of New York (SDNY) ha[d] interviewed former ADM employees about [the] accounting practices," with "a SDNY prosecutor ask[ing] about the company's pricing practices related to the sales of goods from ADM's commodities units to its Nutrition division."  A March 7, 2024 article from *Reuters*, based on "three sources with knowledge of the matter," subsequently reported that the "criminal probe into ADM's accounting issues . . . is escalating fast and directly relates to accounting issues that the company said in January were the subject of an internal probe."

302.    Notably, Defendants have never contended that ADM voluntarily reported its accounting or internal control issues to the SEC prior to June 30, 2023, or to the DOJ prior to January 2024.  And, both the SEC and DOJ have continued (and escalated) their investigations following the March 2024 Restatement, despite ADM (falsely) claiming the accounting errors were "immaterial."  On April 30, 2024, Defendants disclosed that ADM had "received an additional document request from the SEC" and confirmed that the DOJ investigation was ongoing.

---

[48]    According to the SEC's Division of Enforcement manual, "the opening of an investigation requires that the assigned staff (at the Assistant Director level and below) conduct an evaluation of the facts to determine the investigation's potential to address conduct that violates the federal securities laws."  Securities and Exchange Commission Division of Enforcement, "Enforcement Manual" dated November 28, 2017, available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.  Meanwhile, the DOJ's stated aim is to pursue "ground-breaking" and "impactful and righteous cases."  February 2024, United States Department of Justice, Criminal Division, Fraud Section "Fraud Section Year in Review 2023," *available at* https://www.justice.gov/criminal/media/1339231/dl.

[49]    Grand jury subpoenas are governed by specific federal rules and policies and are intended to be used for gathering evidence of criminal fraud.

303.     Amidst these enforcement and criminal investigations, Defendants Luthar and Macciocchi departed from ADM, and Defendant Young departed from his director positions on three public companies.  These suspicious and sudden departures of top ADM executives, all of whom worked closely with and reported directly to Defendant Luciano, further support an inference of scienter as to ADM and the Individual Defendants.

304.     On November 10, 2023, approximately four months after the Company received notice of the SEC investigation into the Company's intersegment sales to the Nutrition segment, ADM announced the "retirement" of Macciocchi as SVP, President, Nutrition, and CSMO of the Company, effective at the end of 2023.  However, Macciocchi's "retirement" was clearly not voluntary as the 58-year old Macciocchi was forced to forfeit $2 million in potential compensation upon his departure.  Just months earlier, ADM's 2023 Proxy had detailed that Macciocchi received a one-time retention grant of $2 million in the form of performance-based restricted stock units ("PRSUs"), which would be earned by Macciocchi over the three-year performance period of 2022-2024 based on the "extent to which there is effective integration of key acquisitions within the Nutrition segment."  When Macciocchi was forced to "retire" he forfeited those PRSUs that had been granted to him just one year earlier.  Further proof that there was nothing voluntary about his departure and that it was not a retirement, Macciocchi had just presented extensively about the Nutrition segment's future during a September 2023 conference hosted by Barclays and he immediately took another job in January 2024 at a natural ingredients supplier company.

305.     Luthar was also forced out.  On January 21, 2024, ADM announced that it had placed Defendant Luthar on administrative leave:

> [E]ffective immediately . . . pending an ongoing investigation being conducted by outside counsel for the Company and the Board's Audit Committee regarding certain accounting practices and procedures with respect to the Company's Nutrition reporting segment, including as related to certain intersegment transactions.  The

- 107 -

investigation was initiated in response to the Company's receipt of a voluntary document request by the Securities and Exchange Commission.

In the same filing, ADM also withdrew its outlook for the Nutrition segment and further revealed that its fourth quarter 2023 and FY 2023 earnings release would be delayed.

306.    Then, on April 22, 2024 – a month after the Company revealed that ADM had not recorded intersegment sales at amounts approximating market – ADM announced that Luthar's "administrative leave" would be a permanent termination of employment.  The Company announced that it had reached and entered into an agreement whereby Luthar would "resign," effective September 30, 2024.  Luthar had held the CFO position for less than two years after being appointed in April 2022.  By contrast, his predecessor (Defendant Young) was ADM's CFO for 12 years.

307.    Defendant Young also suffered negative professional consequences as a result of the accounting scandal.  After retiring from ADM, Defendant Young had become a board member at three publicly-traded companies.  In February 2024, after news of the accounting fraud and federal investigations began to come to light, Defendant Young abruptly left his board positions.  As discussed, he left one position a day after his appointment, and in total, he lost out on more than $800,000 in total annual compensation by leaving the boards of the three companies.  ¶¶186-187.

308.    The fact that Defendants Young, Luthar, and Macciocchi, each of whom had significant roles in the Nutrition segment and accounting, departed their high-ranking Board and executive roles at the same time the accounting fraud began to come to light, supports that each of them knew of or recklessly disregarded the true facts that rendered their statements false and misleading.

309.    The fact that each of them reported to Defendant Luciano, further supports his scienter because they could not execute the accounting fraud without his approval.  Indeed, Luciano has admitted that he is "'dictatorial on *what* the strategy is'" at ADM, and he has further explained

- 108 -

that "'[c]apital allocation is about feeding the business. It's feeding Nutrition even if you're starving grain, even if grain made $2 billion and Nutrition makes $300 million. That can only be done by the person at the top'" – *i.e.*, Luciano. Here, Defendants made the decision to feed Nutrition discount raw materials by starving grain of revenue. That decision could have only been made with Defendant Luciano's knowledge and approval.

## LOSS CAUSATION AND ECONOMIC LOSS

310. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ADM common stock and operated as a fraud or deceit on Class Period purchasers of ADM common stock by misrepresenting and concealing that ADM had employed a fraudulent scheme involving intersegment sales of goods between ADM's reporting segments, that ADM inaccurately accounted for and reported intersegment sales, that ADM's reporting segments' results were materially misstated, that the true nature of the Nutrition segment's earnings, business performance, and growth prospects were concealed as a result of ADM's fraudulent scheme, and that ADM violated Company policy and GAAP and failed to maintain adequate internal controls over financial reporting.

311. Defendants' false and misleading statements and omissions, individually and collectively, had their intended effect and directly and proximately caused ADM's common stock to trade at artificially inflated levels, reaching a Class Period high of $98.88 per share.

312. As a result of Defendants' fraudulent conduct as alleged herein, the price at which ADM common stock traded was artificially inflated throughout the Class Period. When Plaintiffs and other members of the Class (defined below) purchased their ADM common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing ADM common stock during the Class Period at artificially inflated prices, Plaintiffs and

- 109 -

other members of the Class suffered economic loss, *i.e*., damages, under federal securities laws, when such artificial inflation dissipated.

313.    As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Defendants, Plaintiffs and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their ADM common stock at artificially inflated prices during the Class Period.  Had Plaintiffs and other members of the Class known the truth, they would not have taken such actions.

314.    When the misrepresentations and omissions that Defendants had concealed from the market were revealed on January 21, 2024, the price of ADM common stock declined by $16.50 per share, or approximately 24.2%, from $68.19 per share on January 19, 2024, to close at $51.69 on January 22, 2024, wiping out approximately $8.8 billion of ADM's market value.  This is reportedly the Company's largest one-day decline since November 13, 1929, which was 2 weeks after the market crash of 1929.[50]

315.    As reflected in the chart below, while ADM common stock fell approximately 24.2%, the S&P 500 actually had a gain of 0.22%, while the S&P 500 Consumer Staples index, of which ADM is a component, declined by only 0.47%:

---

[50]    *See* Karl Plume and Seher Dareen, *ADM shares plunge 24% in worst day since 1929 as CFO is placed on leave*, Reuters (Jan. 22, 2024), https://www.reuters.com/markets/commodities/adm-shares-tumble-cfo-probe-profit-forecast-cut-2024-01-22/.

4871-9240-3397.v2



316.    The new, Company-specific, material information released on January 21, 2024 was directly related to the false and/or misleading statements previously made by the Defendants.

317.    The timing and magnitude of the price decline of ADM common stock negate any inference that the losses suffered by Plaintiffs and other Class members caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

318.    Analyst and media reports reflected that the revelation of the previously undisclosed information was responsible for the stock decline. *See* ¶¶181-183.

**PRESUMPTION OF RELIANCE**

319.    At all relevant times, the market for ADM common stock was an efficient market for the following reasons, among others:

(a)     ADM common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 111 -

(b)      according to the Company's 1Q20 Form 10-Q, the Company had more than 555 million shares of common stock outstanding as of April 30, 2020, demonstrating a very active and broad market for ADM common stock;

(c)      as a regulated issuer, ADM filed periodic public reports with the SEC;

(d)      ADM regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)      During the Class Period, ADM was followed by numerous securities analysts employed by major brokerage firms, such as Barclays, Bank of America, BMO, Credit Suisse, J.P. Morgan, Morgan Stanley, Stephens, and UBS, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

320.     As a result of the foregoing, the market for ADM common stock promptly digested current information regarding ADM from publicly-available sources and reflected such information in ADM's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of ADM common stock.

321.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding ADM's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

322. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from ADM's Class Period filings and oral disclaimers.

323. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of ADM who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading.

## CLASS ACTION ALLEGATIONS

324. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of ADM common stock during the Class Period ("Class"). Excluded from the Class are: Defendants, the current and Class Period officers and directors of ADM, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

325.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ADM common stock was actively traded on the NYSE. According to the Company's 1Q20 Form 10-Q, the Company had more than 555 million shares of common stock outstanding as of April 30, 2020.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the thousands, and that they are geographically dispersed.

326.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

327.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

328.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)    whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

        (c)    whether the price of ADM common stock was artificially inflated during the Class Period; and

        (d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

- 114 -

329.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiffs are not aware of any difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
Against ADM and the Individual Defendants**

330.     Plaintiffs incorporate the foregoing paragraphs by reference.

331.     This count is brought against ADM and the Individual Defendants.

332.     During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

333.     Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of ADM common stock.

334.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of ADM common stock during the Class Period because, in reliance on the integrity of the market, Plaintiffs and other members of the Class paid artificially inflated prices for ADM common stock and experienced losses when the artificial inflation was released from ADM common stock as a result of the leakage and disclosure of information and price decline detailed herein.  Plaintiffs and other members of the Class would not have purchased ADM common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements.

335.     By virtue of the foregoing, ADM and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

336.     Plaintiffs incorporate the foregoing paragraphs by reference.

337.     This count is brought against the Individual Defendants.

338.     Defendants Luciano, Luthar, Young, and Macciocchi acted as controlling persons of ADM within the meaning of §20(a) of the Exchange Act.

339.     By virtue of their high-level positions, participation in and/or awareness of ADM's operations and/or intimate knowledge of ADM's disclosures, practices, and business model, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of ADM, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Luciano, Luthar, Young, and Macciocchi were provided with, or had unlimited access to copies of the reports, press releases, public filings,

and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

340.     As set forth above, ADM violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Defendants Luciano, Luthar, Young, and Macciocchi are liable pursuant to §20(a) of the Exchange Act for ADM's §10(b) violations.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price decline discussed above, when the artificial inflation was released from the Company's common stock.

## COUNT III

### For Violations of §20A of the Exchange Act
### Against Defendants Luciano and Young

341.     Plaintiffs incorporate the foregoing paragraphs by reference.

342.     This count is brought against Defendants Luciano and Young.

343.     As detailed herein, Defendants Luciano and Young were in possession of material non-public information concerning ADM's operations, reporting, financial results, and future business prospects, including, but not limited to, the false statements and omissions disseminated to the investing public.  Notwithstanding their duty to refrain from trading in ADM common stock without disclosing the foregoing materially adverse facts, Defendants Luciano and Young took advantage of their possession of material non-public information regarding ADM to obtain significant insider trading profits during the Class Period.

- 117 -

344.    Certain of Defendants Luciano's and Young's Class Period sales of ADM common stock (set forth below) were made contemporaneously with certain Plaintiffs' purchases of ADM common stock (set forth below and in ECF 27-1) and the purchases of ADM common stock by other Class members during the Class Period.

345.    For example, Defendant Luciano made the following sales of ADM common stock contemporaneously with the following Plaintiff's purchases of ADM common stock:

| Luciano Sales | | | KBC's Fund's Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 10/12/2020 | 57,424 | $50.01 | 10/15/2020 | 2,619 | $49.94 |
| | | | 10/15/2020 | 397 | $49.94 |
| | | | 10/15/2020 | 9,009 | $49.94 |
| 1/31/2022 | 24,388 | $74.32 | 2/4/2022 | 378 | $75.71 |
| 1/31/2022 | 27,276 | $74.79 | | | |
| 1/31/2022 | 97,147 | $74.31 | | | |
| 1/31/2022 | 119,438 | $74.78 | | | |
| 9/9/2022 | 81,332 | $91.78 | 9/13/2022 | 72 | $86.35 |
| 9/9/2022 | 203,199 | $90.97 | | | |
| 10/26/2022 | 109,626 | $93.68 | 10/27/2022 | 229 | $94.13 |
| 10/26/2022 | 190,374 | $93.21 | 10/31/2022 | 968 | $96.98 |

346.    Defendant Young made the following sales of ADM common stock contemporaneously with the following Plaintiffs' purchases of ADM common stock:

- 118 -

| Young Sales | | | KBC's Fund's and NEI's Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 10/12/2020 | 49,020 | $50.02 | 10/15/2020 | 2,619 | $49.94 (KBC) |
| | | | 10/15/2020 | 397 | $49.94 (KBC) |
| | | | 10/15/2020 | 9,009 | $49.94 (KBC) |
| 2/8/2022 | 31,503 | $76.72 | 2/8/2022 | 5,729 | $76.80 (NEI) |
| 2/8/2022 | 123,763 | $76.74 | 2/14/2022 | 476 | $76.12 (KBC) |
| | | | 2/14/2022 | 1,024 | $76.12 (KBC) |
| | | | 2/14/2022 | 1,221 | $76.12 (KBC) |
| | | | 2/14/2022 | 6,991 | $76.12 (KBC) |

347.    Defendants Luciano and Young sold their ADM shares as alleged above at prices artificially inflated by the non-disclosure of material adverse non-public facts, misrepresentations of fact, and the public statements released during the Class Period.  Luciano and Young were obligated to disclose the material non-public adverse information to plaintiffs and other members of the Class before selling their stock.

348.    Plaintiffs and members of the Class who purchased shares of ADM common stock contemporaneously with sales by the Individual Defendants suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as alleged herein; and (ii) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

- 119 -

349. By reason of the above conduct, Defendants Luciano and Young are liable pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR JURY

Plaintiffs hereby demand a trial by jury.

DATED: June 24, 2024                ROBBINS GELLER RUDMAN
                                                           & DOWD LLP
                                               JAMES E. BARZ (IL Bar # 6255605)
                                               FRANK A. RICHTER (IL Bar # 6310011)
                                               CAMERAN M. GILLIAM (IL Bar # 6332723)
                                               MICHAEL J. STRAMAGLIA (IL Bar #6336821)


                                             /s/ James E. Barz
                                             JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
cgilliam@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER D. STEWART
JENNIFER N. CARINGAL
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
cstewart@rgrdlaw.com
jcaringal@rgrdlaw.com

MOTLEY RICE LLC
GREGG S. LEVIN
CHRISTOPHER F. MORIARTY
MEGHAN S. B. OLIVER
CHARLOTTE E. LOPER
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
glevin@motleyrice.com
cmoriarty@motleyrice.com
moliver@motleyrice.com
cloper@motleyrice.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860/882-1676
bnarwold@motleyrice.com

Lead Counsel for Lead Plaintiffs

- 121 -

4871-9240-3397.v2

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
jmcintire@odonoghuelaw.com

Additional Counsel

4871-9240-3397.v2