**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND CHOW, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:24-cv-00634 District Judge Thomas M. Durkin |
| ARCHER-DANIELS-MIDLAND COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF ARCHER-DANIELS-MIDLAND COMPANY'S AND JUAN LUCIANO'S MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .....................................................................................................................3

      A.      ADM Deals in Agricultural Commodities and Products. ......................................3

      B.      The Individual Defendants............................................................................4

      C.      ADM Discloses Intersegment Accounting Errors. ...............................................5

      D.      This Action is Reflexively Filed. ............................................................6

LEGAL STANDARD.............................................................................................................7

ARGUMENT ........................................................................................................................8

I.      PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG
      INFERENCE OF SCIENTER. ...............................................................................8

      A.      Plaintiffs Do Not Allege Any Specific Information Known by Defendants
              at the Time of the Alleged Misrepresentations. ........................................9

      B.      Plaintiffs' Circumstantial Allegations Are Inadequate to Demonstrate
              Scienter. ...............................................................................................11

      C.      Plaintiffs' Motive Allegations Do Not Support a Strong Inference of
              Scienter. ...............................................................................................17

            1.      Compensation Structure.................................................................18

            2.      Stock Sales ..................................................................................19

II.     PLAINTIFFS FAIL TO PLEAD THAT MANY OF THE ALLEGED
      MISSTATEMENTS ARE MATERIALLY FALSE AND MISLEADING.....................21

III.    THE COURT SHOULD DISMISS COUNTS II AND III ALLEGING
      CONTROL PERSON LIABILITY AND INSIDER TRADING. ...................................29

IV.    CONCLUSION....................................................................................................29

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ...................................................................................18

*In re Allscripts, Inc. Securities Litigation*,
No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ................................1

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
No. 18 C 6175, 2020 WL 60186 (N.D. Ill. Jan. 7, 2020) ...................................29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................7

*In re Bally Total Fitness Securities Litigation*,
No. 04 C 03530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) .............................10, 13, 18

*In re Baxter International Inc. Securities Litigation*,
No. 19 C 7786, 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ..................................... *passim*

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................7

*In re BISYS Securities Litigation*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................26

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
No. 10 C 7031, 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) .........................15

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ..............................................................12, 13, 19

*City of Livonia Employees' Retirement System & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................9, 10, 17

*City of New Orleans Employees' Retirement System v. PrivateBancorp, Inc.*,
No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011)............................11

*City of Taylor Police & Fire Retirement System v. Zebra Technologies Corp.*,
8 F.4th 592 (7th Cir. 2021) ...................................................................................25

*Cornielsen v. Infinium Capital Holdings, LLC*,
168 F. Supp. 3d 1033 (N.D. Ill. 2016) ..............................................................21, 25

*Cornielsen v. Infinium Capital Management, LLC*,
916 F.3d 589 (7th Cir. 2019) ........................................................................8, 11

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ........................................................... *passim*

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...............................................................................9

*Eisenstadt v. Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ..............................................................................23

*In re Fairway Group Holdings Corp. Securities Litigation*,
No. 14 Civ. 0950, 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ....................................23

*Fogel v. Vega*,
759 F. App'x 18 (2d Cir. 2018) ...........................................................................28

*Fryman v. Atlas Financial Holdings, Inc.*,
No. 18-CV-01640, 2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .....................................28

*Fryman v. Atlas Financial Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) ..................................................................11

*Gallagher v. Abbott Laboratories.*,
269 F.3d 806 (7th Cir. 2001) ..............................................................................25

*Garden City Employees' Retirement System v. Anixter International, Inc.*,
No. 09-CV-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012).......................................25

*Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*,
No. 20 C 2176, 2022 WL 1642221 (N.D. Ill. May 24, 2022) ....................................16, 24

*In re Hertz Global Holdings Inc*,
905 F.3d 106 (3d Cir. 2018)................................................................................17

*Higginbotham v. Baxter International, Inc.*,
495 F.3d 753 (7th Cir. 2007) ..............................................................................10

*In re ITT Educational Services, Inc. Securities & [Shareholder Derivatives Litigation*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)..................................................................26

*In re K–tel International, Inc. Securities Litigation*,
300 F.3d 881 (8th Cir. 2002) ..............................................................................18

*Lauria v. Biosante Pharmaceuticals, Inc.*,
968 F. Supp. 2d 951 (N.D. Ill. 2013) .....................................................................7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ........................................................................................9

*National Elevator Industry Pension Fund v. Conagra Brands, Inc.*,
    No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022)................................................10

*In re Newell Rubbermaid Inc. Securities Litigation*,
    No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000)...................................22, 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................................9

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)......................................................................................................28

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
    266 F. Supp. 3d 1154 (E.D. Wis. 2017)..........................................................................15

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ....................................................................................15, 18

*In re Pfizer, Inc. Securities Litigation*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008).............................................................................18

*Phoenix Insurance Co. v. ATI Physical Therapy, Inc.*,
    690 F. Supp. 3d 862 (N.D. Ill. 2023) .............................................................................16

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ............................................................................12

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) ........................................................................................18

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ......................................................................................8, 29

*Roberts v. City of Chicago*,
    817 F.3d 561 (7th Cir. 2016) ..........................................................................................7

*Ross v. Career Education Corp.*,
    No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ............................................16

*In re S1 Corp. Securities Litigation*,
    173 F. Supp. 2d 1334 (N.D. Ga. 2001)...........................................................................23

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019).............................................................................17

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ..................................................................................22, 23

*Shemian v. Research In Motion Ltd.*,
   No. 11 CIV. 4068 RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .............................23

*Silverman v. Motorola, Inc.*,
   No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..........................................23

*Societe Generale Securities Services, GbmH v. Caterpillar, Inc.*,
   No. 17-cv-01713, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ......................................12

*In re System Software Associates, Inc.*,
   No. 97 C 177, 2000 WL 283099 (N.D. Ill. Mar. 8, 2000) ................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...............................................................................2, 8, 17, 21

*Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007) ......................................................................................8

*Tricontinental Industries, Ltd. v. Anixter*,
   215 F. Supp. 2d 942 (N.D. Ill. 2002) ...............................................................................9

*Water Island Event-Driven Fund, LLC v. Tribune Media Co.*,
   39 F.4th 402 (7th Cir. 2022) ......................................................................................29

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ......................................................................................13

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ...................................................................10, 12, 27

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................................................17

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................................16, 17

**STATUTES**

15 U.S.C. § 78u–4 ....................................................................................2, 7, 8, 21

Defendants Archer-Daniels-Midland Company ("ADM" or the "Company") and Juan Luciano (collectively the "ADM Defendants") submit this Memorandum in Support of their Motion to Dismiss Plaintiffs', KBC Asset Management NV, Ethenea Independent Investors S.A., and the National Elevator Industry Pension Fund ("Plaintiffs"), Complaint.[1]

## PRELIMINARY STATEMENT

On January 21, 2024, ADM disclosed that the Company had initiated an internal investigation into accounting practices, including certain intersegment transactions, with respect to the Company's Nutrition segment—one of three reporting business segments at ADM—following the receipt of a voluntary request for information from the U.S. Securities and Exchange Commission ("SEC"). (Ex. A (Jan. 22, 2024 Form 8-K).[2]) Unsurprisingly, a putative shareholder immediately raced to the courthouse to allege securities fraud against ADM and several current and former officers of the Company. And he did so without even giving the Company a chance to first assess and disclose whether the investigation would identify any mis-accounted for transactions or result in any corrections to the Company's consolidated financial statements. When ADM later filed its Form 10-K on March 12, 2024, it disclosed that, although, with the benefit of hindsight, the Company identified certain intersegment sales that occurred between Nutrition and its other operating segments that "were not recorded at amounts approximating market[,]" the adjustments needed to correct those transactions would have "no impact on the Company's consolidated balance sheets and statements of earnings,

---

[1] The "Complaint" refers to the Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws, ECF No. 67.

[2] Courts may take judicial notice of documents filed with the SEC. *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *2 n.2 (N.D. Ill. June 29, 2001). For the Court's convenience, Defendants have attached as Exhibits to this Memorandum excerpts from select public filings. ADM's public statements, including its SEC filings, are available in full at investors.adm.com. *See also* www.sec.gov.

comprehensive income (loss), or cash flows" and were "not material to the Company's consolidated financial statements taken as a whole for any period." (Ex. B (2023 10-K) at 8.)

The Company's admission of a mistake only emboldened Plaintiffs, who filed the operative Complaint on June 24, 2024, against ADM and individual defendants Juan Luciano, Ray Young, Vikram Luthar, and Vince Macciocchi (the "Individual Defendants" and together with ADM, "Defendants"). The Complaint sets forth over 60 statements related to the accounting of intersegment sales, Nutrition's operating profits and sources of growth, and the effectiveness of the Company's internal controls that Plaintiffs allege were intentionally false and misleading over a nearly four-year period from April 30, 2020, through January 21, 2024 (the "Class Period"). But an accounting mistake is not in itself securities fraud. Instead, to state a claim, Plaintiffs must allege facts "giving rise to a strong inference" that ADM not only made a mistake, but that Defendants made false and misleading statements related to that mistake with an intent to defraud investors. 15 U.S.C. § 78u -4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). As shown below, Plaintiffs fall woefully short of meeting this burden.

Nowhere in the 349-paragraph Complaint do Plaintiffs assert a single fact showing that any Individual Defendant, much less ADM, knew or had reason to know that intersegment sales were not recorded at rates approximating market at the time of the alleged misstatements or that Nutrition's operating profits were, as a result, different than stated. Instead, Plaintiffs allege that the Individual Defendants *must have known* that the Company recorded intersegment sales at non-market rates in violation of its policies because they occupied senior positions, had access to unspecified information, acknowledged the importance of the Nutrition segment generally, and signed SEC filings. But these types of generic allegations fail to meet the exacting standard for

pleading scienter and are regularly rejected. Nor does the existence of a GAAP violation, government investigation, or job resignations, without more, show scienter. And the facts underlying Plaintiffs' allegations of motive on behalf of ADM executives are similarly benign. Simply put, nothing in the Complaint makes fraud as compelling of a conclusion than simply the existence of a now-corrected mistake.

Finally, even if the threadbare allegations of scienter were somehow sufficient to survive a motion to dismiss the entire Complaint (and they are not), the Court should nonetheless substantially narrow what remains. Plaintiffs fail to plead facts that support that many of the 60-plus statements they point to—a grab bag of vague and unrelated assertions about the Nutrition segment—are either material or false.

## BACKGROUND

### A. ADM Deals in Agricultural Commodities and Products.

ADM is a global agricultural supply chain manager and processor and a premier provider of human and animal nutrition products. (Ex. B (2023 10-K) at 5.) ADM produces ingredients for sustainable nutrition, from staple foods, including flour, oils, and sweeteners, to alternatives, including plant-based meat and dairy, as well as animal nutrition products. (*Id.*) ADM is also a leading supplier of products designed for consumers focused on health and well-being, including probiotics, enzymes, supplements, and more. (*Id.*)

ADM reports financial results in three business segments, which are based on the nature of products and services offered: (1) Ag Services and Oilseeds ("AS&O"), (2) Carbohydrate Solutions ("Carb Solutions"), and (3) Nutrition. (Compl. ¶ 47; Ex. B (2023 10-K) at 6.) Together with the Company's remaining business operations (which are not reportable business segments), ADM reports these segments on its consolidated financial statements. (*Id.*)

3

ADM's AS&O segment includes activities related to the purchase, transportation, and storage of agricultural raw materials and the processing of oilseeds into vegetable oils and protein meals. (Compl. ¶ 33; Ex. B (2023 10-K) at 6.) Its Carb Solutions segment converts corn and wheat into various products used in the food and beverage industry as well as ethyl alcohol and ethanol. (*Id.*) And its Nutrition segment engages in the manufacture, sale, and distribution of specialty food and feed ingredients, including "plant-based proteins, natural flavors, flavor systems, natural colors, emulsifiers, soluble fiber, polyols, hydrocolloids, probiotics, prebiotics, postbiotics, enzymes, [and] botanical extracts." (Ex. B (2023 10-K) at 7.) In connection with its operations, Nutrition purchases certain raw materials from both the AS&O and Carb Solutions segments (through intersegment sales), which it then uses as base ingredients in its end-consumer products. (Compl. ¶ 48.)

### B. The Individual Defendants.

Defendants Juan Luciano, Vikram Luthar, Ray Young, and Vincent Macciocchi are current and former senior executives at ADM. Luciano joined ADM in 2011 and currently serves as the Company's President, CEO, and Chairman of the Board of Directors—positions he has held since 2014, 2015, and 2016, respectively. (Compl. ¶ 27.) Luthar joined the Company in 2004 and served in several roles, including as CFO of Nutrition from January 2020 until April 2022, when he was promoted to CFO of ADM. On April 19, 2024, following a three-month administrative leave, Luthar entered into an agreement to resign from ADM, effective September 30, 2024. (*Id.* ¶ 28.) Young served as CFO of ADM from December 2010 until April 2022, when he briefly transitioned to Vice Chairman of ADM until his retirement in December 2022. (*Id.* ¶ 29.) Macciocchi joined ADM in 2014 and served as Senior Vice President of ADM, and President of Nutrition, from May 2015 until his retirement at the end of 2023 (*id.* at 30), and

4

as Chief Sales and Marketing Officer from January 2020 until his retirement. (Ex. C (2019 10-K) at 117; Ex. D (Nov. 13, 2023 8-K), Item 5.02 (announcing retirement).)

As high-ranking officers, the Individual Defendants spoke on behalf of ADM on investor calls and Defendants Luciano, Luthar, and Young also signed various public filings during the Class Period. (Compl. ¶ 255.) Many of those public filings included consolidated financial statements that reported ADM's operating profits, of which the Nutrition segment's operating profits are a component. Nutrition's operating profits were separately reported in the notes to these consolidated financial statements, along with statements that the "financial statements have been prepared in accordance with generally accepted accounting principles (GAAP)" and "[i]ntersegment sales have been recorded at amounts approximating market." (*See, e.g.*, Compl. ¶ 85; 2020 Q1 10-Q at 31.) (*See, e.g.*, Compl. ¶ 85; Ex. E (2020 Q1 10-Q) at 31.) The public filings and comments made by the Individual Defendants also described, among other things, details regarding the performance of the Nutrition segment, including its various sources of growth, as well as the belief that the Company had in place effective internal controls. (*See, e.g.*, Compl. ¶¶ 124-133, 159.)

### C.    ADM Discloses Intersegment Accounting Errors.

On January 21, 2024, ADM disclosed that it had initiated an internal review under the oversight of the independent Audit Committee of ADM's Board of Directors "regarding certain accounting practices and procedures with respect to the Company's Nutrition reporting segment, including as related to certain intersegment transactions." (Compl. ¶ 179; Ex. A (Jan. 22, 2024 8-K), Item 5.02.) ADM further disclosed that it had retained independent external counsel to assist the review and had placed its then-CFO Luthar on administrative leave. (*Id.*) As a result of the investigation, ADM expected to delay its earnings release and conference call relating to the fourth quarter and full year 2023 financial results, as well as its Annual Report on Form 10-K for

the year ended December 31, 2023. (Ex. A (Jan. 22, 2024 8-K), Item 7.01.) Following ADM's disclosure of the intersegment accounting errors, ADM's stock price declined by more than 20%. (Compl. ¶ 180.)

On March 12, 2024, ADM filed its 2023 10-K, which corrected certain accounting errors in ADM's financial statements. (Compl. ¶ 188.) Specifically, the 10-K disclosed that ADM had "identified certain intersegment sales that occurred between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments that were not recorded at amounts approximating market." (*Id.* ¶ 189.) Importantly, however, ADM explained that "[b]ecause each sale to be adjusted occurred between the Company's reporting segments, the adjustments ha[d] no impact on the Company's consolidated balance sheets and statements of earnings, comprehensive income (loss), or cash flows . . . . and [were] not material to the Company's consolidated financial statements taken as a whole for any period." (Ex. B (2023 10-K) at 8.) As a result, ADM did not restate its consolidated financials for any reporting period.

### D. This Action is Reflexively Filed.

Immediately following the January 21, 2024 press release, and even before ADM filed its 2023 10-K correcting the intersegment accounting errors, a shareholder filed this putative class action alleging securities fraud. (ECF No. 1.) Following the appointment of lead counsel and plaintiffs, on June 24, 2024, Plaintiffs filed the Complaint, asserting claims under Sections 10(b), 20(a), and 20A of the Exchange Act on behalf of investors who purchased ADM common stock during the Class Period. (Compl. ¶ 1.)

Plaintiffs challenge various statements made during the Class Period concerning (1) financial results and accounting, (2) the sources of Nutrition operating profits and growth, and (3) internal controls. (Compl. ¶¶ 82-167.) Plaintiffs allege that all the challenged statements

6

were false or misleading for the same reason—certain intersegment sales were recorded at non-market prices. (*See, e.g.*, Compl. ¶ 94 (alleging that statements about Nutrition's operating profit were false or misleading because ADM's accounting of intersegment sales "inflate[d] Nutrition operating profit"); *id.* ¶ 135(b) (statements about factors contributing to Nutrition's operating profits were misleading because they omitted that Nutrition's profits were "boosted . . . by recording intersegment sales to Nutrition at amounts below market rates"); *id.* ¶ 163(a) (statements about internal controls were misleading because "ADM lacked adequate controls around the measurement of intersegment sales").)

## **LEGAL STANDARD**

To survive a 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). A claim has facial plausibility when the claimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The complaint must do more than recite the elements of a cause of action in a conclusory fashion." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678); *see also Lauria v. Biosante Pharms., Inc.*, 968 F. Supp. 2d 951, 956 (N.D. Ill. 2013) ("[C]onclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth.").

The Private Securities Litigation Reform Act (PSLRA) imposes further pleading requirements on Exchange Act claims. A securities fraud complaint must first "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed[.]" 15 U.S.C. § 78u–4(b)(1). It must also "state with particularity facts giving rise to a strong inference

7

that the defendant acted with the required state of mind[.]" § 78u–4(b)(2)(A); *see Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598–99 (7th Cir. 2019).

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (citation omitted). As explained below, the Complaint does not satisfy the third element (scienter), and as to many statements, fails to also satisfy the first and second elements (falsity and materiality).

## I. PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER.

Plaintiffs fail to allege a strong inference of scienter as to any Individual Defendant. Thus, their allegations of scienter as to ADM also fail. To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant[s]" harbored an "intention to deceive, manipulate, or defraud" when making the allegedly false or misleading statements. *Tellabs*, 551 U.S. at 313. That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. To satisfy the PSLRA's specificity requirements in multi-defendant cases, a plaintiff "must create a strong inference of scienter with respect to *each individual defendant*." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (emphasis added); *see also Cornielsen*, 916 F.3d at 602. Corporate scienter cannot be established in the absence of

8

any individual corporate official's scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

At the pleading stage, plaintiffs may satisfy the scienter element "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Tricontinental Indus. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002). Plaintiffs' Complaint does neither.

**A.      Plaintiffs Do Not Allege Any Specific Information Known by Defendants at the Time of the Alleged Misrepresentations.**

Plaintiffs' case is entirely premised on ADM's disclosure that the Company determined, in hindsight and based on ADM's investigation, that it had recorded certain intersegment sales at prices that did not approximate then-prevailing market prices. But it is well-settled that "there [is] no securities fraud by hindsight." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851, IBT v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) ("There is no 'fraud by hindsight'[.]"). And Plaintiffs offer no basis to conclude that any Individual Defendant—much less all of them—knew that intersegment sales had been recorded at amounts not approximating market at the time the alleged misrepresentations were made.

Plaintiffs gloss over the lack of facts supporting scienter by claiming that Defendants must have known that "Nutrition was buying raw material from ASO and Carb Solutions at below market prices" because they closely monitored "cost inputs to Nutrition growth." (Compl. ¶ 266.) But Plaintiffs do not explain why monitoring costs would necessarily involve monitoring

9

a specific set of intersegment sales that form a component of those costs—let alone the approximate market rate of those sales or their compliance with ADM's policies and with Generally Accepted Accounting Principles ("GAAP"). Even worse, Plaintiffs lean on statements indicating that Nutrition is an important segment for ADM. (*See, e.g.*, *id.* ¶ 263.) That Defendants acknowledged Nutrition as a valuable segment and that they were aware of Nutrition's general performance and operating profits says nothing about whether they were aware that certain intersegment transactions underlying those profits did not approximate market rates or satisfy GAAP. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false."); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 663 (N.D. Ill. 2020) ("Even if Defendants knew about a Pinnacle promotion or practice, it does not necessarily follow that Defendants knew those promotions or practices were fraudulent or wrongful."), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022).

Ultimately, Plaintiffs' attempt to allege that the Individual Defendants *must* have known about the intersegment accounting errors without identifying specifically *how* or *why* they would have known is a non-starter. "[C]ourts in this district have declined to allow plaintiffs to use a 'must have known' theory as 'an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly.'" *Conagra*, 495 F. Supp. 3d. at 659 (quoting *In re Bally Total Fitness Sec. Litig.*, No. 04 C 03530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006)). Here, Plaintiffs' conclusory "must have known" allegations cannot support an inference that any Defendant "knew the statement was false or was reckless in disregarding a substantial risk of its being false." *City of Livonia*, 711 F.3d at 756.

**B.      Plaintiffs' Circumstantial Allegations Are Inadequate to Demonstrate Scienter.**

Without any specific facts supporting scienter as to any Defendant, Plaintiffs are left to point to circumstantial inferences, none of which support a strong inference of scienter.

*Mere Access to Information.* Plaintiffs' core theory is that Defendants had access to information concerning Nutrition's operating profits, and thus knew or should have known that certain intersegment sales were recorded at amounts not approximating market. (Compl. ¶¶ 255-258 ("Defendants were privy to confidential and proprietary information concerning ADM's Nutrition segment and intersegment sales."); *id.* ¶¶ 259-265 ("In their roles as the leaders of ADM and Nutrition . . . the Individual Defendants [needed] to track Nutrition operating profits."); *id.* ¶¶ 268-273 ("Defendants held themselves out to investors and the market as the persons . . . most knowledgeable about [] the Nutrition segment's operating profits and growth, ADM's intersegment sales, and the Company's accounting and internal controls.").) Again, however, because Plaintiffs fail to plead with particularity how access to these categories of information would have revealed that intersegment sales were not recorded at amounts approximating market value or that any alleged statement was known to be false at the time it was made, Defendants' purported access to such information does nothing to show scienter. *See Cornielsen*, 916 F.3d at 602 ("[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information."); *Fryman v. Atlas Financial Holdings, Inc.*, 462 F. Supp. 3d 888, 902 (N.D. Ill. 2020) (rejecting plaintiffs' scienter arguments based on defendants' alleged access to information that undermined the veracity of their statements because plaintiffs failed to "state with particularity the information to which [ ] [d]efendants had access"); *City of New Orleans Emps.' Ret. Sys. v. PrivateBancorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *8 (N.D. Ill.

11

Nov. 3, 2011) ("Vague allegations that defendants had 'access to undisclosed information' have been rejected under the PSLRA.").

*Senior-Level Positions.* Similarly, Plaintiffs cannot rely on the Individual Defendants' executive positions at ADM to suggest they had access to adverse information about intersegment sales to Nutrition or Nutrition's operating profits. "[S]enior positions" within a company "do not suggest scienter without additional support from internal documents or communications." *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17-cv-01713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018). Likewise, generalized allegations about management style (Compl. ¶ 268 (alleging that Defendant Luciano was a "hands-on" executive)) are insufficient. *See Conagra*, 495 F. Supp. 3d at 662 (allegation that CEO had "special familiarity" with business failed to "connect the dots" between CEO's knowledge and alleged practices). Because Plaintiffs do not point to any specific information—such as internal documents or communications disclosing that intersegment sales were below market— Defendants' "positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA." *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *12 (N.D. Ill. Jan. 12, 2021) (quoting *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009)), *aff'd*, 679 F.3d 952 (7th Cir. 2012).

*GAAP Violations.* Plaintiffs also allege, incorrectly, that the existence of a GAAP violation is a basis to infer scienter. *See Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 838 (N.D. Ill. 2000) ("A company's overstatement of earnings, revenues, or assets in violation of GAAP does not itself establish scienter."). In fact, even where (unlike here) there is a formal restatement of prior period financials, "[t]he restatement itself does not create an inference of wrongdoing."

12

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 713 (N.D. Ill. 2005). "Instead, the 'complaint must also show facts supporting an inference that defendants recklessly disregarded the deviance or acted with gross indifference to the misrepresentations in its financial statements.'" *Sabratek*, 100 F. Supp. 2d at 838 (quoting *In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, at *14 (N.D. Ill. Mar. 8, 2000)); *Davis*, 385 F. Supp. 2d at 715 (GAAP violations "fall far short of raising a strong inference of knowing or reckless misrepresentation"). Here, Plaintiffs plead no facts to rule out the opposing (and more plausible) inference that the accounting errors were inadvertent, rather than the result of recklessness or gross indifference.

Plaintiffs allege that because ADM's "accounting policy was simple to apply," the repeated under-recording of intersegment sales in violation of GAAP "shows that this was an intentional act." (Compl. ¶¶ 274-79.) But this theory is wrong as well. Bare allegations of GAAP violations—no matter how "simple"—are insufficient, standing alone, to raise an inference of scienter. *In re Bally*, 2006 WL 3714708, at *7 (rejecting plaintiffs' assertion that the court could "infer scienter from . . . the high number and repetitiveness of the GAAP violations and the simplicity of the accounting principles that were violated"). And, in any event, Plaintiffs' own claim that the intersegment sales were misrecorded consistently for "six year[s]" undercuts their theory that the accounting policies were "straightforward" or "simple" or that Defendants knew of the errors. *See Baxter*, 2021 WL 100457, at *14 (explaining the fact "that the [alleged GAAP violations] had been occurring for over a decade . . . undermine[d] the inference that [defendants] knew about or recklessly ignored [the violations]") (citing *Webb v. SolarCity Corp.*, 884 F.3d 844, 857-58 (9th Cir. 2018) (finding that an accounting error was not "immediately obvious" to the defendants where, among other things, it was not discovered for seven consecutive quarters and was only discovered after consultation with the company's independent auditor)).

*Core Operations.* Plaintiffs' boilerplate "core operations" theory is not viable to allege scienter either. (Compl. ¶¶ 259-267 ("Given that Nutrition was seen as the most important business to [ADM], information concerning the operating profits of ADM's Nutrition segment . . . was essential information to the Individual Defendants.").)

*First*, in cases where the alleged fraud concerns "errors and wrongdoing involving accounting," a core operations inference applies only when the accounting "concern[s] a 'significant part' of a corporate defendant's financial picture." *Baxter*, 2021 WL 100457, at *13-14 (citing cases and concluding core operations inference applies only where alleged accounting fraud concerned a "'significant part' of [defendant's] financial picture—more than 57 percent of its total sales from 2017 through 2019, totaling almost $19 billion"). Here, the intersegment sales do not concern a "significant part" of ADM's financial picture. To the contrary, as the Company disclosed, "the adjustments [correcting the transactions at issue] ha[d] no impact on the Company's consolidated balance sheets and statements of earnings, comprehensive income (loss), or cash flows." (Ex. B (2023 10-K) at 8.) The same is true even analyzing the accounting errors in terms of operating profits at the segment level. (*See* Compl. ¶ 223 (showing that the accounting error overstated Nutrition's yearly operating profits between 2.9%-10.2%)). Moreover, as Plaintiffs recognize, Nutrition is the smallest of ADM's three segments—representing at most "17% of the Company's annual reported operating profit during the Class Period." (*Id.* ¶ 229.)

*Second*, even if the core operations doctrine somehow applied to ADM's intersegment sales, that would not be enough to infer knowledge of accounting or GAAP compliance issues for those sales. Even assuming the Individual Defendants knew about some of the affected intersegment sales, it does not automatically follow that Defendants also knew the intersegment

14

sales were priced at amounts not approximating market or contrary to disclosures, or that there was risk of those errors. *See Baxter*, 2021 WL 100457, at \*14 (explaining that at most, the court could infer defendants' knowledge that a "core" accounting convention was employed, perhaps even "what the convention entailed," *but not knowledge that "[the convention] violated GAAP or that there was a risk this was the case*") (emphasis added); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at \*10 (N.D. Ill. Mar. 27, 2012) ("The fact that enrollments were vital to DeVry's business [did] not create a 'strong inference' that the defendants knew whether or how often its recruiters crossed the line" "to meet management's enrollment expectations."); *cf. Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1166 (E.D. Wis. 2017) ("[K]nowing an accounting rule and knowing that it is not being followed by your company's accountants are two different things."), *aff'd*, 895 F.3d 933 (7th Cir. 2018).

*SOX Certifications.* Next, Plaintiffs ask the Court to infer recklessness based on allegations that the Individual Defendants signed SOX certifications attesting to the accuracy of ADM's financial statements and effectiveness of internal controls over financial reporting. (Compl. ¶ 258.) This approach too has been rejected by courts around the country. *See Baxter*, 2021 WL 100457, at \*15 (citing cases). SOX certifications "are only probative of scienter if [] Plaintiffs allege additional facts showing that, *at the time they made these certifications*, [Defendants] knew or were reckless in failing to recognize that [their] internal controls and procedures were ineffective." *Id.* Plaintiffs do not do so here.

*Executive Departures and Federal Investigations.* Finally, Plaintiffs allege that the "suspicious departure" of Individual Defendants Luthar and Macciocchi from ADM amidst ongoing federal investigations—and Individual Defendant Young's decision to resign from the

15

boards of *other* companies—supports an inference of scienter against ADM and the Individual Defendants. (Compl. ¶¶ 300-309.) But "an inference of scienter arises only when a resignation or termination is accompanied by additional evidence of the defendant's 'wrongdoing.'" *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)), *as amended* (Feb. 10, 2009). Similarly, a federal investigation does not support an otherwise uncompelling assertion of scienter. *See Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, No. 20 C 2176, 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2022) ("Government investigations can help to reinforce allegations of scienter. . . . But making such an inference on its own strikes the Court as improperly inferring fraud by hindsight."). Here, Plaintiffs fail to allege any specific facts to support a theory that any Individual Defendant engaged in wrongdoing, nor have Plaintiffs refuted "the reasonable assumption[s]" that (1) Young resigned from third-party boards to avoid distraction and (2) the ADM departures were either unrelated (in the case of Macciocchi's retirement) or "simply because the errors that [led] to the [corrections] occurred on [their] watch or because [they] failed adequately to supervise [their] department." *Zucco Partners*, 552 F.3d at 1002; *accord Baxter*, 2021 WL 100457, at *17.

Moreover, even if the departures could support an inference of scienter (and they do not), "the extent of the impact of these termination/resignation allegations to each relevant individual defendant is different." *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 894 (N.D. Ill. 2023). At a minimum, these allegations cannot support an inference of scienter against Luciano, who remains ADM's CEO. *See Baxter*, 2021 WL 100457, at *17 (reasoning that the defendant company would not have retained its CFO if the individual had been involved in fraudulent conduct). Likewise, Defendant Young retired from ADM well before the

16

investigation, and Plaintiffs fail to explain how resigning from the boards of companies *unrelated to ADM* could support an inference of scienter against him (*see* Compl. ¶¶ 186-187, 307 (no allegations that those companies knew something Plaintiffs did not))—much less how they could support an inference against ADM, his former employer. As for Macciocchi, Plaintiffs point to the compensation he forfeited upon his departure—but executives regularly "forfeit … potential compensation" (*id.* ¶ 304) when they leave one job for another, a fact that does not suggest wrongdoing. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020) (plaintiff's allegation that "resignation was 'highly suspicious' because [defendant] was 'only seven months into his lucrative three-year employment agreement'" was "insufficient to establish an inference of scienter"). And that Mr. Macciocchi spoke about Nutrition's future several months before leaving is not evidence of anything other than continued performance of his duties. Finally, Plaintiffs' allegations that Luthar entered into a separation agreement with ADM and "resign[ed]" following the corrections (Compl.¶ 306), fall far short of overcoming "'the reasonable assumption that the resignation occurred as a result of' the release of bad news." *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 118 (3d Cir. 2018) (quoting *Zucco Partners*, 552 F.3d at 1002). *cf. Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[M]embers of management resign for all sorts of reasons, including . . . simply because the optics of changing management are better for investors."). Without more, none of the resignations supports an inference of scienter that is "at least as compelling" as the "opposing inference" that the defendant resigned for reasons unrelated to the alleged fraud. *Tellabs*, 551 U.S. at 314.

**C.    Plaintiffs' Motive Allegations Do Not Support a Strong Inference of Scienter.**

Finally, Plaintiffs fail to adequately allege any motive to defraud. "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia*, 711 F.3d at

758. And "a generalized motive common to all corporate executives"—such as "the desire to increase the value of a company and attain the benefits that result"—is not enough to establish scienter. *Davis*, 385 F. Supp. 2d at 714; *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018).

### 1. Compensation Structure

Plaintiffs first argue that ADM's compensation structure, which allegedly prioritized Nutrition's operating profits, motivated the Individual Defendants to commit fraud. (Compl. ¶¶ 280-293.) But courts consistently decline to infer scienter from such a generic corporate incentive. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (holding that defendants' "incentive to . . . improve their bonuses" was too generic to satisfy the PSLRA); *see also In re Bally*, 2006 WL 3714708, at *9 ("[T]he motive to earn bonuses and awards . . . [is] too common among corporations and their officers to be considered evidence of scienter."); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 635–36 (S.D.N.Y. 2008) ("Performance based compensation plans 'are typical of nearly every corporation' and are usually insufficient to plead motive."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. . . . It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."). Nor have Plaintiffs shown that ADM's compensation package allowed Individual Defendants to "benefit to an unusual degree" when compared to the "accepted range for corporate executives of similarly sized companies." *Davis*, 385 F. Supp. 2d at 714 (dismissing for failure to plead scienter) (quoting *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002)). Without more, Plaintiffs' compensation-related allegations do not support an inference of scienter.

18

### 2.    Stock Sales

Next, Plaintiffs allege that certain Individual Defendants' sales of ADM stock during the Class Period supports an inference of scienter. (Compl. ¶¶ 294-299.) But the simple fact of stock sales is not sufficient to allege scienter absent a threshold showing that the timing and amount of sales were suspicious—a threshold Plaintiffs fail to meet. *See Sabratek*, 100 F. Supp. 2d at 841 ("[T]o adequately allege scienter based on insider trades, the plaintiffs must set forth facts establishing that the individual defendants' sales were suspicious because of the timing and amount of the sales."). Plaintiffs assert that the Individual Defendants' sales are suspicious primarily because Defendants Luciano, Young, and Macciocchi did not sell shares in the four years before the Class Period. (*See* Compl. ¶¶ 295-298.) Yet that is far from "suspicious," for several reasons.

*First*, Plaintiffs allege in their complaint that ADM's stock price "languish[ed] for years as market conditions remained unpredictable" in the years leading up to the Class Period. (Compl. ¶ 36.) Indeed, Plaintiffs report that "ADM's stock price crept from an average of around $27.20 in January 2009 to an average of $28.60 in January 2013, a modest 5% increase in over four years." (*Id.*) ADM stock was "around $40 at the end of 2017" (*id.* ¶ 44), and "around $35 per share at the start of the Class Period" (*id.* ¶ 294). It is therefore unsurprising that the Individual Defendants did not actively trade their shares in ADM during the years leading up to the Class Period, especially when doing so may have realized a loss, or at least an insubstantial gain. In contrast, during the Class Period, it would have been unusual *had* the Individual Defendants continued to hold onto their ADM shares, even as the price of the stock reached double or triple the acquisition price. Were courts to accept a corporate executive's desire to buy low, hold, and sell high, as sufficient to establish scienter in an alleged fraud scheme, "most

19

corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless." *Davis*, 385 F. Supp. 2d at 714.

*Second*, ADM policy requires executives "to own shares of common stock with a fair market value ranging from one to six times the individual's base salary." (*See, e.g.*, Ex. J (2020 14A), at 41 ("Executives may not sell any company securities until the applicable guideline is met.").) With respect to Defendant Macciocchi, who did not join ADM until 2014 (Compl. ¶ 30), the most plausible inference is that, in the years leading up to the Class Period, Macciocchi was holding ADM stock to build reserves that would satisfy ADM's directive that "each member of senior management [] maintain a significant ownership position in shares of ADM's common stock." (*See* Ex. J (2020 14A), at 41.)

*Third*, with respect to Defendant Luthar, Plaintiffs do not even try to claim that the timing or the amount of sales were unusual. Nor could they. Luthar only sold a relatively small number of shares during the Class Period even when ADM's stock was soaring. Luthar's failure to reap the benefits of the alleged fraud cuts directly against any inference of scienter.

*Finally*, there is nothing "suspicious" about the number of shares sold by any Individual Defendant. Indeed, despite Plaintiffs' allegations that Defendant Luciano "dumped" his shares during the Class Period (Compl. ¶ 295), ADM's Proxy disclosures from 2020-2024 show that Luciano's ownership position in ADM significantly *increased* during the Class period—from "23.6x" his based salary as of March 16, 2020, to "74.4x" his base salary as of April 4, 2024. (*See* Ex. F (Beneficial Ownership Chart); *see also* Exs. G-N.) Defendants Young's and Macciocchi's ownership interests increased over that period as well. (*Id.*)

Ultimately, Plaintiffs' generalized circumstantial allegations and generic attempts at establishing a motive fail to support an inference that Defendants intended to engage in a

fraudulent scheme because they are not "*at least as likely as*" equally germane opposing inferences of non-fraudulent intent, *see Tellab*, 551 U.S. at 328—namely, that the Individual Defendants, in their roles as the leaders of ADM, were truly optimistic in their forecasting concerning the growth potential for ADM, including Nutrition; that they pushed employees to grow Nutrition and its operating profit (but not to commit fraud); and finally that, like many of the ADM's shareholders prior to and during the Class Period, they capitalized on the dramatic increase in the value of their shares.

Given Plaintiffs' overall failure to plausibly allege scienter for any Defendant, the Court should dismiss their Complaint in its entirety.

## II. PLAINTIFFS FAIL TO PLEAD THAT MANY OF THE ALLEGED MISSTATEMENTS ARE MATERIALLY FALSE AND MISLEADING.

Even if Plaintiffs adequately alleged scienter (and they have not), many of the challenged statements were not false or misleading. To state a claim under Section 10(b), Plaintiff must allege either (1) an untrue statement of material fact or (2) the omission of a material fact that was necessary to make a particular statement not misleading in light of the circumstances under which it was made. 15 U.S.C. § 78u-4(b)(1). Plaintiffs must do more than claim the statements were false and misleading; they must demonstrate with specificity why and how each statement was misleading. *Id.*; *see also Cornielsen v. Infinium Capital Holdings, LLC*, 168 F. Supp. 3d 1033, 1044 (N.D. Ill. 2016) ("A plaintiff . . . must identify with particularity the affirmative statement that an omission renders misleading."). Here, Plaintiffs challenge a laundry list of statements concerning ADM's growth, operating profits, and internal controls. (Compl. ¶¶ 82-167.) As explained below, most are not adequately alleged to be false or misleading at the time they were made or are not actionable as a matter of law.

***Optimistic Statements About ADM's Business and Growth Prospects***. To start, many of

the alleged misstatements consist of nonactionable puffery. Plaintiffs challenge numerous statements about the potential earnings and growth opportunities associated with ADM's Nutrition segment that are quintessential statements of corporate optimism and provide no objectively verifiable facts on which a reasonable investor would rely. (Compl. ¶¶ 123-57.) These statements "are too vague to be actionable; they are, in the words of the Seventh Circuit, mere 'puffery,' lacking 'the requisite specificity to be considered anything but optimistic rhetoric.'" *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *7 (N.D. Ill. Nov. 14, 2000) (quoting *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).) For example:

- ADM's Nutrition goal is based on "the *current strategy*, which is *organic growth* and bolt on." (Compl. ¶ 128(a) (emphasis added).)

- "[I]t's a good growth story and a *good growth trajectory* from an *organic basis*. And what we've done is we've really taken the approach of *let's grow organically*." (*Id.* ¶ 128(b) (emphasis added).)

- "The fact that we are in carbohydrates and the fact that we are in oilseeds gives us a footprint to start with this. And *I think* that's *very important*. And that's *sometimes an unseen competitive advantage* that we have." (*Id.* ¶ 129(a) (emphasis added).)

- "[A] relatively small business like Nutrition takes on all that operational excellence and all that low cost to come to the market being *more efficient than anybody else*" and "there are *incredible number of synergies* that are *a little bit like an iceberg*, most of them underwater and not seen." (*Id.* ¶ 129(b) (emphasis added).)

- Nutrition is "a *significant contributor*. And it's actually *very, very robust earnings*, right, *very predictable, robust earnings*." (*Id.* ¶130(a) (emphasis added).)

- ADM is "*growing the Nutrition business* . . . . through . . . *organic growth* and bolt-on acquisitions." (*Id.* ¶ 130(b) (emphasis added).)

- Nutrition has a "*strong organic growth program*." (*Id.* ¶ 132 (emphasis added).)

- ADM's "*growth strategy* . . . encompasses *organic and inorganic initiatives*." (*Id.* ¶ 133(a) (emphasis added).)

- ADM has a "*very good* organic growth story." (*Id.* ¶ 137(a) (emphasis added).)

22

- "We're *focused on our organic growth* and how we'll continue to drive our business." (*Id.* ¶ 141(b) (emphasis added).)

As the Seventh Circuit has repeatedly instructed, non-specific references to "growth" are "better described as puffery rather than as material statements of fact." *Searls*, 64 F.3d at 1066; *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b-5."). Courts in this district and elsewhere therefore have dismissed claims based on statements like the ones challenged here, finding they are inactionable puffery. *See, e.g.*, *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008) ("Statements regarding Motorola's '. . . proven record of growth,' making 'Motorola well-positioned to continue creating value,' [are] so vague and unspecific that no reasonable investor would rely on [them]."); *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1356 (N.D. Ga. 2001) (assertion of achieving "growth milestones" was puffery); *Shemian v. Rsch. In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statements about "exciting growth" were nonactionable puffery), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (statement that company had "extremely large runway for near-term growth" was nonactionable puffery), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015). Claims based on general references to a strategy of "organic growth" should similarly be dismissed.

Plaintiffs' challenged statements about other hoped-for financial benefits flowing from the Nutrition segment fare no better. (*See, e.g.*, Compl. ¶ 130(a) (touting Nutrition's "predictable" and "robust" earnings); *id.* ¶ 141(d) (opining that Nutrition would provide a "stable earnings base"); *id.* ¶ 137(b) (expressing view that there was "an opportunity to margin up this

23

business"); *id.* ¶ 141(c) ("[W]e've identified significant opportunities to margin up this portfolio.").) Those, too, are puffery and provide no basis for a fraud claim. *See, e.g.*, *Newell*, 2000 WL 1705279, at \*13 (statement that "'the Company expects . . . gross margins to improve,' was nothing more than vague puffery").

Finally, courts routinely find similar statements about "synergies" or competitive advantages associated with a company's business segments inactionable as a matter of law. *See Fifth Third*, 2022 WL 1642221, at \*19 (statement that defendant was "taking advantage of cross-sell opportunities generated by synergies formed by the Company's business segments" was "not specific enough to make it material" because it did "not make concrete representations that might make it the kind of substantive statement upon which an investor would rely"); *Newell*, 2000 WL 1705279, at \*7 ("references to synergies" are immaterial puffery). Defendants' statements that there were "synergies" between ADM's segments or that one segment provided a "competitive advantage" to another therefore cannot form the basis of a securities fraud claim. (*See, e.g.*, Compl. ¶ 137(c) (discussing how the Nutrition business "benefit[s] from or complement[s] the traditional ag and processing business of ADM").)

***Statements About the Source of Nutrition's Operating Profits and Growth***. Plaintiffs also challenge a wide variety of unrelated and generalized statements about the factors contributing to the growth and operating profits of ADM's Nutrition segment. (Compl. ¶¶ 124, 125, 126, 127, 131, 133, 136, 137, 138, 139, 140, 141(a), 142, 144, 145, 146, 147, 148, 149, 150, 154, 155.) These statements include:

- "[I]ncreased revenues in North America and EMEAI flavors, continued sales growth in alternative proteins, and additional bioactives income drove improved results . . ." (Compl. ¶ 125.)

- "[R]esults improved year-over-year driven by strong performance from Neovia, good volumes and margins in feed additives, and solid sales in pet care." (*Id.*)

24

- "[F]lavors continued to deliver solid results on good sales mix and margin expansion in North America . . ." (*Id.* ¶ 126.)

- "[R]ising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients." (*Id.*)

- "Health & Wellness delivered higher performance on strong sales for probiotics, improved volumes and margins in fiber, and additional fermentation income." (*Id.*)

Plaintiffs have not alleged any facts suggesting that these statements or any others outlining factors contributing to growth and operating profits were materially false or misleading when made. "In order to adequately plead that Defendants misled investors, 'plaintiffs must point to a specific statement that is made misleading by [an] omission,' and offer 'specific, contradictory information' known to [Defendants] sufficient to establish that [Defendants] made any misleading statements." *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *5 (N.D. Ill. Mar. 29, 2012); *see also Cornielsen*, 168 F. Supp. 3d at 1044 ("A plaintiff . . . must identify with particularity the affirmative statement that an omission renders misleading."); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("What sinks plaintiff's position is their inability to identify any false statement—or for that matter any truthful statement made misleading by the omission.").

Here, Plaintiffs allege that ADM's statements about the factors contributing to Nutrition's growth and operating profits were misleading because they did not include a simultaneous disclosure about the pricing for certain intersegment sales. But in addition to failing to allege scienter with respect to these purported omissions (*see supra* Section I), Plaintiffs fail to adequately allege a close nexus between these statements and the alleged omissions. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) ( "cost-savings estimates" were not misleading because they were "not coupled with more information

25

about the ongoing costs of consolidation," because "the one-time expenses of integration are categorically distinct from recurring savings gained by melding similar businesses"); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2012) (finding no nexus between statements regarding source of revenue and alleged omissions regarding aggressive sales tactics and quota system); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437–38 (S.D.N.Y. 2005) (rejecting claims based on statements that did "not relate to the financial figures that BISYS restated" because they were not "false or misleading").

Instead, Plaintiffs insist that ADM's accurate disclosure of the factors contributing to its growth were somehow inaccurate because they supposedly "concealed that Nutrition operating profits were not being positively impacted by *just* the improved performance or margins of small components of the Nutrition business." (Compl. ¶ 144(b).) But by that logic, the alleged omission of information about intersegment sales—let alone any number of other factors that impact profitability—would render *any* statement about ADM's performance misleading. Plaintiffs fail to plausibly allege that Defendants' disclosure of accurate and specific facts about performance drivers (such as "strong sales for probiotics," or "additional fermentation income") were materially misleading.

Nor do Plaintiffs explain why the alleged omission of information about intersegment pricing rendered ADM's statements that it achieved and expected organic growth in Nutrition false or misleading. Plaintiffs do not (and cannot) allege that Nutrition was *not* experiencing organic growth or how such failure to disclose the alleged information about intersegment sales rendered these challenged statements misleading at the time they were made. Even accepting that the Nutrition segment experienced *less* growth than originally reported in its financial statements, that does not render any *general* statement about growth false—particularly when

26

Nutrition did indeed grow overall.[3] As courts have recognized, "ongoing growth" is consistent with a "declining rate of growth." *Conagra*, 495 F. Supp. 3d at 645 (dismissing claim that statement about company's "ongoing growth" was misleading because of promotional practices that were harming the growth rate). Because Plaintiffs failed to allege any facts showing that the challenged statements were false "at the time [] made, [they] cannot serve as the basis for a securities fraud action." *Davis*, 385 F. Supp. 2d at 712.

Plaintiffs also challenge statements that Nutrition's growth "offset[] some of the deterioration that we've seen in Carb Solutions" (Compl. ¶141(a)) and that lower results in the Animal Nutrition sub-segment were "offset" by successful strategies and gains in other areas (*id.* ¶ 136 ("Animal Nutrition results were lower . . . partially offset by favorable results in amino acids, driven by improved product mix."); ¶ 155 ("Animal Nutrition results were lower compared to the same quarter last year . . . partially offset by cost management optimization actions and improving volumes.")). Yet again, Plaintiffs allege no facts that remotely suggest these statements could have been false or misleading when made; the Nutrition segment did in fact grow when the Company reported growth, even accounting for later corrections, and that growth offset poor performance in other segments. And Animal Nutrition in fact had lower results—something Plaintiffs do not dispute. Even if the offset amounts would have been reduced, that does not make the statements false. Courts in this district have rejected near-identical claims. *See Conagra*, 495 F. Supp. 3d at 645 (statement that growth in one segment "partially offset" declines in another segment not false or misleading even though the rate of

---

[3] Both as originally reported and as subsequently adjusted, Nutrition's operating profit resulted in positive year-over-year growth throughout 2018 to 2022 and negative year-over-year growth from Q1 2023 to Q3 2023. (See Ex. B (2023 10-K) at 35.) In other words, ADM's correction did not change the direction of growth in any period.

growth was declining because "'ongoing growth' is consistent with a declining rate of growth[.]"). The Court should do the same here.

*Opinion Statements About ADM's Internal Controls*. Finally, Plaintiffs challenge certain statements about ADM's disclosure and internal controls over financial reporting that are inactionable statements of opinion, including statements that ADM's controls were "effective." (Compl. ¶¶ 159, 162.) It is well established that these types of statements are opinions, not statements of fact. *See Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640, 2022 WL 1136577, at *17 (N.D. Ill. Apr. 18, 2022) ("statements about the effectiveness of Atlas' internal controls—for instance, Defendants' certification that Atlas' 'internal control over financial reporting is effective'" were opinion statements); *see also Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018).

An opinion can only give rise to liability under the securities laws if the speaker did not hold the belief she professed or had in her possession some specific item of contradictory information that a reasonable person would have thought undercut the opinion so strongly that the speaker *knew* it was misleading not to disclose that information. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "That is no small task for an investor" to plead. *Id.* The Complaint here contains no allegations that come close to clearing that bar. Plaintiffs contend only that the statements were false because ADM "suffered a material weakness in its internal controls during the Class Period." (Compl. ¶ 163(a).) But, as detailed above with respect to scienter, Plaintiffs fail to allege facts suggesting that any of the Individual Defendants knew about the intersegment sale accounting issues at the time—let alone facts to demonstrate that the issues were caused by inadequacies in ADM's controls.

In light of these pleading deficiencies, the Court should dismiss Plaintiffs' Complaint.

28

**III.** **THE COURT SHOULD DISMISS COUNTS II AND III ALLEGING CONTROL PERSON LIABILITY AND INSIDER TRADING.**

Because Plaintiffs fail to state a primary securities fraud claim, the Court should dismiss their Section 20(a) claim alleging control person liability as well. *See Pugh*, 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws."). The same is true of Plaintiffs' Section 20A claim for insider trading. *See Arbitrage Event-Driven Fund v. Trib. Media Co.*, No. 18 C 6175, 2020 WL 60186, at *11 (N.D. Ill. Jan. 7, 2020) ("Section 20A provides a derivative cause of action for an underlying insider trading violation while in possession of material, nonpublic information. Therefore, the Plaintiffs must plead a primary offense—here under Section 10(b)—to state a claim for a predicate offense under Section 20A.") (citation omitted), *aff'd sub nom. Water Island Event-Driven Fund, LLC v. Tribune Media Co.*, 39 F.4th 402 (7th Cir. 2022).

**IV.** **CONCLUSION**

For the foregoing reasons, the ADM Defendants respectfully submit that the Complaint should be dismissed.

Dated: August 23, 2024.

Respectfully submitted,

*/s/   Marcella L. Lape*
Marcella L. Lape
Charles F. Smith
Laura Bernescu
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
320 South Canal Street
Chicago, IL 60606
(312) 407-0700
marcie.lape@skadden.com
charles.smith@skadden.com
laura.bernescu@skadden.com

Scott Musoff (admitted *pro hac vice*)

29

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
scott.musoff@skadden.com

*Attorneys for Defendants Archer-Daniels-Midland Company and Juan Luciano*

30