UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND CHOW, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>  vs.<br><br>ARCHER-DANIELS-MIDLAND COMPANY, et al.,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  1:24-cv-00634<br><br>Judge Thomas M. Durkin<br><br><u>CLASS ACTION</u> |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

4896-2277-0150.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................................................1

II.     BACKGROUND ..............................................................................................................4

        A.      ADM's Expansion into the Nutrition Market Initially Fails..................................4

        B.      ADM Engages in a Six-Year Accounting Fraud Scheme to Inflate
                Nutrition Results .................................................................................................5

        C.      ADM's Stock Price and Defendants' Compensation Become Increasingly
                Tied to Nutrition's Inflated Results ........................................................................6

        D.      The Investigations and Admissions .........................................................................9

        E.      Materiality and Executive Departures After the Accounting Scheme...................10

III.    ARGUMENT..................................................................................................................12

        A.      Legal Standards.....................................................................................................12

        B.      The Complaint Adequately Alleges False and Misleading Statements .................13

                1.      ADM's Statements Regarding Financial Results and Accounting
                        Were Materially False and Misleading .......................................................14

                2.      The Sources of Nutrition Profits and Growth Statements Were
                        Materially False and Misleading................................................................15

                        a.      The Statements Concealed that a Material Source of
                                Nutrition Profits Was the Accounting Fraud ...............................15

                        b.      The Statements Are Not Immaterial "Puffery"............................20

                3.      The Internal Controls Statements Were Materially False and
                        Misleading.................................................................................................24

        C.      The Totality of Factors Supports a Strong Inference of Scienter as to Each
                Defendant.............................................................................................................26

                1.      Defendants Had Motive to Engage in and Conceal the Accounting
                        Fraud .........................................................................................................29

                2.      Defendants' Numerous Statements, Senior Positions, and Direct
                        Roles in Monitoring Nutrition's Profits and Accounting Contribute
                        to a Strong Inference of Scienter ...............................................................34

4896-2277-0150.v1

**Page**

3. The Core Operations Doctrine Supports a Strong Inference of Scienter ...........................................................................................37

4. The Simplicity of the Accounting Policy Supports a Strong Inference of Scienter ..................................................................40

5. Executive Departures Support a Strong Inference of Scienter ..................42

6. Government Investigations Support a Strong Inference of Scienter .........46

7. Corporate Scienter Is Established ..............................................................47

8. Defendants' Additional Arguments Are Meritless ....................................48

  a. There Is No Group Pleading ...........................................................48

  b. This Is Not a Case Based on Hindsight .........................................49

D. The Control Person and Insider Trading Claims Have Been Adequately Alleged ......................................................................................................51

IV. CONCLUSION.............................................................................................52

4896-2277-0150.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ........................................................................................33

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ....................................................................................26

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)..........................................................................................21

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .................................................... *passim*

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) .........................................28, 36, 38, 49

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009).........................................................................41

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................15

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................45

*Blatt v. Corn Prods. Int'l, Inc.*,
2006 WL 1697013 (N.D. Ill. June 14, 2006) ..............................................................21

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)......................................................................12

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill Feb. 27, 2018) .................................................... *passim*

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ......................................................................26, 42

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan 23, 2012)....................................................... *passim*

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) .............................................................22, 29

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ........................................................................................19, 23

4896-2277-0150.v1

**Page**

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ...............................................................33, 42

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)...........................................................................41

*Flynn v. Exelon Corp.*,
  2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ................................................... *passim*

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ...........................................27, 31, 36

*Fryman v. Atlas Fin. Holdings, Inc.*,
  462 F. Supp. 3d 888 (N.D. Ill. 2020) ................................................................28, 36

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) ..................................................................................20

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ................................................... *passim*

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .............................................................................37, 50

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ................................................... *passim*

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ................................................................43, 47

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) ......................................................................22

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................34, 35

*In re Bally Total Fitness Litig.*,
  2006 WL 3714708 (N.D. Ill. July 12, 2006).......................................................33, 42

*In re Baxter Int'l Inc. Sec. Litig.*,
  2021 WL 100457 (N.D. Ill. Jan 12, 2021) ....................................................... *passim*

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................................20

**Page**

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)......................................................................46

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019).....................................................................38

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ...............................................................47

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)...............................................................25

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ....................................................................24

*In re GoHealth, Inc. Sec. Litig.*,
   2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) .......................................................20, 22

*In re Hertz Glob. Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018)....................................................................................44

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012)......................................................................20

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 WL 3154863 (D. Ariz. Aug. 9, 2010)..............................................................41

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................40, 41

*In re Newell Rubbermaid Inc. Sec. Litig.*,
   2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ..........................................................23

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014)........................................................................44

*In re Pfizer, Inc. Sec. Litig.*,
   538 F. Supp. 2d 621 (S.D.N.Y. 2008)......................................................................33

*In re Ravisent Techs., Inc. Sec. Litig.*,
   2004 WL 1563024 (E.D. Pa. July 13, 2004)............................................................41

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ..................................................................21, 38

4896-2277-0150.v1

**Page**

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) ..................................................................51

*In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) ...............................................................39

*In re Upstart Holdings, Inc. Sec. Litig.*,
  2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ..................................................49

*In re Valeant Pharm. Int'l, Inc., Sec. Litig.*,
  2019 WL 2724075 (D.N.J. June 30, 2019)..........................................................32

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ..........................................................25

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................................19

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)................................................................................27

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ................................................................34

*Kelsey v. Allin*,
  2016 WL 825236 (N.D. Ill. Mar. 2, 2016)...........................................................49

*Lindelow v. Hill*,
  2001 WL 830956 (N.D. Ill. July 20, 2001)...............................................18, 21, 36

*Loc. 472 v. Fifth Third Bancorp*,
  2022 WL 1642221 (N.D. Ill. May 24, 2022) ..................................................23, 24

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ..............................................24, 34, 37, 47

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  2008 WL 2178150 (N.D. Ill. May 22, 2008) .......................................................52

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ....................................................................... *passim*

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................3, 13, 39, 47

**Page**

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)...............................................................27, 31, 37

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).................................................................................................50

*O'Driscoll v. Argosy Univ.*,
2014 WL 714023 (N.D. Ill. Feb. 25, 2014) .........................................................................32

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
266 F. Supp. 3d 1154 (E.D. Wis. 2017)...............................................................................41

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) .......................................................................42, 44, 46

*Plumbers & Pipefitters Loc. Union 718 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) ................................................................................................33

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
*Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ..............................................................................16, 21

*Plumbers and Pipefitters Loc. Union v. Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) ..................................................................................36

*Ret. Sys. & Loc. 295/Loc. 851, IBT v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................................50

*Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ...............................................................12, 22, 49

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)................................................................ *passim*

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017) ..............................................................................26, 49

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) ........................................................................44

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) ..........................................................................................23, 24

*SEC v. Kelly*,
663 F. Supp. 2d 276 (S.D.N.Y. 2009)...................................................................................14

**Page**

*Shah v. Zimmer Biomet Holdings, Inc.*,
    348 F. Supp. 3d 821 (N.D. Ind. 2018) ..............................................................................13, 52

*Sills v. United Nat. Foods, Inc.*,
    2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024)...................................................................19

*Silverman v. Motorola, Inc.*,
    2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ....................................................................24

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ............................................................................................19

*Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ..............................................................28, 37

*Stransky v. Cummins Engine Co., Inc.*,
    51 F.3d 1329 (7th Cir. 1995) ............................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)................................................................................................. *passim*

*The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs.*,
    2009 WL 4506418 (E.D. Mich. Nov. 30, 2009) ...............................................................19

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...........................................................................52

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991).......................................................................................................21

*Van Noppen v. InnerWorkings, Inc.*,
    136 F. Supp. 3d 922 (N.D. Ill. 2015) ...............................................................................23

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) ..............................................................20, 23, 28, 36

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015) ...................................................................22

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) ..................................................................................47

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ............................................................................................41

4896-2277-0150.v1

**Page**

*Woolgar v. Kingstone Cos., Inc.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................................................44

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)............................................................................................................12, 51, 52
§78t(a) ...................................................................................................................51
§78t-1 ..............................................................................................................51, 52
§78u-4 ...............................................................................................12, 26, 27, 49
§78u-4(b)(2)...........................................................................................................49
§78u-4(b)(3)(b) ......................................................................................................49

Federal Rules of Civil Procedure
Rule 9(b) ...............................................................................................................27

4896-2277-0150.v1

## I.  INTRODUCTION

This case arises from ADM's six-year accounting fraud to inflate the operating profits of its newest and most important business segment: Nutrition.[1]  In addition to this lawsuit, both the SEC and DOJ have ongoing investigations into the fraud.  In the wake of the investigations, Defendants Luthar and Macciocchi were terminated from their positions at ADM and Defendant Young, who had previously retired from ADM, was forced to immediately resign from multiple public board positions.  Investors suffered massive losses as the disclosure of the fraud caused the Company's stock price to suffer its biggest decline since the Great Depression in 1929.  This lawsuit seeks to recover those damages pursuant to the federal securities laws that were passed after the Great Depression to protect investors from just this type of situation.

For years, ADM's stock price languished due to low profit margins, highly-volatile commodity prices, and unpredictable earnings.  To generate excitement for investors, in 2014, ADM entered the human and animal Nutrition business.  Unlike ADM's historical businesses, the Nutrition business had the potential to generate high margins and predictable earnings.  Accordingly, analysts following the Company cared most about the Nutrition business in valuing ADM's stock, placing nearly twice as much value on Nutrition's earnings than on the earnings of ADM's other two segments.

However, the Nutrition segment initially disappointed – suffering losses from 2015 to 2017 as ADM's stock price declined as well.  In 2018, to boost its lagging stock price, ADM began manipulating intercompany sales to shift earnings from the less important segments to the critical

---

[1]  Capitalized terms not defined herein have the meaning as assigned in Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws (ECF 67) ("Complaint").  Defendants ADM and Luciano filed a joint motion to dismiss the Complaint, *see* ECF 80 ("ADM Br."), and Defendants Young, Luthar, and Macciocchi each filed separate motions to dismiss, *see* ECF 82 ("Young Br."); ECF 84 ("Luthar Br."); ECF 88 ("Macciocchi Br.").  This opposition responds to all four motions.  Citations to "¶_" and "¶¶_" refer to paragraphs in the Complaint unless otherwise noted.  All citations are omitted and emphasis is added unless otherwise noted.

- 1 -

Nutrition segment. ADM's publicly disclosed accounting policy that complied with GAAP required ADM to record intercompany sales (from one business segment to another) at market prices. In violation of that policy and GAAP, ADM began recording intercompany sales to the Nutrition segment at below market prices. By reducing the prices that the Nutrition segment paid for raw materials, the accounting fraud increased the Nutrition segment's operating profits and created a false impression to investors of higher earnings than were actually being achieved. Confirming this was a deliberate fraud to boost Nutrition's operating profits, throughout the six-year scheme, ADM continued to record intercompany sales to the other two segments at market prices in compliance with its stated policy and GAAP.

The scheme worked and Nutrition profits began to climb. In fact, it worked so well that ADM's leaders revised the Individual Defendants' incentive compensation program to benefit from the inflated Nutrition results at the start of the Class Period. Although ADM had historically based incentive compensation on ADM's consolidated earnings (which were not affected by the accounting scheme because Nutrition's gains were another segment's losses), ADM changed its incentive compensation program in 2020 to focus on the operating profits of only the Nutrition segment. Media and a compensation expert have noted that ADM's change was unusual and suspicious in focusing on just one segment of the business, and experts have found that such compensation systems incentivize wrongdoing. Following commencement of the fraud, ADM's stock price soared from roughly $35 per share at the start of the Class Period in 2020, to over $60 in 2021, and to over $90 in 2022. The Individual Defendants profited from the scheme, collectively receiving tens of millions of dollars from incentive compensation and stock sales as the Nutrition segment operating profits drastically increased. When the fraud was eventually revealed in January 2024, ADM's stock price collapsed, and investors suffered more than $8 billion in market losses.

- 2 -

4896-2277-0150.v1

Defendants now seek to dismiss this classic case of securities fraud by citing a host of distinguishable cases and claiming that the accounting fraud was just a "mistake" or "inadvertent" error, and that this lawsuit was filed "reflexively." ADM Br. at 1-2, 6-7, 13. There are victims in this case, but none of them are Defendants, who reaped massive financial rewards from the scheme while investors suffered massive losses. The six-year accounting fraud was not "inadvertent" nor was it a "mistake." The deliberate nature of the fraud is evidenced by the fact that ADM changed the Individual Defendants' compensation system to focus on Nutrition profits, and the fact that intercompany sales to the other segments were properly recorded at market prices, with only Nutrition profits being inflated. It was no coincidence that three Individual Defendants – each represented by separate counsel in this case – were forced out of their positions as the SEC, DOJ, and Board launched investigations. Given the totality of facts and circumstances alleged in the Complaint, the most plausible inference to be drawn at this stage is that Defendants knew of, or made their statements with reckless disregard of, the accounting fraud. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709-11 (7th Cir. 2008) ("*Tellabs III*") (finding scienter adequately pled and stating "[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely").

Rather than file this lawsuit "reflexively," the Court-appointed Lead Plaintiffs filed the operative complaint five months after the disclosure of the fraud. By the start of the Class Period, the scheme had been ongoing for two years and the Board – with the input of the Individual Defendants – suspiciously began tying the Individual Defendants' incentive compensation to the Nutrition segment's inflated operating profits. At a minimum, it is "at least as compelling as any opposing inference" that Defendants were extremely reckless to make (admitted) false and misleading statements that concealed the accounting fraud from which they personally profited. *See*,

- 3 -

4896-2277-0150.v1

*e.g.*, *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at \*4 (N.D. Ill. Jan 23, 2012) (finding scienter adequately alleged because "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness").

Because this is a classic case of securities fraud, the motions to dismiss should be denied. Defendants seem to acknowledge they face an uphill battle by asking the Court for a limited dismissal, stating that if the allegations are "sufficient to survive a motion to dismiss the entire Complaint," the Court should "narrow what remains" by eliminating a few statements. ADM Br. at 3. But even that is not warranted at this stage and Defendants will have the opportunity to seek partial, or full dismissal, after development of a full record through discovery.

## II. BACKGROUND

### A. ADM's Expansion into the Nutrition Market Initially Fails

For more than 100 years, ADM has served as a middleman in the agricultural industry by purchasing, transporting, and processing crops. ¶¶4, 32-33. Although its operating segments have undergone various name changes over the years, ADM's historical business has been driven predominantly by two segments: (i) Ag Services and Oilseeds ("ASO"),[2] which focuses on buying, storing, reselling, and processing oilseeds and soybeans; and (ii) Carbohydrate Solutions ("Carb Solutions"), which focuses on similar processes and revenue sources for corn and wheat. ¶¶32-33.

These two historical segments relied heavily on trading in agricultural commodities, which are highly volatile and generate low profit margins. ¶34. The Company has explained in SEC filings that "wide fluctuations" in the "availability and prices of agricultural commodities" cause "volatility . . . in the Company's operating results." *Id.* Because of the volatility and low margins of its businesses, ADM's stock price languished for years leading up to 2014, increasing just 5% from

---

[2] Prior to July 2019, ASO was actually comprised of two separate segments: (i) "Agricultural Services" or "Origination," and (ii) "Oilseeds Processing" or "Oilseeds." ¶32 n.3. For ease of reference and consistency, those segments will be referred to collectively as the single ASO segment herein.

4896-2277-0150.v1

January 2009 to January 2013. ¶36. In that same time, the S&P 500 Index catapulted more than 70% – in excess of tenfold ADM's growth. *Id.*

In order to boost ADM's faltering stock price and meager profit margins, ADM's leaders (including Defendants Luciano, Young, and other ADM executives), decided to invest billions of dollars to move ADM into the higher margin "Nutrition" business. ¶¶38-39, 260, 268-269. The expansion began in 2014, when ADM paid $3 billion to acquire WILD Flavors. ¶40. Defendant Luciano claimed the acquisition would benefit "our stock" because the Nutrition segment provided "high-margin low volatility, high growth markets that can be a growth engine." *Id.*

Initially, the expansion was a bust and ADM's Nutrition segment suffered a 4% decline in operating profit from 2015 through 2017. ¶44. In that same time, ADM's stock price declined from trading at around $50 per share at the start of 2015, to around $40 per share at the end of 2017. *Id.* Analysts continued to issue low ADM stock price targets and complained that the Nutrition segment "continues to fall short of expectations." ¶45.

### B. ADM Engages in a Six-Year Accounting Fraud Scheme to Inflate Nutrition Results

Under pressure from the multi-billion dollar investment and poorly performing stock price, ADM and the Individual Defendants engaged in an accounting scheme to shift tens of millions of dollars in profits from the historical business segments (ASO and Carb Solutions) to Nutrition by manipulating intercompany sales to Nutrition. *See* ¶¶46-54. Since the ASO and Carb Solutions businesses focused largely on the sale of raw materials, the Nutrition segment purchased raw materials from those segments. ¶48. ASO and Carb Solutions also sold raw materials to each other. ¶¶227, 278. Intercompany sales are ripe for manipulation because the Company controls both sides of the transaction and that is exactly the scheme at the center of this case. ¶¶49, 204.

- 5 -

Under GAAP, ADM was required to disclose how it accounted for intercompany sales so that investors could judge the performance of the individual segments. ¶¶50, 201-206. Here, ADM disclosed that its accounting policy for intersegment sales was to record those sales at market rates. ¶¶51, 206. In other words, ADM claimed that the Nutrition segment paid the same prices for raw materials from ASO and Carb Solutions as did external customers in arm's length transactions. *Id.* However, as later admitted in the Restatement, from 2018 through 2023, ADM violated its disclosed accounting policy and GAAP by selling materials to the Nutrition segment at discounted pricing and rebates far below market. ¶¶53-54, 188-191, 199-200, 207-208. By doing so, ADM shifted substantial profits from ASO and Carb Solutions to Nutrition by improperly recording lower operating costs (*i.e.*, lower raw material costs) for Nutrition, which boosted its operating profits by tens of millions of dollars. ¶¶53, 207-208, 223-224. This falsely inflated the operating profits for the closely watched, and most important, Nutrition segment from 2018 through 2023. *Id.*

## C. ADM's Stock Price and Defendants' Compensation Become Increasingly Tied to Nutrition's Inflated Results

Not only did the Individual Defendants benefit from the perception that they had turned the Nutrition segment around, but they personally profited from the scheme. First, the accounting scheme improved Nutrition's performance, which Defendants continued to emphasize as critical to ADM's success. *See* ¶¶62-67, 231-233, 263-264. For example, without the accounting fraud, the Nutrition segment would have reported operating profit of $312 million in 2018, the same as in 2017, resulting in a 0% growth rate for Nutrition. ¶55. However, by fraudulently shifting profits to Nutrition, ADM reported operating profits of $339 million, a 9% growth rate. *Id.* Then, in 2019, while both the ASO and Carb Solutions segments reported operating profit declines, Nutrition reported a year-over-year increase of 23%. ¶58. During a January 30, 2020 conference call in which the disappointing 2019 ASO and Carb Solutions profits were reported, Defendant Luciano kept

- 6 -

4896-2277-0150.v1

investors upbeat by highlighting the "impressive year of growth for Nutrition" and promising that the Company "expect[ed] another year of 20%-plus growth in profitability in our Nutrition segment in 2020." *Id.* Luciano claimed that ADM expected Nutrition to make up 25% of ADM's operating profit "within the next 3 to 4 years." *Id.*

Second, in order to allow executives to cash in on the scheme, at the start of the Class Period in 2020, ADM changed "the short-term and long-term [executive] incentive compensation plans" to "emphasize [ADM's] focus on the Nutrition segment of our business." ¶59. Specifically, instead of focusing on overall profitability as a metric for executive compensation, ADM created a "new [compensation] metric" based on "operating profit growth in the Nutrition segment." *Id.* Thus, executive compensation was divorced from the Company's prior overall profits metric and instead tied directly to Nutrition segment operating profits. ¶56; *see also* ¶¶281-293.

Tying compensation to a specific segment's performance is a known fraud risk because, as stated by experts in an article published in the *Harvard Business Review*, "[w]hen people's remuneration depends strongly on a financial measure, they are going to maximize their performance on that measure; no matter how." ¶60. Thus, "cooked books, false sales reports, and illegal means to performance emerge when financial incentives cause leaders to care more about looking good in terms of results than actually doing well in terms of creating value." *Id.* After the compensation change, Nutrition's operating profits reportedly grew 37% in 2020, and another 20% in 2021. ¶62. From 2018 to 2022, the Nutrition segment's reported profits more than doubled, from $339 million to $736 million. *Id.*

And third, the Individual Defendants sold more than $100 million worth of ADM stock to unsuspecting investors while the stock was artificially inflated by the concealment of the accounting scheme. *See* ¶¶294-299. The (purportedly) stable and growing Nutrition segment operating profits excited analysts and drove up the stock price. For example, in the third quarter 2020, analysts from

- 7 -

Barclays noted that "a further shift within the broader ADM portfolio towards nutrition should be welcomed by investors, as this business has not only at [sic] high levels of profitability, it also has a fairly stable level of profitability in any given quarter." ¶68. The analysts also observed that "nutrition is a clear focus for ADM's management team," and added that "[a] relatively higher share of its nutrition business should give ADM several benefits" including "1) higher consolidated profitability, 2) less earnings volatility, and 3) stable cash flows, which ultimately should drive higher valuation multiples in the future." *Id.*

Analysts also valued the seemingly high-margin and stable Nutrition operating profits far more than the volatile and unpredictable profits of the other segments. ¶¶69, 77, 234. In formulating their price target for ADM stock in October 2020, analysts at J.P. Morgan assigned the Nutrition segment a valuation "multiple" that was 1.85 times the other segments. ¶¶69, 234. Similarly, in April 2022, J.P. Morgan analysts applied a valuation multiple to the Nutrition segment that was 1.8 to 2.2 times the other segments. ¶234 n.32. Analysts from Credit Suisse succinctly stated in 2022 that "the Nutrition segment represents the company's highest value business unit." ¶70. Analysts from J.P. Morgan also recognized the connection between Nutrition earnings and stock price in 2023, discussing the "higher multiple Nutrition segment (where peers typically trade at mid-teens EBITDA multiples)" compared to "the lower multiple AS&O segment (where peers trade at high-single-digit multiples)." ¶70. With the accounting scheme concealed, such Nutrition-focused valuations drove the stock price from $35 at the start of the Class Period to more than $90 during the Class Period, allowing the Individual Defendants to receive more than $107 million by selling over 1.3 million shares of ADM stock at artificially inflated prices. *See* ¶294.

During the Class Period, the Individual Defendants were well aware of, and contributed to the market's heightened focus on Nutrition. For example, Defendant Luciano claimed ADM's plan was to get to "$1 billion" in Nutrition operating profits (¶62), and Defendant Macciocchi said he

- 8 -

"wake[s] up every day thinking about [that goal]," bragged about the segment's margins of up to 20%, and touted the ability to "margin up" even further (¶137(b)). Similarly, Defendant Young stated during a March 3, 2021 investor call that "becoming a global nutrition player has been actually a very important core pillar of our strategy going forward." ¶64. And, during ADM's July 27, 2021 earnings call, Defendant Luciano told investors that although ASO would grow only "moderately" and Carb Solutions would be "flat to slightly declining," ADM saw "strong growth" in Nutrition, reflecting the "algorithm of how the business has moved." *Id.*

## D. The Investigations and Admissions

Throughout the Class Period, Defendants never voluntarily ceased or disclosed their illicit accounting scheme. ¶73. Instead, they got caught. ¶74. On June 30, 2023, the SEC sent ADM a "document request . . . relating to intersegment sales between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments." *Id.* Thereafter, ADM and the Board of Directors Audit Committee hired outside counsel to initiate an internal investigation into the matter, which Defendants also concealed from the public. ¶75. Several months later, on Sunday, January 21, 2024, ADM published a press release disclosing that: (1) the SEC had been investigating ADM's accounting practices and procedures relating to the Nutrition reporting segment, including intersegment transactions; (2) the Company had initiated an internal investigation prompted by the SEC investigation; (3) ADM had placed Defendant Luthar on administrative leave, effective immediately, pending the results of the investigation; (4) ADM was withdrawing its entire outlook for the Nutrition reporting segment; and (5) ADM expected to delay issuing its earnings results for fourth quarter 2023 and FY 2023, and delay filing its report on Form 10-K for FY 2023. ¶¶76, 178.

Less than two months later, the Company confirmed the accounting fraud. On March 12, 2024, ADM filed its delayed 2023 10-K correcting errors in ADM's previously issued financial

- 9 -

statements, restating historical financial results for the ASO, Carb Solutions, and Nutrition segments dating back to 2018, and admitting its previously-issued filings with the SEC were not prepared in accordance with GAAP. ¶¶188-189. In the 2023 10-K, ADM admitted that although "[t]he Company ha[d] historically disclosed . . . that intersegment sales have been recorded at amounts approximating market," in truth, "certain intersegment sales" to Nutrition "were not recorded at amounts approximating market." ¶189. According to ADM, Nutrition's operating profits were overstated by tens of millions of dollars from 2018 through 2023 as a result of "the measurement of intersegment sales pricing or rebates relating to products sold to the Nutrition reporting segment by the [ASO] and Carb[] Solutions reporting segments." ¶¶190, 223.

### E. Materiality and Executive Departures After the Accounting Scheme

Whereas immaterial accounting errors would not require disclosure, here the Company admitted that: (1) ADM suffered a "material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for intersegment sales"; (2) ADM reported "intersegment sales that were not recorded at amounts approximating market" and were therefore recorded "at amounts that were not in accordance with ASC 606, *Revenue from Contracts with Customers*"; and (3) as a result, ADM had falsely inflated Nutrition operating profits from 2018 through 2023. ¶¶54, 199-200, 212, 220, 223-224. ADM's stock price dropped 24% in response to ADM's January 21, 2024 disclosures relating to the accounting scheme and investigations, marking the stock's largest one-day percentage decline since 1929. ¶180. Analysts promptly slashed their ADM price targets by up to 50%, noting not only the likely impact of ADM's "[a]ccounting issues" on Nutrition profits, but also that ADM faced "confidence issues as the street will likely look at [ADM's] numbers with caution." ¶181. Media also reported that the news "shook the commodity world" and caused shares to "tumble." ¶¶182-184.

4896-2277-0150.v1

In addition to the massive impact on the stock price, the accounting scheme had a material impact on ADM's financial results and liabilities. ADM admitted in March 2024 that the years-long scheme had inflated Nutrition's operating profits by up to 25%. *See* ¶¶222-223. ADM also confirmed that the accounting scheme had caused the Company to "become subject to" a litany of risks, each of which "could have a material adverse effect on the Company's business, results of operations, financial condition and liquidity." ¶¶193-194.

Finally, demonstrating how serious the matter was, many of those responsible were soon forced out of the Company. In November 2023, a few months after the Company received a document request from the SEC, Defendant Macciocchi was forced to "retire" and forfeit a grant of $2 million worth of performance-based restricted stock units. ¶304. In January 2024, the same month the investigation was publicly disclosed, Defendant Luthar was placed on "administrative leave" in connection with the investigation, and the DOJ commenced a grand jury investigation, interviewing and serving grand jury subpoenas on former employees. ¶¶301, 305. On April 22, 2024, a month after the Company disclosed the financial impact of the accounting scheme, ADM announced that Luthar's "administrative leave" would be permanent and Luthar would "resign," effective September 30, 2024. ¶306. Luthar held the CFO position for less than two years. ¶¶28, 306. And, in early February 2024, just as the DOJ had launched its investigation, Defendant Young abruptly surrendered his seats on the boards of directors of three publicly-traded companies (Hormel Foods Corporation ("Hormel"), Marsh & McLennan, and International Paper), "effective immediately." ¶186. His resignations were suspicious and indicative of his exposure in the investigations, particularly given that he left the Hormel position a day after his appointment. *Id.* In total, he lost out on more than $800,000 in annual compensation by leaving the boards of the three companies. ¶¶186-187.

- 11 -

### III. ARGUMENT

While the DOJ and SEC investigations are ongoing (¶¶301-302), this lawsuit was brought on behalf of investors. The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). As the Seventh Circuit has stated, "the modern securities laws were designed . . . to 'substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *rev'd in part on other grounds*, 551 U.S. 308 (2007). Here, the Complaint alleges violations of §10(b) of the Exchange Act and SEC Rule 10b-5. ¶¶330-335. Defendants argue only that some statements were not materially misleading and that they did not act with scienter, conceding all other elements were adequately pled. *E.g.*, ADM Br. at 8. Defendants' motions to dismiss should be denied because Defendants concealed the accounting scheme and failed to provide "'full disclosure'" and meet the "'high standard of business ethics'" that was required for executives and companies that choose to raise money from the public. *Tellabs I*, 437 F.3d at 595.

### A. Legal Standards

Although the Private Securities Litigation Reform Act ("PSLRA") raised the level of specificity required at the pleading stage, it did not move the trial up to the pleading stage. *See Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (the "PSLRA . . . requires no proof as opposed to plausible allegations"); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) (finding PSLRA's pleading standards "are still *pleading* standards – not evidentiary ones" and relying upon allegations from third-party short-seller report in denying motion to dismiss) (emphasis in original). In considering a motion to

- 12 -

dismiss, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Tellabs III*, 513 F.3d at 705. Accordingly, defense counter-factual narratives should be rejected at the pleading stage because "resolution of [fact] dispute[s] must wait for another day, after plaintiffs have had an opportunity to conduct discovery." *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 840 (N.D. Ind. 2018) (denying motion to dismiss and rejecting counter-narrative that undisclosed problems "did not occur until the very end of the third quarter"). Furthermore, in deciding if falsity and scienter have been adequately pled, the Court may not parse allegations for individual analysis but must consider them "holistically" and "consider the complaint in its entirety." *Tellabs II*, 551 U.S. at 309-310, 326.

### B. The Complaint Adequately Alleges False and Misleading Statements

The Complaint alleges that Defendants made false and misleading statements regarding: (1) Financial Results and Accounting (¶¶83-122), (2) the Sources of Nutrition Operating Profits and Growth (¶¶123-157), and (3) Internal Controls (¶¶158-167). Once the Court finds that Plaintiffs have alleged a false and misleading statement by each Defendant, the falsity element has been met, and the Court need not rule on all statements. *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *8 (N.D. Ill. Oct. 30, 2012) (holding that because plaintiffs "met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category" of statements); *see also Lakeland*, 2012 WL 607578, at *2-*3 (denying motion to dismiss and addressing categories of statements rather than each individual statement). Here, Defendants do not challenge, and therefore concede, that they each made at least one statement in the Financial Results and Accounting category and that all statements in that category (¶¶83-122) were materially false and misleading when made. *See* ADM Br. at 21-28 (contesting falsity for only a subset of the

- 13 -

challenged statements while not disputing falsity for any statements in ¶¶84-122).[3]  The falsity

element is therefore established and Defendants' motions on that ground should be denied.  To the

extent the Court intends to consider the particular statements that were challenged by Defendants,

each is adequately alleged as materially false and misleading.

> **1.      ADM's Statements Regarding Financial Results and
> Accounting Were Materially False and Misleading**

Defendants ADM, Young, Luciano, and Luthar all signed financial statements that included

the inflated Nutrition results, falsely claimed intercompany sales were recorded at market rates, and

falsely claimed that the financials were prepared in accordance with GAAP.  *See* ¶¶85, 87, 89, 93,

96, 99, 101, 104 (ADM filings signed by Luciano and Young); ¶¶108, 110, 112, 114, 117, 119, 121

(ADM filings signed by Luciano and Luthar).  The false financial results were repeated in press

releases issued by ADM (¶¶84, 86, 88, 91, 95, 98, 100, 102, 107, 109, 111, 113, 116, 118, 120) and

in ADM's annual proxy statement signed by Defendant Luciano (¶105).  In addition, Defendant

Macciocchi publicly reported the false financial results during conference calls.  ¶¶90, 97; *see also*

¶92 (same for Young); ¶103 (same for Luciano).  Each of the statements by each of the Defendants

in this category were clearly false as reflected by the restatement of the reported results and

admission that the Company violated its accounting policy and GAAP.  *See* ¶¶199-208, 217-240.

Thus, unsurprisingly, none of the Defendants challenge, and therefore all of them concede, these

statements are adequately alleged to be materially false and misleading.  *See also, e.g.*, *SEC v. Kelly*,

663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (holding that the company's decision to restate financial

results "belies any suggestion that any misstatement or omission was not material").

---

[3]      *See also* Macciocchi Br. at 11-13 (same, adopting ADM's falsity arguments); Luthar Br. at 9-10 (same); Young Br. at 4-5 (same).

- 14 -

### 2. The Sources of Nutrition Profits and Growth Statements Were Materially False and Misleading

Defendant ADM and each of the Individual Defendants made a number of statements reinforcing the false and misleading financial results. They did so by touting the purportedly strong performance of the Nutrition segment, attributing the performance to organic growth and acquisitions, and citing only legitimate factors benefiting Nutrition's operating profits. *See* ¶¶124, 128(a), 129, 131-132, 149 (Luciano); ¶¶125-127, 133, 136, 138, 140, 142 (Luciano and Young); ¶¶130, 141(a), (d) (Young); ¶¶128(b), 137, 141(b)-(c) (Macciocchi); ¶¶145, 147-148, 150, 153-155 (Luciano and Luthar); ¶¶139, 146 (Luthar). These statements were misleading because they failed to tell the full story and disclose that a material source of Nutrition's operating profits and growth was the accounting scheme wherein the Company violated its stated accounting policy by charging below market rates on intercompany sales to the Nutrition segment. *See* ¶¶53-54, 201-208, 222-240. Defendants' attempts to dismiss these statements should be rejected.

### a. The Statements Concealed that a Material Source of Nutrition Profits Was the Accounting Fraud

Statements are actionable if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). At this stage, "[t]he Court need not resolve whether the statements were actually false; it is enough that Plaintiff has described with particularity why he believes the statement to be misleading." *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *7 (N.D. Ill. Apr. 21, 2021) (Kendall, J.) (denying motions to dismiss and rejecting arguments that complaint's allegations "are deficient because the[] [statements] are accurate"). The Complaint need only allege a statement was false or misleading. This distinction is important because "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *Career Educ.*, 2012 WL

- 15 -

5363431, at \*6; s*ee also, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879 (N.D. Ill. 2011) (Castillo, J.) (holding that statement was misleading even though it was not false). That is because "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

Here, Defendants did not tell the whole truth about the improved results and investors would have viewed the accounting fraud as altering the total mix of information. Defendants bragged about the growth in Nutrition operating profits during the Class Period because the investing public was so focused on the Nutrition segment, and its performance had an enhanced impact on the stock price. *See* §II.C. Defendants went beyond just reporting the falsely inflated Nutrition profits. §III.B.1. They repeatedly chose to highlight their purported success in achieving stable, predictable, and growing Nutrition profits and to attribute the sources of that performance to various management initiatives and successes, without disclosing the accounting fraud that was also driving Nutrition's success.

For example, Defendants misleadingly claimed that Nutrition's "***very predictable***" and "***very robust***" profits were growing either: (1) "***organically***" through management driven improved sales of products, or (2) through management's "***bolt on acquisitions***" of Nutrition businesses. ¶130. *See, e.g.*, ¶124 (Luciano attributing increased Nutrition profits to "***all that organic growth [that] is hitting the P&Ls [profits and losses].***"); ¶149 (Luciano stating Nutrition's "very successful story" was achieved "***through a very disciplined strategy of bolt-on acquisitions and organic growth***."); ¶128(b) (Macciocchi stating that for Nutrition, ADM has "***really taken the approach of let's grow organically***."); ¶130 (Young touting that "***we've actually grown the Nutrition business***" to become

- 16 -

"*a significant contributor [with] . . . very predictable, robust earnings*" through "*organic growth and bolt-on acquisitions*.").[4]

In addition to claiming that big picture management initiatives like growing organically and through acquisitions were the source of Nutrition's growth, Defendants also identified the purported granular factors that contributed to those profits. Having investigated the sources of Nutrition profit growth, Defendants Luciano and Luthar highlighted, for example, "*[s]trong sales growth in alternative proteins*," "*robust demand for fiber*," "*strength in amino acids*," "*strong soy protein volumes and margins*," "*[s]trength across probiotics*," "*strong volumes and margins in amino acids*," "*solid performance in texturants*," and "*strong [pet] volumes and margins*" as all positively impacting Nutrition profits in 2022. ¶¶145, 147-148, 150(b).[5]

Defendants further touted Nutrition's purported advantage of sourcing raw materials internally, placing the (fraudulently recorded) intercompany sales to Nutrition directly at issue. Defendant Luciano claimed that the Nutrition segment's ability to purchase raw materials from other segments was "*an unseen competitive advantage that we have*" (¶129(a)) and Defendant Luthar

---

[4]     *See also, e.g.*, ¶128(a) (Luciano claiming that for Nutrition, "*the current strategy . . . is organic growth and bolt on [acquisitions]*"); ¶132 (Luciano repeating similar statement); ¶¶137(a)-(b) (Macciocchi highlighting Nutrition's purported "*very good organic growth story*" resulting in "*margins that are very much aligned in the 20% range*" that could be "*margin[ed] up*" through "*mix shift*"); ¶¶141(b)-(c) (Macciocchi claiming Nutrition growth is "*predicated on organic growth*," resulting in "*25-plus percent margins*" with "*opportunities to margin up*"); ¶141(a) (Young claiming "*Nutrition has grown as expected through M&A and organic growth*"); ¶¶133(a), 142(a) (Luciano and Young emphasizing "*organic and inorganic [growth] initiatives*"); ¶150 (Luciano and Luthar emphasizing same).

[5]     In 2021, Defendants Luciano and Young likewise highlighted the positive impact from "*strong sales . . . [in] beverages*," "*[f]avorable product mix*," "*accelerated income from a customer agreement*," "*higher results in bioactives and fibers*," "*improved demand and margins in amino acids*," "*strength in feed additives and ingredients*," and "*strong demand for alternative proteins*." ¶¶136, 138, 140, 142(b). Defendants Luciano and Young made similar statements in 2020 (¶¶125-127, 133(b)), and Defendants Luciano and Luthar made similar statements in 2023 (¶¶153-155).

- 17 -

attributed "stronger" than expected profits to "*the smart pricing and active supply chain collaboration with our AS&O [and] Carb Solutions teams*" (¶146).[6]

In moving to dismiss, Defendants suggest that these statements were partially true in that the acquisitions and various granular initiatives had contributed to the Nutrition segment's operating profits and growth. *See, e.g.*, ADM Br. at 26-27 (arguing the disclosed sources were "accurate . . . performance drivers" of growth, Nutrition was "experiencing organic growth," and "the Nutrition segment did in fact grow . . . even accounting for later corrections"). But these were misleading half-truths, which the law prohibits. *See, e.g.*, *Lindelow v. Hill*, 2001 WL 830956, at \*2-\*3 (N.D. Ill. July 20, 2001) (holding that even if "some statements complained of by plaintiffs could be read as literally accurate, plaintiffs have sufficiently alleged that the statements were misleading in context"). All these statements were misleading because, rather than "speak the whole truth" about the sources that positively impacted Nutrition's profitability, Defendants concealed that a material contributor was the undisclosed accounting scheme that violated GAAP and stated Company policy. ¶¶205-208, 222-240, 275-279; *see also Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at \*4 (N.D. Ill Feb. 27, 2018) (holding that by "elect[ing]" to discuss claim frequency trends and purported causes thereof, "defendants had a duty to do so in a manner that was not misleading; that is, by disclosing [the company's] reduction in underwriting standards" as an additional cause); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at \*5 (N.D. Ill. Aug. 11, 2021) (finding statements claiming "transitory" issues were source of poor performance were not alleged to be false, but were "misleading" when defendants concealed that their deliberate choice to cut costs

---

[6] *See also* ¶129(b) (Luciano highlighting Nutrition's "*low cost to come to the market*" because of "*incredible number of synergies*" between segments); ¶137(c) (Macciocchi describing how Nutrition benefits from other segments by stating "*[w]e manufacture our own white flake*" and highlighting ADM's "*centers of excellence*, *pending ERP implementation*," "*nutrition customers from [other segments]*," and "*advanced key account management program*"); ¶139 (Luthar emphasizing that ADM was "*driving synergies across the various businesses that Nutrition is capitalized on, to drive earnings growth*").

4896-2277-0150.v1

was also a source); *Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *7 (S.D.N.Y. Sept. 13, 2024) (holding "statements [that] commented on the drivers of the Company's margins . . . while omitting the elephant in the room" that the Company was relying on undisclosed practices to boost margins were "plausibly misleading half-truths about topics that Defendants put into play").[7]

The statements here stand in stark contrast to those in *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021), relied on by Defendants. There, the defendants provided "estimates" of expected cost savings from a merger. *Id.* The Court held that those estimates did not impose a duty to disclose separate "information about the ongoing costs of consolidation" because the one-time costs of consolidation were "categorically distinct from recurring savings gained by melding similar businesses." *Id.* Here, Defendants disclosed many of the sources of the Nutrition segment's profits and growth while omitting the one that inflated profits by up to 25% and would be the most qualitatively important to investors – the manipulation of intercompany sales in violation of GAAP and Company policy. *See Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *6 (N.D. Ill. Feb. 10, 2023) (holding that "by describing the success of Oak Street's marketing strategy and choosing to tell the market that [the company] paid insurance agents for referrals, the defendants were obligated to disclose the [allegedly improper] practice" of paying for referrals on a per-patient basis); *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (holding "statements attributing Humira's success to AbbVie's sales and marketing practices and programs" were misleading for failing to disclose an unlawful kickback scheme to boost Humira prescriptions); *The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs.*, 2009 WL 4506418,

---

[7] *See also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-402 (S.D.N.Y. 2005) (finding statements touting company's profitability were misleading without disclosing profitability was attributable "at least in part, [to] trading practices that violated NYSE rules" because the statements "put the sources of . . . revenue at issue"); *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (holding "by choosing to inform the market that it was training surgeons on how to obtain reimbursements . . . the Company was obliged to further disclose . . . instructions to surgeons to unlawfully code").

4896-2277-0150.v1

at *10 (E.D. Mich. Nov. 30, 2009) (finding disclosure of only two conflicts of interest where company was creating a new company were misleading for "failing to disclose the more significant conflict" that the company could have interests "directly opposed" to the new company).[8]

### b. The Statements Are Not Immaterial "Puffery"

Defendants take a few statements about Nutrition's growth and profits out of context to argue they are immaterial puffery. *E.g.*, ADM Br. at 22-23; Macciocchi Br. at 11-12. However, determining materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts" and is therefore "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Oak St.*, 2023 WL 1928119, at *8 (quotations omitted) (citing Seventh Circuit case law). Thus, Defendants' materiality arguments should be rejected as premature. If considered, Defendants' statements must be viewed in their full context, and the argument can be rejected for several reasons. *See In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022) (holding statements which "identified factors that would positively impact [the company's] performance metrics" were not puffery, and that even if some phrases "'did lean toward hopeful fluff'" context "is integral to the question of materiality" so "'at

---

[8] Defendants' other cases (*see* ADM Br. at 25-27) are distinguishable because the alleged misrepresentations were unrelated to the concealed information, whereas here there was a direct nexus between Defendants' statements describing some positive sources of Nutrition's profits and the additional concealed source (the accounting fraud). *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437-38 (S.D.N.Y. 2005) (holding statements about, for example, "the impact on the Company's business of the September 11 terrorist attacks" did "not relate to the financial figures that [the company] restated or to the business group from which the restated financials originated"); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2012) (dismissing statements where plaintiff failed to allege "that a material portion of ESI's revenue came from [an] undisclosed source"); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 645 (N.D. Ill. 2020) (finding it was not misleading to refer to "'ongoing growth'" based only on the fact that the rate of growth was declining and sales were still growing), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) (finding statement about government scrutiny not misleading for failure to disclose FDA letter that "had yet to be written").

this early stage . . . it is not appropriate for the Court to rule definitively that these statements are mere puffery'").

First, courts have found that a significant stock drop reflecting negative investor reaction to the concealed information is itself sufficient to show that statements were material to investors. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (finding "materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" after truth was disclosed); *Career Educ.*, 2012 WL 5363431, at *6 (same). Here, ADM's stock declined by 24% in response to the January 21, 2024 disclosures, the largest single-day decline in nearly 100 years, and analysts reacted negatively to the disclosure of the concealed information. ¶¶178-183.

Second, context matters, and nearly identical statements found to be puffery in one case have been found to be material in another. *See, e.g.*, *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003) (holding that statements that might appear to be "puffery" or vague "cannot be taken out of context, however, and if these statements reinforce factual misstatements and therefore contribute to ongoing deception, they may become actionable"). [9] The more important the information concealed, the less likely courts will dismiss statements as puffery. *Kraft Heinz*, 2021 WL 3566602, at *10 (rejecting puffery argument and holding that portions of statements "may be

---

[9]     *Compare* ADM Br. at 23-24 (citing cases finding vague and aspirational statements about growth and synergies to be puffery), *with Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) (finding "'indefinite and unverifiable'" terms such as "'high' value" or "'fair'" can be actionable); *Allscripts*, 778 F. Supp. 2d at 879-880 (upholding statement "'[t]hat rollout is going very well'" because "[w]hile the precise meaning of portions of this statement is unclear, what is clear is that a reasonable investor could have been misled by this statement"); *Tellabs I*, 437 F.3d at 597-598 (upholding statements that "we are satisfying very strong demand and growing customer demand," that a product was "experiencing strong acceptance," and that "'[sales are] still going strong'"); *Lindelow*, 2001 WL 830956, at *2 (upholding statement that "'[w]e are very excited about, and are getting ready for, our controlled market launch'"); *Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at *4 (N.D. Ill. June 14, 2006) (holding company's "prediction that it [would] achieve 'improving operating margins'" was not puffery because it was "made in the context of discussing specific factors that might affect profits and operating margins").

- 21 -

vague and upbeat, but that is not enough to get the alleged statement (much less any claim in the complaint) thrown out"); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) (stating "comments regarding . . . a fundamental aspect of [the] . . . business are of vital importance to investors"). Qualitative materiality must also be considered. *See Kraft Heinz*, 2021 WL 3566602, at *21 (holding that "'both quantitative and qualitative factors should be considered in assessing a statement's materiality'").

Here, all of the statements provided factual information related to the sources of profits and growth in the critical Nutrition segment, which the Company had invested billions to acquire and analysts saw as the most important driver of ADM's stock price, while concealing an accounting manipulation that violated Company policy and GAAP. *See* §II.B-C; §III.B.2.a; ¶¶221-240. Further confirming the statements were material, nearly all of the statements were made in SEC filings or in response to analyst questions (*see* ¶¶124-130, 133, 136-138, 140, 145-150, 153-155), and analysts relied on the statements (¶¶170-176). In context, Defendants' statements were not mere "puffery." *See GoHealth*, 2022 WL 1016389, at *5 (rejecting puffery argument for statements that "identified factors that would positively impact its performance"); *Kraft Heinz*, 2021 WL 3566602, at *10 (holding statements that were "generally factual, specific, and in response to questions from analysts" were not puffery); *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (holding statement was not puffery because it "refer[red] to the present condition" and was in the context of SEC filing); *TreeHouse*, 2018 WL 844420, at *2-*3 (holding statements that merger integration was doing "'good'" and "'great,'" and the team was doing "'an 'incredible job'" were sufficiently pled as material because analysts reported on the statement and integration was significant to investors); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 331-32 (D. Mass. 2002) (holding statement that new product "was fueling growth" was not puffery because it was a "precise statement as to the basis for profit growth").

- 22 -

Third, Defendants overstate the cases they rely upon to claim certain of the alleged statements, like those regarding "synergies" or "growth" are always puffery as a matter of law. Again, it depends on context. Defendants' cases are distinct because the statements dismissed were not related to the sources of growth of specific reported operating profits, but were instead statements of predicted or aspirational beliefs regarding vague targets. *See Zebra Techs*, 8 F.4th at 595 (dismissing statement that integration was "'progressing as planned'" as "vague optimism"); *Searls v. Glasser*, 64 F.3d 1061, 1066-1067 (7th Cir. 1995) (finding "loose predictions" of "gains" and phrase that company was "recession-resistant" were "indefinite predictions of 'growth'" and puffery because they are "vague" and "devoid of any substantive information"); *Conagra*, 495 F. Supp. 3d at 653-54 (dismissing vague "predictions" about "'outstanding investment opportunit[ies],'" "'ongoing growth,'" and "'robust innovation'"); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 941 (N.D. Ill. 2015) (dismissing statement that "inside sales 'is going to be . . . large and successful'" as puffery because it "is a 'loose prediction' of inside sales growth").[10]

Similarly, several of Defendants' cases dismissed statements as not misleading due to the failure to establish the existence of the allegedly concealed facts. *See, e.g.*, *Conagra*, 495 F. Supp. 3d at 642 (dismissing "speculative" allegations that did not establish the existence of the concealed "excess product inventory" due to a "lack of detail"); *Van Noppen*, 136 F. Supp. 3d at 929, 936 (finding "inside sales growth" statements not misleading because there was "no support" for

---

[10]    *See also Heavy & Gen. Labs.' Loc. 472 v. Fifth Third Bancorp*, 2022 WL 1642221, at *18-*19 (N.D. Ill. May 24, 2022) (finding strategy statements regarding vague "opportunities" and "synergies" lacked sufficient context to be actionable); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *7 (N.D. Ill. Nov. 14, 2000) (finding general "references to synergies that management expected to result from [a future] merger" were "too vague to be actionable"); ADM Br. at 23 (citing additional cases referring only to vague phrases like "'growth milestones,'" "'exciting growth,'" and an "'extremely large runway for near-term growth'"). Defendants also cite *Eisenstadt v. Centel Corp.*, which involved an entirely different context that found "nonspecific representations that an auction process is going well" was not actionable because "*[e]verybody* knows that someone trying to sell something is going to look and talk on the bright side." 113 F.3d 738, 745 (7th Cir. 1997). The statements here were not in the context of trying to talk up the price of an auction but in describing the purported factors and management actions that led to specific operating profits.

- 23 -

witness's "broad allegation" that the company missed sales goals); *Fifth Third*, 2022 WL 1642221, at *22 (dismissing on scienter grounds where court could only "speculate" about scope and impact of undisclosed conduct at the time the statements were made).[11]  But here, Defendants have admitted that the omitted accounting scheme, which rendered their one-sided and optimistic statements misleading, was material and existed throughout the entire Class Period.  *See* §§II.D-E; §III.B.2.a.; *Tellabs I*, 437 F.3d at 597 (finding statement about "growth rate" actionable when viewed in context and "against the backdrop of the company's upbeat attitude"); *Allstate*, 2018 WL 1071442, at *4 (rejecting vagueness argument because "[e]ven if a reasonable investor understood defendants' conclusions to be uncertain, that understanding would have been based on incomplete information" due to the omitted facts); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (holding statements that company was "committed" to cybersecurity were not puffery because they "relate to a core aspect of [the] business" and "were made repeatedly to assure investors that [the] systems were secure"); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (finding statements about product being "on track" would be material if the product was not on track).

### 3. The Internal Controls Statements Were Materially False and Misleading

Defendants claim that SOX Certifications are inactionable opinions as a matter of law.  ADM Br. at 28; *see also* Young Br. at 4.  That is not true.  *See, e.g.*, *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 656 (N.D. Ill. 2021) (upholding claim that defendants "misrepresented the effectiveness of the company's internal controls" where company later admitted it suffered material weaknesses in internal controls at the time of the statements).

---

[11]     In addition, the *Searls* and *Eisenstadt* cases relied on by Defendants were decided at the summary judgment stage on a complete record, unlike Defendants' request that the court dismiss statements as immaterial as a matter of law, at the pleading stage.

First, through the SOX Certifications, Defendants Luciano, Luthar, and Young represented that the Company's internal controls "were effective" and free from material weaknesses. *See* ¶¶159-162, 164-166. That is a verifiable fact, as confirmed by the Company's admission that it suffered a material weakness during the Class Period and lacked adequate controls to ensure intersegment sales were recorded at market rates in accordance with the Company's stated policy. ¶¶210-216. This was not just a change of opinion, rather it was an admission that controls did not exist to stop Defendants from manipulating intercompany sales prices. *See In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *8 (D.N.J. Apr. 28, 2017) (finding SOX Certifications misleading because "Defendants misrepresented that Valeant's internal controls were operating effectively under Sarbanes Oxley, when in fact material weakness existed during the Class Period").

Second, even if the statements are an "opinion" they are still actionable in this case. Defendants argue that to be actionable the SOX Certifications must have been made with scienter, and they merely reference their argument that the Complaint fails to adequately allege scienter. *See* ADM Br. at 28; Young Br. at 4 (arguing a SOX Certification "does not give rise to securities fraud unless the executive defendant actually knew or should have known" the certification was false). Thus, this argument should be rejected for the same reasons set forth below in opposition to Defendants' scienter arguments. *See Kraft Heinz*, 2021 WL 3566602, at *7 & n.2 (upholding SOX Certifications as false and misleading where company admitted material weaknesses that led to restatement, and noting that "Defendants' [SOX Certification] argument seems more related to scienter, which the Court addresses below"). Courts have also been clear that SOX Certifications can be false or misleading statements if made without a reasonable basis. *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (sustaining claims based on SOX Certifications when plaintiff alleged "Defendants had no reasonable basis" for certifying adequacy of company's internal controls and where "Lead Plaintiffs specifically allege that the internal

- 25 -

4896-2277-0150.v1

controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period").

### C. The Totality of Factors Supports a Strong Inference of Scienter as to Each Defendant

Defendants' scienter arguments suffer from two serious flaws. First, Defendants try to heighten the standard by arguing for **direct evidence of knowledge** (*see* ADM Br. at 9-10), ignoring that circumstantial allegations showing "'reckless disregard of a substantial risk that the statement is false'" is also sufficient. *Oak St.*, 2023 WL 1928119, at \*9-\*10 (rejecting argument that "allegations of specific reports, conversations, or meetings demonstrating the defendants' knowledge" are required to plead scienter); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (stating plaintiffs do not need "evidence" because the "PSLRA did not . . . purport to move up the trial to the pleadings stage"). Circumstantial evidence is enough at trial, and certainly enough at the pleading stage prior to discovery. *See, e.g.*, Seventh Circuit Pattern Civil Jury Instruction No. 1.12 (stating "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence"); *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 850 (N.D. Ill. 2017) (holding that scienter may be inferred from "circumstantial evidence of conscious misbehavior or recklessness").

Second, Defendants cite cases holding that an individual allegation "alone" did not create a strong inference of scienter.[12] But, "courts must consider the complaint in its entirety" and ask "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

---

[12] *See* ADM Br. at 11 (citing *Cornielsen* as rejecting "'conclusory allegations of scienter derived from a defendant's mere access to information'"); Macciocchi Br. at 6-7 (same and adding that "core operations" cannot establish scienter on "a stand-alone basis"); ADM Br. at 12 (citing *Chu* as stating "'violation of GAAP does not itself establish scienter'"); Young Br. at 4, 8 (arguing that GAAP violation "on its own" fails to show scienter and citing *Roth* as holding that signing a SOX Certification "'does not suffice to allege scienter'"); *id.* at 10 (citing case to argue the "'mere existence'" of government investigations do not support scienter); Luthar Br. at 6 (citing case as stating inference of scienter cannot be based only "on [defendants'] positions within the company").

whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23 (emphasis in original).[13]  Thus, no single allegation must do the job alone because the totality of allegations is sufficient to plead scienter, especially since the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324; *see also Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21, *29-*30 (N.D. Ill. Apr. 18, 2022) ("*Fryman II*") (holding a "tie goes to the plaintiff").

Here, Nutrition was the most important segment of the Company. ¶¶260-267.  It was closely monitored by the Individual Defendants, each of whom spoke specifically about Nutrition's operating profits to investors. *Id.*; *see also* ¶¶268-273.  The accounting scheme to fraudulently inflate Nutrition profits blatantly violated basic GAAP and the stated Company policy, and persisted for nearly six years, during which the Individual Defendants personally profited from the scheme through incentive compensation and massive stock sales. *See* ¶¶275-287, 294-299.  When the scheme began to be investigated by federal agencies, several Individual Defendants were pushed out of their jobs. *See* ¶¶300-309.  At this stage, these detailed allegations are more than sufficient to meet Plaintiffs' burden of alleging that Defendants knew of or at least recklessly disregarded the existence of the accounting scheme and move this case into discovery, as they are similar to and even exceed allegations upheld in recent cases from this District. *See, e.g.*, *Oak St.*, 2023 WL 1928119, at *9-*10 (finding scienter adequately pled based on allegations of incentive compensation, "repeated" misleading statements, the obviousness of the violations, and the

---

[13]     *See also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal on scienter grounds and rejecting defendants' argument that "'[t]he sum of several zeros' . . . 'is still zero'" because the "inferential significance of any single allegation can be determined only by reference to all other allegations"); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (rejecting attempts at "'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA").

- 27 -

4896-2277-0150.v1

importance of business practices impacted); *Allstate*, 2018 WL 1071442, at *5 (finding CEO scienter adequately alleged primarily from insider stock sales).[14]

In contrast, Defendants attack the allegations individually and do not even reference, much less apply, the Supreme Court's mandate to "consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23 (emphasis in original). None of the cases Defendants rely upon contain the totality of scienter factors present in this case. To start, many of the cases were dismissed because the alleged statements were not even misleading (which is admitted here), so it necessarily follows the plaintiffs were unable to plead a strong inference that the defendants knew or recklessly disregarded that the statements were misleading. *See*, *e.g.*, *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *7 (N.D. Ill. Sept. 26, 2018) (discussing scienter as hypothetical grounds for dismissal "if [plaintiff] had sufficiently alleged false statements or omissions"); *see also* §III.C.2 (distinguishing *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888 (N.D. Ill. 2020), and *Conagra*, 495 F. Supp. 3d 622, on same grounds).

In addition, Defendants rely most on *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457 (N.D. Ill. Jan 12, 2021), but, as explained herein, the simplicity of the GAAP and Company policy violations here, and unique fact that the violations were committed solely to boost Nutrition profits (rather than inadvertently applied across all intercompany sales) provide additional evidence of

---

[14]    *See also AbbVie*, 2020 WL 5235005, at *5 (finding scienter adequately alleged based on "numerous statements" and nature of statements, core operations, existence of conduct that allegedly violated stated policy, prior settlement for different product, and incentive compensation, without discussion of insider stock sales, obviousness of misconduct, or executive departures, and despite defendants' claim that the they had "no reason to believe" the concealed conduct was improper and instead "advertis[ed] it to the public"); *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *5 (N.D. Ill. Sept. 7, 2021) (finding "totality" of allegations supported strong inference of scienter without discussion of any allegations of insider trading, incentive compensation, executive departures, or government investigations).

scienter not present in *Baxter*. §III.C.4 (discussing the complex GAAP that was misapplied "in general" in *Baxter*). Moreover, unlike in *Baxter*, the CFOs were terminated in this case (§III.C.5), the Individual Defendants sold over $100 million worth of ADM stock at inflated prices and their compensation was tied to the specific segment at issue (§III.C.1), the Individual Defendants spoke specifically about the components that impacted Nutrition profits without disclosing the accounting scheme (§III.C.2), and the SEC and DOJ are conducting ongoing investigations into the fraud (§III.C.7). *C.f. Baxter*, 2021 WL 100457 (making no mention of SEC or DOJ investigations and noting CFO remained after accounting errors were revealed, defendants did not sell "any" stock, and defendants' incentive compensation was "typical" and tied to company performance generally). In short, the totality of the allegations adequately plead that Defendants acted with scienter, and their attempts to scrutinize individual allegations in isolation should be rejected.

### 1. Defendants Had Motive to Engage in and Conceal the Accounting Fraud

While motive to commit fraud is not required to sufficiently allege a strong inference of scienter because "there is little if any significance attributable to the absence of an allegation of a personal financial motive" (*Career Educ.*, 2012 WL 5363431, at *11), when present, "'motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference.'" *Hospira*, 2013 WL 566805, at *16. Here, insider stock sales, and the extraordinary incentive compensation plan that tied the Individual Defendants' pay to the profits of the Nutrition segment specifically, provided motive for each of the Individual Defendants to engage in or recklessly disregard the accounting scheme.

First, experts have tied large bonuses and stock options to the "overly risky behavior and short-term strategies" that led to the "global economic crisis of 2008" because "[w]hen people's remuneration depends strongly on a financial measure, they are going to maximize their performance

- 29 -

on that measure," including through "cooked books, false sales reports, and illegal means." ¶60. Here, in 2020, after the accounting scheme had been underway for two years, ADM substantially changed its compensation system. ¶284. As senior managers, the Individual Defendants attended the compensation meetings and Luciano was involved in making recommendations on the compensation structure. ¶¶282-283. As part of the 2020 change, ADM went from awarding incentive compensation based on a metric focused on total company profits to a metric focused on "operating profit growth in the Nutrition segment." ¶¶59, 284-288. Thus, the Individual Defendants had significant financial incentives to boost Nutrition profits, including by continuing and concealing the accounting fraud, which supports a strong inference of scienter. *See, e.g.*, *Oak St.*, 2023 WL 1928119, at *9 (finding motive and scienter where defendants' "incentive awards" were tied to adding new patients, a portion of which were allegedly being added through the undisclosed unlawful tactics); *Exelon,* 2021 WL 1561712, at *10 (finding motive and scienter where defendants "stood to gain from the [undisclosed] scheme"); *AbbVie*, 2020 WL 5235005, at *5 (finding motive and scienter where defendants' "compensation was tied directly to" sales of the product that were boosted by undisclosed conduct).

Indeed, Nutrition reported operating profit doubled during the accounting scheme as Defendants' cash bonuses and stock awards were tied to those results. *See* ¶¶61-62, 285-289. The Individual Defendants received stock awards that were in the millions of dollars and 4 to 8 times larger than their regular salaries. ¶286.[15] After the fraud was revealed, media reported on the "outsized influence" Nutrition performance had "on recent executive bonuses" and quoted an expert stating the system of tying compensation to just the Nutrition segment was "highly unusual." ¶292.

---

[15] For example, based on the February 13, 2023 stock price of $81.90 per share, of the approximately $48.5 million of 2020 performance stock awards that were awarded, roughly $28.6 million were to Luciano, $1.8 million to Luthar, $10.5 million to Young, and $7.6 million to Macciocchi. *See* ¶291.

- 30 -

4896-2277-0150.v1

Second, not only was the Individual Defendants' incentive compensation directly tied to Nutrition's success, but the Individual Defendants also cashed in and directly benefited from the fraud by selling stock at the artificially inflated prices. During the Class Period, analysts weighted Nutrition profits at nearly double the other segments in setting stock price targets, and the stock price rose from the $30s to the $90s. *See* §II.C; ¶¶69-71, 94. Defendants took advantage by selling massive amounts of stock in sales that were unusual compared to their pre-Class Period conduct:

| Defendant | Total Stock Sales in 4 Years Prior to Class Period | Class Period Sales |
|---|---|---|
| Luciano | $0 | $83 million |
| Young | $0 | $16 million |
| Macciocchi | $0 | $7 million |
| Luthar | Not available | $670,000 |

*See* ¶¶295-298. Some of these sales occurred almost immediately after ADM publicly reported Nutrition's inflated results. *E.g.*, ¶295 (Luciano selling $20 million worth of stock 6 days after ADM reported inflated Nutrition profits). A commentator even noted that Luciano's sales were "unusual," "timely," and "opportunistic." ¶296.

Courts have found far lower and less suspicious insider sales support scienter. *Fryman II*, 2022 WL 1136577, at *30 (finding stock sales by defendants and non-defendants – ranging from $460,000 to $721,000 – "support an inference of scienter"); *Allstate*, 2018 WL 1071442, at *2, *5 (finding sale of $6.2 million by individual defendant contributed to strong inference of scienter); *Ustian*, 2009 WL 2386156, at *10 (finding fact that executives "pocketed $2 million and $828,655 in bonuses" supported scienter because the court did "not regard such [sums] to be common" or "insignificant").

In response, Defendants make unpersuasive factual arguments inappropriate for a motion to dismiss, and erroneous legal arguments. As to factual arguments, Defendants highlight that they did not sell all of their stock, but they also concede they were not permitted to sell all of their stock and

- 31 -

instead were required to hold stock worth multiple times their salary. *See, e.g.*, ADM Br. at 20; Macciocchi Br. at 10. Courts have rejected the notion that failing to significantly deplete stock holdings negates the fact that substantial shares were sold at the artificially inflated prices. *See In re Valeant Pharm. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at \*9-\*11 (D.N.J. June 30, 2019) (rejecting argument that stock sales did not support scienter because defendant continued to hold a substantial number of shares, noting possible reasons for continuing to hold shares included fear that selling more would cause suspicion); *Allstate*, 2018 WL 1071442, at \*5 (rejecting argument that stock sales "did not represent a substantial portion of his holdings" because "this claim lies outside of the complaint" and "raises a factual issue . . . not properly decided at this stage of the litigation"). Similarly, Defendants' claim that the value of their holdings increased during the Class Period (*e.g.*, ADM Br. at 20) does not negate scienter but is the natural consequence of having made false and misleading statements that artificially drove up the price of the stock from $35 to more than $90. ¶¶15, 294. The Individual Defendants' overall number of shares held declined from 2021 to 2024 due to their large sales. *See* ECF 80-7.

In further attempts to make factual arguments that are more appropriate for trial, Defendant Macciocchi claims that he did not sell shares prior to the Class Period because he was purportedly "building stock reserves to come into compliance with ADM's policy" (Macciocchi Br. at 10) and the Individual Defendants claim that they did not sell prior to the Class Period because they expected the stock price to increase later (ADM Br. at 19). But these are speculative fact disputes not appropriate for a motion to dismiss. *See Allstate*, 2018 WL 1071442, at \*5 (refusing to consider "factual issue" from outside the complaint in assessing insider sales); *O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at \*5 (N.D. Ill. Feb. 25, 2014) ("As the Seventh Circuit explained approximately

- 32 -

27 [now 37] years ago, 'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations.'").[16]

Next, Defendants' legal arguments fare no better. The highly unusual compensation system in this case that tied incentive awards to one segment's performance is unlike general allegations that defendants stand to do well when the company does well, which courts in cases cited by Defendants have found to be unconvincing.[17] Defendants rely on *Davis*, 385 F. Supp. at 797 (ADM Br. at 19-20; Luthar Br. at 7; Young Br. at 9), but it actually supports a finding of scienter under the facts of this case. There, the court did not find a defendant's $542,000 in stock sales to be unusual because he "had sold comparable amounts of stock in previous years." *Davis*, 385 F. Supp. 2d at 715. Here, in contrast to selling over $100 million during the Class Period, none of the Individual Defendants reported any sales in the four years prior to the Class Period. ¶¶294-299. The court in *Davis* specifically noted that "[i]f [the defendant] never had sold stock before, this would bolster the relevance of [his class period] sale for purposes of *scienter*." 385 F. Supp. 2d at 715.[18]

---

[16] Also, Macciocchi's factual argument can be refuted by the exhibit submitted by ADM showing Macciocchi held stock worth 7.4 times his salary before the start of the Class Period in April 2020 when he was only required to hold 3 times his salary. ECF 80-11. And the Individual Defendants' claim they did not sell before the Class Period because they expected the stock price to increase during the Class Period tends to confirm their knowledge of the accounting fraud. §II.C.

[17] *Cf. Plumbers & Pipefitters Loc. Union 718 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (rejecting general allegations that "top managers had an incentive to make [the company] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options" because same could be said "about every firm in the world"); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005) (finding allegations of "general desires to keep stock prices high to make the company appear profitable or to increase officer compensation" are not enough to establish motive); *In re Bally Total Fitness Litig.*, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) (similar and noting complaint's failure to plead any "large insider stock sales," which would be "suggestive of scienter"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (similar); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 635 (S.D.N.Y. 2008) (finding "generic" allegations about desire to "increase [a] severance package" insufficient to plead motive).

[18] Defendant Young's claim that Plaintiffs have not shown his "alleged failure to sell stock in the four years leading up to the putative class period is unusual or suspicious" (Young Br. at 9) misses the point. As explained in *Davis* (relied on by Young), the issue is that his $15.9 million in Class Period sales were unusual and suspicious because they were not made consistent with any prior routine pattern of selling in the four years leading up to the Class Period. His citation to *Pugh v. Trib. Co.* is unavailing because, in contrast to

- 33 -

### 2. Defendants' Numerous Statements, Senior Positions, and Direct Roles in Monitoring Nutrition's Profits and Accounting Contribute to a Strong Inference of Scienter

Defendants again overstate the law in claiming that their positions and "access" to non-public information cannot contribute to a strong inference of scienter. *E.g.*, ADM Br. at 11-12. It is relevant that Plaintiffs did not indiscriminately sue individuals or lower-level employees without any role in monitoring and reporting on the Nutrition segment's operating results. Rather, the allegations show that each of the Individual Defendants had direct responsibility for entering into, monitoring, and publicly reporting on the Nutrition segment. *See* ¶¶268-272. Luciano was the President, CEO, and Chairman of the Board of ADM. ¶¶27, 255. Luthar was ADM's CFO and CFO of the Nutrition segment, as well as Head of Investor Relations. ¶¶28, 255. Young served as CFO of ADM and Macciocchi was President of the Nutrition segment. ¶¶29-30, 255. The facts here distinguish the case from situations where the defendants had no direct role over the concealed matters, and support an inference of scienter. *See, e.g.*, *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding fact that CEO was "'deeply involved'" in company's lending process supported inference he was aware of undisclosed financial troubles); *RTI*, 532 F. Supp. 3d at 662 (finding fact that defendants, "whom served as [the] CEO, CFO, or other high-level roles," were "responsible for designing and supervising [the company's] internal controls" supported scienter); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (stating "each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations").

---

Young's large stock sales after four years of inactivity, the plaintiffs there failed to provide "any context showing that the applicable time period [of the sales] was unusual." 521 F.3d 686, 695 (7th Cir. 2008).

- 34 -

Moreover, Defendants held themselves out as directly knowledgeable about the financial performance of the Nutrition segment, claimed to monitor its performance, and reported on and certified its accounting results and internal controls by signing the financial statements (Young, Luthar, Luciano) and speaking publicly about its performance (all Defendants). *See, e.g.*, §III.B.; ¶¶255-258, 268-272; *Tellabs I*, 437 F.3d at 603 (holding that "'[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate'"); *Atlas Air*, 324 F. Supp. 2d at 491 (holding the "individual defendants were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading"). Throughout the Class Period, Defendants reported on or publicly boasted about Nutrition's operating profits or growth, investigated and publicly identified the purported sources of the Nutrition operating profits, and assured investors the Company was complying with its stated policy and GAAP in accounting for intercompany sales. *See* §III.B; ¶272.[19] Making repeated, specific, and misleading statements does support an inference of scienter. *See*, *e.g*., *Oak St.*, 2023 WL 1928119, at *10 (finding "defendants' repeated statements about [the company's] marketing practices and AKS compliance support an inference that the defendants knowingly concealed the allegedly improper practices"); *Kraft Heinz*, 2021 WL 3566602, at *13 (finding defendants' "repeated references" to cost-cutting and post-merger efficiencies contributed to scienter); *AbbVie*, 2020 WL 5235005, at *5 (finding defendants' "numerous statements" on sales practices were "strong circumstantial evidence that [they] had detailed information regarding" the practices); *Career Educ.*,

---

[19]     The Complaint includes such statements by each Individual Defendant, such as Luciano and Young (¶¶85, 87, 89, 93, 96, 99, 101, 104, 125-127, 133, 136, 138, 140, 142); Luciano and Luthar (¶¶108, 110, 112, 114, 117, 119-121, 145, 147-148, 150, 153-155); Luciano (¶¶103, 105, 124, 128(a), 129, 131-132, 149); Young (¶¶92, 130, 141(a),(d)); Luthar (¶¶139, 146); and Macciocchi (¶¶90, 97, 128(b), 137, 141(b)-(c)).

4896-2277-0150.v1

2012 WL 5363431, at *10 (finding from CEO's statements about an issue that "[o]ne may readily and reasonabl[y] infer" the CEO "made it his business to look into" the issue).

In other words, specific allegations from "internal documents and communications" showing direct "knowledge" of the accounting fraud (ADM Br. at 12) are not required because Defendants are liable for recklessly disregarding the fraud when speaking so frequently about the purported sources of the Nutrition segment's profits and growth. *See, e.g.*, *Lindelow*, 2001 WL 830956, at *8 (holding that where subsidiary project was considered a "'core project'" of parent company, it was "strongly inferential that every officer or director of [the parent company] either had the knowledge of the feasibility of launching [the project], or, if not, that [their] failure to have such knowledge equated to reckless disregard"); *Grubhub*, 2021 WL 4077327, at *5 (finding defendants' "ability to monitor diner quality and analyze trends" and "numerous statements regarding diner quality" supported strong inference of scienter for statements concealing negative diner quality information).

This case is not like the cases relied on by Defendants. It is unlike *Fryman*, where the plaintiff failed to plead falsity because it could not "allege[] the existence of any internal information that contradicted [the] public statements" and therefore could not allege "'access'" to such non-existent information. 462 F. Supp. 3d at 902.[20] Here, ADM admitted that its internal records showed Nutrition profits were materially overstated because intersegment sales to Nutrition were "not recorded at amounts approximating market" in violation of the Company's stated policy and GAAP. ¶200. In addition, the frequency of Defendants' discussions of Nutrition's operating profits, growth, and the sources of profits and growth, combined with holding themselves out as monitoring

---

[20] Defendants cite to other cases that are similarly distinguishable for failing to allege the existence of material undisclosed facts, rather than the admitted material accounting violations in this case. *See, e.g.*, *Conagra*, 495 F. Supp. 3d at 644, 663 (finding plaintiff failed to show company's sales promotions amounted to "fraudulent channel stuffing" so court could not infer defendants "knew [any] promotions or practices were fraudulent or wrongful"); *Plumbers and Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 745 (S.D. Ind. 2009) (finding plaintiff failed to plead any omissions of material facts that would render statements misleading), *aff'd sub nom. Zimmer*, 679 F.3d 952.

- 36 -

the Nutrition segment and complying with the accounting policy, distinguishes this case from those relied upon by Defendants where the concealed matters occurred in remote corners of the business. *See, e.g.*, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757-760 (7th Cir. 2007) (affirming dismissal of claims against company's U.S. executives relating to foreign subsidiary's data manipulations in Brazil).

Defendants' reliance upon *Caterpillar* is also misplaced because the defendants there had disclosed the alleged wrongful conduct and publicly disputed the IRS's view of the tax scheme's impropriety. 2018 WL 4616356, at *2, *6-*7. In contrast, Defendants here concealed the fact that that ADM was recording intercompany sales to the Nutrition segment at below market rates, and falsely assured investors that ADM complied with its disclosed accounting policy and GAAP, only to later admit that ADM had been violating the accounting policy and GAAP for six years. *See RTI*, 532 F. Supp. 3d at 663 (holding the fact that defendants "attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial reporting during the class period is more than sufficient at the pleading state to indicate recklessness"); *Ustian*, 2009 WL 2386156, at *9 (finding the extent to which defendants' statements "depart[ed] from the truth" supported "stronger" inference that defendants were aware of or recklessly unaware of accounting problems).

### 3. The Core Operations Doctrine Supports a Strong Inference of Scienter

Defendants claim the "core operations" factor alone is insufficient (*e.g.*, ADM Br. at 14), but, again, courts find this factor contributes to scienter when plaintiffs "are not relying exclusively on the core operations inference." *Oak St.*, 2023 WL 1928119, at *10. Defendants cannot refute that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or

to an important transaction that would affect a company's performance.'" *Sears*, 291 F. Supp. 2d at 727; *Grubhub*, 2021 WL 4077327, at *6 (accord).

Here, after years of stagnant and volatile performance as primarily a commodities firm (¶¶32-37), ADM made the strategic decision to "becom[e] a global nutrition company" (¶260). ADM entered the Nutrition segment in 2014 by executing the largest acquisition in its history, and ultimately invested $6 billion to acquire Nutrition-related businesses. ¶¶40-41, 231. The Company spent years advancing its "targeted expansion down the value chain into higher margin, differentiated products for Human and Animal Nutrition." ¶56. ADM made Nutrition a "core pillar of [its] strategy" (¶64) and diverted resources away from its historical businesses in favor of investing to grow Nutrition (¶261). Defendants described Nutrition as ADM's "fastest growing segment" and assured investors that the Company's transformation into a Nutrition business would result in "predictable, robust," "high margin [and] low volatility" earnings that would benefit "our stock" price. *See* ¶¶40, 230. Indeed, analysts saw Nutrition as "the company's highest value business unit" and weighed Nutrition's earnings higher than the volatile and less predictable earnings of the other segments. *See* ¶¶68-71, 234-235. ADM highlighted Nutrition profits every quarter, analysts asked about the Nutrition segment's actual or projected profits at every quarterly earnings call during the Class Period (¶264), and Nutrition's increased operating profits provided the bright spot for ADM while the other segments continued to languish and suffer from unpredictable and volatile results (*see* ¶¶64-68). *See also* ¶¶229-233, 261-265 (further describing how Nutrition was critical to ADM's business).

As courts recognize, common sense dictates that senior executives are more likely to be aware, or to speak with reckless disregard, of matters that reflect core operations of their business. *See, e.g.*, *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 731 (D. Minn. 2019) (finding scienter supported because it is "reasonable to assume that top management w[as] 'aware of

- 38 -

matters central to that business's operation'"). For core matters, the Seventh Circuit has found that the competing inference that senior executives were in the dark is "exceedingly unlikely." *Tellabs III*, 513 F.3d at 709-11 (finding scienter adequately pled and stating "[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely"); *In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (finding unpersuasive the competing inference that defendants "were essentially clueless as to the major problems existing within the company").

Defendants' attempt to minimize the significance of the accounting fraud by claiming consolidated earnings were not impacted (*e.g.*, ADM Br. at 14) is unpersuasive. ADM is a multi-segment business that reports results on the segment level. *See* ¶¶32-33, 41, 69, 83-121. As such, the Individual Defendants managed ADM, and the market valued ADM, at the segment level, with the Individual Defendants specifically highlighting Nutrition segment performance throughout the Class Period. *See* §II.C; §III.B.2. The purpose of the scheme was to shift earnings from the less important segments to the most critical, Nutrition segment, which drove both the stock price and the Individual Defendants' incentive compensation. *See* ¶¶230-236, 261-267, 281-292. Contrary to Defendants' claim of "mistake," this was not an oversight or unintentional error that affected all intercompany sales, as only sales to Nutrition were altered. ¶227. Intercompany sales between the other segments were recorded in compliance with GAAP at market prices. ¶¶227-278.[21]

---

[21] Contrary to Defendants' claim, the court in *Baxter* did not "conclud[e]" that the core operations doctrine "applies only where alleged accounting fraud concerned . . . 'more than 57 percent of [a company's] total sales.'" ADM Br. at 14. Instead, the court noted that the core operations could be invoked for such sales, but the inference was not sufficient in the absence of enough additional allegations supporting scienter. *Baxter*, 2021 WL 100457, at *14. Defendants' citation to *Boca Raton Firefighters' and Police Pension Fund v. DeVry Inc.* is likewise misplaced because there the court assumed that the operation was "vital" but found it did not matter because the purportedly concealed facts were "not inconsistent with the defendant's public statements." 2012 WL 1030474, at *10-*11 (N.D. Ill. Mar. 27, 2012).

- 39 -

      **4.     The Simplicity of the Accounting Policy Supports a Strong Inference of Scienter**

Defendants cite to cases making the unremarkable assertion that a GAAP violation "'does not itself establish scienter.'" ADM Br. at 12; *see also* Young Br. at 8-9. While "[t]he mere *fact* that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a restatement or violation, however, may ultimately do so." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) (emphasis in original). Similarly, "the magnitude of the restated financials and the pervasiveness and repetitiveness of [the company's] GAAP violations; the simplicity of the accounting principles violated . . . and the importance of the contracts involved" serve to "amplify the inference of scienter." *Id.* at 636.

Here, there is no dispute that for six years, ADM violated its stated accounting policy and GAAP to materially inflate Nutrition profits. ¶¶189-191, 223. Defendants argue, however, that the Court should hold, at the pleading stage, that "the accounting errors were inadvertent, rather than the result of recklessness or gross indifference." ADM Br. at 13. But executives are not typically terminated for, and the SEC and DOJ generally do not expend substantial resources to investigate, inadvertent errors. *See* ¶¶300-308; §II.D. Moreover, the nature of the accounting violations refutes any inference of mere inadvertence and further supports the totality of allegations supporting a strong inference of scienter.

The accounting fraud did not involve complex accounting standards or require the exercise of judgment or the estimation of future results. ¶276. Rather, the Company had a long-standing policy of booking intercompany sales at market rates, and GAAP required only that ADM follow that publicly-disclosed policy. ¶¶275-277. ADM unerringly followed the policy for sales between ASO and Carb Solutions, but violated the same policy for the critical Nutrition segment, falsely inflating Nutrition profits for six years. ¶¶277-279. Further, the Individual Defendants publicly demonstrated

- 40 -

their knowledge of the specific factors that impacted Nutrition profits which included intercompany sales (¶¶124-157), claimed their ability to source commodity raw materials internally through intercompany sales was a competitive advantage which provided lower costs to Nutrition (¶¶129, 137, 139, 146), and knew their compensation was directly tied specifically to Nutrition's profits (¶¶281-293). In this context, the simplicity of the accounting fraud clearly provides further support for a strong inference of knowing or deliberate disregard. *See MicroStrategy*, 115 F. Supp. 2d at 637 (finding scienter where plaintiff alleged that the revenue recognition violations were so obvious, not only because of the simplicity of the GAAP, but because the company's "own publicly acknowledged policy of not recognizing revenues from an arrangement until 'evidence of the arrangement is provided . . . by a contract signed by both parties'"); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *6-*7 (D. Ariz. Aug. 9, 2010) (finding inference of scienter supported by the "relatively straightforward and simple" nature of the GAAP rule and accounting methodology that was "specifically identif[ied]" in the company's SEC filings signed by defendants).[22]

Defendants again cite distinguishable cases (*e.g.*, ADM Br. at 13; Young Br. at 8) with only "bare" or unsupported allegations of GAAP violations, or involving complicated accounting or judgmental errors that did not uniformly inflate results.[23] For example, in *Baxter*, the court

---

[22]    *See also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (holding violation of a "'single GAAP rule'" that materially impacted the company's financials was probative of scienter); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185-86 (S.D. Cal. 2009) (finding inference of scienter supported by violations of "basic accounting rules"); *In re Ravisent Techs., Inc. Sec. Litig.*, 2004 WL 1563024, at *9 (E.D. Pa. July 13, 2004) (holding violation of "simple" policy that "revenue was to be recognized when [company] was notified it was delivered" supported finding of "recklessness or conscious behavior . . . sufficient to plead scienter").

[23]    *See, e.g.*, *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1167 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018) (noting "[t]he accounting rules the plaintiffs allege were violated are complex and technical, and the plaintiffs have not alleged with sufficient particularity why or how senior executives at Kohl's would have been so familiar with those rules so as to see a problem"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 847, 857-58 (9th Cir. 2018) (finding the accounting rules for lease and power purchase agreements were "more complex" and involved using a "burden ratio" formula to allocate "indirect overhead costs" between multiple divisions, the misapplication of which resulted in a "minute

- 41 -

recognized that "violating straightforward accounting rules may point towards a finding of scienter," but found that – unlike here – the application of GAAP at issue "'was not so straightforward,'" "could be burdensome," and involved "'generally impractical'" foreign exchange translations, requiring "'time- and effort-saving methods to approximate the results of detailed calculations.'" 2021 WL 100457, at *17. Moreover, in *Baxter*, the court noted that the company's "longstanding" incorrect application of GAAP made it more likely the defendants "assumed the existing FX Convention was GAAP-compliant." *Id.* In contrast here, the GAAP violation did not occur universally for all intercompany sales, but only selectively for intercompany sales *to* the critical Nutrition segment, and the practice violated – rather than continued – ADM's longstanding policy and practice. ¶¶226-227, 275-279. Thus, it would be unreasonable to infer Defendants "assumed" for six years that the unlawful intercompany sales complied with GAAP or the Company's stated policy.

### 5. Executive Departures Support a Strong Inference of Scienter

It is no surprise that Defendants Luthar, Young, and Macciocchi each have separate counsel from the Company, as they have all suffered adverse employment consequences from the scheme. *See* §II.E. Courts find, and Defendants do not appear to dispute (*e.g.*, ADM Br. at 16; Luthar Br. at 8), that executive departures that are "uncharacteristic when compared to the defendant's typical hiring and termination patterns or [that were] accompanied by suspicious circumstances," can support an inference of scienter. *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 893 (N.D. Ill. 2023) (finding scienter established and denying motion to dismiss).

---

error"); *Bally*, 2006 WL 3714708, at *7-*8 (finding court could not "infer scienter" where list of accounting errors "did not consistently overstate revenues and income or consistently understate losses" and not crediting vague allegations of "simplicity" of accounting); *Davis*, 385 F. Supp. 2d at 710, 715 (noting that "violations of GAAP" alone can "provide some evidence of *scienter*" but finding the "allegations [were] insufficient to determine whether [the conduct] constituted a GAAP violation"); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 838 (N.D. Ill. 2000) (stating "bare" allegations did not support scienter where "it [wa]s not even clear that [the company] committed GAAP violations" and the practice was consistent with disclosed policy).

4896-2277-0150.v1

Here, a few months after the SEC began its internal investigation, Defendant Macciocchi, the head of the Nutrition segment, was forced to "retire." It clearly was involuntary as he lost millions in potential compensation, was only 58, and did not actually "retire," as he soon took a different job. ¶304. Just two months later, in January 2024, the SEC investigation was publicly disclosed and Defendant CFO Luthar was placed on "administrative leave" and then later forced to resign. ¶¶305-306. One month later, although Defendant Young had already departed from his position as CFO of ADM, he had to abruptly surrender his seats on the boards of directors of three publicly-traded companies (Hormel, Marsh & McLennan, and International Paper), "effective immediately." ¶¶186-187, 307. Those public company resignations were undoubtedly tied to his role in the accounting fraud of another public company, ADM.

These executive departures were uncharacteristic, suspicious, and support an inference of their culpability in the accounting fraud at ADM. The departures coincided with the SEC and DOJ investigations into the very matters for which the Defendants were responsible. ¶¶300-308. Defendant Macciocchi had been with the Company for ten years, was the head of Nutrition, had been elevated to ADM's Chief Sales and Marketing Officer in 2020, and forfeited a grant of $2 million worth of performance-based restricted stock units upon his departure. ¶¶30, 304. Defendant Luthar's termination was tied directly to the Company's response to the SEC investigation, and was so abrupt that the Company did not have a replacement. *See* ¶¶179, 305-306. It was uncharacteristic for the Company to switch CFOs after just two years. *See* ¶306. Finally, Defendant Young left the Hormel position a day after his appointment, and in total, lost out on more than $800,000 in total annual compensation by leaving the boards of the three companies. ¶¶186-187, 307. Thus, the timing and nature of these executive departures support an inference of scienter. *See, e.g.*, *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (holding that "reinforcing the case for scienter is the allegation that [the defendant] resigned in the wake of the restatement, before a

- 43 -

replacement CFO was selected"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-633 (S.D.N.Y. 2014) (holding "resignations" that occurred around the time of, and a few months after, IRS announcement regarding the company "suggest[ed] that both defendants were 'terminated in relation to the undisclosed tax issue'" and "suggest[ed] a higher level of wrongdoing approaching recklessness or even conscious malfeasance"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024) (finding executive departures around time of investigation, one defendant's sudden departure from another public company, and another defendant's departure without payment of potential compensation supported inference of scienter).[24]

Defendants make several illogical arguments to try to suggest the departures were mere coincidence, but each fails. First, Luthar claims his departure was innocuous because he was able to negotiate an exit that kept him on as an advisor for a few months after he was removed as CFO. Luthar Br. at 9. However, Luthar held the CFO position for less than two years and was placed on "administrative leave" and terminated because of the investigation. ¶¶305-306. Luthar leaves out that although his and ADM's lawyers negotiated a deal allowing him to "assist the Company . . . as needed" in exchange for the release of employment claims, that agreement prohibits him from "report[ing] to the workplace in the same manner as applied immediately prior to the Transition Date." ECF 86-1 at 5. Unlike in the case cited by Luthar, *In re Cyberonics Inc. Sec. Litig.*, Luthar's abrupt placement on administrative in connection with outside counsel's investigation, amidst an ongoing federal investigation, and subsequent outright termination of his employment provides

---

[24]    Defendants cite cases from this District that likewise hold such departures support an inference of scienter. *See, e.g.*, *ATI*, 690 F. Supp. 3d at 894 (finding sudden departure around time of negative disclosures supported inference of scienter); *Career Educ.*, 2012 WL 5363431, at *10 (holding the "timing of [defendant's] resignation," which coincided with disclosure of improprieties, "lends weight to a finding of scienter"). Defendants' other cases lack the same facts and circumstances present here to support scienter. *See Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020) (finding early resignation alone insufficient); *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) (finding resignations alone, which were not alleged to have been connected to government investigation, were not sufficient to establish scienter).

4896-2277-0150.v1

"evidence in the record that the resignation[] w[as] indeed forced." 523 F. Supp. 2d 547, 553-554 (S.D. Tex. 2007) (finding resignations as part of "change in direction for the company" followed by chairman speaking "well of both people" and retaining one as consultant did not support scienter).

Second, as to Young, ADM claims that he "resigned from third-party boards to avoid distraction" (ADM Br. at 16; *see also* Young Br. at 10), but if he was uninvolved there would be no distraction as even ADM's non-Defendant board members have not resigned to "avoid distraction."[25] The most reasonable inference is Young left because he knew he is implicated, and the competing inference that he innocently left a Board one day after his appointment because he did not feel like staying is far less plausible. Like all of Defendants' factual disputes, the factual disputes about their specific roles in the fraud and reasons for departure must await trial. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").

Third, Macciocchi claims (without citation to any support) that he "left the Company on good terms for a different opportunity – an opportunity that he initially engaged in discussions for in April 2023." Macciocchi Br. at 9. But those unsupported assertions are contrary to the allegations in the Complaint which allege his "retirement" was involuntary and he was clearly forced out in the wake of the SEC investigation based on the timing and his forfeiture of millions in compensation. ¶304. These facts, not Macciocchi's unsupported counter-facts, must be accepted as true. *See* §III.A.;

---

[25] For example, Patrick Moore has been a board member of ADM since before the start of the Class Period. *See* Archer-Daniels-Midland Company, Schedule 14A*,* as filed with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/7084/000119312524091968/d540412ddef14a.htm. Not only did Mr. Moore not leave ADM's Board but he also, unlike Defendant Young, remains a board member of another publicly traded company. *Id.*

- 45 -

*Kraft Heinz*, 2021 WL 3566602, at \*3, \*8 (holding court "must accept all factual allegations in the complaint as true" and refusing to adjudicate factual disputes on motion to dismiss).

Finally, Luciano points out that, unlike the others, he retained his role at ADM. *See* ADM Br. at 16. Of course, as the CEO and Chairman of the Board, it is not surprising that those below him would fall first, but even their suspicious resignations support Luciano's scienter. *See ATI*, 690 F. Supp. 3d at 894 (finding that departures and scienter "applicable to Diab (and Coco) logically covers – to some extent – the rest of the high-level executive team who would be working together to manage the company"); *see also* ¶309 (alleging facts showing accounting fraud would require Luciano's knowledge and approval). Moreover, Luciano undermines the arguments of the other Individual Defendants when he cites to *Baxter*, 2021 WL 100457, at \*17, as support that "the defendant company would not have retained its CFO if the individual had been involved in fraudulent conduct." ADM Br. at 16. Of course, here, the CFOs were not retained and lost their jobs. ¶¶305-308. In any event, the scienter analysis does not rise or fall on a single factor, nor is an evaluation of each Defendant's relative culpability proper at the motion-to-dismiss stage. *See generally In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 171-72 (S.D.N.Y. 2008) (noting that in viewing allegations in the light most favorable to plaintiffs at the motion to dismiss stage, defendants' "finger-pointing confirms their culpability").

### 6. Government Investigations Support a Strong Inference of Scienter

Defendants acknowledge that government investigations can reinforce allegations of scienter and only argue that investigations cannot support an inference on their own. *See, e.g.*, ADM Br. at 16. But, as discussed, the SEC and DOJ have limited resources, and they open investigations to address conduct that potentially "violates the federal securities laws" and "gather[] evidence of criminal fraud," particularly fraud "perpetrated by senior executives." ¶¶300-301 & n.48-49.

- 46 -

Despite Defendants' claims here that the GAAP violations were just "mistakes," the SEC has not closed its investigation and instead the DOJ has issued grand jury subpoenas to ADM and former employees. ¶¶301-302. The fact that both the SEC and DOJ took the rare steps to open (ongoing) investigations is further support, with the rest of the allegations, for an inference of scienter that is at least as plausible as Defendants' competing inference of innocent "mistake." *See, e.g.*, *RTI*, 532 F. Supp. 3d at 663 (finding SEC's initiation of an investigation into company's accounting practices and internal controls "'provides additional support for finding that scienter has been adequately pleaded'"); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-115 (D. Mass. 2014) (finding company's receipt of a "'document preservation request from the SEC and a federal grand jury subpoena from the [DOJ] related to its accounting practices and procedures'" was "one more piece of the puzzle" that "add[ed] up to a strong inference of scienter").

### 7.     Corporate Scienter Is Established

The scienter of any Individual Defendant is sufficient to establish corporate scienter. *See, e.g.*, *Akorn*, 240 F. Supp. 3d at 821 (holding that pleading executives' scienter established corporate scienter). Moreover, while scienter is adequately alleged for each of the Individual Defendants, the admission to the six-year accounting fraud that violated Company policy and GAAP to boost Nutrition profits is an admission that ADM's senior management was responsible for booking those sales, which is also sufficient to establish scienter of the entity. *See Tellabs II*, 513 F. 3d at 710 (stating that "it is possible to draw a strong inference of corporate scienter" from "the individuals who concocted and disseminated the fraud" whether or not they are named defendants); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *31-*34 (D.N.J. Aug. 8, 2018) (noting under Seventh Circuit approach corporate scienter could be attributed from "unnamed members of senior management" given "the breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the company"); *Kraft Heinz*, 2021 WL 3566602, at *14 (finding

- 47 -

4896-2277-0150.v1

complaint adequately pled "strong inference of scienter as to [the corporation] based on the allegations that non-Defendant executives knew or had access to information . . . that contradicted the Company's public statements").

### 8. Defendants' Additional Arguments Are Meritless

Recognizing the compelling facts supporting scienter present in this case, Defendants raise additional oft-rejected arguments for dismissal, which should likewise be rejected here.

#### a. There Is No Group Pleading

Defendant Luthar and Defendant Young complain of "'group pleading'" (Luthar Br. at 5; Young Br. at 6), and Defendant Macciocchi and Defendant Luciano similarly complain of "non-specific allegations" (Macciocchi Br. at 5; ADM Br. at 12). Defendants' arguments have no merit. The Complaint clearly identifies the statements made by each Individual Defendant, each of their duties and responsibilities, each of their specific stock sales and compensation, and terms of each of their departures. *See* §III.B; §III.C.1-6. While some of the allegations apply to all Individual Defendants (*e.g.*, the compensation plans tied to Nutrition performance), the allegations are particularized to each Defendant. For example, Defendant Luthar cites paragraph 256 as showing "Plaintiffs rely heavily on group pleading." Luthar Br. at 5. But paragraph 256 states the "Individual Defendants" were involved in the drafting of "such . . . statements," which refers to the prior paragraph attributing statements to each Individual Defendant by name. *See* ¶¶255-256. There is no "group" pleading. *See, e.g.*, *Exelon*, 2021 WL 1561712, at *10 (rejecting "group pleading" argument because plaintiff "attributed specific statements and actions to individual Defendants and entities").[26]

---

[26] Defendants do not cite any analogous case and instead rely solely on *Cornielsen v. Infinium Cap. Mgmt. LLC*, which affirmed dismissal where, unlike here, plaintiffs conceded "they did not know which Individual Defendant said what" and had "a single paragraph" in the complaint discussing scienter collectively. 916 F.3d 589, 599, 602 (7th Cir. 2019).

4896-2277-0150.v1

While framed as group pleading or generalized allegations, Defendants' core argument is that the Complaint does not identify internal documents or communications showing, for example, that each Defendant had specific knowledge of the accounting fraud. However, as noted, if direct evidence (such as witness testimony and internal company documents) were required at the pleading stage, that would reverse *Tellabs II* and drastically limit the Exchange Act because discovery is precluded under the PSLRA prior to a ruling on the motion to dismiss and investors do not have access to internal company documents. *See* 15 U.S.C. §78u-4(b)(3)(b). But the PSLRA did not bar Exchange Act claims, rather it simply precluded reliance on conclusory allegations of scienter, requiring that the complaint contain allegations sufficient to support a "strong inference" of scienter. 15 U.S.C. §78u-4(b)(2). As recognized by the Supreme Court and Seventh Circuit jury instructions, scienter can be established with circumstantial evidence of reckless disregard rather than direct knowledge. §III.C; *see also TreeHouse*, 2018 WL 844420, at *3 (holding the PSLRA "requires no proof as opposed to plausible allegations"); *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *22-*23 (S.D. Ohio Sept. 29, 2023) (finding totality of allegations supported inference of scienter despite "identif[ying] no particular documents that contradict the challenged statements" and no "'confidential witnesses, [] accounts of conversations or meetings, [or] internal documents or reports'").[27]

### b.     This Is Not a Case Based on Hindsight

Defendants also rely on well worn "'fraud by hindsight'" arguments (ADM Br. at 9; Young Br. at 4) that are inapplicable in this case. This is not like the cases Defendants rely upon where after the challenged statements were made events unfolded that rendered prior statements untrue.

---

[27]     *See also Gonzalez*, 241 F. Supp. 3d at 857 (holding scienter adequately pled in complaint lacking allegations regarding internal documents or confidential witnesses); *Kelsey v. Allin*, 2016 WL 825236, at *5 (N.D. Ill. Mar. 2, 2016) (same); *Grubhub*, 2021 WL 4077327, at *5 (same); *Oak St.*, 2023 WL 1928119, at *6 & n.4 (holding internal "reports, conversations, or meetings" are not required and finding scienter adequately pled without any such internal documents or reference to any confidential witness accounts).

4896-2277-0150.v1

*See City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851, IBT v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) (affirming dismissal where defendants made statements that "First Flight" would occur in two months and then company failed to achieve first flight by that time).[28]

Rather, ADM has admitted that not only did the accounting scheme occur during the entire Class Period, but also that it existed for two years before the start of the Class Period, and Defendants were required to disclose those then-existing facts. *Exelon*, 2021 WL 1561712, at *8 ("Plaintiff is not arguing Defendants were required to accuse themselves of wrongdoing; Plaintiff pleads throughout the Complaint that Defendants were making misleading statements and engaging in [illegal conduct] . . . but representing otherwise. The statements, in other words, were incorrect when they were made."); *Allstate*, 2018 WL 1071442, at *4, *6 (rejecting "hindsight" argument because defendant's "post-class statement does not merely indicate that [defendant's] assurances . . . were incorrect in retrospect; it suggests that they were incorrect when made"); *see also AbbVie*, 2020 WL 5235005, at *4 (noting defendants' factual arguments "may be revisited after discovery on a motion for summary judgment or at trial"). Moreover, that the scheme was ongoing for years before the start of the Class Period adds to the strong inference that the Defendants either knew of it, or were extremely reckless in repeatedly claiming to follow the stated accounting policy without checking. *See, e.g.*, *Exelon*, 2021 WL 1561712, at *10 (finding fact "that the bribery scheme lasted 8 years" contributed to totality of allegations supporting scienter).

---

[28]    *See also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (reversing dismissal on scienter grounds and noting separately that "allegations that defendants should have anticipated future events" are not sufficient to show fraud); *Higginbotham*, 495 F.3d at 755-757, 760 (finding inference that U.S. executives were aware fraud by "Brazilian managers" at a foreign subsidiary based on later remediation of internal controls in Brazil were mere "hindsight" allegations).

**D.      The Control Person and Insider Trading Claims Have Been Adequately Alleged**

The Individual Defendants argue that if the Complaint fails to allege a primary §10(b) violation then the control person claims against each of them must be dismissed, and Defendants Young and Luciano argue the same reason compels dismissal of the insider trading claims asserted only against the two of them.  But since a primary §10(b) violation has been adequately alleged as to each Individual Defendant, so too have the control person and insider trading claims.

Section 20(a) of the Exchange Act imposes secondary liability on "controlling persons" of the person or entity that commits a primary §10(b) violation.  15 U.S.C. §78t(a); *see In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1031 (N.D. Ill. 2004) (upholding §20(a) claims against defendants in variety of positions because determination of "'whether an individual defendant is a "controlling person" under §20(a) is a question of fact that cannot be determined at the pleading stage'").  Here, the Individual Defendants (as CEO, CFOs, and Nutrition President) do not dispute they are "controlling persons" of ADM, and argue only that if the underlying §10(b) violation is dismissed then the control person claims must also be dismissed.  *See* ADM Br. at 29; Young Br. at 11; Luthar Br. at 10; Macciocchi Br. at 13.  Since a §10(b) violation has been adequately alleged so too have the controlling person claims under §20(a).  *Exelon*, 2021 WL 1561712, at *11.

Next, §20A of the Exchange Act (15 U.S.C. §78t-1) imposes liability for insider trading "against persons who purchase or sell a security 'while in possession of material, nonpublic information.'"  *Tellabs I*, 437 F.3d at 605.  This claim likewise requires that the plaintiff plead "'a separate underlying violation of the Exchange Act,'" *id.*, which is established here by the §10(b) violation.  Plaintiffs have asserted the insider trading, §20A claims against Defendants Luciano and Young because Plaintiffs purchased stock contemporaneously with their sales.  ¶¶345-347.

- 51 -

Defendant Luciano's sole argument is there is no §20A liability without an underlying §10(b) violation. ADM Br. at 29. However, because a §10(b) violation has been adequately pled against Luciano for the reasons set forth above, so too has the §20A claim. Similarly, Defendant Young rehashes his scienter arguments to claim that the §20A claim cannot be established without proof of "'actual knowledge'" of the accounting scheme. Young Br. at 12. But, as explained above, Plaintiffs have adequately pled a strong inference of scienter, which is sufficient to plead the §20A claim. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1050 (N.D. Cal. 2016) (finding §20A claim established based on finding of "requisite scienter" for the §10(b) claim). The cases relied on by Defendant Young are inapposite because they involved defendants with no primarily §10(b) liability. *See Zimmer*, 348 F. Supp. 3d at 849 (dismissing insider trading claims against outside investor funds that were not subject to §10(b) liability and did not "participate[] in the management of [the company] or attend [Board] meetings"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 2008 WL 2178150, at *2 (N.D. Ill. May 22, 2008) (dismissing insider trading claim against defendant where the "Section 10(b) allegations against [him]" were "no longer in play").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

DATED:  September 23, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
CAMERAN M. GILLIAM (IL Bar # 6332723)
MICHAEL J. STRAMAGLIA (IL Bar # 6336821)


                              /s/ James E. Barz
                              JAMES E. BARZ

- 52 -

4896-2277-0150.v1

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
cgilliam@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER D. STEWART
JENNIFER N. CARINGAL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
cstewart@rgrdlaw.com
jcaringal@rgrdlaw.com

MOTLEY RICE LLC
GREGG S. LEVIN
CHRISTOPHER F. MORIARTY
MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
glevin@motleyrice.com
cmoriarty@motleyrice.com
moliver@motleyrice.com
cloper@motleyrice.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/882-1676
860/882-1682 (fax)
bnarwold@motleyrice.com

Lead Counsel for Lead Plaintiffs

- 53 -

4896-2277-0150.v1

- 54 -

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
jmcintire@odonoghuelaw.com

Additional Counsel

4896-2277-0150.v1