**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND CHOW, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:24-cv-00634 District Judge Thomas M. Durkin |
| ARCHER-DANIELS-MIDLAND COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF ARCHER-DANIELS-MIDLAND COMPANY'S AND JUAN LUCIANO'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

ARGUMENT.................................................................................................................................1

I.      PLAINTIFFS FAIL TO PLEAD SCIENTER ..................................................................1

        A.      Plaintiffs' Must-Have-Known Theory Is Insufficient to Establish Scienter............2

        B.      The "Nature" Of The Accounting Issues Does Not Support Scienter .....................5

        C.      Executive Departures and Federal Investigations Say Nothing About
                Scienter ....................................................................................................................7

        D.      Plaintiffs' Motive Allegations Are Generic and Insufficient..................................8

II.     PLAINTIFFS FAIL TO PLEAD FALSITY OR MATERIALITY AS TO MANY
        OF THE ALLEGED MISSTATEMENTS .........................................................................10

III.    CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ..................................................................................9

*Allison v. Oak Street Health, Inc.*,
No. 22 C 149, 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .....................................3, 9, 14

*In re Bally Total Fitness Securities Litigation*,
Nos. 04 C 3530 et al., 2006 WL 3714708 (N.D. Ill. July 12, 2006) ..................................5

*In re Baxter International Inc. Securities Litigation*,
No. 19 C 7786, 2021 WL 100457, (N.D. Ill. Jan. 12, 2021).............................................4, 5

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ...................................................................10

*City of Livonia Employees' Retirement System & Local 295 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................9

*City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.*,
No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...............................................11

*City of Taylor Police & Fire Retirement System v. Zebra Technologies Corp.*,
8 F.4th 592 (7th Cir. 2021)...............................................................................14

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ....................................................................5, 10, 11

*In re Enzymotec Securities Litigation*,
Civil Action No.: 14-5556 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15,
2015) ..................................................................................................15

*In re GoHealth, Inc. Securities Litigation*,
No. 20-cv-5593, 2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ...........................................13

*Hedick v. Kraft Heinz Co.*,
No. 19-cv-1339, 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021)...........................................13

*Higginbotham v. Baxter International, Inc.*,
495 F.3d 753 (7th Cir. 2007)............................................................................3

*Holwill v. AbbVie Inc.*,
No. 1:18-cv-06790, 2020 WL 5235005 (N.D. Ill. Sept. 1, 2020)...........................................3, 4, 14

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) ..................................................................2

*Lowry v. RTI Surgical Holdings, Inc.*,
    532 F. Supp. 3d 652 (N.D. Ill. 2021) ..............................................................2, 15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) .......................................................................11, 13

*In re Medicis Pharmaceutical Corp. Securities. Litigation*,
    Nos. CV-08-1821-PHX-GMS et al., 2010 WL 3154863 (D. Ariz. Aug. 9, 2010)...............6

*In re MicroStrategy, Inc. Securities Litigation*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................6

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015).......................................................................................15

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ...........................................................................9

*Phoenix Insurance Co. v. ATI Physical Therapy, Inc.*,
    690 F. Supp. 3d 862 (N.D. Ill. 2023) ..............................................................8, 9

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) ...........................................................................9

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*,
    778 F. Supp. 2d 858 (N.D. Ill. 2011)...........................................................12, 13

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    No. 22-CV-6339 (AS), 2024 WL 1898512 (S.D.N.Y. May 1, 2024)..................................8

*Silverman v. Motorola, Inc.*,
    No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)...........................................12

*In re Supreme Industries, Inc. Securities Litigation*,
    No. 3:17CV143PPS-MGG, 2018 WL 2364931 (N.D. Ind. May 23, 2018).........................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................2, 9

*In re Valeant Pharmaceuticals International, Inc. Securities Litigation*,
    Civil Action No. 15–7658 (MAS) (LHG), 2017 WL 1658822 (D.N.J. Apr. 28, 2017) ...........................................................................................15

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. National Elevator Indus. Pension Fund v. Conagra Brands, Inc.*,
    No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022) ....................................3, 4, 12, 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)............................................................................................8

**STATUTES**

15 U.S.C. § 78u–4(b)(1) ....................................................................................................11

Defendants Archer-Daniels-Midland Company ("ADM" or the "Company") and Juan Luciano (together the "ADM Defendants") submit this Reply in Support of their Motion to Dismiss Plaintiffs' Complaint (ECF No. 79.)[1]

### ARGUMENT

Plaintiffs' Opposition (ECF No. 91, "Opp.") confirms that the Court should dismiss their securities fraud claims for multiple independent reasons.[2] Fundamentally, Plaintiffs fail to connect the dots between ADM's corrected accounting for intersegment sales and Plaintiffs' theory of executive-level securities fraud. Their scienter theories—that the Individual Defendants *must* have been involved with any issue affecting the Nutrition segment, that they *must* have been aware of errors in the application of a discrete accounting principle, and that executive departures from ADM at different times for different reasons *must* be related—cannot carry this case past the pleading stage. Nor can Plaintiffs' theory of motive, which is nothing more than the always-present opportunity to profit from performance-based compensation and stock sales.

### I.      PLAINTIFFS FAIL TO PLEAD SCIENTER

Plaintiffs concede that they do not plead specific facts that directly show what any Individual Defendant knew at the time of the alleged misstatements. (Opp. at 26.) Nor do they argue that any of their circumstantial allegations are strong enough to plead scienter standing alone. Instead, they hope that, taken together, a patchwork of weakly suggestive circumstantial allegations creates enough smoke to satisfy Plaintiffs' pleading burden. But that is not the case here. To establish a "strong" inference of scienter, as required, Plaintiffs' theory "must be more

---

[1]    All capitalized terms are given the same meaning as in the ADM Defendants' Memorandum of Law in Support of their Motion to Dismiss. (*See* ECF No. 80 ("Br.").)

[2]    As explained in the Opening Brief, because Plaintiffs fail to state a primary securities fraud claim, the Court should dismiss their claims under Section 20(a) and Section 20A as well.

than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) ("Tellabs II") (emphasis added). The Complaint fails this standard.

### A.     Plaintiffs' Must-Have-Known Theory Is Insufficient to Establish Scienter

Plaintiffs' Opposition primarily argues scienter based on a theory that the Individual Defendants *must* have known or recklessly disregarded that certain intersegment sales were recorded at amounts not approximating market. But the Complaint does nothing to connect any of the Individual Defendants, who held different high-level executive positions, to the misapplication of a discrete accounting policy to a particular subset of sales. Plaintiffs rely on cases where plaintiffs alleged detailed and particularized connections between the defendant-executives and the subject matter at issue. (*See* Opp. at 34 (citing *Jones v. Corus Bankshares, Inc.,* 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (CEO "'deeply involved'" in company's lending process); *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662 (N.D. Ill. 2021) (defendants individually "design[ed] and supervis[ed] internal controls")).) But those cases are easily distinguishable. Here, there are no allegations suggesting that any of the Individual Defendants had involvement in implementing accounting policy, analyzing GAAP requirements, or calculating approximate market prices for intersegment sales.

Without any connection between the Individual Defendants and the accounting issues, Plaintiffs fall back on a general claim that the Individual Defendants were high-level executives responsible "for entering into, monitoring, and publicly reporting on the Nutrition segment." (Opp. at 34.) But even if it were reasonable to conclude that Individual Defendants monitored Nutrition's high-level metrics, or even specific categories of costs, there is no basis to infer that they would have monitored the component of those costs at issue here: a specific subset of intersegment sales. It is even less plausible that they would have applied accounting

2

methodologies to calculate the approximate market rate for those sales, and less plausible still that they would have evaluated whether that calculation complied with ADM's policies or GAAP. Plaintiffs' theory depends on several distinct and unsupported assumptions, and courts regularly dismiss securities fraud cases for making these very leaps. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false."); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 663 (N.D. Ill. 2020) ("Even if Defendants knew about a Pinnacle promotion or practice, it does not necessarily follow that Defendants knew those promotions or practices were fraudulent or wrongful."), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022). This Court should do the same.

Alternatively, Plaintiffs try to collapse the falsity and scienter elements by arguing that "[m]aking repeated, specific, and misleading statements" supports scienter. (Opp. at 35.) But in all the cases Plaintiffs cite, the statements at issue drew a direct link between the underlying conduct and the alleged fraud. *See, e.g.*, *Allison v. Oak St. Health, Inc.*, No. 22 C 149, 2023 WL 1928119, at *10 (N.D. Ill. Feb. 10, 2023) (statements about "marketing practices and [Anti-Kickback Statute (AKS)] compliance" were relevant to knowledge about marketing practices that allegedly violated the AKS); *Holwill v. AbbVie Inc.*, No. 1:18-cv-06790, 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020) (statements about sales practices relevant to knowledge about those practices). For example, in *Oak Street*, 2023 WL 1928119, defendants stated that the government placed "a lot of limits on what [insurance agents] can actually do" and that "per-patient based compensation methodologies are closely scrutinized by federal agencies." *Id.* at *10 (alteration in original). The court concluded those statements plausibly suggested that defendants were aware

3

of the limitations the AKS imposed on their marketing practices. *See id.* By contrast here, Defendants made no statements about the implementation of accounting policy for intersegment sales. While Plaintiffs lean on general statements about Nutrition's profits and performance, every executive opines on those broad topics; doing so does not demonstrate knowledge about a discrete accounting application. If it did, executives would be subject to strict liability for everything they say. That is not the law.[3]

Plaintiffs' last attempt to dodge the particularity requirement is the so-called "core operations" theory, "under which 'officers of a company can be assumed to know of facts critical to a business's core operations[.]'" *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021) (quoting *In re Supreme Indus., Inc. Sec. Litig.*, No. 3:17CV143PPS-MGG, 2018 WL 2364931, at *8 (N.D. Ind. May 23, 2018)). Because this doctrine is a limited exception to the general rule that having a senior position within a company does not itself support scienter, the doctrine only applies where "the subjects of the statements or omissions are . . . of great importance to the company." *W. Palm Beach Firefighters' Pension Fund.*, 495 F. Supp. 3d at 662. Again, Plaintiffs ignore the difference between an important segment and the details of intercompany accounting policy as applied to that segment. Regardless of whether the Nutrition segment was itself a "core" operation, *accounting of intersegment sales to Nutrition* could only qualify as core if that accounting amounted to a "significant part" of ADM's "financial picture." *Baxter*, 2021 WL 100457, at *13-14. But Nutrition represented at most 17% of ADM's operating profit, and the accounting error at issue

---

[3] The same is true of SOX certifications attesting to the accuracy of ADM's financial statements and effectiveness of internal controls over financial reporting. *See Baxter*, 2021 WL 100457, at *15 (SOX certifications "are only probative of scienter if [] Plaintiffs allege additional facts showing that, *at the time they made these certifications*, [Defendants] knew or were reckless in failing to recognize that [their] internal controls and procedures were ineffective").

in this case only altered *Nutrition's* reported profits between 2.9%-10.2% in each relevant year. (Compl. ¶¶ 223, 229.) Because these were not material to ADM as a whole they could not possibly relate to "core operations." And even if intersegment accounting was somehow a core operation, that still could not justify an inference that the Individual Defendants knew that the actual accounting for a subset of transactions "violated GAAP or that there was a risk that this was the case." *Baxter*, 2021 WL 100457, at \*14. The allegations here are several layers removed from any "core" operation that courts have relied on to infer scienter.

**B.      The "Nature" Of The Accounting Issues Does Not Support Scienter**

Plaintiffs also contend that the Court should infer scienter from the fact of the accounting correction itself. Yet they concede that even a formal restatement of prior period financials—which did not occur here—"does not create an inference of wrongdoing." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 713 (N.D. Ill. 2005). To get around this roadblock, Plaintiffs make several baseless arguments about the supposedly unique "nature" of this intersegment accounting issue. In particular, Plaintiffs claim that deriving a price approximating a "market" rate did not require "complex accounting standards" or "the exercise of judgment." (Opp. at 40.) But that is nothing more than Plaintiffs' say-so. Pricing intersegment sales in accordance with ADM policy requires an estimation of what a hypothetical external counterparty would have paid in an arm's-length transaction. That exercise would necessarily require examination of factors including supply and demand, historical pricing, and whether market comparables exist, among numerous other considerations. But the Complaint does not plead any facts about any of these factors let alone applicable accounting methods for approximating such market rates. Courts reject theories premised on such unsupported characterizations. *See, e.g.*, *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at \*7 (N.D. Ill. July 12, 2006) (rejecting inference of scienter based on claimed "simplicity of the accounting principles that were violated").

5

Plaintiffs cite a few out-of-circuit cases where courts found that an accounting policy violation was so clear cut and blatant that it could support an inference of scienter. In *In re MicroStrategy, Inc. Sec. Litigation*, 115 F. Supp. 2d 620 (E.D. Va. 2000), for example, a company ignored its own policy of not recognizing revenue until there was a "contract signed by both parties." *Id.* at 637. The court acknowledged that "the application of accounting principles often involves details and minutiae," but concluded that "the accounting principle violated here boils down to the well-worn adage, 'Don't count your chickens before they hatch.'" *Id.* at 638. This case does not present a similarly straightforward and calculation-free exception to the general rule that accounting is a complex and judgment-laden area of expertise. Plaintiffs' reliance on *In re Medicis Pharm. Corp. Sec. Litigation*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010), is likewise misplaced. In *Medicis*, the court explained that a plaintiff "cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious," but instead "must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that principal was being interpreted." *Id.* at *5. The court there determined the plaintiffs met this standard by alleging that executives had specifically identified the company's reserve methodology as one of the company's most "critical accounting policies." *Id.* at *6. Here, however, Plaintiffs point to no similar statements by Defendants that emphasized ADM's intersegment accounting policy or indicating any knowledge about how it was applied.

Plaintiffs also argue that the particular subset of transactions that were corrected point to scienter, but in doing so strain to make something out of nothing. For example, they allege there were no similar issues with "sales to external customers." (Compl. ¶ 227.) That makes no sense. The policy at issue applies—and its complexity exists—precisely because there is no external

6

customer and thus no arm's-length sale to set the price. Plaintiffs also claim that there were no issues with "intersegment sales between Carb Solutions and ASO." (*Id.*) But they fail to plead any facts about those alleged other intersegment sales that would allow any meaningful comparison. And it is unsurprising that difficulties approximating market pricing would arise with certain categories of transactions and not others. Without more context, this alleged difference says nothing about any Individual Defendant's state of mind.

### C.      Executive Departures and Federal Investigations Say Nothing About Scienter

Plaintiffs also try to argue that distinct executive departures support a finding of fraud against all Defendants. Not so. First, Luciano is not even part of any "departures" analysis. He has been the CEO throughout the period covered in the Complaint and to this day. Moreover, Young left ADM long before the investigation began, and Macciocchi retired to pursue another opportunity months before the investigation was disclosed. Plaintiffs' rhetoric (*see* Opp. at 43 (arguing Macciochi's retirement "clearly was involuntary" and Young's resignation from other boards "were undoubtedly tied" to ADM's "accounting issues")) cannot substitute for well-pled factual allegations that connect these distinct and unrelated events to conduct at issue here. And even Luthar's transition agreement is consistent with the benign assumption that ADM chose to go in a different direction because errors that led to the corrected financials occurred while he was CFO—rather than that Luthar engaged in any misconduct.

Plaintiffs rely on *Phoenix Insurance Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862 (N.D. Ill. 2023), where the court applied a framework for evaluating the impact of resignations the Ninth Circuit set forth in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009). But in *Zucco Partners*, 552 F.3d 981, the court made clear that "[m]ere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot

7

support a strong inference of scienter." *Id.* at 1002. Accordingly, the court held that defendant's

CFO retiring "just prior to the disclosure of Digimarc's improper accounting and lack of

financial controls during his tenure" did not support scienter. *Id.* But that is precisely what

Plaintiffs' theory is here (and in the case of Young, even more attenuated still).[4] And while the

court in *Phoenix Ins.*, 690 F. Supp. 3d 862, held that a "rushed" CEO termination with no

replacement in place along with negative disclosures was enough to "lend modest support to an

inference of scienter," the court also made clear that "the extent of the impact of these

termination/resignation allegations to each relevant individual defendant is different." *Id.* at 894.

Plaintiffs cite no authority to support their generalized and one-size-fits-all approach.

Similarly, in the absence of any direct or circumstantial allegations implicating the

Individual Defendants in wrongdoing, an ongoing federal investigation that has not resulted in

any findings says nothing about any executive's state of mind. Plaintiffs claim that the

government prioritizes investigating fraud "perpetrated by senior executives," (Opp. at 46), but

of course the purpose of an *investigation* is to determine whether such fraud even occurred.

Without more context, investigations "furnish little support for an inference of scienter as to any

Defendant." *Phoenix Ins.*, 690 F. Supp. 3d at 894.

> **D.      Plaintiffs' Motive Allegations Are Generic and Insufficient**

Finally, Plaintiffs do not detail any motive other than "generalized motive[s] common to

all corporate executives" that courts consistently reject as a basis to infer scienter. *Pension Tr.*

*Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018). Although

---

[4]     Plaintiffs cite *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, No. 22-CV-6339
(AS), 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024), as an example of a court inferring scienter
based on a "departure from another public company." (Opp. at 44.) But in *Dentsply*, the executive in
question (1) resigned from the company at issue after its internal investigation began, (2) took a job at
another company, and then (3) was *fired* from that second company after the investigation was
announced. *Id.* at *11. None of those allegations are present here.

Plaintiffs argue this failing has "little . . . significance" (Opp. at 29), here the absence of motive weighs against scienter because the Complaint alleges that the Individual Defendants deliberately committed fraud. *See Tellabs II*, 551 U.S. at 325 ("[T]he significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."). "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia Emps' Ret. Sys. & Loc. 295 v. Boeing Co.*, 711 F.3d 754, at 758 (7th Cir. 2013).

Plaintiffs contend that the Individual Defendants were motivated to commit fraud because they could profit from ADM compensation and stock sales. But despite Plaintiffs' gratuitous citations to articles opining that bonuses and stock options played a role in the decades-earlier 2008 financial crisis (Opp. at 29), courts have made clear these types of allegations are far too generic and common to allow a compelling inference of scienter. *See Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("incentive to . . . improve their bonuses" too generic to satisfy the PSLRA); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated[.]"). Moreover, the cases Plaintiffs cite involved unique compensation schemes directly related to the alleged fraud. *See, e.g.*, *Oak St.*, 2023 WL 1928119, at *9 (compensation linked directly to new patients acquired through fraudulent practices). By contrast here, the Individual Defendants' compensation was based in part on operating profit growth, which could stem from any number of business activities. And while Plaintiffs make much of a 2020 change to compensation structure that incorporated Nutrition operating profit growth as a metric, they acknowledge that change occurred *two years after the alleged scheme began*. It therefore cannot explain why Defendants supposedly would have risked their livelihoods to commit securities fraud two years earlier.

9

As for the Individual Defendants' similarly unremarkable stock sales, none of the Individual Defendants' sales were unusual in size or timing. (Br. at 19–21.) Plaintiffs implicitly concede that Defendant Luthar's sales were not unusual. And critically, they do not contest that the value of all the Individual Defendants' ADM holdings *rose* during the relevant period— which directly refutes that the Individual Defendants knew something was amiss. Plaintiffs argue that the increase in the value of stock held by Individual Defendants was driven by stock price, not overall number of shares held, but even if true, that suggests nothing more than a commonplace attempt to sell a reasonable proportion of shares after a stock price increase. Ultimately, Plaintiffs fall short of their burden of pleading facts to suggest any stock sales were "suspicious." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000). Instead, the Complaint supports that Defendants reasonably did not sell stock in the years leading up to the Class Period, while the price "languish[ed] [] as market conditions remained unpredictable[.]" (Compl. ¶ 36.)[5] Given Plaintiffs' own characterization of market conditions, it is unsurprising that the Individual Defendants did not sell their ADM shares earlier.

## II.     PLAINTIFFS FAIL TO PLEAD FALSITY OR MATERIALITY AS TO MANY OF THE ALLEGED MISSTATEMENTS

Even if Plaintiffs could plead scienter—which they have not—the Court should dismiss claims premised on statements that were not materially false or misleading. In their Complaint, Plaintiffs overreach and incorrectly allege that almost every statement Defendants made about Nutrition or ADM's controls was a material misstatement. But Plaintiffs fail to plead facts with

---

[5]     Plaintiffs rely on dicta in *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005), that "if [the defendant] never had sold stock before, this would bolster the relevance of this sale," but there the court held that despite a factual question about whether such prior sales had occurred, the stock sale did not support scienter either way because (as is the case here) not all of the Defendants engaged in similar trading. *Id.* at 715. Moreover, in *Davis* the court did not address the impact of a lack of previous sales during a period of stagnant or "languishing" stock price.

10

specificity that demonstrate how and why many of those statements were misleading and material. And Plaintiffs' suggestion that once the Court finds Plaintiffs have alleged one false and misleading statement, it need not rule on the remaining statements (Opp. at 13) is contrary to both the PSLRA and case law in this Circuit. The Seventh Circuit has emphasized that the PSLRA requires a plaintiff to "specify *each* statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("Tellabs I") (quoting 15 U.S.C. § 78u–4(b)(1)) (emphasis added). And courts routinely consider whether 'different alleged misstatements can form the basis of claims and narrow cases accordingly. *See, e.g.*, *id.* at 598 (analyzing alleged misstatements statement by statement and concluding some statements were sufficiently alleged to be material and false and others were not); *see also City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *17–22 (N.D. Ill. Feb. 13, 2013) (same); *Davis*, 385 F. Supp. 2d at 709 (same). The same result is warranted here.

 *First*, the alleged statements about ADM's earnings being "predictable" and "robust," the "strength" of its current "organic growth strategy," and its intercompany "synergies" are classic examples of immaterial corporate puffery. Plaintiffs insist that the Court must pretend otherwise at the pleading stage, but courts in this District frequently grant motions to dismiss claims based on corporate puffery. *See Conagra*, 495 F. Supp. 3d at 651 (citing cases where courts held statements immaterial as a matter of law at the pleading stage); *see also Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *8 (N.D. Ill. Sept. 23, 2008).

 Plaintiffs argue that ADM's stock drop after the corrective disclosures suggests that these statements were material. That misses the point: "post-merger stock drop and investor reaction

11

allegations are not enough to show the materiality of *these particular statements*." *Conagra*, 495 F. Supp. 3d at 653 (emphasis added). That is especially true where, as here, Defendants do not contest that ADM corrected prior financial statements. "That *some* pre-merger statements influenced investor and analyst expectations is consistent with other statements amounting to immaterial corporate puffery." *Id.*; *see also Silverman*, 2008 WL 4360648, at *10 (in a stock drop suit, distinguishing between statements that were puffery and those that were not).

Plaintiffs also argue that Defendants' vague and indefinite statements somehow become material because "[t]he more important the information concealed, the less likely courts will dismiss statements as puffery." (Opp. at 21.) That confuses the standard, and courts have rejected similar arguments. "[T]he relevant question is not the materiality of the statement's topic (i.e., key business metrics), but rather whether the statement has enough specificity to make it material as a matter of law." *Conagra*, 495 F. Supp. 3d at 651; *see also Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 873 (N.D. Ill. 2011) (rejecting argument that statements "rose above mere puffery because, in context, they gave the market confidence," and explaining that "[t]he referenced statements in [*Tellabs I*] were actionable not because they gave the market confidence, but rather because they were properly pleaded to be false when made").

While Plaintiffs are correct that courts look at a statement's "context" to determine whether it is puffery, the question is whether the context shows the statement amounted to a "measurable prediction of results based on calculations or modeling." *Conagra*, 495 F. Supp. 3d at 652. The cases Plaintiffs cite demonstrate this distinction, rejecting puffery arguments for statements that were specific and quantifiable. *See, e.g.*, *Hedick v. Kraft Heinz Co.*, No. 19-CV-1339, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (rejecting argument that quantified

12

statements such as a "description of '$1.5 billion, [in] synergy savings that we see'" and an "assertion that 'cumulative savings from our Integration Program went to $1.58 billion at the end of Q3'" were instances of vague corporate puffery) (alteration in original); *In re GoHealth, Inc. Sec. Litig.*, No. 20-cv-5593, 2022 WL 1016389, at *1, *5 (specific predictions about "internal metrics" including "a ratio representing commission revenue relative to customer acquisition cost" not puffery); *Tellabs I*, 437 F.3d at 597-58 (statement that "we feel very, very good about the robust growth we're experiencing" was vague and thus not actionable, but statement that product was available when it was not was actionable because it was "particular, specific, and, according to the complaint, completely false"). Unlike those cases, here Plaintiffs challenge indefinite predictions of growth and synergies. The Court should dismiss claims premised on those statements. (Br. at 21–24.) *See Allscripts*, 778 F. Supp. 2d at 872 (statements that company would "'deliver solid results,' and was 'in position to capitalize' on a significant market opportunity amount to nothing more than vacuous management speak").

*Second*, Defendants' statements about factors that contributed to Nutrition's growth and operating profits were not false or misleading. While specific profit figures were later corrected, that correction did not change that Nutrition's profits were stable and growing, or that the stated factors contributed to that stability and growth. (*See* Br. at 24–25.) Rather than challenge this premise, Plaintiffs maintain that any accurate description of a factor contributing to earnings growth is misleading solely because the growth as corrected was lower than initially reported. That is a non-sequitur because (1) the enumerated factors did in fact contribute to the growth Nutrition experienced, and (2) the challenged discussions of those factors had nothing to do with the accounting decisions that ADM later corrected. A reasonable investor would not interpret statements touting "additional fermentation income" or the competitive advantage of

13

intersegment sales as a guarantee that accounting mistakes would not affect profit figures.

Plaintiffs again rely on distinguishable cases to justify their expansive theory. They cite *Oak Street*, 2023 WL 1928119, but that case involved very different circumstances: Oak Street disclosed that "it paid insurance agents for referrals," but omitted that it did so "on a per-patient basis," which allegedly violated the law. *Id.* at *6. In other words, plaintiffs alleged that Oak Street described a specific practice but omitted a key detail about that practice that would have revealed the practice's illegality to investors. Unsurprisingly, the court held that because Oak Street had already discussed the practice at issue but omitted the material detail that made the practice illegal, Oak Street was obligated to disclose the detail to make its prior description not materially misleading. *Id.*; *see also AbbVie*, 2020 WL 5235005, at *3 (omission of unlawful kickback scheme made discussion of marketing practices misleading). That is not the case here. There was nothing unlawful or untrue about the initiatives highlighted, and Plaintiffs do not allege that Defendants omitted anything about them. Instead, Plaintiffs' theory is that any time profits are recorded inaccurately, all statements about factors that contributed to those profits are automatically misleading. This has no support in the case law. To the contrary: "A corporation need not couple each piece of good news with disclosure of some tangential difficulty." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021).

***Third***, Plaintiffs continue to argue that the Individual Defendants' statements of opinion about internal controls contained in SOX Certifications were material misstatements despite clear authority to the contrary. Plaintiffs maintain these were statements of "verifiable fact" (Opp. at 25), but they do not even address the cases Defendants cite, which hold that identical statements are opinions. (*See* Br. at 28.) The only authority Plaintiffs cite in support of their position is one case from the District of New Jersey where the court recognized a claim based on

14

statements about the effectiveness of internal controls in a single sentence—and did not address whether those statements were opinions. (*Id.* (citing *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, Civil Action No. 15–7658 (MAS) (LHG), 2017 WL 1658822, at *8 (D.N.J. Apr. 28, 2017)).)

Plaintiffs also argue in the alternative that if these statements were opinions, they are nonetheless actionable under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 194 (2015). That argument fails as well. The Complaint does not allege facts suggesting that Individual Defendants knew controls were ineffective. And while Plaintiffs argue that there is an alternate path based on a lesser showing that the statements were made without a "reasonable basis," the only case they cite for that proposition did not analyze the issue under the *Omnicare* framework or address whether the statements were opinions. (Opp. at 25–26 (citing *In re Enzymotec Sec. Litig.*, Civil Action No.: 14-5556 (JLL) (MAH), 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015)).) Moreover, Plaintiffs cite cases where, unlike here, specific allegations suggested that defendants both oversaw and deliberately violated the internal controls in question. *See, e.g.*, *RTI*, 532 F. Supp. 3d at 661–62 (N.D. Ill. 2021) (upholding claim supported by specific facts implicating the defendants "as the key personnel responsible for designing and maintaining RTI's internal controls," and "indicating that at least some of the individual defendants directed account managers to ship products early"). None of the cases Plaintiffs cite support treating routine opinion statements about the effectiveness of internal controls as actionable misstatements.

## III.    CONCLUSION

For the foregoing reasons and the reasons set forth in ADM Defendants' opening brief, the ADM Defendants respectfully submit that the Complaint should be dismissed.

15

Dated: October 23, 2024.

Respectfully submitted,

*/s/  Marcella L. Lape*
Marcella L. Lape
Charles F. Smith
Laura Bernescu
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
320 South Canal Street
Chicago, IL 60606
(312) 407-0700
marcie.lape@skadden.com
charles.smith@skadden.com
laura.bernescu@skadden.com

Scott Musoff (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
scott.musoff@skadden.com

*Attorneys for Defendants Archer-Daniels-Midland Company and Juan Luciano*

16