UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND CHOW, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:24-cv-00634 |
| | ) | Judge Thomas M. Durkin |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| ARCHER-DANIELS-MIDLAND COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

SUPPLEMENT TO LEAD PLAINTIFFS' COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

4911-5568-7700.v1

Lead Plaintiffs KBC Asset Management NV, Ethenea Independent Investors S.A., and the National Elevator Industry Pension Fund, hereby supplement Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws (ECF 67) (the "Complaint") as set forth below.

1. Through this supplement, the following language supplements the Complaint at: (a) ¶1 where the words "April 30, 2020 through January 21, 2024" are replaced with the words "April 30, 2020 through November 4, 2024" to supplement and extend the Class Period; (b) ¶23 where the words "*See* ECF 27-1" are replaced with the words "*See* Supp. Ex. 1" to supplement, update, and correct a Lead Plaintiff certification to conform to the supplemented Class Period; and (c) page 63 where the section titled "Post-Class Period Events" is removed to conform to these supplements.

2. Through this supplement, the following paragraphs supplement the Complaint following ¶197 in the section titled "The Truth Begins to Emerge":

**Supp. ¶1.** On November 4, 2024, after the market closed, ADM published a press release admitting that Nutrition profits were materially overstated during the Class Period and further revealing the extent and scope of ADM's internal control failures.

**Supp. ¶2.** More specifically, ADM's press release (a copy of which ADM also attached to a Form 8-K filed after trading hours on November 4, 2024) stated:

> Following ongoing dialogue with the staff of the United States Securities and Exchange Commission, the Company will amend the Company's fiscal year 2023 Form 10-K (the "FY 2023 Form 10-K") and Form 10-Q for the first and second quarters of 2024 (collectively, the "Q1 and Q2 2024 Form 10-Qs") to restate the segment information disclosure (Note 17 included in the FY 2023 Form 10-K and Note 13 included in the Q1 and Q2 2024 Form 10-Qs) included in those filings. . . . The restated filings will include corrections for newly identified errors related to intersegment sales (described below), will reflect the previously-corrected errors, and will provide disclosures applicable to restated segment information.

**Supp. ¶3.** By formally restating "the previously-corrected errors" in the 2023 10-K, ADM admitted for the first time that the overstated operating profits corrected by the 2023 10-K (*see* ¶¶189-191, 223) were material overstatements. The press release further described "newly identified errors" in its intersegment sales. The newly identified errors did not inflate the operating profits of any segment, but they did reveal the extent and scope of ADM's internal control failures was greater than previously known. Specifically, the release stated:

- 1 -

In addition, in the course of testing new controls implemented as part of the Company's material weakness remediation plan in the third quarter of 2024, ADM identified additional misclassified intersegment transactions. These newly identified errors concern additional intersegment sales for each of its Ag Services and Oilseeds, Carbohydrate Solutions and Nutrition segments that included certain intrasegment sales and should have included exclusively intersegment sales. The Company also identified some intersegment transactions between Ag Services and Oilseeds and Carbohydrate Solutions that were not accounted for consistently in accordance with revenue recognition and segment reporting standards and should not have been reported as intersegment sales.

**Supp. ¶4.** On this news, ADM's stock price declined by $3.30 per share, or approximately 5.97%, from a closing price of $55.30 per share on November 4, 2024, to a closing price of $52.00 per share on November 5, 2024, and removing additional artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.

**Supp. ¶5.** Analysts and media reacted negatively following the November 4, 2024 release. For example, on November 5, 2024, securities analysts from Jefferies reported that "Restatement Headwinds Continue: The continued investigation by the SEC has led [management] to announce that it will be extending further restatements across all its segments for previously filed FY23 and subsequent 2024 quarter filings." (emphasis omitted). And *Bloomberg* published an article the same day titled "ADM Has Yet to Get a Handle on Accounting Months After Scandal," which reported that "ADM has erased almost $12 billion in market value since the accounting issues first became public in January. The stock plunged as much as 12% on Tuesday to the lowest level since December 2020, heading for its worst annual performance in almost a decade."

**Supp. ¶6.** On November 18, 2024, ADM filed an Amendment No. 1 on Form 10-K/A to the 2023 10-K (the "Second Restatement"). In the Second Restatement, the Company no longer referred to the restatement of prior financial results as merely a "correction" of accounting errors or as "revised" results. Rather, ADM "restated" its previously issued Nutrition operating profits reported from FY 2018 through FY 2023. In amending the March 12, 2024 10-K, ADM deleted from the 2023 10-K language which had described the accounting errors that had inflated Nutrition's publicly-reported operating profits as "immaterial" (*see* ¶302). The Second Restatement also quantified the Nutrition segment's operating profits misstatements for all quarters from 1Q22 through 3Q23, showing that, in all quarters except one, the Nutrition segment's operating profits were inflated by more than 5% and as much as 24%, as follows:

| Nutrition Segment Operating Profit Misstatements | | | | | | | |
|---|---|---|---|---|---|---|---|
| $ (in millions) | **1Q22** | **2Q22** | **3Q22** | **4Q22** | **1Q23** | **2Q23** | **3Q23** |
| Nutrition Operating Profit – Reported | $189 | $239 | $177 | $131 | $145 | $185 | $138 |

4911-5568-7700.v1

| Nutrition Segment Operating Profit Misstatements | | | | | | |
|---|---|---|---|---|---|---|
| Nutrition Operating Profit – Restated | $174 | $210 | $179 | $105 | $138 | $169 | $130 |
| % Overstated | 8.6% | 13.8% | (1.1%) | 24.8% | 5.1% | 9.5% | 6.2% |

**Supp. ¶7.** These disclosures further confirm that ADM fraudulently boosted Nutrition profits by making intersegment sales to Nutrition at below market rates, to the detriment of other segments, not only every year from 2018 through 2023 but also in nearly every quarter in the years leading up to ADM getting caught. Although the Nutrition profits for 3Q 2022 were slightly understated, the restatement showed on an annual basis Nutrition profits were inflated by over 10%.

**Supp. ¶8.** Then, on December 2, 2024, *Reuters* reported on the DOJ's criminal investigation of ADM and its employees, including into potential crimes of "securities fraud and conspiracy" relating to ADM's accounting for intersegment sales to Nutrition. The article stated that, "[t]o provide the most detailed account yet of the probe and the corporate moves that led to it, Reuters interviewed 15 current and former ADM employees familiar with the transactions under scrutiny, seven of whom have already been questioned by federal investigators." The *Reuters* reporters "also spoke with four other people with knowledge of the probe, reviewed hundreds of pages of documents – including the grand jury subpoenas and internal ADM communications – and consulted experts in corporate accounting, executive compensation and securities law."

**Supp. ¶9.** The article recounted interviews that confirmed that the scheme to inflate one segment's profits over another had to be, and was, directed from the top down by the highest levels of the Company. More specifically, the article reported that:

> Several ADM employees told Reuters that senior executives pressured them to conduct internal sales to help Nutrition mask costs or meet profit forecasts as the unit fell short of hopes. Two of the employees said they were told to "pull levers" so that Nutrition could reach growth targets that ADM executives had set, but which the employees themselves saw as unrealistic.

*Reuters* also reported that a 2019 internal email "shows that ADM's two other corporate divisions were 'asked to donate to Nutrition' by offering it millions of dollars in cost breaks." An ADM manager who worked at Nutrition also told *Reuters* that "'[i]t's exhausting'" and "'[y]ou're working feverishly just to basically spin things to hit the number.'"

**Supp. ¶10.** According to the article, those "pressure[d]" to "'donate to Nutrition'" included the Chief Financial Officers of the ASO and Carb Solutions segments:

- 3 -

> As early as 2019 . . . managers of the other two units [ASO and Carb Solutions] faced pressure to subsidize Nutrition.
>
> In September of that year, Rachel Hudson, then chief financial officer of the carbohydrates unit, emailed a small group of colleagues from that division. She wrote that she had spoken with Dan Nisser, her counterpart at the oilseeds unit, because both had been asked to "donate to Nutrition."
>
> Nisser, she wrote, was looking for ways to lower prices for Nutrition by around $2 million. She asked her colleagues if they could come up with similar breaks. "He's thinking $2M," Hudson wrote, referring to possible discounts Nisser was considering for Nutrition. "Are we selling them any sweeteners for formulations where we could give them a rebate?"

**Supp. ¶11.** *Reuters* also reported that "[o]ne employee familiar with intersegment transactions told Reuters that high costs and production snags related to some Nutrition products were eroding profits," and so, "the employee added, ADM executives found workarounds, including one transaction in 2021 through which the company transferred about $20 million from the oilseeds division to Nutrition. The transaction, among those being reviewed by investigators, was justified in internal company communications." The article further reported, according to two other employees and documents reviewed by *Reuters*, "[t]hat same year . . . the carbohydrates division was ramping up discounts for Nutrition on some products," including "dextrose, a simple corn-based sugar," and "the two employees said [the discounts] helped Nutrition's metrics for 2021." *Reuters* added that "[b]y the middle of 2022, according to the two employees and documents reviewed by Reuters, the carbohydrates division lost millions of dollars on sales of discounted ingredients to Nutrition."

**Supp. ¶12.** According to *Reuters*, the federal investigation has "delved into intersegment transactions involving products like lysine, an amino acid" and "whether the oilseeds unit cut favorable deals to nutrition for 'white flake,' a protein-rich soy product." The article stated that "[s]ome oilseed employees were so concerned about the prices at which [ASO] sold [white flake to Nutrition] that they began to refer to the transactions as 'white flakegate.'" The article also stated that "[f]our people who worked with Luciano told *Reuters* that in meetings he repeatedly mentioned that stock of companies specializing in higher-value food products traded at a premium to that of companies focused on agricultural commodities."

3. Further, through this supplement, the following paragraphs supplement the Complaint following ¶318 in the section titled "Loss Causation and Economic Loss":

**Supp. ¶13.** ADM's stock price remained inflated because the January 21, 2024 disclosures did not reveal to investors the full extent and scope of Defendants' fraudulent misconduct and material weaknesses in internal controls.

**Supp. ¶14.** On November 4, 2024, when the misrepresentations and omissions that Defendants had concealed from the market were further revealed after the market closed, the price of ADM common stock declined by $3.30 per share, or approximately 5.97%, from $55.30 per share on November 4, 2024 to close at $52.00 per share on November 5, 2024.

- 4 -

**Supp. ¶15.**     As reflected in the chart below, while ADM common stock declined by 5.97%, the S&P 500 rose 1.23%, while the S&P 500 Consumer Staples index declined only 1.57%:



**Supp. ¶16.**     The new, Company-specific, material information released on November 4, 2024 was directly related to the false and/or misleading statements previously made by the Defendants.

**Supp. ¶17.**     The timing and magnitude of the price decline of ADM common stock negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

**Supp. ¶18.**     Analyst and media reports reflected that the revelation of the previously undisclosed information was responsible for the stock decline. *See* Supp. ¶5.

DATED:  January 30, 2025                    MOTLEY RICE LLC
                                           GREGG S. LEVIN
                                           CHRISTOPHER F. MORIARTY
                                           MEGHAN S.B. OLIVER
                                           CHARLOTTE E. LOPER


                                           /s/ Meghan S.B. Oliver
                                           MEGHAN S.B. OLIVER

                                           28 Bridgeside Blvd.
                                           Mount Pleasant, SC  29464
                                           Telephone:  843/216-9000
                                           glevin@motleyrice.com
                                           cmoriarty@motleyrice.com
                                           moliver@motleyrice.com
                                           cloper@motleyrice.com

- 5 -

MOTLEY RICE LLC
WILLIAM H. NARWOLD
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/882-1676
860/882-1682 (fax)
bnarwold@motleyrice.com

DATED:  January 30, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
CAMERAN M. GILLIAM (IL Bar # 6332723)
MICHAEL J. STRAMAGLIA (IL Bar # 6336821)

/s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
cgilliam@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER D. STEWART
JENNIFER N. CARINGAL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
cstewart@rgrdlaw.com
jcaringal@rgrdlaw.com

- 6 -

4911-5568-7700.v1

MOTLEY RICE LLC
GREGG S. LEVIN
CHRISTOPHER F. MORIARTY
MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
glevin@motleyrice.com
cmoriarty@motleyrice.com
moliver@motleyrice.com
cloper@motleyrice.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/882-1676
860/882-1682 (fax)
bnarwold@motleyrice.com

Lead Counsel for Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
jmcintire@odonoghuelaw.com

Additional Counsel

- 7 -

4911-5568-7700.v1