UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAYMOND CHOW, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARCHER-DANIELS-MIDLAND COMPANY; JUAN LUCIANO; VIKRAM LUTHAR; RAY YOUNG; AND VINCIENT MACCIOCCHI,<br><br>Defendants. | No. 24 C 634<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

A class of shareholders of the Archer-Daniels-Midland Company ("ADM") allege that ADM and four of its officers made false statements in violation § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5. They also claim violations of § 20(a) of the Exchange Act. Defendants have each filed motions to dismiss, with ADM and its CEO, Juan Luciano, filing a joint motion. All four motions are denied.

**Legal Standard**

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023).

In addition to the Rule 12(b)(6) standard, the "[h]eightened pleading requirements" of Federal Rule of Civil Procedure 9(b) "apply to complaints alleging fraud." *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) requires a plaintiff to provide precision and some measure of substantiation to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (internal quotation marks omitted). In other words, "a plaintiff must plead the who, what, when, where, and how of the alleged fraud." *Id.* (internal quotation marks omitted).

2

Furthermore, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional pleading requirements in securities fraud cases. *See Cornielsen*, 916 F.3d at 598-99. The PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## Background

ADM is divided into three business "segments." They are: (1) Ag Services and Oilseeds, which focuses on buying, storing, reselling, and processing oilseeds[1] and soybeans; (2) Carbohydrate Solutions, which focuses on buying, storing, reselling, and processing corn and wheat; and (3) Nutrition, which makes products animals and people consume. Many of ADM's Nutrition products are made from its soybeans, seeds, corn, and wheat. ADM's Nutrition segment purchases these ingredients from the other two segments. ADM reported in SEC filings that it accounted for these transactions at fair market value in accordance with Generally Accepted Accounting Principles ("GAAP"). But beginning in 2018, ADM was actually accounting for these transactions below fair market value. After the SEC initiated an investigation

---

[1] "Oilseeds" are primarily used to make products like canola cooking oil.

3

regarding ADM's intracompany transactions, it eventually admitted the erroneous accounting in a corrected 10-K filing in March 2024.

By accounting for these transactions at below fair market value, ADM's Nutrition segment reported much higher profit than it was actually experiencing. This allegedly caused ADM's stock price to increase from $35 to $90 between 2020 and 2022. When ADM filed its corrected report with the SEC, its stock price fell to $50.

Two years after ADM began improperly accounting for the Nutrition segment's transactions, ADM's board altered the compensation of its officers so that it was tied to the growth of the Nutrition segment. In this way, ADM's officers, including the four Individual Defendants in this case, directly benefited from the inaccurate accounting of the Nutrition segment's profits.[2] The Individual Defendants also took advantage of ADM's inflated stock price by selling millions of dollars' worth of ADM stock during this time period. By contrast, the Individual Defendants did not sell any ADM stock before the Nutrition segment began to show inflated profits.

Plaintiffs allege that Defendants' reports to the SEC that the Nutrition segment made intracompany purchases at fair market value was a false statement. Plaintiffs also allege that the violations of GAAP with regard to the Nutrition

---

[2] The "Individual Defendants" are the following four people: (1) Juan Luciano is ADM's Chief Executive Officer, President, and Chairman of the Board; (2) Vikram Luthar was ADM's Chief Financial Officer from 2022 until 2024, and had worked for ADM in various positions since 2004; (3) Ray Young was ADM's Chief Financial Officer from 2010 until 2022; and (4) Vincient Macciocchi was ADM's former President of Nutrition from 2015 until 2023, and also served as Chief Sales and Marketing Officer from 2020 until 2023.

4

segment accounting resulted in Defendants making false statements about the Nutrition segment's profits and growth. Additionally, Plaintiffs allege that Defendants falsely stated that ADM's "internal controls" were effective when they knew that the Nutrition segment accounting was incorrect.

## Analysis

Plaintiffs claim that these false statements violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5. The elements of a claim under § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

### I. Falsity

Defendants argue that Plaintiffs have failed to plausibly allege that Defendants' statements about the Nutrition segment's profits and growth and ADM's internal controls were false. But Defendants do not argue that ADM's misstatements in its SEC reports regarding the Nutrition segment's accounting of intracompany transactions were accurate. In other words, Defendants implicitly concede that the statements about the intracompany transactions being accounted for in accordance

5

with GAAP were plausibly false. This is likely because ADM admitted as much in the corrected 10-K filing of March 2024.

Plaintiffs allege that this implicit concession is sufficient to plausibly allege with particularity a false statement for purposes of their § 10(b) claim, such that it is unnecessary for the Court to reach Defendants' arguments that Plaintiffs have failed to plausibly allege the falsity of the other categories of statements. Defendants disagree and argue that Plaintiffs are required to plausibly allege the falsity of every statement on which they base a claim for a § 10(b) violation.

But whether the statements regarding the Nutrition segment's profits and the statements regarding ADM's internal controls are plausibly false is dependent upon the falsity of the statements regarding the Nutrition segment's accounting. ADM conceded in its corrected 10-K that it misstated its accounting practices in its reports to the SEC. This concession by ADM is sufficient to plausibly establish with particularity the falsity of the statements regarding the Nutrition segment's accounting. If Defendants plausibly knew the statements about the accounting were false, then Defendants plausibly also knew that their statements about the Nutrition segment's profits and ADM's internal controls were also false. This is because it cannot be true that a company conducting fraudulent accounting (1) can be said to have sufficient internal controls, and (2) can be said to have legitimate reported profits. Defendants' arguments about "partial truth" and "puffery" are irrelevant if they plausibly knew the accounting was incorrect. Thus, if Plaintiffs have plausibly

6

alleged "scienter" they have plausibly alleged the falsity of the statements regarding the Nutrition segment's profits and ADM's internal controls.

## II. Scienter

The state of mind necessary to state a claim under § 10(b) is described as "scienter," which "means an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Cornielsen*, 916 F.3d at 601 (7th Cir. 2019). Like falsity, "scienter," must be alleged with "particularity" by identifying "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The allegation of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). To satisfy the PSLRA's specificity requirements in multi-defendant cases, a plaintiff "must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008); *see also Cornielsen*, 916 F.3d at 602. Corporate scienter cannot be established in the absence of any individual corporate official's scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

Here, although Plaintiffs do not allege direct evidence that Defendants knew the statements to the SEC about the accounting were false, the allegations of circumstantial evidence of their knowledge are strong. The primary evidence of scienter centers on the Individual Defendants' pecuniary interests. Two years after

7

the false accounting practice was implemented, Defendants changed their compensation structure to benefit from it. Specifically, under the new structure, Defendants' compensation was directly tied to the profits of the Nutrition segment specifically, rather than that of ADM as a whole. This chain of events plausibly suggests a motive to at least maintain the fraudulent practice. Further, Defendants then took advantage of the Nutrition segment's allegedly fraudulent profit reports by selling stock during the class period.

Additionally, the Individual Defendants, as ADM's highest-ranking officers, had direct responsibility for entering into, monitoring, and publicly reporting on the Nutrition segment's profits. Indeed, the Individual Defendants made public statements describing their knowledge and responsibility for the Nutrition segment's profits. *See* R. 67 ¶¶ 255-258, 268-272. And Courts have frequently held that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'" *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *see also Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *6 (N.D. Ill. Sept. 7, 2021) (same). There are many allegations in the complaint showing that ADM and its officers considered the Nutrition segment to be at the "core" of ADM's growth plan. *See, e.g.*, R. 67 ¶¶ 40-41, ¶ 56-57.

Furthermore, the accounting fraud did not involve complex accounting standards or require the exercise of judgment. *See id.* ¶ 276. Rather, ADM had a long-standing policy of booking inter-segment sales at market rates, and GAAP required

8

only that ADM follow that publicly-disclosed policy. *See id.* ¶¶ 275-277. ADM followed this GAAP policy for sales between its other two business segments but violated the same GAAP policy for transfers to the Nutrition segment. *See id.* ¶¶ 277-279. Further, the Individual Defendants made many public statements demonstrating their knowledge about the Nutrition segment and its profits. *See id.* ¶¶ 124-57, 281-293. In this context, the apparent simplicity of the accounting fraud provides further support for a strong inference of knowing or deliberate disregard. Other court have reached similar findings in similar circumstances. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637 (E.D. Va. 2000) (finding scienter where a company violated GAAP and its own publicly stated accounting method); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *6-*7 (D. Ariz. Aug. 9, 2010) (same).

To top it all off, several of the Individual Defendants left their positions after the false reports were disclosed, and ADM is the subject of government investigations based on the false reports to the SEC. *See Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp,* 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2022) ("Government investigations can help to reinforce allegations of scienter[.]"); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (finding that officer resignations can "reinforce" allegations of scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-633 (S.D.N.Y. 2014) (finding that "resignations" can "suggest a higher level of wrongdoing approaching recklessness or even conscious malfeasance"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024) (same). Both these facts cement the

9

strong inference that can be drawn from the allegations reviewed above that the Individual Defendants were aware that ADM had misstated its accounting process.

Defendants pick apart Plaintiffs' allegations and point to cases finding that each type of allegation Plaintiffs include in their complaint is insufficient in isolation to establish a strong inference of scienter. But this case is different. Here, Plaintiffs have made strong allegations of motive, public statements, the core nature of the Nutrition segment, and the straightforward nature of the fraud. These allegations combined with the suspicious departures and government investigations create a strong inference of scienter. Defendants cite no case with allegations this robust where a court granted a motion to dismiss.

Defendants' argument regarding the allegation of motive is a case in point. Defendants argue that "courts consistently decline to infer scienter from . . . a generic corporate incentive." R. 80 at 18. But there is nothing generic about the incentives at issue here. A "generic" incentive would be the commonplace incentive structure in which officer compensation is linked to the profits of a company as a whole. Here, the Individual Defendants' compensation was linked to a specific segment of the company. The traditional compensation structure was changed in the wake of ADM beginning the fraudulent accounting practices. Defendants' compensation structure enabled them to directly benefit from the fraudulent accounting practices.

10

Defendants then allegedly took advantage of these circumstances further by selling ADM stock after it doubled in value when they had not sold stock previously.

Defendants argue, both in their briefs and at oral argument, that the two years between the beginning of the accounting fraud and the compensation structure change cuts against the compensation structure change being evidence of scienter. *See* R. 92 at 9. Certainly, if the accounting fraud and compensation structure change had begun simultaneously it would have been a very strong indication that the two actions were connected. However, the temporal separation does not necessarily undercut the strength of the allegations that the compensation structure indicates knowledge of the fraud. This is because the decision to tie the Individual Defendants' compensation to the Nutrition segment's performance suggests that the Individual Defendants would have closely examined the Nutrition segment's financial records. ADM's board ultimately made the decision to change the compensation structure, but the Individual Defendants were all either board members or high-ranking officers who had responsibility for advising the board on such an important decision. It is highly unlikely that the Individual Defendants did not closely review the planned change in compensation structure and examine the underling relevant financial information. And Plaintiffs allege that a close examination of the accounting would have revealed the fraud. *See* R. 67 ¶¶ 275-78. Instead, the Individual Defendants allegedly decided to perpetuate and take advantage of the fraud. So, while the two-year separation might indicate that the change in compensation structure does not necessarily indicate knowledge of the fraud, it just as easily can be understood the

11

other way. And in light of the allegation that the accounting fraud was not complicated, the Court finds that the change in compensation structure makes it more likely that the Individual Defendants, and by extension ADM itself, were aware of the fraud.

As in all cases, there are potential alternative explanations for these facts. Defendants urge the Court to find that the alternative explanations outweigh the inferences Plaintiffs ask the Court to draw. But this series of events is highly suspicious and can hardly be described as "generic." Common sense says that the change in incentive structure is as close as circumstantial evidence can be to direct evidence that Defendants knew about the accounting misstatements.

Lastly, Defendants' only argument that the § 20(a) claims should be dismissed is because they are dependent on the same factual allegations at the § 10(b) claims. Having denied the motions to dismiss the § 10(b) claims, the motions to dismiss the § 20(a) claims are denied as well.

## Conclusion

Therefore, Defendants' motions to dismiss [79] [81] [83] [87] are denied.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 12, 2025