1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RAYMOND CHOW, Individually      )  Case No. 24 C 634
and on behalf of all others     )
similarly situated,             )
                                )
                Plaintiffs,     )
                                )
        v.                      )
                                )
ARCHER-DANIELS-MIDLAND          )
COMPANY, et al.,                )  Chicago, Illinois
                                )  March 6, 2025
                Defendants.     )  2:02 p.m.

   TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT ON THE MOTIONS TO
                             DISMISS
        BEFORE THE HONORABLE THOMAS M. DURKIN

APPEARANCES:

For the Plaintiffs:     MOTLEY RICE LLC
                        BY:  MS.  MEGHAN S. B. OLIVER
                        28 Bridgeside Boulevard
                        Mount Pleasant, South Carolina 29464


                        ROBBINS GELLER RUDMAN & DOWD LLP
                        BY:  MR. CAMERAN GILLIAM
                             MR. JAMES E. BARZ
                        200 S. Wacker Drive, 31st Floor
                        Chicago, Illinois 60606


For Defendants          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Archer-Daniels-         BY:  MS. MARCELLA L. LAPE
Midland Company and     155 N. Wacker Drive
Juan Luciano:           Chicago, Illinois 60606


                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                        BY:  MR.  SCOTT D. MUSOFF
                        One Manhattan West
                        New York, New York 10001

APPEARANCES (Cont'd):

For Defendant          MORVILLO ABRAMOWITZ GRAND IASON & ANELLO
Vincent Macciocchi:    P.C.
                       BY:  MR. JOSEPH P. KLEMME
                       565 Fifth Avenue
                       New York, New York 10017


For Defendant          VEDDER PRICE P.C.
Vikram Luthar:         BY:  MS. RACHEL T. COPENHAVER
                            MS. NUSRA ISMAIL
                       222 N. LaSalle Street
                       Chicago, Illinois 60601


For Defendant          PERKINS COIE LLP
Ray Young:             BY:  MR. JOSE A. LOPEZ
                            MS.  KATHERINE POKORNY
                       110 N. Wacker Drive, 34th Floor
                       Chicago, Illinois 60603-5559


Court Reporter:        ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                       Official Court Reporter
                       United States District Court
                       219 S. Dearborn Street, Room 1432
                       Chicago, Illinois 60604
                       312.408.7782
                       Elia_Carrion@ilnd.uscourts.gov

                       *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: All right. This is Case No. 24 CV 634, Chow v. Archer-Daniels-Midland Company.

May I please ask the attorneys present on behalf of the plaintiffs to please state their names.

MS. GILLIAM: Cameran Gilliam, Robbins Geller Rudman & Dowd, on behalf of lead plaintiffs.

THE COURT: Okay.

MR. BARZ: Good afternoon, Your Honor. Jim Barz, also from Robbins Geller, on behalf of the lead plaintiffs.

MS. OLIVER: Meghan Oliver with Motley Rice, also on behalf of the plaintiff.

THE COURT: All right.

THE CLERK: And on behalf of defendants, please.

MS. LAPE: Good afternoon, Your Honor. Marcie Lape from Skadden Arps on behalf of Defendant Archer-Daniels-Midland Company, as well as Mr. Juan Luciano.

THE COURT: Okay.

MR. MUSOFF: Good afternoon, Your Honor. Scott Musoff from Skadden Arps as well.

MR. KLEMME: Good afternoon, Your Honor. Joe Klemme from Morvillo Abramowitz on behalf of Defendant Vince Macciocchi.

MS. COPENHAVER: Good afternoon, Your Honor. Rachel Copenhaver from --

THE COURT: Yeah, I'm sorry. In front of the mic; that's all.

MS. COPENHAVER: Good afternoon. Rachel Copenhaver from Vedder Price on behalf of Defendant Vikram Luthar.

THE COURT: Okay.

MS. ISMAIL: Nus Ismail, also on behalf of Vikram Luthar, of Vedder Price.

MR. LOPEZ: Afternoon, Your Honor. Jose Lopez, Perkins Coie, on behalf of Defendant Ray Young.

MS. POKORNY: Good afternoon, Your Honor. Katie Pokorny, Perkins Coie, on behalf of Mr. Ray Young.

THE COURT: All right. Thank you all for coming in. I thought I would benefit from some oral argument on this; allocated about an hour.

(Off the record.)

THE COURT: Given the number of people -- typically, I let people argue from tables. They -- as long as they're in front of a mic, but I think given the number of people here, you ought to come up to the podium when you're arguing and -- we'll do it that way.

The defendants can divide up the time any way they wish to. It's your motions to dismiss so you probably ought to go first. I'll let plaintiffs respond, either per defendant or in total, however you want to divide it, and I'll likely have some questions.

So anything else you want to discuss about the protocol, otherwise we can begin?

Okay, then, I'll hear from any one of the defendants who's prepared to argue on their motion to dismiss.

MS. LAPE:  All right.

THE COURT:  Does anyone need the laptop or any PowerPoints or anything or no?

MS. LAPE:  No, Your Honor, we do not.

THE COURT:  Okay.

MR. BARZ:  Plaintiffs are going to use one.

THE COURT:  You are?  All right.  When we get to your turn, we'll switch over to the slides.

All right.  Since everyone came on me pretty fast, make sure you identify yourself again when you come up here.

MS. LAPE:  Of course.  Good afternoon, Your Honor. Marcie Lape from Skadden Arps.  I'm here on behalf of Archer-Daniels-Midland Company, or ADM, as well as Mr. Juan Luciano, who's currently the CEO and chairman of the board.

And I'll be doing the majority of the argument this afternoon for the defendants, although my codefense counsel here will likely come up and -- and add anything that they'd like to on behalf of the individual defendants that they represent.

THE COURT:  All right.  Thank you.

MS. LAPE: Your Honor, this is a classic case of fraud by hindsight. It's well-established that an accounting mistake, even one that leads to a restatement, is not in itself securities fraud. But that is exactly what plaintiffs' case rests on here. And as we'll explain, none of the other allegations that plaintiffs rely on can add up to an inference of scienter as to any of the defendants. The case really should be dismissed in its entirety.

On January 21, 2024, ADM disclosed that it initiated an internal review related to certain accounting practices and procedures with respect to its nutrition segment, and in particular, with respect to intersegment transactions.

The company further disclosed that the investigation had been initiated following the receipt of a voluntary request from documents from the Securities and Exchange Commission, and that during the pendency of the investigation, it had determined to place on administrative leave its then CFO, Mr. Vikram Luthar.

Just four days later, this complaint was filed in the infancy of the investigation. A month and a half later, on March 12, 2024, ADM disclosed that with the benefit of hindsight, the company had determined that there were certain intersegment transactions that had not been recorded at amounts that approximated market. These were transactions between the nutrition segment and the other segments of the -- the company

that were reporting segments, agricultural services and oilseeds and carbohydrate solutions.

Now, importantly, because the company issues its financials on a consolidated basis, there was no effect whatsoever with respect to the -- the consolidated balance sheet, with respect to the income statement, the statement of earnings, or the cash flows.

THE COURT: Wasn't compensation of the officers geared toward the profitability of the nutrition segment?

MS. LAPE: So beginning in 2020, Your Honor, there was a change in the compensation structure for incentive payment where the -- there was a component with respect to the operating profit of nutrition. Now, remarkably, though, the plaintiffs allege in their complaint that this fraudulent scheme started in 2018 and there's no answer to how that could serve as motive; a compensation structure that started in 2020 could serve as motive for something that occurred two years prior.

THE COURT: Why was it done? Why was it done during those two years before there was the -- the intercompany profits were tied to compensation?

MS. LAPE: Why -- why was what done, Your Honor?

THE COURT: Why -- why were the intercompany profits booked improperly and showed profits that, you know, under GAAP shouldn't have been allowed?

MS. LAPE: Your --

THE COURT: Or is that the unknown?

MS. LAPE: Your Honor, that -- that -- that is the unknown.

THE COURT: All right.

MS. LAPE: I -- there were certainly errors here. That -- that is the truth here. You know, I -- I know that the plaintiffs like to allege that this was a -- just a simple accounting policy and that that, for instance, should be one of the factors that the Court should be considering when thinking about scienter. I would suggest that there are no allegations in the complaint whatsoever that would give credence to that allegation that it's simple.

This was a policy that required you to approximate what the market price would be for a transaction. That necessarily involves a lot of discretion. It -- it's not a ministerial task like a revenue recognition, like the cases that plaintiffs cite. Microstrategy where you're actually thinking about, has a contract been signed and is that a -- and -- and that allows you to book the revenue? This you're thinking about, what would be the approximate market rate? Is there an arm's length transaction that we can compare this to? What is the current market supply and demand? What other external factors should we be considering? Are there different things that we need to adjust for because it's an intercompany

sale and not a sale to third parties?

THE COURT: Well, intercompany sales are not --

MS. LAPE: So this is simple --

THE COURT: I'm sorry. I interrupted. Sorry. Go ahead.

MS. LAPE: Yeah. Okay, Your Honor.

THE COURT: Well, then, if you're moving to a new point, I have a question.

Intercompany sales are not unusual, correct? That -- that happens among large conglomerates where they have different divisions and segments?

MS. LAPE: If -- it is, Your Honor; that's true.

THE COURT: Doesn't GAAP require that those be done at market price?

MS. LAPE: GAAP does require that and that was the -- the requirement at the -- at the company as well. There was a policy in place.

THE COURT: And GAAP was followed for intercompany sales between carbohydrates and the ag services divisions. Isn't that correct?

MS. LAPE: So you'll see, Your Honor, that there was an original decision to just correct the financials in March of 2024, but ultimately, following remediation, the company did discover that there were additional mistakes with respect to both intersegment transactions and intrasegment, and that

related to all three of the segment divisions.  That's in the plaintiffs' supplement at paragraph --

THE COURT:  Okay.

MS. LAPE:  -- 4, I believe.

And so there were errors that were discovered in all three of those units and so ultimately the company did determine to restate their financials versus just correcting them.

THE COURT:  Was it the practice of the company to gauge compensation off of segment profitability before the -- some of these intersegment transactions were booked at below market price -- or at above -- actually, below market price, which would jump -- which would allow for a higher income to be recognized?

MS. LAPE:  My understanding is that prior to 2020, operating profit of the entire company was considered with respect to the compensation -- for incentive compensation, and it wasn't until 2020 that they started focusing on nutrition profit.

THE COURT:  Is there anything in the record to indicate -- understanding there's been no discovery --

MS. LAPE:  Yes.

THE COURT:  -- is there anything in the record to indicate why that change was made?

MS. LAPE:  No, there is not, Your Honor.

THE COURT: Okay. And that leads to the question, though, is it a plausible complaint to infer that with that kind of a change -- there may be a very good explanation for it somewhere buried in the discovery if the motion to dismiss is denied, but on its face, doesn't that appear odd that the one segment's profitability would be the basis for compensation of officers, as opposed to the overall company, and that change occurring at least in the middle of the period where these transactions were booked below market value?

MS. LAPE: I don't think it's necessarily unusual, Your Honor, because this was a segment that the company was very focused on.

THE COURT: Say that again.

MS. LAPE: I don't think it's unusual because this was a segment that the company was very focused on. They were looking at the segment as a means to grow the company because it was -- it was new and exciting. It -- it -- there were reasons to believe that that was a great source of profitability for the company going forward and it was a -- something that the -- the executives were focused on, so I don't -- I don't think it's unusual.

And, again, the plaintiffs allege that this scheme -- that this intentional scheme happened in 2018, began in 2018, and this -- this wasn't put in place until 2020, so it just can't serve as a motive for an intentional fraudulent scheme if

it occurred two years following the beginning of the -- the errors.

THE COURT: Well, could it mean the scheme is shorter than alleged also? You -- you match below-market transactions generating an above -- an inflated revenue for the segment at a period of time, not the entire period the plaintiffs' alleging, but at least at a period of time where the compensation is tied to that profitability.

MS. LAPE: We -- we don't know and discovery will show, Your Honor.

THE COURT: Sure. No, I understand.

Who -- who approved this change in the compensation? Is that something at the officers or was it a board level --

MS. LAPE: It was a board level decision, Your Honor.

THE COURT: Okay. All right.

MS. LAPE: Based on the disclosure of the restatement -- or -- or the need to correct the financial, as well as a further disclosure of an investigation by the DOJ, the plaintiffs insist here that ADM and the individual defendants, certain officers and former officers, committed securities fraud. And plaintiffs contend that because of the existence of this -- these handful of intersegment sales transactions, certain intersegment sales transactions, not all, that were not at rates that approximated markets, that every -- nearly every statement that the defendants made over a

five-year period related to the counting for intersegment transaction sales, the efficacy of controls, and the operating profits and the growth factors into nutrition were false and misleading and intentionally so.

The problem with plaintiffs' case, Your Honor, is that they do not adequately plead that any defendant had the requisite scienter to commit securities fraud. Were there accounting mistakes here? Yes. That -- that is not in dispute. But accounting mistakes alone do not constitute fraud.

To plead scienter, the plaintiffs must state with particularity facts giving rise to a strong --

THE COURT: Slow down a little if you're going to quote something.

MS. LAPE: What?

THE COURT: Slow down a little when you quote something --

MS. LAPE: Of course.

THE COURT: -- because people always read quicker than they speak normally when they're reading something and it's tough for the court reporter.

MS. LAPE: Yes.

THE COURT: Go ahead.

MS. LAPE: Plaintiffs must state with particularity facts giving wrong -- rise to a strong inference that the

defendants harbored an intent to deceive, to defraud, to manipulate. And allegations must be cogent. They must be at least as compelling as the opposing inference of nonfraudulent intent. And plaintiffs don't meet that burden here.

Viewing all of the facts that they allege, the most plausible inference here is that the defendants, they did not understand, they did not know that there were any intersegment transactions that were not recorded at rates approximately -- approximating market.

THE COURT: None of the defendants knew that? Is --

MS. LAPE: There's no allegation in the complaint that any of the defendants knew that, Your Honor, none.

THE COURT: Even the CFO?

MS. LAPE: Even the CFO.

THE COURT: Okay.

MS. LAPE: And there are no allegations to support that any defendant had any reason to believe that any statements that they were making were false.

Now --

THE COURT: Does the -- what was the magnitude of it? You -- you mentioned that not all of these adjustments to the financials were based on transactions that were booked below market value. So is there a -- you'd have to -- I -- I can find it, but going back to that, I was just wondering if you knew the amount. You know, is there a certain percentage of

the restatement that would be attributable to the below market value transactions?

MS. LAPE: So, Your Honor, it ranged between 2 percent to 10 percent of the nutrition's profits per year is what's alleged in the complaint.

THE COURT: Okay.

MS. LAPE: And nutrition accounted for roughly 17 percent of the revenue of the company.

THE COURT: All right. Can you put a dollar value on that?

MS. LAPE: I --

THE COURT: Might -- it might be mental math and I'm not going to require you to do that right now, but --

MS. LAPE: Yeah.

THE COURT: -- we're -- we're talking millions of dollars?

MS. LAPE: We are -- we are talking millions of dollars, Your Honor, you're correct.

THE COURT: How about the compensation? I'm not sure it's -- how much the public disclosure ever was. It's in the papers. But we're talking millions of dollars in compensation, too, aren't we?

MS. LAPE: Millions of dollars in stock awards --

THE COURT: Okay.

MS. LAPE: -- yes, Your Honor.

So the plaintiffs here assert that they've alleged in totality enough facts to support an inference of strong scienter as to the defendants. But the problem with plaintiffs' argument, Your Honor, is that they add up multiple inadequate inferences of scienter to try to get to a strong inference of scienter, and doesn't work.

Zero --

THE COURT: They're allowed to add up together.

MS. LAPE: Absolutely.

THE COURT: Okay.

MS. LAPE: But zero plus zero plus zero does not add ten --

THE COURT: All right.

MS. LAPE: -- up to ten. That's not how the security laws work, and standing alone or together, they do not meet their requirement to plead a strong inference of scienter. Plaintiffs acknowledge here that there are no facts to support any actual knowledge. That's in their -- in their opposition brief. They acknowledge that. They're focused on --

THE COURT: Nor would -- nor would they be able to find it without discovery, but -- but that's the nature of complaints because many times you don't have any smoking gun. It may not even exist, but almost inevitably, the security cases are based on, at least the initial stage, public statements by the company itself.

MS. LAPE: Absolutely, Your Honor.

THE COURT: So...

MS. LAPE: So they're focused on circumstantial evidence here, and they're focused on facts that they suggest prove that defendants recklessly disregarded the risk that their statements were inaccurate. But that standard, that requires an extreme departure from the standards of ordinary care to the extent that the danger was either known or should have been known to these defendants. That's not anywhere in the complaint.

Plaintiffs primarily claim that the defendants must have known about the inaccurate accounting for intersegment sales because of their positions in the company, because they were reporting on the operating profits of nutrition, they were reporting on the growth factors.

THE COURT: Don't officers, when they attest to the accuracy of financials, implicitly say, we know what's in there and it's true?

MS. LAPE: They do, but they don't -- they -- they don't implicitly state that they've verified the accounting behind all of the different elements that add up to their financials.

THE COURT: Okay.

MS. LAPE: And -- and that's what's going on here. There's the -- the access to information alone is not enough to

infer scienter. There has to be something more. And plaintiffs here don't provide any link. They don't suggest that there were any reports that the defendants reviewed, that there were any statements by confidential witnesses. There's not a single allegation in the complaint that any defendant actually had any involvement in assessing or analyzing the intersegment transactions, that they had any role in accounting policies, that they had any role in analyzing GAAP compliance. It -- it's not in the complaint.

And nor are the statements that the individual defendants made about the nutrition segment, the broad statements about profits and growth. Those aren't sufficiently linked to intersegment sales. Plaintiffs point to a number of cases in their opposition brief, including the recent *Oak Street* case in this -- in this jurisdiction, Your Honor, to argue that repeated statements on a certain topic can support an inference of scienter. But those cases are inapposite because in those cases, the statements at issue were directly linked to their alleged wrongdoing.

So in *Oak Street*, for instance, Your Honor, there were -- that case involved allegations that the company had made statements about their patient acquisition strategies. And the plaintiffs allege that those patient acquisition strategies violated the federal law's antikickback statute, but that wasn't disclosed. And so the Court found that those

repeated statements about those same acquisition statements -- strategies could -- could lead to an inference of scienter because it was directly linked. They weren't compliant with law.

This is completely apposite from there. This -- the statements that the defendants were making here were about the general overall profits of the company -- of the nutrition segment, about the growth factors, not about the underlying intersegment sales between -- between the divisions. It's just that there's not a direct link in there to infer that wrongdoing.

So plaintiffs are simply left with their general allegations that these defendants had access to confidential information, they had access to proprietary information, access to the cost inputs that went towards the operating profits of the company. But even if we assumed that that is true, that doesn't get the plaintiffs where they need to be because the Seventh Circuit in *Higginbotham* told us that access to the reports is not enough. It is different to say that somebody has an access to a report and knowing that the report is false.

And similarly, the fact that certain of the defendants here signed SEC filings that discussed the policy with respect to intersegment transaction, the only thing that tells us is that they might have known -- they should've known what the accounting policy was for the company, but it doesn't infer

that they knew that the company wasn't following that policy. Again, there's an absence of linkage there.

Now, the plaintiffs try to rely on the core operations theory. And that, as Your Honor likely knows, is a limited exception to this general principle that access to information is not enough. But the core operations policy doesn't fit here. And the reason why is because that theory only applies where it's critical mission. It's -- it's statements about a subject matter that are critical to the company's entire viability.

And, again, that's not what's at issue here. This is not about a product that the nutrition segment sells, that it is, you know, 80 percent of its revenue and all of a sudden the FDA came out and said, you're not going to be able to sell that product anymore. That would be core operations. That would be mission critical. This is about a discrete accounting policy that's being applied to a handful of cost inputs that go into the operating profits.

And courts in this circuit have held that when -- for an accounting issue to rise to the level of the core operations theory, it has to be a significant part of the company's entire financial picture.

And as we talked about earlier, the nutrition segment itself is just 17 percent of all of the company, and the intersegment sales at issue here were between 2 percent to

10 percent and had zero effect on the consolidated financials of the company overall.

THE COURT: How could it have a zero effect?

MS. LAPE: Zero -- zero financial effect because -- because the intersegment sales --

THE COURT: I see.

MS. LAPE: -- offset each other.

THE COURT: Right. I understand.

MS. LAPE: Yeah.

THE COURT: Okay. Now, I -- and the part that's troubling, as I mentioned at the start, is if compensation was tied to overall sales of the company or revenue goals of the consolidated financial statements, then this would be an accounting error which had no -- where no individual officer had any dog in the fight. Maybe there was some internal politic type reason, but here there's financial -- it appears, at least, on its face, as alleged, and that's all we have, that there's a financial motive to this, and that's the troubling part where it -- it -- that one segment's profits are tied to -- tied to salaries of officers.

MS. LAPE: Not to salaries, Your Honor, but to -- to the bonus structure.

THE COURT: The bo- --

MS. LAPE: Yeah.

THE COURT: All right. Their overall compensation,

yes.

MS. LAPE: And -- and again, I know I've already said this, but I do think the two-year discrepancy between when -- when the fraudulent actions allegedly started and the -- and the change in compensation does counsel against a finding of -- of motive and scienter there --

THE COURT: No, and I -- and plaintiffs should be well to address that when you get up.

MS. LAPE: And the -- the other thing on that point, Your Honor, that I would -- I would ask the Court to look at is in the supplement at paragraph 6. There's also a chart that shows how these intersegment sales affected the nutrition segment. And if you look at the third quarter for 202020 -- 2022, the errors actually understated nutrition profits by a small portion during that quarter. And so it -- it is not all in one direction, Your Honor. And as I also mentioned, the ultimate restatement did have errors, not just in nutrition but affecting the different segments as well.

I've already mentioned that -- that this is not a simple policy. This was much more intricate and much more difficult to apply, and so that should not be an inference of scienter either.

Another thing that the plaintiffs focus on is the executive departures. And the fact alone of executive departures is not enough to infer scienter. There has to be an

additional -- additional allegations of wrongdoing here, and there aren't any specific additional allegations of wrongdoing as to any defendant.

There also needs to be individualized assessment with respect to the executive departures, because departures of one executive doesn't have an effect on whether another executive might have scienter.

For Mr. Luciano, for instance, he has been and currently remains the CEO and chairman of the board, and so he should not be part of any departure analysis at all.

For Defendant Young, he retired before from ADM before the investigation. The complaint alleges that he resigned from three boards upon the announcement of the investigation. But the fact that he resigned from these boards leads to a reasonable assumption that he didn't want to be a distraction to those companies. It doesn't infer scienter.

For Defendant Luthar, he entered into a separation agreement with the company and ultimately resigned. But, again, that supports a reasonable assumption that the resignation occurred because of the results of bad news. He was the CFO during the time period that -- during part of the time period of -- that the accounting irregularities occurred, and errors occurred on his watch. Reasonable assumption is that he resigned due to mismanagement, not because of securities fraud.

And with respect to the other individual defendant, Vince Macciocchi, nothing about his decision to leave ADM supports a finding of scienter. Executives regularly forfeit compensation, the ability to earn awards of stock when they change jobs. There's -- there's nothing unusual about that and it doesn't create an inference of scienter.

Another factor that the plaintiffs point to is the existence of the SEC and DOJ investigations. But those don't infer scienter either. Put simply, an ongoing investigation without any findings says nothing about an individual's state of mind.

THE COURT: Is there anything public about that investigation at this point?

MS. LAPE: So the -- there are some public articles about the investigation. And in the plaintiffs' supplement to the complaint, they referenced a Reuters article that does have some -- some reporting about the DOJ investigation, but there aren't any public --

THE COURT: No --

MS. LAPE: -- statements --

THE COURT: No --

MS. LAPE: -- by the government or that company.

THE COURT: None by the SEC?

MS. LAPE: Yes, none.

THE COURT: Okay. All right.

MS. LAPE: Plaintiffs attempt to supplement their complaint by drawing on anonymous allegations that are in the Reuters article that they rely on in the supplement. But the Seventh Circuit again tells us that confidential witness statements need to be heavily discounted. And that's because it's hard to see how that information can be compelling.

We don't know who those witnesses are; we don't know if they have an axe to grind; we don't know if they're being truthful, and so those should be discounted. And there's other courts around the country that have said that where it comes from a secondhand reporter, it should be even more deeply discounted.

Whether or not this Court considers the allegations for the Reuters -- from the Reuters article, however, they don't change the analysis here because that article says nothing about any of the individual defendants here that could create a strong inference of scienter.

The article mentions only Juan Luciano and only in one statement, and the only thing that the article says, which is repeated in the plaintiffs' supplement, is that he -- four unknown employees mentioned that he stated in meetings that companies that focus on specialty nutrition products trade at higher amounts than companies that are focused on commodities. That says nothing about whether or not he know -- knew anything about intersegment transactions or whether or not they

recorded -- were recorded appropriately.

Plaintiffs' reliance on that Reuters article is really just a repackaging of their main argument, that because of their position in the company, these defendants should have known. And, again, that's just not sufficient.

Aside from these circumstantial elements, the plaintiffs also focus on motive and the opportunity to commit fraud. But really, for motive, the only thing that plaintiffs point to is that they had a motivation to earn revenue; have to earn bonuses and incentive compensation, and those standard allegations are not sufficient for the PSLRA.

There's --

THE COURT: What else could there be a motive for, though, in a -- in a financial restatement issue? I mean, it's either a mistake or it was intentional and they knew what was going on and they had a motive to do it. But other than arguing there's a potential to get more bonuses, I don't know what else you could argue or what else could be alleged. Maybe there's other examples in securities fraud cases where there's some other motive, but that always seems to underlie either preservation of -- of benefits or stock value or the acquisition of it.

MS. LAPE: Yeah, there -- there could certainly be a case, for example, Your Honor, where there's a -- a potential acquisition in the works and some party may benefit from that

personally, so --

THE COURT: Right.

MS. LAPE: -- I do think there are -- are different instances where there could be motive, but I don't believe that they exist here.

There are allegations here that some of the individuals benefited from stock sales, but stock sales standing alone are not -- are not sufficient to show a strong inference of scienter. There has to be something suspicious about the timing and the scope of those stock sales, and that's absent from this case here.

With respect to timing, the plaintiffs focus on the fact that in the four years preceding the class period, the defendants did not trade, but, though -- but during that period, they also plead that the stock was languishing; it was stagnant. And so it's not unusual that a party wouldn't sell their stock during that time period.

And then there's a five-year class period, and so it's also not unusual that during a five-year class period as the stock is rising, executives would be selling compen- -- selling stock along the way.

THE COURT: No, I -- I fully agree there's alternative explanations for almost every aspect of what's in the plaintiffs' complaint.

MS. LAPE: Yeah.

THE COURT: But we're dealing with plausibility under a heightened pleading standard, but it's still -- plausibility is the -- is the standard I have to judge on a motion to dismiss. But I'm -- I'm -- I'm with you that there are alternative explanations for just about every aspect of what the plaintiffs allege.

MS. LAPE: And the alternative -- the alternative explanations, Your Honor, also we believe are more compelling than the opposite inference that there's fraudulent intent here.

THE COURT: Okay.

MS. LAPE: With respect to the scope of the stock sales, there's nothing unusual. Luthar, the plaintiffs don't even challenge that he had significant stock sales during the time period. And with respect to the other three defendants, Luciano, Macciocchi, and Young, all three of their -- the value of their holdings actually rose throughout the class period.

With respect to Mr. Luciano in particular, his holdings increased during the class period from 23 times his base salary to 74 times his base salary, so he retained significant stocks in his possession, which counsels against an inference of scienter.

The absence of motive here really undermines any allegation of wrongdoing. When it comes down to it, the only thing plaintiffs do in their complaint is serve up a

smorgasbord of different insufficient allegations of scienter. But put together, those simply do not raise to the level of a strong inference of scienter, and that is what is required.

Again, plaintiffs' allegations simply amount to fraud by hindsight and should be rejected.

THE COURT: All right. Thank you, Ms. Lape.

MS. LAPE: Thank you.

THE COURT: Before we hear from plaintiffs, are -- are there individual arguments anyone wanted to make on behalf of their clients beyond what Ms. Lape just covered? Not too long, if you have something on an individual, and then I'll just let the plaintiffs respond in total.

MR. KLEMME: Sure. Joe Klemme for Vince Macciocchi --

THE COURT: Okay.

MR. KLEMME: -- from Morvillo Abramowitz. And I just want to reiterate a few points that company counsel made.

As we laid out in the papers, the Court should dismiss the complaint as to Vince Macciocchi because it completely fails to allege scienter. There are multiple ways the plaintiff tried to get around this. They reference the compensation structure, his position as an executive, the nutrition division, the cooperations doctrine, and his retirement, but none of those give rise to an inference of fraudulent intent individually or collectively.

In terms of the executive compensation issue, what

that boils down to for Mr. Macciocchi is he was incentivized to -- to cause his own business to be -- to be successful. That is a compensation structure that's present for every executive everywhere basically, and it's -- the case law is clear that it's -- basically it's too common for it to account -- to be considered as evidence of motive as to him.

Many of the plaintiffs' other arguments we think really boil down to trying to infer fraudulent intent based on his high-level corporate position. The law is clear in this circuit that fraudulent intent cannot be derived from that. They reference Mr. Macciocchi's public statements about the nutrition division. He's the executive of the nutrition division. He's going to make public statements about that. That doesn't suggest that he's aware of any accounting issues, accounting irregularities.

Similarly, the cooperations doctrine, there's nothing to suggest that the accounting issues represented a core operation of ADM or the nutrition division or that they affected a large enough number of -- amount of profits for it to amount to a cooperations issue.

Finally, regarding Mr. Macciocchi's retirement, we provided the -- the narrative of what occurred in our papers. Obviously, the plaintiffs' complaint must be taken as true, but we don't think that their conclusion is warranted. We think the inference that we have highlighted that he moved on from

his position for another job is more compelling, especially when you consider the fact that he started that new job in January 2024. That's in the complaint.

The plaintiffs try to suggest that this was some sudden thing that happened towards the end of 2023. I think it's unlikely he would have a new job at 2024 if he was really let go, you know, towards the end of 2023 in some sudden firing. That's simply not what happened. We don't think the allegations support that conclusion. And that -- that's all my points, so I just wanted to reiterate those.

Thank you.

THE COURT: Thank you.

Anyone else that -- you're not -- you all filed briefs, so it's not as if your clients are unrepresented and haven't had arguments made on their behalf, but if you want to add something that hasn't been raised already, you're free to.

MS. COPENHAVER: Sure. Thank you, Your Honor.

THE COURT: Sure.

MS. COPENHAVER: Again, Rachel Copenhaver from Vedder Price on behalf of Defendant Vikram Luthar.

Your Honor, I just wanted to briefly address a couple of points that came up as part of recent questions that you asked to -- to Ms. Lape and that relates -- I wanted to just emphasize that Mr. Luthar was CFO for a limited time period, less than half of the time period for the proposed class

period. He was CFO beginning of April of 2022 through January 19th of 2024.

And, Your Honor, I know you asked some questions relating to the compensation plan and changes that happened, which that obviously happened in 2020, and there are allegations in the complaint that referred to, you know, members of management being involved without reference to any specific individual defendants. And just to be clear, that's a time period for which Mr. Luthar was not CFO; predates him having that role at the company, so -- and there are no allegations in the complaint suggesting or anywhere establishing that Mr. Luthar had any role in the compensation plan's creation at the company. So I just wanted to address that.

And then --

THE COURT: And counsel said it was the board that --

MS. COPENHAVER: Correct.

THE COURT: -- did this.

Was there interaction with the officers, or is that simply not part of the record that's publicly available at this point?

MS. COPENHAVER: That's correct, I'm not aware of it being --

THE COURT: Okay.

MS. COPENHAVER: -- part of the record at this time.

THE COURT: All right.

MS. COPENHAVER: And then not to belabor some of the other points that Ms. Lape made, but just to emphasize that as it relates to my client, there is also a control person liability claim in Count 2 related to -- to 20A for -- for all the reasons that were raised relating to why the complaint should be dismissed as to ADM. For all those same reasons, there's no basis to bring a 20A claim against Mr. Luthar, and that should be dismissed as well on Count 2.

THE COURT: All right. Thank you.

MS. COPENHAVER: Yeah, thank you.

THE COURT: All right. Anyone else? For Mr. Young?

MR. LOPEZ: Just very briefly, Your Honor. Jose Lopez of Perkins Coie on behalf of Mr. Young.

My comments I want to focus on the 20 capital A, the insider trading. Just two quick points.

The allegations are that the insider trading occurred twice; once in 2020 and then again in 2022. That is highly unusual. Usually if there's insider trading allegation, it's that it's done all at once and that everybody, you know, rushes in and cashes out their stock; or as here, and you'll hear from them, that stock sales are an inference of scienter and that holding is not.

Again, this was referenced, but for our particular client, in 2020 through 2022, the holdings increased 15 times

his salary all the way up to 51 1/2 percent -- I'm sorry -- 51.2 percent of the salary. So this is not a situation where these executives were dumping all of their stock while they had inside information.

And, again, if you look at the particular allegation for the MMPI, it is very general and it covers operations, reporting, financial results, future business prospects, all of those things are allegedly the material nonpublic information. Typically, what you would see is a stock sale at or right at a particular date with a very specific type of material nonpublic information.

So here, to allege two separate transactions where the executives actually significantly increased their stock holdings really undermines both the scienter and any suggestion of insider training.

Thank you, Your Honor.

THE COURT: Okay. Thank you.

All right. I'll hear from plaintiffs.

MR. BARZ: Yes, Your Honor. Good afternoon again, Your Honor. Jim Barz on behalf of the plaintiffs.

We do have a PowerPoint, which we'll put up on the screen. We've provided it to defense counsel, and I'll pass up to Your Honor as well.

THE COURT: All right.

MR. BARZ: Thank you.

And I note there's nothing new in this PowerPoint, with the exception of two cases I'll get to in a minute, which we provided to counsel last night to respond to their last brief.

Before I start with my PowerPoint, though, I want to address these open questions that Your Honor had raised. One is about, was management involved in the compensation exchange? And the answer is yes. And I assume that it was accidental that the counsel missed that.

But if you look at paragraph 282 of our complaint, the 2020 proxy that announced this change noted that mem- -- members of management attend the meetings and make recommendations to the committee regarding compensation for officers. Okay. And then Mr. Luciano, of course, is not only the CEO but the chair of the board, so they all were involved in that, which then also ties back to Your Honor's other question about, well, why did we start the case in 2020 instead of 2018. And that was simply to be conservative.

I think we do have scienter for these folks going back to 2018, but we looked at two big events and we figured, to be conservative, to make sure that we've more than met our burden of alleging -- alleging scienter, let's start at 2020, and that was this compensation change and that's what these stock sales.

$107 million --

THE COURT: Yeah, I think be careful on the mics.

Off the record.

(Off the record.)

THE COURT:  Back on the record.

Go ahead.

MR. BARZ:  Thank you, Your Honor.

So we had two major events that took place around this time.  One is, if you look at the four years leading up to the class period, there's no sales, zero, from any of the four named defendants.  If you look at the class period, the 4-year class period, so it's a 4-year period, mentioning it's a 4-year period, $107 million in sales.  We thought that was very unusual.  And in fact, when courts look to whether the stock sales are unusual, they look to whether they're part of a 10b5 plan or some regular trading plan to exercise -- sorry -- to exercise options over time.  But we don't have that here.

We've got everything being sold when the stock price is inflated from about $35 a share to about $100 a share.  So I wanted to address those --

THE COURT:  Wouldn't that be normal?  I mean, if the stock goes up, that's when people cash out some of their stock benefits.  Isn't that -- it would be unusual not to?

MR. BARZ:  Well, all facts, as Your Honor noted, could be interpreted in two ways, but certainly, that's where you get into the comparisons.  Is it unusual for this particular person's trading period?  And when these folks change their

compensation plan and the scheme is ongoing and they go from no sales to 107-, it's one more brick in the story of scienter, and we've got more.

So let me -- if I could, Your Honor, I'm going to skip through the beginning about false and misleading statements and start at scienter. This is what we're here to decide today, and this is the standard as elucidated by the Supreme Court. To qualify as strong, an inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Tie goes to the plaintiff. Have we met our burden? We believe we've met it and then some.

And we were aided significantly, Your Honor, by two major events, the restatement and a Department of Justice investigation. Those are extremely rare facts in securities fraud cases that make dismissals even rarer.

So this is the choice. Was this an innocent mistake as the defendants suggest, or have we met our burden of showing that it was a knowing participation scheme or an extremely reckless disregard of the existence of the stream -- of the scheme?

They claim it's complex accounting. We say it's a simple policy of charging the same rates you charged your other customers. You did it correctly for over a decade; you did it correctly with the other segments, but now you get it wrong for six straight years? And it's always one direction here. It's

always inflated the annual nutrition operating profits, so -- and in terms of the amount, Your Honor, we set that out in the complaint at paragraph 223. It's about $200 million over the course of the scheme, anywhere from 3 percent to as high as 24 percent of the reported revenues.

So initially, they called it a correction and they gave us only the annual numbers. And in the supplement, when they admitted that this is material, it does qualify as a restatement, they gave us the quarterly breakdown. And we give you that in a chart in the supplement at paragraph 6.

So if you compare that to I think it was either the *Baxter* or the Bali case that was dismissed that they cite and relied on, those errors went in multiple directions. They weren't always inflating the profits, so then it looks more like a mistake, as opposed to when you get it wrong in one direction.

Now, keep in mind, this policy that they have is to just charge rates that approximate the market. They admitted that these rates didn't even approximate the market. These aren't close misses. These are big misses.

And employees we know that were interviewed -- I mean, this is where we really got helped, right? So we can't talk to current employees that are represented, but the press did, because those are the folks that the -- that are being brought into the grand jury through this Department of Justice

investigation, and some of them spoke. And they called it "white flakegate." Seemingly a clear reference to the Watergate scandal. And a scandal. This wasn't an innocent mistake. These were intentional errors done at the time.

THE COURT: I don't understand white-flaking. What -- what does that mean?

MR. BARZ: So I'm going to get to white flake because it actually ties this case up really nicely. White flake is a component that's sold from the ASO, the ag seeds division. It's protein made out of soy and it's sold to the nutrition division, used as part of their animal nutrition products, and that's where most of this inflation occurred. And I'm going to get to that and I'm going to get to how all of these defendants talked about white flake, amino acids, and nutrition.

So they call it an inadvertent mistake, but we know it wasn't because these employees, several of them interviewed, said they were pressured from senior executives. And that's important, too. This was a top down, not a bottom-up scheme.

They say, well, these errors were only identified with the benefit of hindsight. Well, maybe by the board in the investigation, but not by the people doing it at the time because they were told to pull levers so that they could reach what they considered unrealistic targets set again from the top down by the ADM executives.

These are the CFOs of the other divisions. These are

not low-level people, and they were pressured to donate to nutrition with millions of dollars in rebates off of what would be your normal market rates.

One nutrition manager said he had to spin things to hit the number. And again, does the government really investigate innocent mistakes as these investigations were ongoing? We don't think so. This investigation appears to have begun from a whistleblower, because in the complaint we allege it started in June of 2023 is where they issued the subpoenas. The company doesn't disclose it until six months later in January of 2024. So how did the SEC get wind of this? It wasn't something the company found and reported. Whistleblower had to be behind it. And now it's gone even to the Department of Justice.

Who knew about white flakegate, as they called it? According to this article, the federal prosecutors are asking employees about whether the ASO unit cut favorable deals to nutrition for white flake. The employees got so concerned about the pricing, they called it white flakegate.

Well, during the class period, some of the false and misleading statements we alleged, you have Mr. Luciano talking about what's driving these improved nutrition results. It's because the white flakes that they sourced internally, it's a competitive advantage.

Mr. Macciocchi, similarly, mentioning how they

manufactured their own white flake and that cheap white flake then boosts the amino acid margins which boost nutrition's profits.

Investigators are looking into those trans- -- the federal investigators, the prosecutors are looking into those transactions involving amino acids. Well, what else do we see during the class period? Grant -- they -- they talk about there's no specific statements. They're bragging, Luciano and Young. And then Luciano and Luthar, when Luthar takes over during this scheme when the nutrition segment profits were being inflated, they're talking about how it's coming from improved margins in amino acids again and again.

Who tracked animal nutrition? Again, if you look at 2022, most of the inflation came through this white flakegate amino acids, animal nutrition, which was $111 million as restated, 170- as falsely reported at the time, 53 percent inflation.

Macciocchi: We've identified significant opportunities to margin up this portfolio in reference to animal nutrition.

Luthar: He's talking about the benefit for the nutrition business of their smart pricing and collaboration with the other segments.

Of course, those are the segments that are pricing these products below market rates.

Luciano and Luthar:  Bragging that animal nutrition profits were higher than the prior year primarily to strengthen amino acids.

This below market pricing is something that's discussed by every one of these defendants.  And if you look at what Judge Kennelly wrote, for your education, a case I was also involved in, he said, when they talk about whether statements can support an inference of scienter, no one thing alone has to do it.  You look at the totality, and it depends on the case and how all the allegations fit together.

But as Judge Kennelly noted, when they're talking recently on these topics, one may readily and reasonably infer that the speaker made it his business to look into the issue.

So in addition, we've got them talking specifically about the areas that were inflated, we've got departures.  This is another factor that courts look to that can support an inference of scienter.  Macciocchi says he left for a new job. Well, that's not what the company said.  The company said he retired in just months after the SEC investigation began.  He forfeited $2 million.  Not a lot of people walk away from a job in the middle of a year when they're going to lose $2 million. And he didn't retire.  He started a new job.

Luthar claims he voluntarily departed, but the board -- it wasn't voluntary.  The board put him on administrative leave effectively immediately when they

announced to the public this SEC investigation. He'd only been there for two years. The prior CFO was there for 12 years, and they had no one to replace him.

And those are facts that other courts have held render departure suspicious. Similar to Young, he claims he left these three other boards to avoid a distraction. He joined one board and left it the very next day. He joins January 30th of '24. On February 1st of '24, he quits. February 5th, the company announced that not only the SEC but the Department of Justice has opened an investigation. That's highly suspicious. He leaves two other boards as well.

How would it be a distraction if he has no involvement, if he's not being spoken to by the SEC and DOJ? Say, well, that was a firm I left a year ago; it has nothing to do with me. He could've easily stayed on.

Notably, the ADM directors that placed Mr. Luthar on leave and so on and so forth and started this investigation, they haven't quit. Doesn't involve them. They're still there.

Now, Luciano takes a lot of effort to say, well, hey, I wasn't fired; I'm still there. But he's the hands-on C -- CO. He's the guy that led them into the nutrition business knowing that it had the biggest impact on the stock price. His sales were described, not by me, by commentators that we quoted in here as unusual, timely, and opportunistic. $83 million in sales he cashed out. And he was directly involved in that

compensation change, which puts us similar to *Oak Street* and *AbbVie*, two other cases Robbins Geller is handling where we had similar facts where you've got a compensation tied not to the overall performance. And that's what's so important about these cases. When all you can say is the CO does better when the company does better, the courts say, well, always. But this is very unusual to tie it just to one segment.

They claim they weren't informed of the accounting, but they made representations to the public that they were. They claim there's no facts that they had reason to know of the accounting violations, but they represented to the public in 23 consecutive SEC filings that these intersegment sales were recorded at amounts approximating market.

I think it was Judge Holderman in the *Lindelow* case that said on what I'd call similar facts, if you didn't know at that point and you keep talking about it, it's at least extremely reckless.

So we talked a lot about who stood to gain. Again, it wasn't this -- we know it's an intentional scheme from the Reuters articles. This isn't an innocent mistake. It's on purpose. They're being directed to pull levers. And we know it's not bottom up because they said it came from the top down, and the top down is the same people that benefited from this.

So let me just end here, but I think it's clear that choice of scienter is more plausible. We just have to be the

same but more plausible and innocent one. And you look at the language out of *Tellabs*, which we like: Is it conceivable that they were unaware of the problems? It's conceivable but exceedingly unlikely.

Similarly, in *Ulta*, when they weighed competing inferences, the inference that they were clueless as to all of this is pretty unpersuasive when you put it all together.

Lastly, the Reuters article. Defendants have pointed out some cases that say you should discount anonymous sources. Those cases arrive from when the plaintiffs allege these anonymous sources.

If you look at the same *Lehman Brothers* case they cite at the bottom there, that same case says: However, if they come from the media who doesn't have the motive or bias of the plaintiffs bringing the case, then they're more credible, not less.

And these are the two new cases. The only ones we haven't cited yet is the *Mylan* and the *Lottery* case which, again, we gave to them last night, both saying, it's perfectly fine to rely on anonymous sources from reliable media.

And -- well, I guess last, last, corporate scienter can be independent of the defendants. We think we've got scienter on each and every one of them, but even without it, you can find it because you know the scheme was intentional and, therefore, the corporation's liable.

And I've given you some charts at the end here that address the individual defendants, as well as a comparison to our cases and their cases. Other than that, if you have any other questions, I'm happy to answer them.

THE COURT: I don't. Thank you.

MR. BARZ: Okay. Thank you.

THE COURT: Ms. Lape, briefly, if you want to address some of this, you can. I don't necessarily need to hear from everybody, but if you've gotten something brief, I'll let you argue in reply.

MS. LAPE: Thank you, Your Honor. I just wanted to make a few short points.

First, you had asked me about, well, isn't it possible that the scheme didn't actually start until 2020, and I -- as I sat down, I recalled that the restatement does in fact go back to 2018. So certainly, there were accounting errors that went back to 2018, Your Honor, and that's in the -- in the public record, of course.

And during that time period, since 2018 to today, there have been different executives, different compensation structures. And so the more compelling inference there is that there were mistakes that were done and those were likely -- those likely occurred on the lower level, not from the executive level up. Not securities fraud.

Mr. Barz commented about how this was a -- just a

simple policy and all you had to do was apply the rates charged to other customers. But one thing that is not anywhere in the complaint is an allegation that the products that were being sold were in fact even being sent and -- and -- and priced and -- and sold to other parties, and that there was a comparison there. That's -- that's nowhere in the complaint.

With respect to the Reuters article, it's interesting, the -- the plaintiffs did send over to us the two cases that they relied on last night, the *Lottery* case, and as well as the Mylar case, and we were reading the *Lottery* case last night, and we thought, wow, well, this case is actually really, really great for us because the *Lottery* case is -- is a case that was on its third motion to dismiss. This is the case that's in -- in the packet he just cited for you --

THE COURT: Right.

MS. LAPE: -- at -- it's out of Southern District of New York just two weeks ago, 2025 WL 605485. And again, this was the third time that it was up on a motion to dismiss, and the case had allegations very similar to what we have here. There were allegations that defendants had violated accounting principles and revenue recognition guidelines; that there was a large magnitude of fraudulent transactions; there was a subsequent admission of a misstatement of revenue; there was timing and circumstances related to resignations; there was a DOJ and an SEC investigation. And despite all of those facts,

the Court dismissed the complaint finding that there was no inference of scienter.

Finally, on the third try, the plaintiffs came forward with evidence of specific facts to link the CFO of *Lottery* to the alleged fraudulent scheme, because the plaintiffs had finally alleged that he had actually signed a promissory note that directly led to the fraudulent transactions. And so the court then allowed the case to proceed as against the CFO and -- and -- and the company, but the other individuals were dismissed, despite that all of those other factors were present, just like they're here, because all of those, zero plus zero plus zero doesn't equal 10.

THE COURT: Now, the second argument you made, can you restate that again? I had some trouble following it. The --

MS. LAPE: Sure, Your Honor. So the second argument that I made was that up on the screen Mr. Barz had presented that this was just a simple policy of rates charged to other customers. But absent from the complaint are allegations that white flake, for instance, was being sold to other customers. That's not in the complaint.

THE COURT: I see. Okay. Thank you.

MS. LAPE: Thanks.

THE COURT: All right. I'm not going to rule today, of course, but I would like to see the attorneys back in chambers for a minute, so if you wouldn't mind coming back.

49

(Concluded at 3:02 p.m.)

*    *    *    *    *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


*/s/ Elia E. Carrión*                    *10th of April, 2025*

Elia E. Carrión, CSR, RPR, CRR, CRC
Official Court Reporter