IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYMOND CHOW, individually and on behalf ) Case No. 24 C 634
of all others similarly situated, et )
al., )
)
                    Plaintiffs, )
)
                        vs. )
)
ARCHER-DANIELS-MIDLAND COMPANY, et al., ) Chicago, Illinois
                                        ) September 10, 2025
                    Defendants. ) 1:11 P.M.

      TRANSCRIPT OF PROCEEDINGS - Telephonic Motion Hearing
BEFORE THE HONORABLE KERI L. HOLLEB HOTALING, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        ROBBINS GELLER RUDMAN & DOWD LLP
                           BY:  MR. CHRISTOPHER D. STEWART
                           655 W. Broadway, Suite 1900
                           San Diego, California 92101

                           ROBBINS GELLER RUDMAN & DOWD LLP
                           BY:  MR. FRANK A. RICHTER
                           200 S. Wacker Drive, 31st Floor
                           Chicago, Illinois  60606

                           MOTLEY RICE LLC
                           BY:  MR. ANDREW P. ARNOLD
                                MS. CAMERAN M. GILLIAM
                           28 Bridgeside Boulevard
                           Mount Pleasant, South Carolina 29464

For the Defendants:        QUINN EMANUEL URQUHART & SULLIVAN
                           BY:  MR. TYLER C. MURRAY
                           191 N. Wacker Drive, Suite 2700
                           Chicago, Illinois 60606

                           QUINN EMANUEL URQUHART & SULLIVAN
                           BY:  MR. JESSE BERNSTEIN
                           295 Fifth Avenue
                           New York, New York 10016

** NOTE:  FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
   RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED **

APPEARANCES (Cont'd):

ALSO PRESENT:                    Ms. Jessica Staiger
                                 In-House Counsel for
                                 Archer-Daniels-Midland


Court Reporter:                  PAMELA S. WARREN, CSR, RPR
                                 Official Court Reporter - Retired
                                 23869 N. High Ridge Drive
                                 Lake Zurich, Illinois 60047
                                 312.823.0001
                                 pswcsr@gmail.com

                          * * * * *

        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings held in open court:)

THE CLERK:  24 C 634, Chow versus Archer-Daniels-Midland Company, et al.

Counsel, can we start with plaintiffs's counsel and then we'll proceed with defendants.  Please state and spell your last name for the record.  And again we'll start with plaintiffs's counsel first.

MR. STEWART:  Good morning.  This is Chris Stewart for plaintiffs.  S-t-e-w-a-r-t.

MR. RICHTER:  Good morning.  Frank Richter for plaintiffs.  R-I-C-H-T-E-R.

MR. ARNOLD:  Good morning.  This is Andrew Arnold for plaintiffs.  A-R-N-O-L-D.

MS. GILLIAM:  Good afternoon, your Honor.  This is Cameran Gilliam, G-I-L-L-I-A-M, also on behalf of plaintiffs.

THE COURT:  Okay.  And then on behalf of Archer-Daniels-Midland, who do we have?

MR. MURRAY:  Good afternoon, your Honor.  Tyler Murray on behalf of the Archer-Daniels-Midland Company.

MR. BERNSTEIN:  Good afternoon, your Honor.  This is Jesse Bernstein, B-E-R-N-S-T-E-I-N, on behalf of Archer-Daniels-Midland.

MS. STAIGER:  Good morning.  Jessica Staiger, S-T-A-I-G-E-R, in-house counsel for Archer-Daniels-Midland.

THE COURT:  Okay.  Is that everybody?

Okay. Well, good afternoon, everyone. This is Judge Holleb Hotaling. I think this is the first time that we have actually all spoken to one another. And I apologize, I know this motion has been pending for a little bit. I had a jury trial that took up some of my time after this was fully briefed, and so my apologizes that it took me a little while to get to this.

It is something I wanted to have oral argument on after I reviewed the motion to compel. And I wish we could be all in person together. I really like doing my oral arguments on, you know, contested motions such as this in person. Due to kind of some of the activities going on in Chicago this week, anything that we could switch to telephonic or virtual, we all did that just to make sure that -- so the Court all just kept moving along. And so I apologize, we switched it to telephonic, but that's why we did so. So thank you for joining me telephonically as opposed to in person.

I don't know who will be arguing on behalf of, you know, of the class or on behalf of ADM, but the Court -- you know, like I said, I have reviewed the motion. But I would appreciate, you know, argument on this because I think it is -- it is (unintelligible) not so simple. Difficult to determine kind of what is the actual legal and factual overlap, you know, between the requests that were made to ADM from the government, from the SEC and the DOJ, and, you know, everything

going on in this case, because I'm newer to the case.

So I'd like to hear really about that issue. I know that parts of this -- there is a motion to file parts of this under seal. Part of it I noted that -- it is highlighted it would be under seal in the defendants's opposition (unintelligible) you know, some of the language that's (unintelligible) for me the government's request. And so it is tough for me.

I know we're going to be speaking about this. And some of this people want it under seal. But kind of understanding those requests and their scope is obviously going to be before the Court in determining this motion.

So I'm sensitive to that, but I'm just saying too that I'm going to need to, you know, potentially -- because I think I'm going to write something up. It might be brief. But I would like to write something up on this after this hearing.

So I just wanted to raise that as an issue too that we could potentially address because I think the scope of that is important, right, to my ruling on this motion.

Okay. So with that, maybe I'll hear from plaintiffs first because it is plaintiffs's motion. I don't know who will be speaking on behalf of the plaintiffs's class. But just let me know who you are. Identify yourself so we can have it in the transcript.

And I would like to hear from you, you know, as to

these issues from the things that I just highlighted.  But whatever you would like to also inform the Court about.

MR. STEWART:  Good morning, your Honor.  This is Chris Stewart on behalf of plaintiffs, and I'll be addressing plaintiffs's motion today.

THE COURT:  Great.

MR. STEWART:  Thank you, your Honor.  I think what I'll start with is essentially, you know, the way that we -- the way that we see the issues is the case is made clear that if the documents are relevant, both the government investigation and the civil case, then the production is warranted in that situation.

Now based on what we know from what the company stated publicly, there is -- there is one investigation, and the investigation is a company that's stated intersegment sales investigation.  There is no second investigation that the company has disclosed.

And when we look at the description of the investigation, it is precisely what plaintiffs are alleging in this case.  It is the accounting, accounting scheme to boost Nutrition's product.

Now defendants don't claim that the second investigation and we -- what we have been doing is we're trying to understand -- we tried to understand, okay, what is this -- what are the SEC requests.  We want to understand what

is the SEC asking for.

THE COURT:  Uh-huh.

MR. STEWART:  We don't have that information. (Unintelligible) the information that we have is about the -- what the SEC has requested.  It is in the briefing.  And even those examples that defendants have provided we believe support -- supports our case.

So this -- we have continued to push for a full complete (unintelligible).  We think that it will take time and resources rather than litigating over search terms and custodians.  Again, discovery is in its early stage, and that's a major consideration by the Court that both sides have cited the Broiler Chicken case, the (unintelligible) case --

THE COURT:  Yeah.

MR. STEWART:  So it is -- it is a -- it is very important for us to get this discovery early, specifically now that we are past substantial completion deadline by which we only had one (unintelligible) production.  But we think that it will really jump start things and get us back on track for the schedule that both parties negotiated.

Now what we understand is that ADM says, well, there is not 100 percent overlap between the government investigation and your case.  And so they give four examples.  And those are the four examples that the parties have addressed in their briefing.

And they said these are the -- these are the examples that we say support denial. And presumably these are ADM's best examples.

Again, they haven't given us the SEC request. They could have provided the SEC request to the Court in camera. They chose not to. And when we look at those requests, we believe that all four of that support our motion in this case.

And I'm happy to go through them. The first example they give, and this is the energy hedging that they disclosed for the first time in their opposition to our brief. And they say, you know, well, there is the energy hedging. One entity was transferring energy hedging profits to other entities.

And this fits squarely in with what Judge Durkin upheld in our case or cases about Nutrition's profit. And so this -- this energy hedging scheme, it is -- well, energy hedging is directly relevant to our case.

It goes -- one important issue it goes to is mistake. Now if the company is not only boosting Nutrition's operating profits through intersegment sales, but it is also doing it through the transfer of energy hedging profits, they completely undermine defendants's claim that this was simply a mistake and that this all was unintentional. It goes directly to defendants's (unintelligible) issue.

And in the state claims it is very important because that was a major theme in defendants's briefing at the motion

to dismiss, and it was an issue that was called out in the Court's order about that, you know, their defense is this is a mistake. So we think that's -- that example supports our case.

The other three examples they give they say, well, this is -- you know, this is indicia that these requests are overbroad. And one of them has to do with is all communications for a four-month window. And this -- the four-month window is December 2020 to March 2021.

And this is an important point in our case because the company that revised its executive compensation plan in February 2020 took time to -- to tie compensation closer to Nutrition.

And so this is following that time period. It is near the start of our class period. And many of the people that we identify in those documents that we have cited from this time period are folks that are identified in the initial disclosures. They are folks that the company has identified in their responses to a specific interrogatory as people who are involved in the negotiations, pricing, and recording of (unintelligible) and sales.

And when you look at the examples that we have provided to the Court, this is Exhibit N, I, O, and K, you see that these top-level people at the company, including the individual defendants, are discussing the very issue in our case, which is transferring -- transferring operating profits

to Nutrition to help out Nutrition precisely because -- and this is in Exhibit I -- the multiple for Nutrition is much higher than oil (unintelligible). That's precisely what we alleged in our complaint that they are focused on the multiple for Nutrition and that's providing operating profits for one segment to Nutrition is going to (unintelligible.)

The -- the third example they give --

THE COURT: I'm sorry. Seems to me like I'm -- you're fading in and out. I just want to make sure that, you know, through our court system that it is recording you well enough so we can have a proper transcript.

So I don't know if there is anything you can do to address that, you know, Mr. Stewart. I'm not sure. I just want to make sure we get what you're saying, I can hear it, and then we also can record it properly.

MR. STEWART: Sure. I'll try to stand closer to the phone. I apologize.

THE COURT: Thank you.

MR. STEWART: The third example that --

THE COURT: Can I ask you one thing about that example, the all communications from 12/1/2020 through March 31st, 2021? It does appear, right -- I understand you're saying that a number of these individuals, right, that were identified, that those were the same individuals that clearly are potentially relevant to this case and that have been

identified in other responses in this case.

But my question is, it sounds like from what we know about this government request is that this (unintelligible) with anything that these individuals were communicating about during that time.

Do we have a sense, right -- I mean, this is a very large defendant. They could be communicating about things that have absolutely nothing to do with what's at issue in your case and could be communicating about something entirely different in their business. Do we have a sense, like even for this example, just as to these communications, how many documents this represents? Do you know, like, for this time? Because, I mean, communications of 19 pairs of people over that many months about every single thing they have ever talked about through all of these means that are identified could be a lot of documents.

And I'm just -- I understand you want the relevant ones. But you don't want the irrelevant ones. And I would assume there would be a lot of irrelevant communications that aren't about what you care about related to your case. If it is about other parts of the people's work that they are performing for ADM entirely, it has nothing to do with this case.

MR. STEWART: Sure. Well, I mean, to answer your question, we do not know how many documents the company

provided to the government in response to this particular request.  That's --

THE COURT:  Okay.

MR. STEWART:  -- an (unintelligible) that was (unintelligible).

THE COURT:  Yeah.  Okay.

MR. STEWART:  But we -- from what we can tell, the government -- you know, the government had done their homework. They have zeroed in on this specific four-month time period. And when we look at the documents that we have from this four-month time period, we see these are the communications that are going on regarding helping Nutrition, transferring the profit. And so we have a good faith basis for understanding -- for our understanding that this is an important time period in, not only our case, but the government's investigation as well.

And even if there are other documents in the production where they are not talking about their sales per se, they may be talking about executive compensation, they may be talking about other compensation areas which are also part of our case.

And again, even if they are not talking about intersegment sales specifically, if the fact that, for example, 90 percent of the communication -- 75 percent of the communications that are about this Nutrition issue, and maybe 25 percent are not about a Nutrition issue, that still goes to

show that this Nutrition issue was such an important part of the case at the time that most of their communications during this time period are spent on that particular issue.

So I understand that the company -- the best example they gave is maybe somebody's coffee preference.

THE COURT: Yes.

MR. STEWART: You know, we don't see that as -- the possibility that there is an email about a coffee preference should be the end all to our request for the government production in this case.

Unless you have further questions for that, I can address the last two examples as well.

THE COURT: Yeah. That was my question as to that.

Now go ahead. Onto the next one.

MR. STEWART: Sure. The third example is calendar invites and call logs of specific meetings, executive committee, other committee meetings, budget meetings for a seven-month time period.

Again, the government has intentionally chosen seven specific months. One month in 2019. One month in 2020. And then five months in 2022. Again, no showing that this example or the prior example I went through, that it is an overbroad or unduly burdensome volume of documents. There is no actual affidavit provided by the company saying that the production for this request or the last request was substantial. No

reason to believe that, again, the call logs, producing them would be unduly burdensome. Again, this is a reproduction.

And again, even if these -- the discussions about these -- in these meetings are not necessarily about intersegment sales per se, which is what defendants want to limit it to, again, they could be talking about relevant other -- other relevant issues in our case, executive compensation, internal controls, other parts, intersegment transactions in general. For example, the transfer of profits through means other than intersegment sales.

And finally, the accounting policies example. Defendants again, they want to unduly narrow this to just accounting policy -- accounting policies regarding intersegment sales. And they say, well, this should exclude as irrelevant and overbroad accounting policies regarding revenue recognition, inventory, and cost of goods sold.

Now the first example, revenue recognition, this is particularly fascinating for us because we have specific allegations in the complaint that the company was required to comply with ASC 606 which is the revenue recognition GAAP regulation, and as well as internal company policies for accounting for revenue recognition. So the contention that revenue recognition is irrelevant to our case particularly, we disagree with.

In terms of inventory and costs of goods sold, well,

on costs of goods sold, that is an -- that's an input to calculating profit. In our case we allege that the operating production -- that the operating profit was inflated (unintelligible) Nutrition division and the costs of goods sold for the products that were transferred, that's going to be another policy that potentially was violated as well.

And as well -- and in terms of inventory, you know, when they transfer these raw materials at below market prices, that's going to not impact just the sales and the profits but also what the inventory carried on the books for.

And so carving out these accounting policies as overbroad, we vehemently disagree with, that the company is violating multiple accounting policies. That just further undermines their claim that this was all a mistake. And it would support plaintiffs's claims, including on scienter and internal controls.

And one additional point, you know, they -- I think part of what the company has argued is, well, these are overbroad because these were seeking documents before the class period. You know, what we have in the first (unintelligible) is the company -- the company has looked at the government production and determined that documents from 2018 and 2019 and in 2020, before the class period, these are all relevant to plaintiffs's case. And they are producing documents from 2018, 2019.

So the idea that this motion should be denied because it is seeking documents from before the class period, we disagree with. The company's made a decision that documents before the class period are relevant and they should be produced in this case.

THE COURT: Can you give me the full dates of the class period, just so I have them while I'm considering all this?

MR. STEWART: Sure. The class period begins on April 30th, 2020, and it ends on November 4th, 2024.

THE COURT: Okay. Thank you.

MR. STEWART: And you know -- from -- so from our standpoint, you know, all of the documents that we are seeking, that's pursuant to our motion, are relevant. There is no undue burden in reproduction.

We're at the early stage of the case. If the -- a full production would substantially assist the parties in not only getting back on track from the substantial completion deadline, but also just being able to target, target documents using -- and negotiate search terms and custodians and whatnot because, frankly, you know, we don't know how the company has created the government production. They won't tell us what search term, custodians, or other parameters were used. How they negotiated with the government to create this 291,000 corpus of documents, provided production, and they won't tell

us what parameters they used for the initial poles.

So there is that first layer. They pull documents from the company. They won't tell us what parameters were used for that.

Then they whittle that universe down even further to provide the government production. They won't tell us what parameters they used for that.

This is information that we believe is basic information that should be provided as part of a good faith meet and confer. We believe it is required to be provided under the ESI protocol on page 3. And so we don't want to be kept in the dark any longer. And we take a substantial production and a production that we're requesting pursuant to our motion would help get things back on track.

THE COURT: Could I ask you one other thing, Mr. Stewart, is their argument they made which, you know, they just -- they refer to this as, you know, clone discovery that you're just asking them to reproduce, right? Obviously what they have produced to these governmental entities and not in any way adjust that production. And that you didn't, you know, then have to do any substantive kind of discovery request on your own. And that the courts generally, you know, disfavor this.

Can you address that for me, please?

MR. STEWART: Sure. Well, I'll start with -- we

started with -- we started with these initial requests because we see that many -- many courts have granted this production -- granted this so-called clone discovery where there is substantial overlap. You know, we have cited the Chipotle case. We cited other cases for this.

Now we understand that defendants cite some cases. For example, Outpatient or the Forth decision that, you know, denied a request for substantial -- or excuse me -- the government production or the clone discovery.

In both of those cases, either the discovery was at an advanced stage and so there were no efficiencies -- no efficiencies to be gained, or there was a separate charged conspiracy that the Court is grappling with when the party says, well, we don't want to get -- you know, we want the entire production, but there is a separate charged conspiracy that would also be found in the production that the plaintiff seeks.

You know, we have propounded other discovery requests because, frankly, you know, we were hoping to have these documents much earlier than -- than they're trickling in. You know, we have a responsibility to seek documents that we believe will support our case. We still think that a production of the government documents would substantially assist us.

There are likely other relevant documents outside of

that government production that we will also need for our case. It is our understanding the government -- you know, we had elements that we need to show that the government doesn't have to show.  There is facets of our case that are broader than the government -- the government investigation that we also have to address in discovery.

So there are separate requests that we have propounded.  I think the defendants have made that point -- pointed that out.

THE COURT:  Uh-huh.

MR. STEWART:  But in our case, you know, we believe we have made the showing that courts look for, which is a substantial overlap.  Even the Outpatient case it says it depends on the circumstances.  It cites the Chipotle decision.

Defendants case is -- they cite to -- you know, they say that the -- well, plaintiffs haven't shown relevance so, you know, the burden for -- it doesn't shift for them to make the -- to show the burden -- that there is no burden for it.

You know, they cite this Norfolk case in their opposition to 8.  And the Court said, you know, it addressed the burden even on the basis that some of the documents may be relevant.

Now we think we have more than sufficiently shown that, not just some of the documents in the government production, but from what we can tell all the documents in the

government production would be relevant to our case and should be produced.

THE COURT: Thank you. Thank you, Mr. Stewart.

Okay. So I don't know who on behalf of ADM is going to argue. You can go ahead.

MR. MURRAY: Good afternoon, your Honor. Tyler Murray on behalf of ADM. And, Judge, I will try to be efficient and directly responsive here. But I would like to start by setting the record straight on a few things I just heard.

THE COURT: Okay.

MR. MURRAY: My hope is that some of this background --

THE COURT: I'm sorry, Mr. Murray.

MR. MURRAY: -- (unintelligible) --

THE COURT: I don't want to interrupt you. I apologize. But this is the Judge. If there is anybody who is not speaking, please put your phone on mute. I think that might be one of the issues, that other sounds are coming through. And I just want to make sure, again, that we get a clear record, that I am able to hear counsel, and that, obviously, our system is able to record counsel accurately for our transcript.

Okay. With that, Mr. Murray, go ahead.

MR. MURRAY: Thank you, Judge. Can you hear me okay?

THE COURT: I can. I hear you better now. Yeah.

MR. MURRAY: Great. And my hope in giving you some of this background is that it will be helpful to you too if you decide to write an opinion on this.

THE COURT: Great.

MR. MURRAY: So plaintiff -- plaintiffs's initial request was for the entirety of ADM productions to the government.

THE COURT: Yeah.

MR. MURRAY: That request for clone discovery really was way overbroad and not a proper way to proceed here, absent a compelling justification.

As Judge Durkin put it in one of the Broiler Chicken cases cited in our responsive brief, it is not appropriate.

So in short, it really wasn't a valid request. And notwithstanding our reasonable objections, it was never refined. We could have just said no but we didn't. Instead, to keep things moving, we have been producing documents.

So we began by producing a very targeted production of core communications and documents, some of which plaintiffs have cited in their briefing.

THE COURT: Uh-huh.

MR. MURRAY: That production almost entirely mirrored ADM's initial focused production to the government related to intersegment sales with Nutrition.

Now we could produce those documents without applying

search terms because they were so central. It wasn't a lot of documents. It was about a thousand. But it was core documents.

And once you get beyond those core documents, there is just far too much irrelevant material to just back up the dump truck without applying search terms.

Now since then, we have continued to produce documents in response to plaintiffs's 48 additional requests, including core communications and documents. And I'll return to that in a minute.

So this substantial completion argument on a facially improper request really fizzles out when you look at the sequence of things. And as for the 1 percent argument -- that's a catchy number -- but it is just false because it assumes that every single document within the government production are relevant, which isn't the case.

There are duplicates in the government production. There are calendar invites that have nothing to do with intersegment sales to Nutrition or intersegment sales at all.

A lot of documents that just aren't relevant here. So that's numbered, it kind of (unintelligible), but it is just wrong.

Now in addition to producing core documents, ADM didn't counter plaintiffs by just saying, no, your request is improper. Well, we did say that. But we also took the time to

think through and proposed search terms to run across the government production.

Now remarkably, and I don't use that word lightly, Judge, plaintiffs just didn't respond. They just refused to engage on our proposed search terms.

Their response, again remarkably, was filing this motion to compel. Notwithstanding their refusal to meet on terms and notwithstanding the pendency of this motion, ADM has continued to produce relevant documents.

So here we are. And plaintiffs's motion --

THE COURT: I'm sorry, one -- one clarification, Mr. Murray. Have you continued to produce documents, you know, since the filing of this motion that are from the prior government production or that would have been covered in the prior government's production?

MR. MURRAY: Correct.

THE COURT: Okay. And do you know the quantity of documents you have produced now? Like --

MR. MURRAY: It is --

THE COURT: -- what the total number of documents is.

MR. MURRAY: I do, Judge. It is north of 9,000 documents.

THE COURT: Okay.

MR. MURRAY: There have been -- there have been six productions to date.

THE COURT: Okay.

MR. MURRAY: And what would really help move things along is if we could get together with plaintiff and agree on search terms. But that's --

THE COURT: And you had already sent them search terms, correct? So they have had your search terms that you have proposed; is that right? And you said you just never had a response on that.

MR. MURRAY: That's correct, Judge.

THE COURT: Okay.

MR. MURRAY: And, you know, I think what you're getting at here is this is what I would be asking, I think you're asking, is is there some overlap between those productions, the government productions and what plaintiffs have requested.

THE COURT: Right.

MR. MURRAY: Of course there is.

THE COURT: Yeah.

MR. MURRAY: And we have -- we have acknowledged -- we have acknowledged that. Now does that entitle plaintiffs to every document that was produced to the government? Of course not. As your Honor well knows, that's just not how the Rules of Civil Procedure work.

Instead, plaintiff needs to consider and draft their own discovery requests. And as they have demonstrated, they

are perfectly capable of doing that; i.e., their 48 RFPs. And which we have already met and conferred multiple times and for which ADM already has produced thousands of documents that spoke to the allegations in the complaint.

In other words, I think we're well on our way in a process that will provide plaintiffs with relevant documents and a process which has some guardrails that prevent a free-for-all fishing expedition that will actually make discovery more (unintelligible).

Now, I know your Honor is well aware of the law in this district related to clone discovery, so I'm not going to belabor it. But as Judges Cummings and Harjani have distinctly put it, it is favored.

THE COURT: Yeah.

MR. MURRAY: Or in Judge Durkin's words, reflect the production of documents previously produced to government entities is not appropriate.

So plaintiffs would have really had to come up with a compelling reason why it is necessary here. And that's just what they want or prefer. And they just can't.

They say it wouldn't be a big burden on ADM. That's not a compelling reason. For starters, we don't even get to burden until plaintiff can establish the relevance of all categories for the documents.

They also say they want to see everything that ADM

provided to the government because, essentially, if they find some other bad act, that might be evidence of scienter on the bad acts that are alleged in this case.

They actually say in their reply brief, and I'm quoting here, that ADM was potentially involved in multiple schemes make defendants's claims of innocent mistake less likely. That's not a compelling reason either, Judge.

So the term "fishing expedition" is sometimes overused in discovery disputes. But that's exactly what this is.

As your Honor well knows, guesswork and speculation don't establish relevance. And because plaintiffs's position is a stretch, they are now expanding the actual allegations in the complaint in a pretty transparent effort to try to fit within those allegations everything in the government production.

The problem is -- and I know plaintiffs don't like this reality -- but there are a lot of documents in the government productions that aren't relevant here. And you hit on a big one, Judge. And I think it is pretty glaring. All communications between 19 identified individuals irrespective of subject matter. So if that RFP were sent over by plaintiff and wasn't just a piggybacked government request, we, of course, would justifiably object that it is way overbroad. No subject matter limitation at all.

THE COURT: Yeah.

MR. MURRAY:  That would be -- that would be just a nonstarter because this, of course, would include conversations about work unrelated to the intersegment sales at issue here, not to mention the Cubs or the Sox.  I think we had a reference to what kind of coffee do you like in their briefing.  It goes to (unintelligible) and the like.

And that's when --

THE COURT:  Right.

MR. MURRAY:  -- search terms are used.

THE COURT:  Right.  And that's --

MR. MURRAY:  That's what --

THE COURT:  -- beyond personal -- what the Court is concerned about, and why I read that question to plaintiffs, is even beyond, let's say, personal communications.  And we all know everybody has those, unfortunately, through their work, right, emails and chats and everything else.  It is the -- it is just a very large business.

And that was kind of my question.  It is a large business which has -- I'm sure these individuals have other things they're doing that may not relate at all to the issues that are, you know, here in the center of this case.

And, yeah, the government may have asked for everything, regardless of substance, because they are the government and they generally can do things like that.

And to me, responding to a government request may be

different than responding to a run-of-the-mill discovery request in a civil case as well.

And so I -- do you have a sense at all as to, like, those certain categories you have highlighted and that they went through with the Court? Like, for example, this one, these are all communications from that period or all these calendar invites from the seven specific months. Do you have sense at all as to the quantity of what those documents represent? I assume it is quite large, but I don't know. But I would assume it is quite large.

MR. MURRAY: I can comfortably and confidently say today it is in the thousands. But I don't have a precise number.

THE COURT: Okay. All right.

MR. MURRAY: But I think you have really hit the nail on the head in terms of a distinction between a government request like this and a request in a case that's before your Honor. The government just has far more leeway in the scope of what it is they may ask for. And I think that's -- that's an issue that we're dealing with here.

Another example of a subject matter that we pointed out to plaintiffs, not relevant to the complaint, the documents related to ASO's energy hedging PML. As we -- as you point out, Judge, this is a massive company. And it is not just a food company, it is also a commodities trading company. And

that is an entirely different subject matter from what is alleged in the complaint. Indeed the word "energy" appears a total of zero times in the complaint.

Now I do think it is worth identifying for you a few paragraphs in the complaint that do frame what the allegations actually are.

THE COURT: Right.

MR. MURRAY: And I think it is important to note that we're not dictating relevance here or are officially narrowing anything, we're relying on a plain reading of the allegations in the complaint.

So just by way of a few examples --

THE COURT: Uh-huh.

MR. MURRAY: -- in paragraph 3, the plaintiffs allege that ADM, quote, charged below market rates for intercompany sales of materials from ADM's other segments to the Nutrition segment.

In paragraph 152, plaintiff described the alleged scheme involving, quote, recording intersegment sales from ASO and Carb Solutions to Nutrition at below market rates.

And in paragraph 207 plaintiff cites or admits (unintelligible) and products sold to the Nutrition reporting segment by AG services and Oilseeds and Carbohydrate Solutions reporting segments.

These are just a few examples.

And, your Honor, that's how Judge Durkin understood the allegations in the complaint. In the Judge's motion to dismiss ruling, he framed all allegations as tied to the following baseline fact: ADM's Nutrition segment purchases, these ingredients from the other two segments, period.

And contrary to plaintiffs's contention, their allegation in the government investigations aren't (unintelligible).

I'll point you to the company's SEC disclosure. One of them. Specifically the 2024 10K at page 19. And we cited this in our response brief. And it reads: The company's under investigation by the SEC and the DOJ relating to, among other things, intersegment sales between the company's Nutrition reporting segment and the company's AG services and Oilseeds and Carbohydrate Solutions reporting segments.

So put simply, the government investigation are broader than the allegations in plaintiffs's complaints.

Now again, I get why the plaintiffs are imputing their allegations. They want to get at everything that was produced in the government productions. And the thinking is that if the government asks for it, it might show some other bad conduct. The plaintiff argued that, well, if there is some bad document relating to ASO Energy that could be relevant to scienter, because if the defendant did something bad over there, it makes it more likely they had fraudulent intent on the conduct over

here.  The conduct they actually allege.

The problem is that that's a classic fishing expedition.  (Unintelligible) saying it is speculation and it doesn't come close to establishing actual relevance.

If your Honor will indulge me, I would like to spend a couple of minutes on ADM's proposed alternative approach moving forward.

THE COURT:  Yeah, that would be fine.

And I have one other question just for myself.  You know, like I said, you know, I'm having to respond to some of the language related to these requests, but I don't have anything that was like -- and it sounds like plaintiffs mentioned this, but I didn't have the language of the SEC requests.  Is that something that could be provided to me, at least in part, so that I could see the scope of that request myself?

MR. MURRAY:  Yeah.  That is something we can do.

THE COURT:  Great.  So maybe after -- at the end of the argument today, you can set a date for that to be provided to me in camera just for my personal review.  Okay?

Go ahead.  Go ahead and get to your proposal.

MR. MURRAY:  Happy to, Judge.

THE COURT:  Great.

MR. MURRAY:  So instead of waiting on the Court to rule on this motion, which it is already seeking to delay

things might have done, in response to plaintiffs's 48 RFPs, we have been meeting, we have been conferring, and we have been producing documents. And we really tried to prioritize documents that are central to the complaint's allegations.

So we have produced and are continuing to produce documents and communications concerning the pricing and financial reporting of the relevant intersegment transactions. So this includes documents, including emails, related to how and by whom prices for these sales were determined or changed. The pricing methodology of these sales. Negotiations of these sales. Also documents and communications related to Nutrition's gross.

These communications and documents are at the very nub of the case and include relevant documents in the government production.

So, respectfully, our strong view is that we should proceed with this approach, which would go even faster if plaintiffs would meet with us to settle on agreeable search terms.

And plaintiffs's argument that applying search terms to the government production is unworkable, it is just wrong. We are open to discussing data sharing with respect to the government production, including date range, custodians, search terms.

But either way, applying search terms to the

government production would be the widely accepted process here.

And plaintiff not wanting to miss a speculative chance at digging up more fodder just isn't a sufficiently compelling reason to reject ADM's perfectly reasonable and efficient approach. What we're proposing is a routine time-tested (unintelligible) approach, which is the norm here.

What plaintiffs are proposing would be a significant departure from the norm. And they simply haven't demonstrated a compelling reason for the Court to allow it.

So in sum, Judge, we would respectfully request that your Honor deny plaintiffs's motion and instruct the parties to continue to move deliberately toward an agreed protocol, including negotiated search terms, that will provide the plaintiff with all requested and discoverable documents, no more and no less.

THE COURT: Okay. Thank you, Mr. Murray.

I appreciate --

MR. MURRAY: Thank you.

THE COURT: -- Mr. Murray's comments today. I really appreciate Mr. Stewart's. It is always helpful for the Court. Like I said, I wish you would have all been here in person.

Mr. Murray, what date could you provide those SEC -- you know, the language of those SEC requests to the Court in camera by? Is that something you could get me for

(unintelligible)?  Like is that -- I would assume that would be fairly easy to do.  Could I have it by the end of this week?

MR. MURRAY:  Yes, Judge.

THE COURT:  Okay.  Great.  So --

MR. MURRAY:  Actually -- your Honor, if we could, if we can request Monday, that would be helpful.  I'm just thinking of scheduling.

THE COURT:  Okay.  So we'll say by close of business on the -- that would be September the 15th.  Okay.  So I'll put that in my order today.

I obviously have this motion to compel under advisement.  This is obviously going to be continued.

But I'm going to get you out my ruling in short order.  The Court will do that.  Like I said, I apologize, I know this was longer for something to be pending before me than is my normal practice.  But just so you know, now that we have all met on the case and, you know, I'll get this ruling out shortly, I hope to be able to be, you know, helpful in this case to all of you.  You know, to keep it moving in an efficient manner.

You know, we have other big cases.  I know you mentioned the Broilers case.  I'm working on this Turkey antitrust case here as a magistrate judge.  So I'm very familiar with those cases and the size of those cases in our district.

So, again, I appreciate this argument. I wish we could have been in person. But maybe the next time we'll be able to be if there is another motion that arises.

But I'll just get this out, I hope, in the next, like, two weeks. Okay? And I don't think it should take me any longer than that. Okay.

MR. MURRAY: Judge, I hate to interrupt you. If I could just flag one more thing for you that I forgot to mention.

THE COURT: Yeah.

MR. MURRAY: I think it is important to note for the Court that in addition to the written request the government has made, they have also made voluntary oral requests as well.

THE COURT: Right. I'm sure. Okay. Yeah. I understand that.

MR. STEWART: Your Honor -- your Honor, this is Chris Stewart again. Do you mind if I have one additional minute to (unintelligible) some points I heard?

THE COURT: Sure. I noticed that there is another hearing to start about 15 minutes ago, so I know those parties are trying to call in. But go ahead. Yes.

MR. STEWART: It should be quick, your Honor. The first -- the first thing is ADM claims they have been producing documents. They produced only roughly 9,300 documents. About half of which we received yesterday. So it has been six months

we're just getting -- we're only at 5,000 documents.

The second point that counsel made, he is saying there is scores of irrelevant documents. He failed to explain why they were produced to the government if they were irrelevant to the government's investigation into intersegment sales. They can object to burden to the government, but they didn't. So why did they produce all of those government -- those communications?

Third is there is nothing improper about the request. It would be -- it is a commonly done request to seek documents from other cases or investigations in securities cases where there is over (unintelligible). I believe the law is clear in that case and should be produced to us in this case.

And, fourth, just to clarify, I believe you had an earlier question. While our class period begins in April 2020, we allege that the scheme started in 2018. And it is (unintelligible) receiving documents from as early as 2018 because that's when the dispute had allegedly began.

And, fifth, you know, counsel suggests that the government investigation is broader. But, again, they have only given one example. It is the energy hedging example.

But, you know, we're not fishing here. We're not saying give us docs related to tax violations or antitrust violations. We're asking for documents related to the scheme the (unintelligible) Nutrition profits, and by defendants's own

description, energy hedging was done to boost Nutrition profits. So defendants are really trying to flip this on us and suggest, you know -- they can argue innocent mistake while hiding documents that will directly undermine their mistakes.

So -- but I appreciate the additional time, your Honor, to respond to those points.

THE COURT: Of course. Thank you, Mr. Stewart. I appreciate it.

Okay. All right. So as I said, the Court is going to take this under advisement. I'm going to get a ruling out, I hope, in the next two weeks. I think that should be definitely doable.

I will put in my order today that ADM is to produce the written SEC request in camera for the Court's review. We'll have the email address where you can send that. Obviously, it will be on the docket (unintelligible) the email address. That will be by Monday (unintelligible) on 9/15/2025.

Okay. And then I think after my ruling comes out, I'll probably set, you know, other future dates, you know, for us to have, you know, potentially an in-person status on things. Sometimes on these larger cases it is very helpful. And if lead counsel just comes and other people are on telephonically, I know that's helpful.

As I said, I want to get your case moving, moving in a more expeditious manner. I certainly don't want to be the

cause of any delay.

Okay. So thank you very much. I appreciate everybody's time today. You guys have a good afternoon.

MR. MURRAY: Thank you, Judge.

THE COURT: Thank you.

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitation of using a digital-recording system.

*/s/Pamela S. Warren*                    September 11, 2025
Official Court Reporter - Retired                Date
United States District Court
Northern District of Illinois
Eastern Division